1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF VIRGINIA
2                        ALEXANDRIA DIVISION


3
    ----------------------------x
4                               :
    STEVEN KNURR et al          :
5                               :
              versus            : Civil Action Number
6                               :
    ORBITAL ATK INC.et al       : 1:16-CV-1031
7                               :
                  Defendant.    :
8   ----------------------------x

9                                    November 4, 2016

10          The above-entitled jury trial was continued
         before the Honorable T.S. ELLIS, United States
11       District Judge.

12          THIS TRANSCRIPT REPRESENTS THE PRODUCT
         OF AN OFFICIAL REPORTER, ENGAGED BY THE
13       COURT, WHO HAS PERSONALLY CERTIFIED THAT
         IT REPRESENTS TESTIMONY AND PROCEEDINGS OF
14       THE CASE AS RECORDED.

15

16

17

18

19

20

21

22

23

24

25
                                                          1

```
 1                    A P P E A R A N C E S

 2
       FOR THE PLAINTIFF:
 3     (Construction Laborers Pension Trust of Greater St. Louis)

 4               Craig Crandall Reilly, Esquire.
                 Law Office of Craig C. Reilly
 5               111 Oronoco St
                 Alexandria, VA 22314
 6
                 Danielle Myers, Esquire.
 7               Robbins Geller Rudman & Dowd LLP
                 655 West Broadway, Suite 1900
 8               San Diego, CA 92101

 9               James Barz, Esquire.
                 Robbins Geller Rudman & Dowd LLP
10               200 S. Wacker Drive, 31st Floor
                 Chicago, IL 60606
11

12     FOR THE DEFENDANT:
       (Orbital ATK, Inc.)
13
                 Lyle Roberts
14               Cooley LLP
                 1299 Pennsylvania Ave., NW
15               Suite 700
                 Washington, DC 20004-2400
16
       FOR THE DEFENDANT:
17     (Arkansas Teacher Retirement System)

18               Susan Rebecca Podolsky
                 The Law Offices of Susan R. Podolsky
19               1800 Diagnal Road
                 Suite 600
20               Alexandria, VA 22314

21
       OFFICIAL UNITED STATES COURT REPORTER:
22
                 MS. TONIA M. HARRIS, RPR
23               United States District Court
                 Eastern District of Virginia
24               401 Courthouse Square
                 Tenth Floor
25               Alexandria, VA 22314
                 763-443-9034
                                                            2
```

EASTERN DISTRICT OF VIRGINIA

1                    **P R O C E E D I N G S**

2

3              THE COURT: You may call the next matter.

4              THE DEPUTY CLERK: Steven Knurr et al versus

5      Orbital ATK Inc. Et al; 1:16-CV-1031.  Counsel, please

6      note your appearance for the record.

7              THE COURT: All right.  For the plaintiff who is

8      here?

9              MS. PODOLSKY: Good morning, Your Honor.

10             THE COURT: For the plaintiff.

11             MS. PODOLSKY: For the plaintiff, I don't know

12     that we have a plaintiff here.  We have two --

13             THE COURT: Oh, that's right.  You all are here

14     fighting over the purse.

15             MS. PODOLSKY:  Correct.  We are two movants and

16     the defense.

17             THE COURT: All right.  Go ahead, Ms. Podolsky.

18             MS. PODOLSKY: Thank you, Your Honor.  Susan

19     Podolsky on behalf of Arkansas Teacher Retirement System.

20     And I have with me Mr. Naumon Amjed from the Kessler Topaz

21     firm.  And also Francis McConville from the Labaton

22     Sucharow firm.  I've also brought with me Mr. George

23     Hopkins, who is the executive director of Arkansas Teacher

24     Retirement System, if the Court wants to ask him

25     questions, but he's here to participate.

DISTRICT OF COLUMBIA SUPERIOR COURT

```
 1              THE COURT: All right.

 2              MR. REILLY:  Good morning, Your Honor.  Craig

 3    Reilly here for the Construction Laborers Pension Trust of

 4    Greater St. Louis, one of the movants.  I would like to

 5    introduce the Court to my co-counsel, Danielle Myers and

 6    James Barz, B-A-R-Z.  And Ms. Myers will address the

 7    Court.

 8              THE COURT: All right.  Thank you.

 9              MR. ROBERTS:  Lyle Roberts with Cooley Law Firm

10    on behalf of the defendants.

11              THE COURT: You don't have a dog in this hunt, do

12    you?

13              MR. ROBERTS:  Not exactly, Your Honor, but we

14    have made a submission to the Court on this issue.

15              THE COURT: Yes.  I wonder why.  Why you think

16    you should be heard on it?  But I'll ask you that in a few

17    minutes.

18              All right.  In fact I might deal with that two

19    minor issues to begin with.

20              First of all, I was reminded of my first

21    introduction to attorney affidavits.  Many, many years

22    ago, close to 45, when I first was involved in cases in

23    the Southern District of New York, I was shocked and

24    surprised to find a flurry of lawyer affidavits.  They

25    were common.  I thought that was odd.  45 years later, I
```

4

1    still think it's odd.  I think it's very odd.  Because, I

2    think what attorneys say is generally representation.  If

3    it's a sworn fact, and if it's disputed, what am to do,

4    put them on the stand and have them cross-examined?  I

5    don't think so.

6         So, I merely point this out -- I mean these

7    affidavits don't do anything, but to say this is a true

8    and correct copy of a resume.  How does a lawyer know

9    that?  I think they are a waste.  But, they are also a way

10   to suspect that there might not be knowledge.  So, I would

11   avoid it.  I would avoid submitting affidavits by lawyers

12   in this case.  A true and correct copy of this or that.

13   There is almost never any dispute about it.  I would

14   prefer to have representations.  Now it's a minor point.

15        And let me turn to the defendant in this matter

16   and just give me a very brief -- I was curious of why,

17   even though you don't have a formal dog in this hunt, you

18   still want to be heard on it.

19        MR. ROBERTS:  Certainly, Your Honor.  I think

20   really for two reasons.  First, is that, in looking at

21   Your Honor's past cases in the area of security litigation

22   and on the issue of lead plaintiff selection, you pointed

23   out the Computer Sciences case that you would like to hear

24   if defendants have any issue about one of the applicants

25   that is likely to come up on class certification.  So, we

1    put in our submission in order to meet what we thought was

2    Your Honor's instructions.

3           THE COURT: Your submission doesn't really raise

4    any argument about the adequacy of either of the two

5    candidates, does it?

6           MR. ROBERTS: Well, Your Honor, I think --

7           THE COURT: Can you give me a yes or a no?

8           MR. ROBERTS: I think it does raise a potential

9    issue about the adequacy of Arkansas Teachers.  And, the

10   potential issue is that there are significant pay to play

11   allegations and information out there about the

12   relationship between Arkansas Teachers and it's selected

13   counsel in this case.  That's something that we think we

14   will have to explore quite extensively in discovery and

15   the potential issue of adequacy at class certification.

16          THE COURT: Why?

17          MR. ROBERTS: Well, Your Honor, I think there are

18   a number of cases that --

19          THE COURT: What do you mean by "pay to play"?

20   We hear that over and over again on the news these days.

21   Exactly what do you mean by the use of that term?

22          MR. ROBERTS:  In this particular instance, Your

23   Honor, there were a series of donations made by the law

24   firm to one of the board members of Arkansas Teachers.

25   That board member was subsequently convicted of a bribery

DISTRICT OF COLUMBIA SUPERIOR COURT

1    claim not as to the donations from the law firm, but as to

2    a similar set of circumstances where the state treasurer

3    had handed out business from the state in return for

4    kickbacks.  And so in light of that factual scenario, it's

5    something --

6              THE COURT: How would you present that to the

7    Court?

8              MR. ROBERTS: I'm sorry, Your Honor.

9              THE COURT: How did you present that?

10             MR. ROBERTS: We presented that -- well, perhaps,

11   Your Honor, in a way that you didn't care for it.  In the

12   sense of an attorney declaration --

13             THE COURT: That's right.

14             MR. ROBERTS: We certainly did present a public

15   information --

16             THE COURT: Do you think that Arkansas Teachers

17   would agree with your characterization?  I suspect not.

18   In which case, would you then go to the stand and be

19   cross-examined about your characterization of those facts?

20             MR. ROBERTS: I don't think we drew any

21   characterizations of those facts.  I think --

22             THE COURT: All facts are characterized.  You

23   can't report them.  Even if you said it was not raining

24   outside, it was only drizzling, there would be a dispute.

25             But anyway, there is no statutory -- there is no

1      statutory bar to your expressing of view about this.

2      Obviously, when a defendant expresses a view against a

3      particular representation, it causes the fact finder to

4      say, "Gee whiz, they are afraid of those people so maybe

5      those people are the best people."

6                MR. ROBERTS: Can I explain why that isn't the

7      case here, Your Honor?  Both applicants are represented by

8      able law firms.  They are both institutional investors.

9      We don't have a dog in the hunt in the sense of which one

10     of those we face as part of this litigation.  What we are

11     concerned about, and I think the Court should take into

12     consideration as to whether it will exercise it's

13     discretion and give a waiver to the professional plaintiff

14     bar to Arkansas Teachers, is that we will have to engage

15     in a lot of time, effort and resources both on behalf of

16     the parties and the Court in exploring these allegations

17     and determining whether they raise an issue for adequacy

18     and class certification.  We think that's a factor the

19     Court should take into consideration when its exercising

20     its submission here.

21                THE COURT: All right.  Thank you.

22                MS. PODOLSKY:  Would the Court like to hear from

23     Arkansas Teacher on that point?

24                THE COURT: Why don't I hear from Arkansas

25     Teachers on all the points.

1           MS. PODOLSKY: Yes, sir.  I'm happy to do that.

2     I'll be presenting on behalf of Arkansas Teachers.  I'm

3     happy to start there or I'm happy to start where I was

4     originally planning to start or wherever the Court --

5           THE COURT: Earn the big dollars that you are

6     paid and exercise your judgment.

7           MS. PODOLSKY: Yes, sir, I will.  I will point

8     out that this is -- these cases are and this case will be

9     obviously taken on a contingency basis.  So, even if

10    Arkansas Teachers are appointed, eventually the fee

11    decision made by you, if there is a favorable result.  So

12    at this point right now I've not earned any -- made any

13    big bucks but hopefully I will earn them.

14          So where I would start, Judge, is talking about

15    Arkansas Teacher.  And I would like to do that because I

16    agree with you 100 percent.  We have a bulls eye on our

17    back in this hearing and I think it is because we are the

18    toughest opponent.  And, I say that based on the

19    declaration of Mr. Hopkins, not my declaration, but the

20    evidence that we have submitted, it was through the

21    declaration of Mr. Hopkins and then the settlements also

22    that we had brought to the Court's attention.

23          So, Mr. Hopkins is the executive director of

24    Arkansas Teacher.  He tells you in his declaration very

25    clearly that he takes that obligation very seriously.

9

1    That he has a fiduciary obligation to the fund.   To

2    fund -- the fund of the retirement system for the

3    teachers, the bus drivers -- school bus driver, the

4    lunchroom workers.   The fund has $15 billion in assets.

5    And, it's part of his job to protect and safeguard the

6    fund.

7              When the fund is harmed by a fraud or an alleged

8    fraud, he takes it very seriously.   He tells you very

9    clearly, and we make no bones about this, we're not

10   running from it at all, Judge.   He takes the opportunity

11   to exercise his statutory right to vigorously pursue and

12   vigorously prosecute the securities action.   He's done

13   that numerous times.   He's here to do it today.   He has

14   the three of us here to represent Arkansas Teacher and to

15   tell you that we have every intention and we have every

16   commitment and dedication to do that.   Mr. Hopkins tells

17   you in his declaration that he has the resources to do it.

18   He has himself and he is an attorney, has been an attorney

19   for 30 years, licensed -- I beg your pardon -- 29 years.

20   So, he has, he himself, has experience as an attorney in

21   this subject matter.   He has extraordinary experience as

22   the executive director of Arkansas Teacher in managing the

23   law firms and in running these cases, because he is not a

24   wildflower or a potted plant.   He is an active,

25   passionate --

1            THE COURT: You're dating yourself Ms. Podolsky.

2      There aren't but just a few people in the courtroom who

3      remembers the reference to a potted palm.

4            MS. PODOLSKY: Well, hopefully you are one of

5      them.

6            THE COURT: Unfortunately I am one of them.  In

7      fact, I can probably remember hearing "This is the day

8      that will live in infamy."  Not many people remember that.

9            MS. PODOLSKY: In the same category, yes, sir,

10     absolutely.

11           So what he does say in his declaration is that

12     he has developed the practicing methods to do that.  He

13     has a staff of himself plus four other lawyers, plus other

14     professionals who help him do that.  He is actively

15     involved in the cases, in the case strategy, the trial

16     strategy, the discovery strategy.  He attends mediations.

17     He drills down on settlement offers that comes to him.  He

18     drills down on the settlement offers that go out.

19           So, I just want to make clear that he has given

20     you evidence in the form of his own declaration that

21     substantiates my statements that he -- that Arkansas

22     Teacher and we are fully prepared to prosecute the

23     litigation.

24           We have or Mr. Hopkins, let me say, on behalf of

25     Arkansas Teacher and on behalf of the classes whom he has

11

1    also represented as a lead plaintiff in many actions, has

2    obtained over $800,000,000 in successful results for the

3    class members.  So as I said, and I don't mean to repeat

4    myself, we're not running from the fact that we do this on

5    a frequent basis.  I just want to make clear why that is.

6            THE COURT: Well, then let's go to the central

7    issue as a concession of the shortness of life.

8            MS. PODOLSKY: Yes, sir.

9            THE COURT: The real issue is not who has the

10   largest potential loss, because that's pretty clear.  The

11   issue is whether your client should be barred since it had

12   five cases, more than five cases, within the last three

13   years.

14           MS. PODOLSKY: Yes, Your Honor.

15           THE COURT: And the statute makes clear that

16   that's a presumptive bar.  Why shouldn't I respect that

17   even though it's not perhaps absolute and appoint the

18   other candidate?

19           MS. PODOLSKY: I will give you all of these

20   reasons.  Number one, that argument, being most of it by

21   the Robbins Geller firm, had not succeeded since 2009.

22   It's been advanced numerous times.  We gave you 10 cases

23   in our brief starting in 2010 forward.  That argument has

24   never succeeded, not once.

25           THE COURT: What does that tell me other than

12

1    judges ignore Congress?

2           MS. PODOLSKY: No, I believe what it tells you --

3    and if you look at the *Extreme Networks* case, which is a

4    2016 case, in which I would commend you -- it's the best

5    most recent and the best explanation of the statute its

6    purpose and legislative intent, and also the provision

7    that you're referencing the discretion of the Court.  In

8    that case, the Court says that the growing -- what that

9    number indicates is that the -- in the volume in the case,

10   is that there's a trend among all the courts because they

11   agree that what Congress meant was to restrict

12   professional plaintiffs, not restrict institutional

13   investors.  There is not a single case dealing with

14   Arkansas Teacher or not.  Not a single case since 2009

15   that has applied this provision.

16          THE COURT: So, you think I should read into the

17   statute an exception for institutional investors; but it

18   isn't there, is it?

19          MS. PODOLSKY: No, sir.  The answer to your

20   question is that statute says, "consistent with the

21   purposes of this section."  That's what the statute says.

22   "Consistent with the purpose of this section."  No person

23   may prosecute more -- there's a five and three.  More than

24   five cases in three years.  The legislative intent is

25   abundantly clear.  And it defines what "professional

13

DISTRICT OF COLUMBIA SUPERIOR COURT

1     plaintiff" means.  It says, "The purpose of the provision.

2     . ."  -- and no one disagrees with this -- "The purpose of

3     the provision is to restrict professional plaintiffs."

4     The legislative history defines professional plaintiff.

5     The legislative --

6             THE COURT: I can tell you're not a fan of

7     Justice Scalia.  He wouldn't read all of these other

8     signs.  He would look at the language of the statute.

9     Does the statute define "person" anywhere?

10            MS. PODOLSKY: The statute does not define

11    person.  So, exactly in that circumstance Justice Scalia

12    would agree that you look to the legislative intent,

13    because "person" is not defined.  The dictionary --

14            THE COURT: You need to read Justice Scalia a

15    little more carefully.  I don't think he would agree with

16    you.  But anyway I take your point that your view is that

17    because the statute says "person" that it doesn't include

18    institutional investors.

19            MS. PODOLSKY: More than that.

20            THE COURT: Suppose for a moment I don't agree

21    with that, what's the next argument?

22            MS. PODOLSKY: The statute says "professional

23    plaintiff."  And the --

24            THE COURT: I thought you said it said,

25    "professional person" or said "person" "no persons."

14

DISTRICT OF COLUMBIA SUPERIOR COURT

1          MS. PODOLSKY: I beg your pardon.  The title of

2     that provision is "professional plaintiff" and then

3     there's a period and then it goes on to say "person."

4          THE COURT: The title is not Congresses.  The

5     title is done by some person in the staff office.  So, it

6     isn't a congressional act that goes to the president that

7     says "professional person," is it?

8          MS. PODOLSKY: I'm not actually sure about that

9     because it's in -- I believe it's in the actual text of

10    the statute.  I'm not saying you're wrong --

11         THE COURT: No, I'm talking about the title.

12         MS. PODOLSKY:  The title, yes, but this little

13    section says "professional plaintiff."  And then the

14    legislative history, the conference reports specifically

15    defines "professional plaintiff."  The conference report,

16    which is the report that comes out of both houses, as you

17    know, says, "Professional plaintiffs who own a nominal

18    number of shares. . ."  Which is not Arkansas Teacher,

19    right?  We have 49,000 shares and we invested over

20    $4,000,000 to purchase those 49,000 shares.  That is not

21    us.  Professional plaintiffs who own a nominal number of

22    shares in a wide array of public companies permit lawyers

23    readily to file abusive securities class action lawsuits.

24    These lead plaintiffs often receive compensation in a form

25    of a bounty payment or bonuses.  That's also not the case

                                                          15

DISTRICT OF COLUMBIA SUPERIOR COURT

1    here.  Right?

2              So, that's what a professional plaintiff is in

3    the legislative history of the statute.  A professional

4    plaintiff is a person who owns a nominal number of shares

5    and who receives compensation in the form of a bounty

6    payment or a bonus.  It is abundantly clear that this

7    statute was enacted in order to discourage precisely that

8    sort of practice in favor of encouraging.  And this is all

9    over the legislative history and we cited profusely in our

10   papers.  In favor of the institutional investor, because

11   of what Congress wanted to do was to ensure that

12   institutional investors who has a large investment and who

13   have the resources that Arkansas Teacher has -- both of

14   which Arkansas Teacher has -- that those are the lead

15   plaintiffs in these cases because they can vigorously and

16   zealously prosecute -- I'll say potential in order to be

17   fair to Mr. Roberts and his client and any other potential

18   frauds.  And, there is no question that that was the

19   purpose of the PSLRA.

20             And, in fact the purpose of the section

21   generally says in the legislative history, "These

22   provisions are intended to encourage the most capable

23   representative of the plaintiff class to participate in

24   class action litigation and to exercise supervision and

25   control of the lawyers for the class."  These provisions

16

DISTRICT OF COLUMBIA SUPERIOR COURT

1    are intended to increase the likelihood that parties with

2    significant holdings and issuers, significant holders,

3    49,000 shares $4,000,000 worth of shares.  "Whose interest

4    are more strongly aligned with the class of shareholders"

5    as is by Arkansas Teachers appointment in numerous cases,

6    successors in numerous cases, "will participate in the

7    litigation and exercise control over the selection and

8    actions of plaintiffs. . ."

9         THE COURT: Tell me --

10        MS. PODOLSKY: Yes.

11        THE COURT: Let's get to the -- enough is enough.

12   I've read all the file briefs and I really was interested

13   in your -- to see if you could elucidate anything more

14   about your position with respect to that provision.  But,

15   let me ask you a separate question.

16        You propose in this case that the Court appoint

17   Arkansas Teachers and two law firms.  Why two law firms?

18        MS. PODOLSKY: Mr. Hopkins has retained two law

19   firms in this case.  I'll first point out that he has a

20   statutory right.  The lead plaintiff has a statutory

21   right, plain and simple, in the statute.  A statutory

22   right to appoint whomever they choose.  The reason we have

23   two appointed here is because he is seeking to obtain the

24   best possible representation and the highest --

25        THE COURT: So, if he had eight law firms that

17

DISTRICT OF COLUMBIA SUPERIOR COURT

1   would be all right too?  Let me ask you this, in all of

2   these lawsuits that Arkansas Teachers have been involved

3   in --

4           MS. PODOLSKY: Yes, sir.

5           THE COURT: -- whose been the lawyer, the same

6   lawyer?

7           MS. PODOLSKY: No.  So, Mr. -- so not unlike a

8   corporation, Mr. Hopkins has a stable of firms whom he

9   retains on different matters.

10          THE COURT: Why did you say, "not unlike a

11  corporation" that should somehow make it okay?

12          MS. PODOLSKY: No, it makes it common.  It's not

13  an uncommon practice.  It's a common practice for large

14  companies, large funds, managing large assets or running a

15  very big company worth billions.

16          THE COURT: I'm not moved much by two law firms.

17          MS. PODOLSKY: I understand that.  And if -- if I

18  may be -- if I may make an assumption, and the Court will

19  certainly correct me if my assumption is incorrect.  My

20  assumption is that it's because two law firms could charge

21  more than one law firm and there could be a potential

22  duplication of efforts.  Is that your primary concern?

23  Because -- because I'd be happy to address it.

24          I have myself worked with both law firms in this

25  case in this court in front of Judge Brinkema and I have

18

DISTRICT OF COLUMBIA SUPERIOR COURT

1    holdings.  And I've worked another case in Richmond in

2    front of Judge Gibney with two law firms.  So, I can

3    assure you that there is no duplication effort.  It

4    doesn't happen --

5              THE COURT: Well, then why aren't there two law

6    firms?

7              MS. PODOLSKY: Because you have two -- I would

8    say two minds are better than one.

9              THE COURT: Well, then why aren't 10 minds better

10   than one?

11             MS. PODOLSKY: Ten could be, but there obviously

12   has to be a --

13             THE COURT: I'm not moved by two law firms.

14             MS. PODOLSKY: Understood.

15             THE COURT: What else do you have?

16             MS. PODOLSKY: I would say that that's not a

17   matter to disqualify Arkansas Teachers though.

18             THE COURT: That -- that's right.  That's not a

19   reason to disqualify the Teachers.

20             MS. PODOLSKY: Correct.

21             THE COURT: It is a reason why I might, if I

22   appoint the Teachers, appoint only one law firm.  Which of

23   the two law firms would you prefer?

24             MS. PODOLSKY: So, I -- Mr. Hopkins may address

25   that or I'm happy to.

                                                           19

DISTRICT OF COLUMBIA SUPERIOR COURT

1           THE COURT: No, you can confer with him.  I don't

2      want him to address it.  You can confer with him and tell

3      me.

4           MS. PODOLSKY: I know his answer.

5           THE COURT: All right, then tell me.

6           MS. PODOLSKY:  His answer would be the firm

7      closest in proximity to the Eastern District of Virginia.

8      And that would be the Kessler Topaz firm.

9           THE COURT: All right.  Have you said anything or

10     do you have anything to say about this provision that the

11     professional plaintiff won that you haven't said in your

12     briefs that are here today?

13          MS. PODOLSKY: I don't -- I'm hesitating because

14     I believe that all of the points are in the brief.  I

15     would take 30 seconds to crystalize.

16          THE COURT: All right.  Go ahead.

17          MS. PODOLSKY: I would say that since 2010 all of

18     the cases -- I did say this earlier -- I understand have

19     determined -- have not applied the professional plaintiff

20     provision to an institutional investor to disqualify that

21     institutional investor.  I believe that is because these

22     courts are looking at both the statute and the legislative

23     intent and they are exercising their discretion to pick

24     the -- to pick the presumptively -- the presumptive lead

25     plaintiff provided that the Court has that comfort level

1     that the presumptively lead plaintiff would do what the

2     Court expects it to do.

3          When I read these cases, that's what I see.

4     And, that's frankly what I see with respect to the cases

5     where the Court doesn't appoint.  The older cases in 2009

6     prior.  That's -- that's where I think this boils down to.

7     Is that you have to have that comfort level, because we

8     are the presumptive lead plaintiff under the statute.  So,

9     irrespective of whether you and I agree how to read the

10    statute, it is abundant, in terms of whether there's an

11    absolute prohibition, there's not an absolute prohibition,

12    but in terms of whether the statute says it doesn't apply

13    or the statute says you exercise discretion.  Either way,

14    it is our view that you come to the same result, because

15    at the end we have given you very clear evidence.

16    Evidence, not just what I have to say, but evidence that

17    Arkansas Teacher will discharge its obligation exactly as

18    this Court expects it to do.

19         So, if we're the presumptive lead plaintiff

20    under the test, there is no reason under those

21    circumstances to disqualify us.

22         THE COURT: All right.  Now address what he said

23    and then I'll hear from the other side.

24         MS. PODOLSKY: So, he said that he didn't

25    characterize.  First of all, he's relying on newspaper

21

1    articles.  That's what he's given you as facts.  Newspaper

2    articles.  Other than the fact that there were

3    contributions, and I don't dispute that, but he does

4    characterize it.  He's saying there are significant

5    allegations out there which -- where is "out there."  And

6    under the same similar set of circumstances the courts

7    have had an issue with a potentially lead plaintiff.  So I

8    agree with all of that.

9            First of all, these contributions were in 2009.

10   There are no similar or recent contributions.  Mr. Hopkins

11   makes that clear in his declaration.  So, you have

12   absolute evidence that there is nothing -- there are no

13   contributions from this firm at all recently.

14           Second of all, the person to whom the

15   contributions were made left office in 2013.  So, I don't

16   have any understanding as to how a contribution in 2009 --

17   which by the way is itself legal -- because if it was not

18   illegal, it's a legal contribution in 2009 to a person who

19   leaves office in 2013 had anything to do at all with the

20   appointment of the lead plaintiff counsel in 2016 in this

21   case.  Particularly given that that firm has not made any

22   other current contributions.  And, on top of all of that,

23   Mr. Hopkins is the person with the exclusive authority to

24   make the decision to retain counsel, to appoint counsel,

25   and to fire counsel.  He makes the decision whether to

1    take a case or reject a case.  He makes the decision

2    whether to initiate a case on his own and to find someone

3    to do that.  He is the sole person with that authority.

4    That authority has been delegated to him by the board of

5    trustees.  The board of trustees, as a group, does not

6    influence his decision and does not communicate with him

7    about his decisions, generally speaking.  This particular

8    state treasurer, who is a member of the board of trustees,

9    did not communicate with him about this decision and does

10   not communicate generally about these decisions or did not

11   communicate generally about these decisions with him at

12   all.  She hasn't been around in terms of holding a state

13   office in three years.

14         Mr. Hopkins was not aware of the contributions

15   until Mr. Roberts brought them to our attention via these

16   articles and his submission.  So, in my view this does not

17   amount to a legal hill of beans now or even at class

18   certification if the Court appoints us and we go to class

19   certification and win the case.  It's not an issue.  There

20   is nothing out there.  There are not substantial

21   allegations.  The bribery conviction for this state

22   treasurer had nothing at all to do with the contribution

23   in 2009 by the Labaton Sucharow firm.  And I mean it had

24   nothing to do with it.  It's not a similar circumstance,

25   it's not an identical circumstance, it is not even a

23

1    remotely, remotely in the same ballpark.  She was

2    convicted for kickbacks to a bonded broker.  She had cash

3    in a cigar box that was being exchanged back and forth.

4    It was an illegal activity.  And in no way shape or form

5    has anything to do with what you're deciding here today.

6              THE COURT: All right.  Let me hear from

7    Ms. Myers.

8              MS. PODOLSKY: I do have one case on that if you

9    would like to know.

10              THE COURT: All right.

11              MS. PODOLSKY: That's the Third Circuit in *In Re*

12    *Cendant*.  And I'll just say --

13              THE COURT: Is it in your brief?

14              MS. PODOLSKY: Yes, sir, it is.

15              THE COURT: Then I'll find it.

16              MS. PODOLSKY: Thank you very much, sir.

17              THE COURT: All right, Ms. Myers.

18              MS. MYERS: Your Honor, may I please the Court.

19    I think the best spot for me to start is with the case

20    law.  The Court is clearly familiar with the statute, what

21    it says, and what the arguments are.  So I want to focus

22    on what Arkansas says is basically a futile battle.

23    Because, in the last six years every court has rejected

24    this argument.  I want to talk about those decisions.

25              In particular, as they relate to Arkansas

                                                             24

1    Teacher itself, which this argument has been raised

2    against it since 2012, meaning for the last four years it

3    has been in violation of the Professional Plaintiff Bar.

4            They cite six cases in their papers.  In four of

5    those six cases, Your Honor, the competing movant was

6    either an individual investor or a group of unrelated

7    individual investors.  The case law that we have cited to

8    the Court, and also that they have cited, supports the

9    notion that there must be a need, which the statute also

10   says, except as the Court may otherwise permit, consistent

11   with the purpose of the statute for them to exceed the

12   bar.

13           Well, the cases unanimously agree that when

14   there is a competing movant that is not an institutional

15   investor, it may be appropriate in those circumstances to

16   lift the bar.  So in four of their six cases that was the

17   case.  And in two of the other six cases, Your Honor, the

18   Court flat out held that the bar did not apply to an

19   institution.

20           Despite the statutory language that says, "In

21   addition to a person, a person can be a lead plaintiff for

22   an officer, director or fiduciary of a lead plaintiff.

23   And Mr. Hopkins here is the executive director of Arkansas

24   Teacher.  That is clearly an officer, director or a

25   fiduciary and he has personally signed at least 25 of

25

1    their certifications in the last three years.  So, Your

2    Honor, Mr. Hopkins qualify directly under the statute, the

3    statutory language, that they don't address in any of

4    their briefing, Your Honor.  They don't respond to our

5    point on "What does that mean if it doesn't mean Mr.

6    Hopkins?"

7              So, we would submit, Your Honor, that the fact

8    that the last six times this argument has been raised

9    against them has failed, is not the insurmountable battle

10   that they make it out to be.

11             THE COURT: Do you know of any case in which the

12   bar has been enforced against an institutional investor?

13             MS. PODOLSKY: Yes, Your Honor.  We've cited

14   several to the Court.

15             THE COURT: What do you think is the most

16   opposite case?

17             MS. MYERS: I believe it's the *Telxon* decision,

18   Your Honor, from the Northern District of Ohio.  Which,

19   oddly enough is the very first decision from 1999 by Judge

20   O'Malley that address this.  And it lays out not only what

21   the statute says and whether the Court should go into

22   legislative history, but it also addresses the

23   circumstances consistent with the statute and the goals of

24   the statute which we acknowledge what the goals are.  They

25   focus on one goal.  There's actually three or four goals

26

1    of the statute, Your Honor.  One of them is undoubtedly to

2    encourage institutional investors.  But, if you're going

3    to look at the legislative history, there are several

4    other goals that are discussed in that legislative

5    history.  Not only the increase of institutional

6    oversight, which in this case, Your Honor, will be

7    satisfied no matter who the Court picks.  We're both

8    institutional investors, we both lost a lot of money and

9    both hired good law firms.

10         But there's two other goals they ignore.  One of

11   them is to prevent overrepresentation by plaintiffs.

12   That's in the statute.  It's clearly in the statutory

13   provision.  That goal will not be satisfied if Arkansas

14   Teacher is appointed.

15         There's another goal.  The increase in client

16   control over plaintiff's counsel.  You know they talked

17   about the fact -- Your Honor asked them, "Well, if there

18   are eight law firms, would you hire them?"  The Court can

19   note how many people are in the room today.  They in fact

20   have eight people with them.

21         THE COURT: They in fact have what?

22         MS. MYERS: Eight people with them.  There are

23   eight lawyers -- seven lawyers.

24         So one of the goals of the PSLRA --

25         THE COURT: How many do you have?

27

1          MS. MYERS: We have just the three of us, Your

2    Honor.

3          So, one of the goals was to increase client

4    control over plaintiff's counsel.  Again, that will not be

5    satisfied if Arkansas is appointed.  So they're not only

6    overseeing the 13 active cases, they admit that they've

7    been in 35 in the last three years.  But they are

8    outnumbered.  They've got two law firms as the Court

9    noted.

10         So, we would submit you need to read the

11   legislative history if you're going to go there, which we

12   don't think you need to.  You need to read it holistically

13   and you need to look at all the goals of the statute.  And

14   that's what the case law looks at, Your Honor.  That's

15   what the cases that they've discussed look at.

16         And I would -- I would submit that, you know,

17   when I was preparing for this hearing, I looked back and I

18   looked at the evolution of this particular statute and the

19   way the cases have evolved over the years.  And they said,

20   "You know we haven't been barred yet."  They're right and

21   they haven't been barred yet.  But, I went back and there

22   was an entity called the Florida State Board of

23   Administration.  And three district courts in a row

24   declined to impose the bar on them.  Until Judge Harmon in

25   Enron who said, "Nine cases is too many."  So, someone

28

DISTRICT OF COLUMBIA SUPERIOR COURT

1    lost three times challenging them before a court said

2    "Nine cases is too many and the statute says five."  Nine

3    is too many.

4          It happened again with an entity called

5    Louisiana Teachers.  They lost -- a competing movant lost

6    twice in a row until Judge Collier in the *UnumProvident*

7    case said, "No, 13 cases is enough."  And then, they were

8    barred again in *American Italian Pasta*.  And the same

9    thing happened again in another entity where it was barred

10   once.  And then another Court said, "No, your eight cases

11   is enough."  And in each one of these cases that I just

12   talked about *Enron*, *UnumProvident*, and the *Cunha* case,

13   which we also cite in our papers, the one thing that all

14   of those had in common were alternative institutional

15   investors, sufficiently large losses, that had no

16   typicality or adequate issue that had hired competent

17   counsel that were also not subject to the bar.  And this

18   is recognized in all of the decisions both sides have

19   cited to the Court.

20          There has to be a need.  It's in the statute

21   itself, Your Honor.  It says, "Except as the Court may

22   otherwise permit consistent with the purpose of the

23   statute."  That purpose is not just that there's an

24   institution at the helm.  The purpose is an institution,

25   client control, no repeat plaintiffs.  That's what that

29

DISTRICT OF COLUMBIA SUPERIOR COURT

1     provision is targeted at.  And these cases all say, they

2     all stand for the proposition that unless there's a need,

3     a clear need, meaning there's no other movant, the

4     competing movants are individual investors and small

5     losses, or, they're competing movants are atypical where

6     they are inadequate.  The defendants have challenged them

7     for some reason where their trading is not usual of the

8     class.

9          Then you can lift the bar.  And, of course, if

10     the Courts agree on all of these points, there are a

11     handful of decisions, and we admit this, where the Courts

12     have said flat out, "The bar does not apply to

13     institutional investors."

14          We respectfully submit that if the Court goes

15     back and look at the statute and looks at the legislative

16     history, that the statute and the legislative history are

17     actually harmonized, because the legislative history says,

18     "Institutions may need to exceed this limit."  And we

19     agree, there may be circumstances -- I just listed four or

20     five of them -- where they may need to exceed the limit.

21     Not a single one of those circumstances is here, Your

22     Honor.  And they say we have the burden to prove that they

23     shouldn't be appointed.

24          But that's not what the statute says, Your

25     Honor.  The statute is broken up into separate parts.  The

30

DISTRICT OF COLUMBIA SUPERIOR COURT

1    rebuttable presumption part is Subsection 3 of the

2    statute.  The professional plaintiff's section, Your

3    Honor, is a stand alone section.  It's Subsection 6.  It's

4    on its own a totally separate section.  So, to be

5    appointed a lead plaintiff under the way the statute

6    itself is set up, you have to not only satisfy the

7    rebuttable presumption, the section of the statute:

8    Timely move, larger loss, typical inadequate.  But, you

9    also have to not be excluded by the five and three bar.

10   They want to subsume the five and three bar under the

11   rebuttable presumption part and say we have to prove they

12   can't be here.

13          We submit, Your Honor, that Congress put the

14   limit and said what "overstretched" means.  It's five.

15   They acknowledge in their reply brief they have been in 35

16   cases, Your Honor, since 2013.  They have moved or sought

17   to be appointed or been appointed in 21 cases that were

18   filed in the last three years.  They admit that they're

19   currently serving in active cases 13 of them, Your Honor.

20          We count 19 because we include cases that are

21   still pending because they are on appeal or the settlement

22   is not done.  Regardless, we all agree, everyone in this

23   room, they exceed the limit.  The declaration that Mr.

24   Hopkins submitted, he told the Court, and we applaud his

25   candor, that he is going to continue doing this.  He said

31

1    it in two spots.  "Until companies stop committing

2    securities fraud, we are going to keep moving."  Well,

3    they moved six times in 2015 and they moved six times in

4    2016.  So they've got 35 cases now.  So is 40 enough?  Is

5    45 enough?  Is 50 enough?  Congress said five, Your Honor.

6    There is not a single court that either side has cited to

7    you that has lifted the bar for a movant that had 35 cases

8    in the last three years.  And there is not a single court

9    that has lifted that bar for 35 cases.

10          But, on the other side, there's institutional

11    investors that does not exceed the limit that has served

12    as lead plaintiff and has also recovered money.  Not as

13    much because they don't have 35 cases in the last three

14    years, hired one law firm, a qualified law firm, and has a

15    larger loss.  And the defendant's haven't raised any

16    issues against them at this stage.  Even if they are not

17    entitled to say so.  Neither has Arkansas Teacher.  So,

18    Arkansas Teacher hadn't actually opposed my motion other

19    than to say I don't have the biggest loss.  So they admit

20    that we're qualified.

21          So, Your Honor, we respectfully submit that

22    under the case law, under the statute --

23          THE COURT: And I take you would concede that,

24    apart from this bar, they would be qualified?

25          MS. MYERS: Yes, Your Honor.

DISTRICT OF COLUMBIA SUPERIOR COURT

```
 1                THE COURT: All right.  That's really the issue
 2      in this, is that --
 3                MS. MYERS: The rubber --
 4                THE COURT: -- the statute that says don't
 5      appoint person whose had five of these in the last three
 6      years?
 7                MS. MYERS: Yes, Your Honor.  That is where the
 8      rubber meets the road.
 9                THE COURT: All right.  Thank you.  Anything
10      else?
11                MS. MYERS: No, thank you, Your Honor.
12                THE COURT: Ms. Podolsky.
13                MS. PODOLSKY: Yes, Your Honor.
14                THE COURT: Why do you think you have a response?
15                MS. PODOLSKY: Beg your pardon?
16                THE COURT: Why do you think you have a response?
17                MS. PODOLSKY: I was going to ask permission to
18      give a quick rebuttal.  If the Court is not interested
19      I --
20                THE COURT: Well, then I'll have to give
21      Ms. Myers -- all right, you go ahead, but make it very
22      brief and then I'll give Ms. Myers a chance to respond to
23      only to what you say.  But at some point we're -- it's got
24      to be all I hear.
25                MS. PODOLSKY: Understood, sir.
```

DISTRICT OF COLUMBIA SUPERIOR COURT

1              THE COURT: But you already killed a small forest

2       in submitting papers to me.

3              MS. PODOLSKY: Yes, sir.  I will direct my

4       comments at -- at Ms. Myers comments and I will be brief.

5              With respect to the burden on this provision

6       that the Court is looking at, there is no language, the

7       statute does not say, we have the burden on this

8       plaintiff -- on this -- on this professional plaintiff

9       provision.  The statute does not say that we have the

10      burden.  If the Court is looking to the text of the

11      statute, it does not say that.  There are quotes on both

12      sides, no question about it, that move the burden.  I

13      would suggest that the Court look at *Extreme Networks* with

14      respect to that matter.

15             I think *Extreme Networks* give the Court the best

16      explanation of how the legislative history works in

17      conjunction -- in how the two provisions work in

18      conjunction with each other.  The *Extreme Networks* is a

19      recent decision, just a few months ago.  It is Arkansas

20      Teachers.  It is against Robbins Geller.  Robbins Geller

21      represents the institutional investor.  It is on all fours

22      of this case.  And *Extreme Networks* go through very

23      clearly why the reasons in all the cases that Robbins

24      Geller points to why that reasoning was flawed and why it

25      should not be adopted by this Court.  Why it is not

1    adopted by *Extreme Networks*, why we suggested it should

2    not be adopted by this Court.

3           You asked -- I apologize, I think it is -- is it

4    Ms. Myers?

5           MS. MYERS:  Yes.

6           MS. PODOLSKY: You asked Ms. Myers what's the

7    most opposite case.  So, Your Honor, haven't asked me my

8    answer to that question along with *Diamond Foods*.

9           With respect to *Telxon* I will tell you that --

10          THE COURT: I think in your argument you told me

11   what the most opposite case was.  That's why I didn't ask

12   you.

13          MS. PODOLSKY: I think I did.  Understood.

14          Thank you very much for being, as you always

15   are, listening.  I appreciate that.

16          The *Telxon* case is a 1999 case.  So it -- it is

17   one of the oldest cases.  It is specifically rejected by

18   the decision out of the District of Columbia.  That's

19   Judge Leon, I think, quite recently.  That reasonably is

20   specifically -- the case is specifically rejected.

21          THE COURT: How does a magistrate judge reject --

22          MS. PODOLSKY:  No, Judge Leon, a district judge.

23          THE COURT: I see.

24          MS. PODOLSKY: Sorry, I didn't mean to be

25   unclear.  He also addresses *UnumProvident* and *Enron*, which

                                                          35

1    is the other cases that Ms. Myers spoke about and he

2    rejects them.

3            With respect to *Enron*, *Enron* is an outlier.  The

4    judge in *Enron* recognized that *Enron* -- he believed that

5    *Enron* was the biggest, baddest, most complicated, most

6    factually intensive securities class action that has ever

7    been brought in the history of the United States.  He

8    wanted, specifically, a firm, a lead plaintiff who did not

9    have -- that didn't have anything to do -- I understand

10   that the -- that the argument is made in the context of

11   the five and three provision -- but he wanted an assurance

12   that the lead plaintiff had very few cases, because of the

13   intensity -- what he perceived to be the intensity with

14   the oncoming litigation in *Enron*.

15           He also, with respect to the Florida State

16   Board, was very concerned because he thought there would

17   be a likelihood that Florida State Board, the lead

18   plaintiff, would be suing the investment advisor regarding

19   the purchases of the Enron stock.  So he had a concern

20   there that that could potentially create a conflict of

21   interest.  So, that's different in that sense.

22           The Louisiana -- Louisiana Pension System that

23   Ms. Myers referred to as a presumptive -- as a lead

24   plaintiff.  The cases that she's referring to, they start

25   with a case called *Chiaretti*.  That's the first case.  And

                                                              36

1    the *Chiaretti* court rejects Louisiana, because it is

2    concerned that the general counsel has several litigations

3    plus two very large funds that it's overseeing.

4              So, that is factually distinct from our case.

5              THE COURT: You've got a lot of cases you're

6    looking at?

7              MS. PODOLSKY: Pardon me.

8              THE COURT: Your client has a lot of cases that

9    they are looking at.

10             MS. PODOLSKY: I understand.  The distinction

11   between Arkansas Teacher and Louisiana is that -- and

12   perhaps also Arkansas Teacher and the FBA, the Florida

13   State Board, is that Arkansas Teacher had a specific group

14   of people dedicated to this and more than one.

15             Mr. Hopkins oversees with a professional staff

16   including four lawyers who are -- who are dedicated to the

17   securities.

18             THE COURT: I don't think the Congress intended

19   for district courts to get into precisely how people are

20   going to staff it.  But in any event, what else do you

21   have?

22             MS. PODOLSKY: So -- and I --

23             THE COURT: In response to Ms. Myers?

24             MS. PODOLSKY: I understand your point.  I would

25   just say if Ms. Myers is making -- is laying the burden of

                                                          37

1    proof on me, then I have to come forward with evidence

2    that I -- that I can do it.  And that Mr. Hopkins has to

3    come through with evidence.  And that's all I'm --

4          THE COURT: I don't have any doubt you both can

5    do it.  The question is who am I going to let do it.

6          MS. PODOLSKY: Yes, Your Honor.  So I understand.

7    Ms. Myers -- my final point with respect to this is that

8    -- Ms. Myers makes the point that Congress is prohibiting

9    repeat players.  Right?  Repeat plaintiffs, repeat

10   players.

11         But that's not -- that's not correct.  Because I

12   give you in our brief 20 cases where the Court

13   specifically says, appoints the presumptive lead plaintiff

14   in spite of the fact that it has more than the five cases

15   that are set forth in the statute.  So, it's not -- the

16   Court --

17         THE COURT: Maybe they are disobeying Congress.

18   Federal courts do that when they can get away with it.

19   Not many of these cases go to the circuit.

20         MS. PODOLSKY: But, that you're right.  You're

21   right.  But it is not the case that every -- it is

22   extraordinary unusual, let me put it that way, it is

23   extraordinary unusual for every single court in the

24   country since 2010 to go this way and be violating a

25   provision in a statute.  Every single case.

                                                        38

```
 1                    THE COURT: No, I can give you many times in
 2        history when that's happened.
 3                    MS. PODOLSKY: I would suggest --
 4                    THE COURT: Especially in the criminal area.  And
 5        then the Supreme Court comes and says 9-0 and judges
 6        across the country scratch their heads.  But anyway I take
 7        your point.  I'm familiar with all of that.
 8                    Now just focussing on what Ms. Podolsky [sic]
 9        said, do you have anything else you want to bring to my
10        attention?
11                    MS. PODOLSKY: May I add one point on the two law
12        firms if you mind?
13                    THE COURT: If you do it in a sentence.
14                    MS. PODOLSKY: Yes, sir.  In *MicroStrategy* you
15        recognized --
16                    THE COURT: I'm familiar with that.
17                    MS. PODOLSKY: Two firms working together.
18                    THE COURT: It doesn't mean that I don't regret
19        it.  And that you don't have a come back for.
20                    MS. PODOLSKY: No, I don't.  I do not, Judge.  I
21        don't think Judge Brinkema regrets allowing more than one
22        firm --
23                    THE COURT: Well, that's her problem, her
24        business.  I don't care.
25                    MS. PODOLSKY: Understood.
```

DISTRICT OF COLUMBIA SUPERIOR COURT

```
 1              THE COURT: All right.  Ms. Myers, do you have
 2    anything you want to say in response to that?
 3              MS. MYERS: So there are three primary points:
 4    Who has the burden, the emphasis of the Extreme Networks
 5    case, and the 20 cases.  I will be very brief.
 6              On the burden, Your Honor, if the Court looks at
 7    the statutory language, it says, "Except as the Court may
 8    otherwise permit, no person may be a lead plaintiff in
 9    more than five cases in three years."  Where that
10    subsection is located in the statute and the language of
11    that subsection doesn't place the burden on us.  It says,
12    "Except as the Court may otherwise permit."  That suggest
13    that the person that's barred needs to convince the Court
14    that there is a need consistent with the statute to allow
15    them to exceed the bar.
16              THE COURT: All right.  On the issue of burden,
17    do you really think I'm going to decide this case on the
18    basis -- not that the burden isn't an issue between you --
19    but do you really think I'm going to decide this case on
20    the basis of burden that somebody didn't meet their
21    burden?
22              MS. MYERS: No, Your Honor.
23              THE COURT: No, I don't think so either.
24              MS. MYERS: I would like to briefly address --
25              THE COURT: Basically, I've got to be satisfied
```

40

DISTRICT OF COLUMBIA SUPERIOR COURT

1    that I have met the requirements of the statute and

2    basically you're both qualified, your clients are both

3    qualified.  I don't see any, with the exception of this

4    one argument here that Ms. Podolsky has addressed, that I

5    think you're both qualified and I think they have the

6    biggest loss, you have the next biggest, and I've got to

7    look at the other factors and decide.  And the principle

8    other factor is the five and three years.  Otherwise, this

9    would be what -- I don't think anybody here remembers,

10   well I don't know maybe Mr. Cummings does back here --

11   remembers a judge in this court, whose now passed from

12   this veil of tears, and he always was fond of saying

13   "There are two kinds of cases:  There are no-brainers and

14   there are really no-brainers."

15          And I -- if there weren't this issue, of course

16   the issue of the five and three, it might be a really

17   no-brainer.  We'll see.

18          Do you have anything else?  You were getting

19   ready to say something about the case.  You know what I'm

20   talking about Mr. Cummings?

21          MR. CUMMINGS:  I do.

22          MS. MYERS: Briefly, Your Honor.  The *Extreme*

23   *Networks* case, the Court in that case for the Northern

24   District of California said that the word "person" isn't

25   defined in the statute in the section on the repeat

                                                        41

1    plaintiff's bar.  So it wasn't clear that apply to

2    institutions.

3           Well, if that holds, Your Honor, that "person"

4    isn't defined, then I don't know that either one of our

5    clients should be here moving, because at the very

6    beginning of the statute when it says, "Who can seek

7    appointment as lead plaintiff?"  It says, "Any person or

8    group of persons."  And neither one of us are persons.

9    We're entities.  So, if the PSLRA.

10          THE COURT: You're a group of persons, right?

11          MS. MYERS: Well, we're not a group of persons --

12   well, yes, we are, Your Honor.  So, I would submit that

13   that Courts reading of the statute does not jive with the

14   statute itself, Your Honor.

15          And then finally, the point about the 20 cases,

16   which is kind of their drum beat.  Again, we submit that

17   in each one of those cases if the Court goes and looks at

18   all 20 of them, there was a reason -- there was a need

19   consistent with the purpose of the PSLRA to lift the bar

20   and let the institution that had exceeded the limit serve.

21          There was no competing movant.  Meaning the

22   motion was unopposed.  Well, who is going to seek to

23   oppose the bar when there's no competing movant?  There

24   were only individual investors.  The other investors were

25   otherwise atypical or inadequate.  Or, candidly, the Court

42

1    just said it doesn't apply to an institution.  So we

2    submit that those 20 cases, where the Court declined to

3    exercise its discretion, they are not binding on this

4    Court, Your Honor.  Thank you.

5         THE COURT: All right.  Thank you.  The arguments

6    have been helpful.  Your briefs have been helpful, but I

7    think I have it.  I am going to reflect on the arguments

8    that you've made today.  They have been helpful.  And I'll

9    let you hear from me promptly because it needs to be

10   resolved very promptly.  Thank you.

11        MS. MYERS: Thank you, Your Honor.

12

13        **(Proceedings adjourned at 11:52 a.m.)**

14

15

16

17

18

19

20

21

22

23

24

25

43

DISTRICT OF COLUMBIA SUPERIOR COURT

1                      CERTIFICATE OF REPORTER

2

3              I, Tonia Harris, an Official Court Reporter for

4    the Eastern District of Virginia, do hereby certify that I

5    reported by machine shorthand, in my official capacity, the

6    proceedings had and testimony adduced upon the motion's

7    hearing in the case of the **STEVEN KNURR, et al versus**

8    **ORBITAL ATK INC.et al**, 1:16-CV-1031, in said court on the

9    4th day of November, 2016.

10             I further certify that the foregoing 44 pages

11   constitute the official transcript of said proceedings, as

12   taken from my machine shorthand notes, my computer realtime

13   display, together with the backup tape recording of said

14   proceedings to the best of my ability.

15             In witness whereof, I have hereto subscribed my

16   name, this the December 1, 2016.

17

18

19

20

21             _____
               Tonia M. Harris, RPR
22             Official Court Reporter

23

24

25

                                                              44