**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **STEVEN KNURR,** *et al.***,** | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No. 1:16-cv-1031** |
| **v.** | ) | |
| | ) | |
| **ORBITAL ATK INC.,** *et al.***,** | ) | |
| **Defendants.** | ) | |
| | ) | |

## <u>MEMORANDUM OPINION I</u>

Plaintiffs in this federal securities class action allege claims under (i) § 10(b) and Rule 10b-5; (ii) § 14(a) and Rule 14a-9; and (iii) § 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"). Defendants seek threshold dismissal of claims under all three provisions, and a separate memorandum opinion addresses the § 14(a) and related § 20(a) claims. This memorandum opinion addresses the questions presented under § 10(b) and the related § 20(a) claims, which are as follows:

(1) whether plaintiffs have alleged facts in the Complaint[1] that warrant, as the Private Securities Litigation Reform Act ("PSLRA") requires, a "strong inference" of scienter with respect to their claim under § 10(b) of the Exchange Act that defendants, a publicly traded aerospace and defense company and four of its high-level officers, intentionally concealed or recklessly ignored significant losses on a government contract; and

(2) whether under § 20(a) of the Exchange Act, the Complaint adequately alleges that the defendants had control over any person liable under § 10(b) of the Exchange Act.

---

[1] On August 12, 2016, named plaintiff Steven Knurr filed this action against Orbital ATK, Thompson, and Pierce individually and on behalf of other Orbital ATK stockholders. Thereafter, the Construction Laborers Pension Trust of Greater St. Louis ("St. Louis Laborers"), the Arkansas Teacher Retirement System, and two institutional investors filed motions for appointment as lead plaintiff and approval of the proposed lead plaintiff's choice of counsel. Following briefing and oral argument on these motions, a memorandum opinion and order issued on November 10, 2016 appointing (i) St. Louis Laborers as lead plaintiff, (ii) Robbins Geller Rudman & Dowd LLP as lead counsel, and (iii) Craig C. Reilly as liaison counsel. *See Knurr v. Orbital ATK, Inc.*, 220 F. Supp. 3d 653 (E.D. Va. 2016). St. Louis Laborers was then granted leave to file its own complaint, which it did on April 24, 2017. This complaint names Orbital ATK, Thompson, Pierce, DeYoung, and Larson and is the sole operative complaint in this action ("Complaint").

Parties have fully briefed and argued these questions, and they are ripe for disposition.

## I.

Before reciting the pertinent facts, it is important to identify the proper source of those facts. First, as the parties agree and as settled precedent requires, the facts recited here are taken chiefly from the Complaint's factual allegations, which must be accepted as true at this stage. *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 625 (4th Cir. 2008) (noting that at the motion to dismiss stage, "we must accept plaintiffs' factual allegations as true"). Defendants have also sought to have additional facts considered by attaching various exhibits to the motion to dismiss.[2] Only certain of these documents are appropriately considered at this stage.

Settled circuit authority permits courts to consider external documents in a motion to dismiss when they "are integral to and explicitly relied on in the complaint, and when the plaintiffs do not challenge the document's authenticity." *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606–07 (4th Cir. 2015) (quotation marks and brackets omitted). The SEC filings attached to defendants' dismissal motion, the transcripts of the August 10, 2016, November 8, 2016, and March 8, 2017 Orbital ATK conference calls, and the Wells Fargo and Barclays analyst reports are integral to or explicitly referenced in the Complaint, and plaintiffs do not challenge their authenticity. Accordingly, these documents are appropriately considered at this stage. Similarly, because the Fourth Circuit permits courts to take "judicial notice of published

---

[2] Defendants' additional documents include: (1) Excerpts from a number of Orbital ATK's and Alliant's forms filed with the U.S. Securities and Exchange Commission ("SEC"), such as forms 10-K and 8-K; (2) Orbital Sciences' Schedule 14A form and Alliant's Form 424B3; (3) Form 4s for defendants Thompson and DeYoung for the period of May 28, 2015 to August 9, 2016 (the class period), which were filed with the SEC; (4) A chart summarizing Orbital ATK's historical stock prices; (5) Transcripts from Orbital ATK's earning conference calls held on (i) August 10, 2016, (ii) November 8, 2016, and (iii) March 8, 2017; (6) A transcript of Alliant's earnings conference call held on August 1, 2013; and (7) Analyst reports from (i) Barclays, dated August 10, 2016, (ii) KeyBanc Capital Markets, dated August 11, 2016, and (iii) Wells Fargo, dated August 23, 2016.

stock prices without converting a motion to dismiss into a motion for summary judgment," it is also appropriate to consider the chart summarizing Orbital ATK's historical stock prices. *Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 655 (4th Cir. 2004). By contrast, Alliant's August 1, 2013 conference call is not referenced in the Complaint, nor does the Complaint cite the KeyBank analyst report, so it is inappropriate to consider these documents at the motion to dismiss stage.

## II.

Corporate defendant, Orbital ATK, is an aerospace and defense company headquartered in Dulles, Virginia. The company's stock trades on the New York Stock Exchange under the ticker symbol "OA." Orbital ATK was formed out of the February 2015 merger between two companies—Orbital Sciences Corporation ("Orbital Sciences") and Alliant Techsystems, Inc. ("Alliant").

In addition to the corporate defendant, the Complaint names the following four individual defendants:

(1) David D. Thompson;

(2) Garrett E. Pierce;

(3) Blake E. Larson; and

(4) Mark DeYoung.

Defendant Thompson has been the Chief Executive Officer and President of Orbital ATK since the merger; before the merger, he was the Chairman of the Board, CEO, and President of Orbital Sciences. Defendant Pierce is currently Orbital ATK's Chief Financial Officer; before the merger he was Vice Chairman of the Board and CFO of Orbital Sciences. Defendant Larson is the Chief Operating Officer of Orbital ATK; before the merger he was the Senior Vice

President of Alliant and President of Alliant's Aerospace Group. Finally, defendant DeYoung was a Director of Orbital ATK from the merger until March 2016; before the merger he served as the CEO and President of Alliant.

Plaintiffs allege that Thompson, Pierce, and Larson made a number of false and misleading statements with respect to the financial success of Orbital ATK after the merger of Orbital ATK's predecessor companies, Orbital Sciences and Alliant. In particular, plaintiffs focus on Thompson, Pierce, DeYoung and Larson's failure to disclose for over a year that a major ammunition contract with the United States Army—the Lake City Contract—was costing Orbital ATK hundreds of millions of dollars. Under Orbital ATK's own accounting policy and Generally Accepted Principles of Accounting ("GAAP"), gross estimated losses on long-term contracts such as the Lake City Contract must be disclosed and recorded as soon as such losses become evident. On August 10, 2016, Thompson, Pierce, and Larson announced that they would be restating several of Orbital ATK's financial statements to reflect nearly $400 million in losses on the Army ammunition contract, and also announced that the losses from this contract should have been recorded earlier pursuant to the accounting policy and GAAP. Defendants' alleged cover-up of the losses on the ammunition contract form the basis of plaintiffs' claims under § 10(b) of the Exchange Act.

Prior to their merger, Orbital Sciences and Alliant were both publicly traded aerospace and defense companies headquartered in Virginia and both sold products such as rockets and satellites to NASA and the United States military. Alliant was also a leading ammunition producer for the United States military; Orbital Sciences did not manufacture or sell ammunition. Both companies relied heavily on government contracts, which were 70% of Alliant's sales and 80% of Orbital Sciences' sales. At the same time, the Complaint alleges that heading into the

merger, Alliant was under pressure to renew a major ammunition contract, and Orbital Sciences was dealing with a series of financial missteps. The Complaint alleges that these pressures set the stage for defendants' fraudulent and misleading statements with respect to Orbital ATK's post-merger financial performance.

With respect to Alliant, plaintiffs' claims focus on the Lake City Contract between Alliant and the United States Army, which Alliant originally entered into in 2000. Alliant manufactured billions of rounds of small caliber ammunition under this contract at the Lake City Plant in Independence, Missouri, and the contract accounted for 13% of Alliant's total revenues in fiscal year 2010; no other contract contributed more than 10% of the company's sales. In fiscal year 2010, Alliant received a four-year renewal on the Lake City Contract. In August 2012, Alliant submitted a bid to the Army to retain the Lake City Contract beyond 2013. The Complaint alleges that Alliant, at this time, was under pressure to retain the Lake City Contract because Alliant had recently lost a bid to renew another major multi-year ammunition Army contract to Alliant's competitor, BAE Systems PLC. To make matters worse for Alliant, BAE Systems was also seeking the Lake City Contract. Accordingly, plaintiffs allege that Alliant and DeYoung "aggressively bid" on the Lake City Contract renewal with a "low-ball bid." (Compl. ¶¶ 47, 38). Alliant and DeYoung's plan apparently worked, as Alliant won the renewal of the Lake City Contract on September 28, 2012; the contract had a seven-year term with a three-year extension option, and production under the contract would begin on October 1, 2013.

Plaintiffs allege that making a profit on the new Lake City Contract would be more difficult compared to the old contract owing to the lower production volume, given that overhead costs had to be spread over the total cost of production. Alliant assured investors that it would monitor costs carefully to account for these reductions in volume, but also made clear that

Alliant would face some pressure with respect to the profit margins on the Lake City Contract. For instance, on various conference calls, DeYoung acknowledged that Alliant won the Lake City Contract on an "aggressive bid" and that winning that bid would require "price reductions which could impact margins in the early years of winning the recompete." (Compl. ¶ 43). After Alliant won the contract, DeYoung reiterated that it was an "aggressive contract" and that the company would experience an "initial period of margin pressure" and "some reduced revenue" as a result. *Id.* ¶ 44. DeYoung also informed investors on October 30, 2014 that Alliant was taking a number of steps to reduce costs and boost profitability on the Lake City Contract, including (i) reducing staff and work force; and (ii) offering commercial ammunition out of the Lake City Plant.

As for Orbital Sciences, the Complaint also alleges that this company was facing its own problems in the year before the merger, namely: (i) lower than expected revenues for each quarter of 2014; (ii) two reductions in revenue guidance for 2014; and (iii) a failed rocket launch in October 2014, which jeopardized a multi-year contract with NASA. The Complaint alleges that these failures raised the stakes for a successful proposed merger between Orbital Sciences and Alliant.

On April 29, 2014, Orbital Sciences and Alliant announced that they planned to merge to form Orbital ATK. Orbital Sciences shareholders would receive .449 shares of Orbital ATK stock in exchange for each share of Orbital Sciences stock held, Alliant shareholders would retain their Alliant stock, and Alliant would be renamed Orbital ATK. Thompson would serve as CEO of Orbital ATK, while Pierce would serve as the CFO. DeYoung would become CEO and Chairman of a new company, Vista, which would be a spin-off of Alliant's sporting segment.

Even though Vista would manufacture ammunition, Vista and DeYoung did not take the Lake City Contract; that contract remained with Orbital ATK.

After conducting due diligence, Alliant and Orbital Sciences, on December 17, 2014, filed a joint proxy statement ("Joint Proxy Statement") with the SEC concerning the merger. Shortly thereafter, both companies held special stockholders meetings on January 27, 2015 to vote on the merger. The shareholders from each company approved the merger, which was announced on February 9, 2015.

Following the merger, Orbital ATK transitioned from Alliant's fiscal year, which ended March 31, 2015, to a fiscal year ending on December 31. The Class Period begins on May 28, 2015, when Orbital ATK reported its first financial results after the merger. The Complaint alleges that defendants began making a series of statements on May 28, 2015 about Orbital ATK's post-merger financial performance. In particular, the Complaint identifies four categories of false and misleading statements as the basis for the § 10(b) claim:

(1) statements regarding merger synergies;

(2) statements regarding the Lake City Contract's performance;

(3) statements regarding financial results; and

(4) statements regarding internal controls.

Because defendants, at this stage, do not contest the materiality or falsity of the statements, a brief summary of the statements suffices.

***Statements Regarding Merger Synergies***

On May 28, 2015, the beginning of the Class Period, Orbital ATK announced its financial results from the first transition period quarter ending on March 31, 2015. Orbital ATK also filed these results with the SEC on Form 8-K. Between May 28, 2015 and May 11, 2016,

Thompson, Larson, and Pierce made a number of public statements in financial releases,[3] conference calls,[4] and investor meetings[5] concerning Orbital ATK's success in achieving merger synergies. Specifically, defendants touted the benefits of and synergies associated with the merger and described the related cost savings and improved profit margins.

The Complaint alleges all of these statements were false and misleading for the following reasons: (i) the positive statements regarding the benefits, cost reductions, and synergies omitted to disclose that such savings and synergies were outweighed by the $375 million loss on the Lake City Contract; (ii) the various statements regarding the benefits of the merger, cost savings, and improved profit margins did not disclose that the Lake City Contract losses negatively impacted Orbital ATK's profit margins; (iii) the Lake City Contract was priced millions of dollars below cost, and, in violation of GAAP and Orbital ATK's accounting policy, defendants failed to record the $375 million loss on the contract when it became evident; and (iv) defendants did not disclose that their efforts to reduce the costs on the Lake City Contract had failed to make the contract profitable.

---

[3] For example, a February 2016 release for Orbital ATK's fourth transition period quarter 2015 and full calendar year 2015 financial results quoted Larson as stating that Orbital ATK had "met production demand in our small caliber ammunition business for commercial and government customers" and that the company had "exceeded [its] cost synergy targets for 2015." *Id.* ¶ 68. Pierce stated in that same release that Orbital ATK expected to see further "benefits from the merger in terms of additional cost and revenue strategies that will propel margin expansion." *Id.*

[4] On May 5, 2016, for example, Thompson, Larson, and Pierce held a conference call to discuss the first quarter 2016 financial results. Larson stated that Orbital ATK was delivering on its merger-related synergies and the company's profit margins had improved. He stated that the company had achieved $85 million in cost reductions in 2015 and was on track to achieve more than $100 million in savings in 2016. He stated that the company's performance and synergy savings were resulting in "improved competitiveness and profit margins in our operations." *Id.* ¶ 73. Thompson added that Orbital ATK's profit margins were benefiting from the cost efficiencies achieved following the merger, and that revenue and cost synergies were on or ahead of schedule.

[5] On March 8, 2016, Pierce spoke at an institutional investors conference on behalf of Orbital ATK. Pierce stated that the merger had gone very well from both a cost and revenue standpoint and stated that Orbital ATK had achieved $80 million in cost reductions in the first nine months following the merger and would add another $20 million in savings.

### Statements Regarding the Lake City Contract's Performance

The next category of allegedly false and misleading statements ranges from May 28, 2015 to May 11, 2016 and involves the financial performance of the Lake City Contract. Again, these statements appeared in financial releases[6] and SEC forms.[7] Moreover, defendants made various statements on conference calls[8] and at conferences.[9] Generally, these statements described the continued success of the Lake City Contract and its high rates of production.

The Complaint alleges that these statements were false and misleading because, in fact, the company was losing money on the Lake City Contract by selling the bullets at a significant loss. In particular, the statements concerning the Lake City Contract's profit margins were false because the contract was in fact operating at negative margins, which resulted in substantial losses. Likewise, statements concerning the profit rate of the Lake City Contract were also false because Orbital ATK was, in fact, losing money on the contract.

### Statements Regarding Financial Results

---

[6] For example, on October 27, 2015, Orbital ATK issued a release announcing its third quarter 2015 financial results, which were filed with the SEC on Form 8-K. The release stated that the Defense Systems Group had delivered 300 million rounds of ammunition in the third quarter. Larson stated in the release that the company had continued its progress in ramping up several programs and also had "a higher production rate of commercial small-caliber ammunition." *Id.* ¶ 83.

[7] On June 1, 2015, Orbital ATK filed its annual report on Form 10-K for the fiscal year ending on March 31, 2015. Thompson, Pierce, and DeYoung signed the form, which contained several statements concerning the Lake City Contract. Specifically, the Form 10-K stated that the company produced approximately 1.4 billion rounds of small-caliber ammunition in the Lake City Plant in the first fiscal quarter of 2015, and that the Lake City Contract contributed to 13% of Orbital ATK's sales in fiscal 2015, 9% in fiscal year 2014, and 19% in fiscal year 2013. The Form 10-K also stated that because of the significant competition for the Lake City Contract, Orbital ATK had "experienced a lower profit rate in the Small-Caliber Systems division following the implementation of [the] new contract." *Id.* ¶ 78. Finally, the Form 10-K warned that an increase in ammunition costs could have an adverse effect on the company's "operating results and profit margin." *Id.*

[8] As an example, on May 5, 2016, Thompson, Larson, and Pierce held a conference call to discuss the first quarter 2016 results. When asked about the outlook for the Lake City Contract, Thompson stated (i) that the "outlook in the small caliber ammo business is pretty good this year" and was "stronger overall than last year"; (ii) that Orbital ATK was seeing a "significant bounce back in demand" in 2016; (iii) that the company produced approximately 400 million rounds of ammunition in the first quarter of 2016, most of which was from the Lake City Plant; and (iv) that the company predicted a "reasonable increase in total small [cal] ammo sales this year." *Id.* ¶ 92.

[9] On March 8, 2016, Pierce spoke at an institutional investors conference on Orbital ATK's behalf and stated that the company's ammunitions business was "coming back" and that the company had driven the cost out of that business. *Id.* ¶ 88.

The Complaint alleges that between June 1, 2015 and May 9, 2016, defendants made a number of false and misleading statements concerning Orbital ATK's financial results in releases[10] and SEC filings.[11] The Complaint alleges that these figures and statements concerning Orbital ATK's financial condition were false and misleading for the same reason—the Lake City Contract had been priced hundreds of millions of dollars below cost, and defendants, in violation of GAAP and the company's accounting policy, did not record this $375 million forward loss on the contract. As a result of defendants' failure to record the loss properly, all of the financial figures reported in these releases and statements were erroneous. For instance, the Complaint alleges that with respect to the figures stated in the 2016 release and Form 10-Q, the total current liabilities were understated by $264 million (22%), the retained earnings were overstated by $255 million (23%), the net receivables were overstated by $119 million (6%), and total equity reported was overstated by $255 million (15%).

***Statements Regarding Internal Controls***

Finally, between May 28, 2015 and May 9, 2016, the Complaint alleges that defendants made a number of false statements in SEC forms[12] and conference calls[13] concerning Orbital ATK's internal financial controls.

---

[10] For example, on May 5, 2016, Orbital ATK issued its release for the first quarter of 2016, which reported total current liabilities of $954 million and total equity of $1.99 billion. *Id.* ¶ 106.

[11] On May 9, 2016, Orbital ATK filed its first quarter 2016 Form 10-Q, which was signed by Thompson and Pierce and included the following statement concerning Orbital ATK's financial condition: total current liabilities of $954 million, retained earnings of $1.36 billion, and net receivables of $1.97 billion.

[12] On June 1, 2015, Orbital ATK filed its 2015 Form 10-K, which was signed by Thompson, Pierce, and DeYoung. The Form 10-K contained three statements concerning Orbital ATK's financial disclosures and control procedures: (i) the "Disclosure Controls Statement," which assured investors that Orbital ATK's CEO and CFO "evaluated the effectiveness of the design and operation of the Company's disclosure controls and procedures" and had "concluded that the Company's disclosure controls and procedures are effective"; (ii) the "Internal Controls Statement," which contained management's conclusion that "the Company's internal control over financial reporting is effective"; and (iii) a Sarbanes Oxley Certification ("SOX Certification"), which stated that Orbital ATK's 2015 Form 10-K complied with the Exchange Act, that the information in the Form fairly presented, "in all material respects," Orbital

The Complaint alleges that these statements were false and misleading because, in fact, Orbital ATK had not integrated the accounting systems of its predecessor companies, and as such, Orbital ATK could not generate accurate financial reporting. Furthermore, the Complaint alleges that Orbital ATK's financial controls at the time suffered from several material weaknesses, particularly with respect to the failure to maintain an effective financial control environment at the company's Defense Systems Group and Small Caliber Systems Division. These statements were false according to the Complaint because defendants continued to conceal the large losses stemming from the Lake City Contract.

After more than a year of positive statements concerning the merger and analysts' corresponding expectations for Orbital ATK,[14] events took a turn for the worse on August 10, 2016. Before the market opened that day, Orbital ATK made the following announcements: (i) that the company would not be able to file its quarterly report for second quarter 2016 on time; (ii) that the company's previously issued quarterly and annual financial statements in fiscal year 2015, transition period 2015, and first quarter 2016 were no longer reliable; (iii) that the company would have to restate its financial statements because of material misstatements related

---

ATK's financial conditions, and that Orbital ATK had such internal financial reporting controls to provide reasonable assurance of the reliability of the company's financial reports. *Id.* ¶ 110.

[13] On May 28, 2015, Thompson, Larson, and Pierce held a conference call to discuss Orbital ATK's first quarter 2015 financial results. Pierce stated that Orbital ATK employees working on financial operational control had "done a superb job . . . integrating [the company's] control systems to run this merged business" and that merging the financial reporting had "turned out to be very, very positive." *Id.* ¶ 109.

[14] Analysts reacted positively to defendants' allegedly false and misleading statements, beginning with a June 1, 2015 analysis from Jefferies, which rated Orbital ATK's stock as a "BUY" and commented on the increasing ammunition volumes from the Lake City Contract. On August 6, 2015 analysts from Credit Suisse and Wells Fargo also positively reviewed Orbital ATK, with Credit Suisse stating that the company was well-positioned in the defense market and Wells Fargo rating the stock as a "market outperform." *Id.* ¶ 123. Next, on October 27, 2015, Credit Suisse and Jefferies both increased their twelve-month price targets for Orbital ATK. And analysts continued to respond positively to the allegedly false and misleading statements made in 2016. On March 1, 2016, Credit Suisse rated the stock as one that would outperform expectations and commented on the growth in the Defense Systems Group. Finally, on May 6, 2016, Barclays and Wells Fargo analysts positively rated the company, and analysts from both firms specifically noted that Orbital ATK's growth forecasts for small-caliber ammunition were encouraging.

to the Lake City Contract; and (iv) that the company's internal financial controls were ineffective and weak.

Also on August 10, 2016, Orbital ATK filed a Form 8-K report, which provided further detail about the misstatements relating to the Lake City Contract. Specifically, the Form 8-K explained that:

> Under generally accepted accounting principles, the Company is required to record the entire anticipated forward loss provision for a contract in the period in which the loss becomes evidence. The Company believes that a forward loss provision should have been recorded for the Contract in fiscal 2015, which was the first year of large-scale production under the Contract.

With respect to the cause of these misstatements, the Form 8-K stated that there were "one or more material weaknesses in [the company's] internal control over financial reporting and disclosure controls and procedures during the Restated Periods." As for the losses caused by the misstatements, Orbital ATK estimated that the forward loss charge would reduce previously reported pre-tax operating income by about $400 million to $450 million and after-tax net income by about $250 million to $280 million. Orbital ATK also estimated that the misstatements resulted in revenues being overstated by $100 million to $150 million, primarily for fiscal year 2015. Finally, the Form 8-K stated that Orbital ATK expected to file an amended Form 10-K for the 2015 transition period, and its quarterly report on Form 10-Q for the quarter ending April 3, 2006 "as soon as reasonably practicable," but that the company had obtained an extension from its lenders to file the reports by November 14, 2016.

Thompson, Pierce, and Larson also held a conference call that day to discuss Orbital ATK's announcement that Orbital ATK's earnings would have to be restated. The transcript from the August 10, 2016 conference call shows that Thompson stated that Orbital ATK's review of its financial processes and controls "ultimately determined that [the Lake City

Contract] had in fact[] been in a substantial loss position since 2014, rather than the roughly breakeven profit level that had been previously recorded." Pierce stated that the Lake City Contract "moved into high-rate production" in fiscal year 2015, and that "[d]espite vigorous and sustained efforts to achieve productivity improvements, and despite realizing substantial cost efficiencies, [the] Lake City team was unable to reduce the production costs far enough for the contract to be profitable." The Complaint also notes Pierce's statement that the Lake City Contract involved a simple product with fixed material costs, so "the latitude that [the company has] is labor costs and overheads and the like, so there's not a lot of room to move on that." Finally, Larson stated that the Lake City Contract team had "achieved more than one-half, to one-half to two-thirds of the objective cost reduction that the bid anticipated."

After these disclosures, Orbital ATK's stock price dropped more than 20%, from a close of $89 per share on August 9, 2016 to a close of $71 per share on August 10, 2016. Analysts from Wells Fargo, Barclays, and Jefferies all lowered their ratings for Orbital ATK, and Wells Fargo analysts noted the surprising magnitude of the revision. In another report issued on August 23, 2016, Wells Fargo reiterated its opinion concerning the substantial size of the earnings restatement.

Three months later, Orbital ATK filed another Form 8-K with the SEC on November 1, 2016. The Form 8-K stated that the company had preliminarily determined, after a multi-month review, that "the majority of the [Lake City Contract] loss provision should be recorded at the inception of the Contract which occurred in fiscal 2013," instead of the August position that the loss should have been recorded in fiscal 2015.[15] Orbital ATK also stated, however, that the preliminary estimate of the loss amount was lower than previously announced, as the estimated

---

[15] Pierce confirmed in a conference call held on November 8, 2016 that the company had verified that the issues related to the Lake City Contract dated back to fiscal year 2013.

13

reduction in pre-tax operating income would be $350 million, instead of the original estimate of $400 to $450 million, and the estimated reduction in after-tax net income would be about $220 million, instead of the original estimate of $250 million to $280 million.

Orbital ATK ultimately filed its Amended Form 10-K for the nine-month transition period ending December 31, 2015 on February 24, 2017. The Amended Form 10-K restated the company's financial statements for the first quarter of 2016, the transition period ending on December 31, 2015, fiscal year 2015, fiscal year 2014, and fiscal year 2013 (except for the first quarter); the Amended Form 10-K also confirmed that the previous financial statements for these fiscal years, as well as the associated quarterly reports, should no longer be relied on due to the misstatements concerning the Lake City Contract. With respect to the Lake City Contract, the Amended Form 10-K confirmed that Alliant had submitted a significantly low bid for the contract on the basis that it would reduce operating costs substantially over the life of the contract. Although the Amended Form 10-K noted that Orbital ATK achieved "significant cost reductions," those reductions "were not sufficient to achieve profitability over the life of the Lake City Contract." As for the misstatements, the Amended Form 10-K confirmed that senior management identified the misstatements in 2016 as part of a company-wide effort to enhance accounting controls and oversight. Once the misstatements were corrected, it became clear that the costs of the Lake City Contract would exceed its revenues over the life of the contract, which meant that the entire anticipated forward loss should have been recorded in 2013 when the loss became evident. Specifically, the Complaint notes that Orbital ATK determined that $32 million of the loss should have been evident when the contract was signed in the second quarter of fiscal 2013, and $342 million should have been evident in the second quarter of fiscal 2014.

The Amended Form 10-K also provided information as to the reasons the misstatements occurred in the first place. The internal investigation revealed that certain personnel in the Small Caliber Systems Division and the Defense Systems Group failed to adhere to company standards with respect to the Lake City Contract. In particular, (i) there was likely a "bias toward maintaining a targeted profit rate;" (ii) there was, in some cases, apparently an "inappropriate use of management reserves to maintain the targeted profit rate;" (iii) "some members of the Small Caliber Systems Division finance staff failed to follow up and inquire further into indications that cost overruns were occurring;" and (iv) "negative information was suppressed, and concerns at the Small Caliber Systems Division about cost overruns were not escalated appropriately" to higher-level company management and finance staff, the Audit Committee, the Board of Directors, or the independent accounting firm.

Finally, Orbital ATK also revealed in the Amended Form 10-K that Orbital ATK was the subject of a non-public SEC investigation, and noted that the restatement could result in government enforcement actions or adverse litigation.

After Orbital ATK filed its Amended Form 10-K, plaintiffs filed the operative Complaint in this matter on April 24, 2017, asserting claims against the defendants. Plaintiffs bring four claims against defendants based on the post-merger statements, as well as defendants' alleged negligence in preparing, reviewing, and disseminating the Joint Proxy Statement issued before the merger: (i) a violation of § 10(b) of the Exchange Act and Rule 10b-5 against all defendants, (ii) a violation of § 20(a) of the Exchange Act against Thompson, Pierce, and Larson, (iii) a violation of § 14(a) of the Exchange Act and Rule 14a-9 against Thompson, Pierce, DeYoung, and Orbital ATK (the "Joint Proxy Defendants"), and (iv) a violation of § 20(a) of the Exchange Act against DeYoung, Thompson, and Pierce.

Defendants then filed a joint motion to dismiss all claims in the Complaint pursuant to Rule 12(b)(6), Fed. R. Civ. P and under the PSLRA.  With respect to the § 10(b) and related § 20(a) claims, defendants argue that the Complaint does not allege facts that warrant a strong inference of scienter, and plaintiffs contend that the Complaint satisfies the PSLRA standard. Defendants' dismissal motion has been fully briefed and argued and is ripe for disposition.

## III.

Section 10(b) of the Exchange Act prohibits the use of "any manipulative or deceptive device or contrivance" in connection with the sale of securities "in contravention of [the] rules and regulations" prescribed by the SEC.  15 U.S.C. § 78j(b).  Pursuant to that prohibition, Rule 10b–5 provides that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.  The elements of a § 10(b) claim are well-established:  "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase of a sale or security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008).

Defendants' motion to dismiss with respect to plaintiffs' § 10(b) claim focuses solely on the second element—whether plaintiffs have alleged sufficient facts to warrant a strong inference that defendants acted with the requisite scienter of "either intentional or severely reckless conduct." *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 884 (4th Cir. 2014).[16] Because the PSLRA "imposes a heightened pleading standard on fraud allegations in private securities complaints,"[17] the complaint must "state with particularity facts giving rise to a *strong inference that the defendant acted with the required state of mind*." 15 U.S.C. § 78u-4(b)(1)(B), (2)(A) (emphasis added). Critically, the Supreme Court established that "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007). And a complaint survives a dismissal motion "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

The Complaint alleges numerous facts and indicia in an attempt to establish a strong inference that defendants Thompson, Larson, DeYoung, and Pierce, and by extension Orbital ATK, acted with the requisite scienter in making the misleading statements described above, including:

 (1) defendants' senior positions with Orbital ATK and corresponding awareness of, responsibility for and control over the Lake City Contract and other subjects of the misleading statements;

(2) multiple "red flags" indicating that the Lake City Contract was operating at a loss;

---

[16] A "reckless act is one that is so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* (quotation marks omitted).

[17] *Id.* at 885.

(3) the simplicity of the "percentage-of-completion" accounting method for the Lake City Contract and defendants' years of experience in using this method for long-term government contracts;

(4) the sheer magnitude of the restatement;

(5) the departure of key employees, particularly DeYoung, government investigations, and defendants' false SOX certifications; and

(6) defendants' motives, namely defendants' profit from incentive compensation or stock sales and desire to complete the merger and make it appear successful.

Defendants argue these allegations are insufficient both individually and as a whole to support a strong inference of scienter. The only proper inference, defendants contend, is that defendants acted in good faith, and thus neither the individual defendants nor the corporate defendant can be liable.

In accordance with Fourth Circuit precedent, each of plaintiffs' individual facts and indicia, and defendants' opposing arguments, will be addressed first to determine whether the allegations give "rise to an inference of scienter and, if so, the strength of that inference." *Yates*, 744 F.3d at 885. Then, the complaint will be "evaluate[d] . . . holistically, recognizing that allegations of scienter that would not independently create a strong inference of scienter might [complement] each other to create an inference of sufficient strength to satisfy the PSLRA." *Id.* at 893 (quotation marks omitted).

### *Defendants' Senior Positions with Orbital ATK and Responsibility for the Lake City Contract*

The Complaint's first set of allegations focuses on defendants' roles as senior executives at Orbital ATK. These roles, plaintiffs contend, gave defendants the ability to and responsibility for monitoring the Lake City Contract, the merger synergies, and the company's internal controls—the precise topics of the misstatements. Specifically, the Complaint alleges that defendants had access to confidential information about the company's finances and internal

controls and were responsible for signing off on the company's public statements, SEC filings, and SOX certifications. These allegations, however, rest on little more than the individual defendants' positions as high-level corporate executives and as such, are not adequate to support a strong inference of scienter.

The Fourth Circuit has rejected the contention that individual corporate officers must "have acted intentionally or recklessly" with respect to a company's accounting problem "merely because . . . they [are] senior executives" of the company. *Id.* at 890. Accordingly, general allegations based on corporate positions are insufficient to satisfy the PSLRA's particularity requirement. Instead, plaintiffs must allege "additional detailed allegations establishing the defendants' *actual exposure* to the accounting problem." *Id.* (emphasis added).[18] In this regard, district courts have found that complaints support a strong inference of scienter with respect to senior executives where those complaints allege facts demonstrating defendants' awareness of the specific problems about which those defendants made false statements.[19]

---

[18] *See also South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008) ("Allegations regarding management's role in a corporate structure and the importance of the corporate information about which management made false or misleading statements may also create a strong inference of scienter when made in conjunction with detailed and specific allegations about management's exposure to factual information within the company."); *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 282 (3d Cir. 2006) ("A pleading of scienter sufficient to satisfy Rule 9(b) may not rest on a bare inference that a defendant must have had knowledge of the facts or must have known of the fraud given his or her position in the company." (quotation marks omitted)).

[19] In *In re Genworth Financial Inc. Securities Litigation*, 103 F. Supp. 3d 759, 767 (E.D. Va. 2015), for example, plaintiffs alleged (i) that defendants admitted to making misstatements about when they last conducted a review; (ii) that defendants knew that "industry experts had identified adverse trends in claim data between 2010 and 2013 that were not accounted for in" the company's reserves and (iii) that defendants knew that the average length for the company's claims was actually longer than the figure used internally to calculate the reserves. *Id.* at 783–84. Similarly, in *Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593 (E.D. Va. 2015), plaintiffs alleged that defendants misrepresented that their high profit margins were due to the use of legitimate, low-cost wood sourcing initiatives when, in reality, the company had high profit margins because of cheap, illegally harvested wood that violated safety standards. *Id.* at 598. In concluding that plaintiffs satisfied the scienter requirement, the court relied on multiple allegations that defendants were more intimately involved in importing the cheap wood than merely overseeing it, namely (i) the company hired two of the individual defendants specifically for the purpose of importing the Chinese wood; (ii) the defendants publicly bragged about inspecting the Chinese mills; (iii) defendants repeatedly assured investors that they had employees at the mills to control quality; and (iv) the company conducted "stringent testing" of the wood to ensure quality and safety. *Id.* at 607.

Here, the Complaint relies chiefly on defendants' positions as corporate executives to support a strong inference of scienter without alleging any facts about defendants' awareness of the Lake City Contract accounting problem. Monitoring company operations, discussing company business on conference calls, and signing off on financial statements are all part and parcel of the role of a senior executive and do not, without more, support an inference of actual exposure to a problem as required to establish scienter. *Yates*, 744 F.3d at 890.[20]

Plaintiffs attempt to provide these more detailed allegations by discussing the importance of the Lake City Contract, defendants' acknowledged monitoring of the contract, and defendants' frequent public statements about the contract. These attempts are unsuccessful.

First, plaintiffs contend that because the Lake City Contract was the company's largest contract, in its largest division, for its largest customer, the contract was one of Orbital ATK's "core operations," all of which, plaintiffs argue, warrant a strong inference of scienter.[21] This contention fails for as the Fourth Circuit has recognized scienter cannot be established simply because a program or contract represents a core business unless, again, plaintiffs can provide "additional detailed allegations establishing the defendants' *actual exposure to the accounting problem.*" *Yates*, 744 F.3d at 890 (emphasis added).[22] Here too, plaintiffs have failed to provide

---

[20] *See also In re Criimi Mae, Inc. Sec. Litig.*, 94 F. Supp. 2d 652, 661 (D. Md. 2000) (concluding that allegations that defendants signed the company's public filings with the SEC, held executive positions in the company, were responsible for the company's operations, had "extensive experience in and knowledge of the real estate finance industry," and "their access to information about the company's financial dealings" were insufficient to "raise a strong inference of scienter").

[21] Accepting plaintiffs' allegations as true that the Lake City Contract was the company's largest and most important contract, it is not even clear if these allegations are enough to establish that the contract was one of the company's core operations. *Cf. In re Genworth*, 103 F. Supp. 3d at 784 (stating that the long-term insurance division of a company was a core operation where a director declared that the division was one of the company's two "core sets of businesses" and that long-term care was the company's "core business").

[22] *See also Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014) ("Proof under this theory is not easy. A plaintiff must produce either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations, such as data monitoring, or witness accounts demonstrating that executives had actual involvement in creating false reports.") (citations omitted); *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063 (9th Cir. 2014) ("[A]bsent some additional allegation of specific information

the required detailed allegations, as plaintiffs' allegations do not show that defendants actually received information that the Lake City Contract was operating at a loss owing to the failure to cut costs.

Next, plaintiffs focus on defendants' monitoring of the Lake City Contract. Specifically, the Complaint notes that DeYoung admitted that Alliant knew the Lake City Plant very well, that DeYoung monitored the Lake City Contract with monthly meetings, and that the other defendants received regular reports about the contract. Contrary to plaintiffs' position, rather than supporting an inference of scienter, this regular monitoring of the Lake City Contract suggests diligence. *Yates*, 744 F.3d at 889 ("We view the frequency of accounting meetings as a sign of diligence rather than evidence of a nefarious purpose.").[23] And where, as here, there is no suggestion that management had access to underlying accounting data or knew that data was being manipulated, management's review of monthly reports and discussion of contract performance lends itself less to an inference of scienter and more to a benign interpretation as there are no facts alleged that would alert these executives to errors or flaws in the reports they reviewed. *See Zucco Partners, LLC v. Digimarc Corp.* 552 F.3d 981, 1000–01 (9th Cir. 2009).[24]

Finally, plaintiffs point to defendants' frequent public statements about the Lake City Contract and the merger synergies as evidence of scienter. For example, plaintiffs focus on a series of statements on the 2015 Form 10-K concerning the production volumes under the Lake

---

conveyed to management and related to the fraud or other allegations supporting scienter, the core operations inference will generally fall short of a strong inference of scienter." (quotation marks omitted)).

[23] *See also Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1246 (10th Cir. 2016) (assuming that "plaintiffs' allegations create an inference that the four executives were briefed on the underlying cost data while attending meetings where the three projects were discussed," but concluding that "mere attendance at meetings does not contribute to an inference of scienter").

[24] *Zucco Partners* found allegations that (i) "senior management . . . closely reviewed the [quarterly] accounting numbers;" (ii) that "top executives had several meetings in which they discussed quarterly inventory numbers;" (iii) that the company's "management had access to the purportedly manipulated quarterly accounting numbers;" and (iv) that "management analyzed the investor numbers closely" were insufficient to establish scienter. *Id.*

City Contract, the contract's contribution to the company's sales, and a warning that rising costs could have an adverse effect on profit margin. These facts also fall short of warranting a strong inference of scienter because the Complaint does not allege facts that suggest a level of direct involvement by any of the executives and thus establishes at most a very weak inference of scienter. *Cf. Kiken*, 155 F. Supp. 3d at 606 (finding plaintiffs satisfied scienter requirement based on numerous facts indicating direct, personal involvement in the subject of the misstatements). As described above, plaintiffs have failed to allege with particularity that the individual defendants were privy to information concerning cost overruns at the Lake City Plant but concealed this information from the public.[25] *Compare Zak*, 780 F.3d at 609 (concluding that plaintiffs satisfied scienter requirement where they alleged that "defendants knew that the FDA expected two successful . . . studies . . . [but] none of the defendants' statements to investors addressed this critical expectation").

In sum, plaintiffs' arguments that the individual defendants were intimately involved in the Lake City Contract and the merger synergies rest on little more than the nature of the defendants' executive positions with Alliant (for DeYoung) and Orbital ATK (for the other defendants), their review of monthly reports, and their signing of financial statements—facts which, without more detailed allegations, simply fall short of supporting a strong inference of scienter.

*Multiple "Red Flags" About Lake City Contract*

Plaintiffs' next set of scienter indicia are various so-called "red flags" that allegedly served to warn the individual defendants that the Lake City Contract was operating at a

---

[25] On the other hand, it appears from the Complaint that other individuals within Orbital ATK did know about the cost overruns but failed to report them up the chain of command.

significant loss and that Orbital ATK was experiencing problems with its internal controls.[26]
These red flags also fall short of warranting a strong inference of scienter.

The Fourth Circuit has recognized that the "presence of red flags, coupled with the breadth and gravity of a company's problems, may provide substantial weight to an inference that high level corporate agents must have been aware of the problems." *Yates*, 744 F.3d at 888 (quotation marks omitted).[27] Those red flags, however, must be "sufficient . . . to alert senior officers to the unreliability of statements about internal controls and financial information." *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 188 (4th Cir. 2009).[28] Moreover, when red flags are public knowledge, it substantially waters down any inference of scienter. *See Owens v. Jastrow*, 789 F.3d 529, 540 (5th Cir. 2015).[29] The red flags at issue in this case were either public knowledge or insufficient to alert defendants to the unreliability of the Lake City Contract accounting. Accordingly, none of them support a strong inference of scienter.

---

[26] The red flags include: (1) the twelve years of experience that Alliant had with manufacturing ammunition at Lake City under earlier contracts, including history of costs and supporting documentation; (2) the aggressive bid for the Lake City Contract, which was below historical costs; (3) the decision not to send the Lake City Contract to Vista, which was a more natural fit for the contract; (4) Orbital ATK's statements that the Lake City Contract had lower profit rates; (5) the SEC rules demanding close scrutiny of the contract, which required acknowledging the materiality of any amount that changed gains to losses; (6) the need to issue two restatements, one in March 2016 concerning long-term contracts and the other in February 2017 to correct the errors related to the Lake City Contract; (7) the fact that Orbital ATK needed several tries to identify correctly the magnitude of the loss on the Lake City Contract and in which fiscal year the loss should have been identified; (8) the high volume and low margin nature of manufacturing ammunition; (9) the fixed nature of production costs, which did not leave a lot of room for cuts in costs; (10) the fact that pricing would decline over the life of the contract; and (11) the failure to achieve the required cost savings over the many months of production before the Class Period.

[27] For instance, "[d]rastic overstatement of accounts, or other red flags, combined with alleged violations of [GAAP] may be enough to establish the requisite level of scienter." *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1267–68 (11th Cir. 2006).

[28] *See also In re Suprema Specialties*, 438 F.3d at 279 ("[C]ourts have recognized that allegations of [GAAP] violations, coupled with allegations that *significant* 'red flags' were ignored, can suffice to withstand a motion to dismiss." (emphasis added)).

[29] *See also Fire & Police Pension Ass'n of Colorado v. Abiomed, Inc.*, 778 F.3d 228, 244 (1st Cir. 2015) (concluding that a company's disclosures of its correspondence with the FDA "undercut any inference of scienter"); *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1211 (11th Cir. 2001) (concluding that disclosures of red flags "significantly undermine[d] any hint of fraud").

To begin with, as noted, many of Complaint's alleged red flags were public knowledge, diluting any significant inference of scienter that can be drawn therefrom. For example, Alliant's twelve years of experience with manufacturing ammunition at the Lake City Plant, Alliant's aggressive bid for the Lake City Contract, the fact that the Lake City Contract remained with Orbital ATK instead of going to Vista, and Orbital ATK's statements about lower profit margins all were public knowledge. Those red flags consequently do not support a strong inference of scienter. The remaining red flags fail to establish a strong inference of scienter because plaintiffs have not demonstrated that those red flags would have necessarily alerted the defendants' to the Lake City Contract accounting errors or Orbital's internal control issues.

To start with, the fact that SEC rules generally acknowledge the materiality of even small amounts of money when those amounts shift gains to losses is simply too generic to qualify as a significant red flag, as there is nothing in the SEC's requirement that should have alerted the individual defendants to the particular accounting problems with the Lake City Contract. Further, plaintiffs make much of the fact that Orbital ATK issued two restatements—one in March 2016 to correct errors in long-term contracts and the other in February 2017 (the Amended Form 10-K) to correct the errors concerning the Lake City Contract. According to plaintiffs, the first restatement should have alerted the individual defendants to potential weaknesses in their cost estimates for the Lake City Contract. This argument fails because the two restatements addressed different problems, and the need for a restatement related to one problem would not automatically signal the existence of other problems to directors. The first restatement addressed the proper application of the percentage-of-completion accounting method to long-term contracts, whereas the problem with the Lake City Contract concerned the inability to cut costs sufficiently. This difference negates any inference of scienter because the existence

of one problem does not necessarily alert managers to the existence of another, different problem.  *See In re Stonepath Grp., Inc. Sec. Litig.*, 397 F. Supp. 2d 575, 588 (E.D. Pa. 2005) (concluding that the "mere fact that there were three restatements [did not] show[] defendants acted recklessly" where the restatements addressed different problems).[30]  Accordingly, this set of red flags was not sufficient to alert the defendants to the Lake City Contract problems and accounting errors and does not support an inference of scienter.

Similarly, plaintiffs use another group of red flags—(i) the high volume and low margin nature of manufacturing ammunition; (ii) the fixed nature of production costs; (iii) the fact that pricing would decline over the life of the Lake City Contract; and (iv) the failure to achieve the required cost savings over the many months of production before the Class Period—to argue that the losses on the Lake City Contract were so obvious from the beginning that defendants either knowingly concealed or recklessly disregarded them.  In support of this argument, plaintiffs cite Pierce's acknowledgment in an August 10, 2016 conference call that the metal costs for ammunition are "pretty much fixed," which means that the "latitude that we have is labor costs and overheads and the like, so there's not a lot of room to move on that" as further evidence that the individual defendants were aware from the start of the difficulty of cutting costs on the contract.  Plaintiffs also point to the statements in the Amended Form 10-K that (i) a $31.5 million loss was "evident" from the contract signing; and (ii) that $342 million in losses "became evidence at the time of initial production" in the second quarter of fiscal year 2014 as evidence that defendants belatedly admitted their awareness of the losses.

---

[30] Even had the first restatement of earnings triggered by accounting errors alerted Thompson, Pierce, and Larson to the fact that there was another problem with the Lake City Contract, their failure to disclose that problem for several months does not support a strong inference of scienter.  As the Seventh Circuit has stated, "[t]aking the time necessary to get things right is both proper and lawful.  Managers cannot tell lies but are entitled to investigate for a reasonable time, until they have a full story to reveal."  *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 761 (7th Cir. 2007) .  Precisely this occurred here; an investigation for a reasonable time disclosed the additional problems with the Lake City Contract.

These red flags also fail to support a strong inference of scienter for the same reason noted above, namely that the Complaint contains no particularized factual allegations that connect the red flags with a specific problem with the Lake City Contract accounting. Specifically, the Complaint fails to provide any particularized facts showing that defendants had contemporaneous information indicating that their cost-cutting estimates were unrealistic. *See Anderson*, 827 F.3d at 1251 (concluding that plaintiffs failed to establish scienter partly because they did "not identify particularized facts showing that the [] executives had known, before [the company] publicly announced the forward loss, that the three projects would fall behind forecasts on cost or production").[31] Indeed, plaintiffs acknowledge that Orbital ATK managed to cut approximately $400 million in costs, one-half to two-thirds of defendants' goal, indicating that defendants' cost-cutting goals were not so quixotic as to amount to recklessness. (Compl. ¶¶ 134, 172). And the fact that Orbital ATK's management itself eventually disclosed the losses on the Lake City Contract further reduces an inference of scienter, for as the Fourth Circuit has noted, management's disclosure of an accounting problem "supports a strong inference that defendants were not acting with scienter but rather were endeavoring in good faith to inform the investing public." *Yates*, 744 F.3d at 888 (quotation marks omitted).

Finally, neither Pierce's statements on the August 10, 2016 conference call nor the statements in the Amended Form 10-K establish that defendants knew about the Lake City

---

[31] Plaintiffs argue that *Anderson* is inapposite because the projects in that case "encountered production delays and cost overruns" that resulted in hundreds of millions of dollars in losses, whereas in this case the individual defendants simply failed to estimate accurately how much costs could be reduced on the Lake City Contract. *Anderson*, 827 F.3d at 1235–36. Although plaintiffs are correct that this case does not involve unexpected delays or cost overruns in the production of ammunition, *Anderson* is nevertheless on point insofar as the executives' failure in that case, as here, to make accurate predictions concerning future events (whether in terms of delays or cost reduction estimates) does not in and of itself establish the requisite strong inference of scienter. Instead, as the *Anderson* court stated, plaintiffs must allege particularized facts showing that the executives were aware of the losses at the time of the public statement. *Compare In re Genworth*, 103 F. Supp. 3d at 767, 783–84 (concluding that plaintiffs satisfied scienter requirement where they alleged multiple facts showing that defendants had contemporaneous knowledge of relevant company problems, but failed to disclose those problems). This, plaintiffs here have not yet done.

Contract problems.  Viewed in context, Pierce was explaining that the estimate for projected losses provided on August 10, 2016 was a conservative one which took into account the difficulty in cutting labor and overhead costs.  And the statements in the Amended Form 10-K were not confessions about the executives' wrongdoing and knowledge with respect to the losses, but explanations that, under the percentage-of-completion method, the losses were evident at earlier dates and should have been recorded on those dates.  *See In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1174 (C.D. Cal. 2007) (concluding that an executive's "attempt to explain what had gone wrong" was not a "confession").  Defendants' statement concerning when the loss should have been reported was simply an admission that Orbital ATK violated GAAP with respect to the Lake City Contract, but it does not  serve to establish a strong inference of scienter.  *See Yates*, 744 F.3d at 887 ("The mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter." (quotation marks and brackets omitted)).

In sum, each of the red flags alleged in the Complaint was either public knowledge or insufficient to alert defendants to the problems with the Lake City Contract estimates and Orbital ATK's internal controls, and thus, none of those red flags can be the basis for the requisite strong inference of scienter.

***Magnitude of the Restatement***

Plaintiffs next concentrate on the sheer magnitude of the loss on the Lake City Contract, asserting that the large amount alone establishes scienter.  Although the Fourth Circuit has stated that "[i]nferential weight may be attributed to the magnitude of [accounting] errors," courts should do so "only in the context of [the company's] financial position."  *Matrix*, 576 F.3d at

184.  When placed in the context of Orbital ATK's overall financial position, the magnitude of the losses here are diminished and accordingly, do not support a strong inference of scienter.

In absolute terms, it is clear the $375 million loss on the Lake City Contract is significant and probative of scienter,[32] but to assess its full weight, the loss must be placed in context.  As noted in the March 8, 2017 and August 10, 2016 Orbital ATK conference calls, the Lake City Contract represented just 5% of the company's total sales as of August 10, 2016 (when the losses were first announced), and full-year revenue for 2016 was approximately $4.46 billion. Moreover, plaintiffs identify no other contracts that suffered from the same error as the Lake City Contract.  *Compare Matrix*, 576 F.3d at 184 (attributing weight to errors where defendant "had to pay more than $100 million (and review nearly 6,500 contracts) to identify and correct [accounting] errors—an enterprise that resulted in approximately 35,000 lines of adjustments to previous financial statements).  The Lake City Contract's relatively low contribution to Orbital ATK's total sales and the fact that no other contracts were similarly affected serve to diminish the weight these losses carry in establishing scienter.

For these reasons too, plaintiffs' reliance on the *Microstrategy* decision is unpersuasive. That case involved a company which reported a net income of $18.9 million over three years, when, in fact, the company lost $36 million during that time and also overstated its revenue by $66 million.  As the *Microstrategy* Court stated, the GAAP violations "and subsequent restatements [were] of such a great magnitude—amounting to a night-and-day difference with regard to [the company's] representation of profitability—as to compel an inference that fraud or recklessness was afoot."  *In re Microstrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 637 (E.D. Va. 2000).  This case does not present such a night-and-day scenario, as Orbital ATK's

---

[32] *See Anderson*, 827 F.3d at 1251 ("The loss of $434.6 million was undoubtedly significant."); *Matrix*, 576 F.3d at 184 (concluding that "[i]nferential weight" could be attributed to a $97 million loss).

restatement affected only a single contract amounting to 5% of the company's revenues, which reduces the inference of scienter that can be drawn from the $375 million loss.

In short, $375 million may be a significant amount of money in absolute terms but placed in the context of Orbital ATK's overall sales and other contracts, that amount of loss alone cannot establish a strong inference of scienter.

### Simplicity of the Accounting

Plaintiffs also contend that the simplicity of the percentage-of-completion accounting method establishes a strong inference of scienter. This argument is unpersuasive because plaintiffs do not actually show the simplicity of the method at issue, and courts have not explicitly recognized the percentage-of-completion method as giving rise to § 10(b) liability.

In some cases, the simplicity of an accounting method can serve as a basis for finding that individual defendants acted with the requisite level of scienter. *See In re Microstrategy*, 115 F. Supp. 2d at 638 (noting that an inference of scienter "takes on added significance if . . . the violated GAAP rules and Company accounting policies are, in fact, relatively simple."). For instance, the Fourth Circuit has noted that premature recognition of revenue, in some circumstances, can give rise to liability under § 10(b). *See Malone v. Microdyne Corp.*, 26 F.3d 471, 478 (4th Cir. 1994).[33] By contrast, in a more recent, post-PSLRA case, the Fourth Circuit rejected the argument that an alleged violation of the percentage-of-completion accounting method, among other indicia, established a strong inference of scienter. *Svezzese v. Duratek, Inc.*, 67 F. App'x 169, 173 (4th Cir. 2003) (per curiam) (unpublished).

In this case, plaintiffs' argument concerning the simplicity of the percentage-of-completion method is flawed in two respects. First, plaintiffs cite no authority indicating that the

---

[33] *See also In re Microstrategy*, 115 F. Supp. 2d at 638 (stating that a company's "premature or inappropriate recognition of revenue" can support a strong inference of scienter).

percentage-of-completion method—which requires companies to "first estimate the total costs of performing the contract and then compare or reconcile that estimate with accrued actual costs at regular intervals . . . over the life of the contract"[34]—is as simple as plaintiffs suggest. Indeed, the Fourth Circuit in *Svezzese* rejected plaintiffs' attempt to establish a strong inference of scienter on the basis of the simplicity of the percentage-of-completion method. *Id.* at 173. And, critically, unlike *Malone*, defendants did not prematurely recognize revenue on the Lake City Contract; the problem was caused by errant cost reduction estimates leading to significant contract losses. Stated another way, this is not a case where defendants counted their chickens before they hatched. Instead, defendants failed to estimate correctly how much the chickens would cost to produce, forcing defendants to correct their misstatements after discovering the true costs of the Lake City Contract. Plaintiffs' argument about the simplicity of the percentage-of-completion accounting method therefore does not establish a strong inference of scienter.

### *Departures, Firings, SEC Investigation, and SOX Certifications*

Plaintiffs' fifth set of scienter allegations focuses on (i) DeYoung's departure from the Orbital ATK Board as well as firings in the company; (ii) an SEC investigation against Orbital ATK; and (iii) Thompson and Pierce's signing of false SOX certifications. As explained below, none of these allegations support a strong inference of scienter.

Plaintiffs first argue that the timing of DeYoung's departure and the firing of other employees raise a strong inference of scienter. Plaintiffs focus on DeYoung's announcement that he would not seek re-election to Orbital ATK's Board of Directors on March 8, 2016—a week after Orbital ATK issued the first restatement relating to long-term contracts. Beyond the timing of his departure, however, plaintiffs provide no other allegations showing that his

---

[34] *Id.* at 171.

decision not to seek re-election had anything to do with the Lake City Contract. *See Zucco Partners*, 552 F.3d at 1002 (concluding that plaintiffs' allegation about timing of CFO's retirement did not support scienter allegations because the complaint did "not indicate whether [the CFO] was nearing retirement age, whether he left to pursue other opportunities, or even the length of his tenure"). Without more, this allegation cannot support an inference of scienter.

Plaintiffs' allegations that Orbital ATK fired employees in the Small Caliber Systems Division and the Defense Subgroup for improper accounting practices, and replaced the company's principal accounting officer since the merger, also fail to establish a strong inference of scienter. Orbital ATK disclosed in its Amended Form 10-K that an internal investigation determined that lower level individuals engaged in improper accounting behavior. Firing those individuals and the person responsible for the company's accounting suggests only that Orbital ATK sensibly sought to fix the problem that prevented full disclosure of the accounting problem with the Lake City Contract in the first place. It does not show that defendants knew about or recklessly disregarded the problem at the time the statements were made.

With respect to the SEC investigation and the SOX certifications, plaintiffs' arguments fare no better. The Fourth Circuit has stated that the allegation that the SEC is conducting an investigation "is too speculative to add much, if anything, to an inference of scienter." *Cozzarelli*, 549 F.3d at 628 n.2.[35] Likewise, plaintiffs' allegation concerning the false SOX certifications also adds nothing to the scienter analysis. *See Cozzarelli*, 549 F.3d at 628 n.2.[36]

---

[35] *See also Brophy v. Jiango Pharm., Inc.*, 781 F.3d 1296, 1304 (11th Cir. 2015) ("The mere existence of an SEC investigation . . . does not equip a reviewing court to explain which inferences might be available beyond a general suspicion of wrongdoing." (quotation marks omitted)).

[36] *See Zucco Partners*, 552 F.3d at 1003–04 ("Boilerplate language in a corporation's 10–K form, or required certifications under Sarbanes–Oxley . . . add nothing substantial to the scienter calculus."); *see also Garfield*, 466 F.3d at 1266 ("If we were to accept DeKalb's proffered interpretation of Sarbanes–Oxley, scienter would be established in every case where there was an accounting error or auditing mistake made by a publicly traded company, thereby eviscerating the pleading requirements for scienter set forth in the PSLRA. We decline to adopt

Because these factors add nothing to scienter analysis, the SEC investigation and SOX certifications cannot support a strong inference of scienter.

In sum, the firings and departures from Orbital ATK, the SEC investigation and the false SOX certifications suggest, at most, innocent inferences—not the nefarious ones required for a showing of scienter.

### Defendants' Motives

Plaintiffs conclude with a series of arguments related to defendants' motives—namely, (i) that Thompson, Pierce and Larson profited from their alleged fraud through incentive compensation; (ii) that Thompson and DeYoung profited through insider trading; and (iii) that Thompson and Pierce, in particular, faced pressure to make the merger successful. None of these financial motives, which are shared by most corporate executives, establish a strong inference of scienter.

With respect to the incentive compensation argument, the Fourth Circuit has made clear, "financial motivations common to every" officer are not a basis for inferring fraud. *Yates*, 744 F.3d at 891. In this regard, because "motivations to . . . increase one's own compensation are common to every company," these motivations "add little to an inference of fraud." *Cozzarelli*, 549 F.3d at 627.[37] But increasing the defendants' own compensation is precisely the motive plaintiffs allege here. Specifically, plaintiffs allege that Thompson, Pierce, and Larson received increases in their base salary and incentive compensation after the merger as well as incentive

---

such an interpretation."). The *Garfield* court held that a false SOX certification could be probative of scienter "if the person signing the certification was severely reckless" in doing so by having reason to know or suspect due to red flags that the financial statements contained material misstatements or omissions. *Garfield*, 466 F.3d at 1266. For the reasons stated above, plaintiffs' purported red flags are not sufficient to establish scienter, even in conjunction with the SOX certifications.

[37] *See also Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 623 (4th Cir. 1999) ("[A]llowing a plaintiff to prove a motive to defraud by simply alleging a corporate defendant's desire to retain his position with its attendant salary, or realize gains on company stock, would force the directors of virtually every company to defend securities fraud actions every time that company effected a merger or acquisition.").

compensation for their success in achieving certain integration milestones. Plaintiffs contend that the fact that the defendants' compensation was tied to the success of the merger supports a strong inference of scienter. This contention is unpersuasive, as the Fourth Circuit has made clear that a motive to increase one's own compensation "add[s] little to an inference of fraud." *Cozzarelli*, 549 F.3d at 627. Moreover, the Complaint fails to provide comparisons to prior years' bonuses, and as such, there is no evidence to suggest these bonuses were in any way unusual. *See Zucco Partners*, 552 F.3d at 1005. As a result, any inference of scienter that can be drawn from the incentive compensation is modest at best.

Beyond mere incentive compensation, plaintiffs contend that DeYoung and Thompson profited from their fraud through insider trading. In particular, plaintiffs allege that from March to June 2015, DeYoung sold nearly $14 million of Orbital ATK stock, which was nearly fourteen times his annual salary. These sales allegedly involved options that were not set to expire for several years, and DeYoung had not reported a sale of Alliant or Orbital ATK stock since December 2009. As for Thompson, plaintiffs allege that he sold 5,000 shares of Orbital ATK stock for $435,000 on May 17, 2016, several months before the disclosure of the Lake City Contract losses when the stock was trading for nearly $90 per share. Plaintiffs argue that DeYoung and Thompson's sales establish an inference of scienter, but neither argument is persuasive.

To be sure, the Fourth Circuit has stated that "[a]llegations of personal financial gain may weigh heavily in favor of a scienter inference," but the "inferential weight that may be attributed to any claim of motive must be evaluated in context." *Yates*, 744 F.3d at 890 (quotation marks omitted). As such, "[i]nsider trading allegations will only support an inference of scienter if the timing and amount of a defendant's trading were unusual or suspicious." *Id.* (quotation marks

omitted).  The Fourth Circuit considers factors such as "the amount of profit made, the amount of stock traded, the portion of stockholdings sold, or the number of insiders involved" to determine "whether an insider's stock sales were unusual in scope." *Id.* (quotation marks omitted).

These factors applied to Thompson and DeYoung's sales suggest the sales can carry only minimal weight in a scienter calculus.  To begin with, the number of insiders involved was small—only Thompson and DeYoung made allegedly suspicious sales while the plaintiffs allege nothing with respect to Pierce and Larson, the other two defendant insiders.  With respect to Thompson, the amount of his sales is not suspicious; he sold 5,000 shares out of over 100,000 outstanding shares, amounting to less than 5% of his holdings.  *See Cozzarelli*, 549 F.3d at 628 (concluding that sales of 13%, 12%, and 5% were "modest to de minimis").[38]  And although DeYoung sold more shares, he did so after leaving his CEO role at Alliant due to the merger (as plaintiffs point out, however, he did remain on the board of Orbital ATK).  Had DeYoung remained in his CEO role, the fact of his sales might support an inference of scienter, but it does not here as DeYoung's departure, rather than an intent to defraud, could have caused him to sell his stock.  *See Cozzarelli*, 549 F.3d at 628 (noting that two executives resigned from the company "around the time of their sales, indicating that their departures, rather than an intent to defraud, may have prompted them to sell their stock").  Furthermore, DeYoung's Form 4 and the chart of Orbital ATK stock prices reveal that DeYoung sold his shares when the stock was trading below $80 per share, which was below the Class Period high of $94.55 per share.

---

[38] Plaintiffs argue that the 5% figure is significant based on the *Microstrategy* decision, in which the court concluded that selling 5% of a company's shares was significant.  *In re Microstrategy*, 115 F. Supp. 2d at 646.  In that case, however, the 5% figure represented the aggregate sales as a percentage of the executives' holdings; in reality, the executives each sold between 10.3% and 51.8% of their total individual holdings.  *Id.*  Furthermore, the court's conclusion that a defendant's sales of 2.2% of his shares was significant was based on the fact that the entire sale occurred in an 8-day period after the company prematurely announced a "watershed" deal in the company's history. *Id.*  Here, Thompson sold his shares several months before Orbital ATK announced the losses on the Lake City Contract.  *See City of Brockton Ret. Sys. v. Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 475 (S.D.N.Y. 2008) ("[Defendant] sold his shares during April, more than ten weeks before the end of the putative class period.  The 10–plus week gap between the defendants' sales and the Company's disclosure of accounting problems is not strongly suspicious.").

Although an executive need not be "perfectly prescient"[39] in predicting when a company's stock might reach a high point, when defendants' sales occur at prices that were not especially high for the class period, any inference of scienter is reduced.

In sum, although Thompson and DeYoung's sales are relevant to the scienter analysis, the fact that other insiders did not also sell stock, combined with the flaws in plaintiffs' allegations with respect to DeYoung and Thompson, suggests these facts warrant at most a weak, and certainly not a strong, inference of scienter.

Finally, plaintiffs argue that Thompson and Pierce had a strong motive to commit fraud because they needed the merger to proceed and to appear successful in light of Orbital Sciences' performance issues leading up to the merger. This argument fails to persuade, for as the Fourth Circuit has noted, "assertions that a corporate officer or director committed fraud in order to retain an executive position, or retain such a position with the merged company, simply do not, in themselves, adequately plead motive." *Phillips*, 190 F.3d at 622–23. In this respect, the Second Circuit noted cogently that "[a]chieving a superior agreement with [the acquiring company] does not demonstrate defendants' intent to benefit themselves at the expense of the shareholders because the shareholders themselves would benefit from a superior transaction." *Kalnit v. Eichler*, 264 F.3d 131, 136, 140 (2d Cir. 2001). Accordingly, no strong inference of scienter can be drawn from Thompson and Pierce's widely-shared and understandable motive to make the merger successful.

To summarize, none of the motives plaintiffs allege—incentive compensation, insider trading or merger success—establish the requisite strong inference of scienter.

---

[39] *In re Microstrategy*, 115 F. Supp. 2d at 647.

Given none of these scienter indicia individually supports a strong inference of scienter, the next step is to consider the indications as a whole to ascertain whether together they warrant the requisite strong inference. As the Fourth Circuit has noted, this step requires courts to "evaluate plaintiffs' allegations of scienter holistically," giving the allegations only "the inferential weight warranted by context and common sense." *Yates*, 744 F.3d at 885 (quotation marks omitted). Importantly, "allegations of scienter that would not independently create a strong inference of scienter might [complement] each other to create an inference of sufficient strength to satisfy the PSLRA." *Id.* at 893.[40] With that said, plaintiffs' inference of scienter must still be weighed "against the opposing inferences that may be drawn from the facts in their entirety." *Id.* (quotation marks omitted). After "compar[ing] the malicious and innocent inferences cognizable from the facts pled in the complaint," the complaint survives only "if the malicious inference is at least as compelling as any opposing innocent inference." *Id.* (quotation marks omitted). Plaintiffs' allegations, considered holistically as required, fail to establish a strong inference of scienter, suggesting instead, at most, that defendants were negligent in their cost reduction estimates for the Lake City Contract and also negligent in failing to detect the losses as they occurred.[41]

Before conducting the holistic analysis, it is important to summarize the indicia established thus far. Plaintiffs' allegations that the individual defendants are high-level corporate officers who monitored the Lake City Contract through meetings and reports must be accepted.

---

[40] Some courts argue that this is not so, reasoning that zero plus zero plus zero plus zero cannot add up to an inference of scienter. *See, e.g.*, *City of Brockton*, 540 F. Supp. at 475. The flaw in this argument is the assumption that the individual indicia of scienter each amount to zero, not simply to a weak inference of scienter. Contrary to these courts' and defendants' reasoning, Fourth Circuit precedent dictates that allegations that are insufficient by themselves to create a strong inference of scienter can nevertheless add up to more than "zero" when considered together with all of plaintiffs' allegations. *See Yates*, 744 F.3d at 893.

[41] The failure to detect the losses as they occurred was the result chiefly of the actions of lower-level individuals who failed to report the losses and were later discharged as a result.

Furthermore, there is no question that the Lake City Contract was important to Orbital ATK's overall business, even if the contract did not rise to the level of a "core operation." The allegations in the Complaint also make clear that Alliant had significant experience in manufacturing ammunition, that Alliant won the Lake City Contract through an aggressive bid, and that the contract's profitability hinged on ambitious cuts to production costs. And the allegations also show that Orbital ATK's internal financial controls suffered from weaknesses, which necessitated the first restatement in March 2016 for several long-term contracts. Finally, there is no question from the allegations that Orbital ATK's corporate officers wanted the merger to be a success, and that DeYoung and Thompson also sold some of their stock before the August 10, 2016 announcement concerning the losses on the Lake City Contract.

The innocent inferences from these allegations taken as a whole are ultimately more compelling than the malicious ones. In *Svezzese v. Duratek*, the Fourth Circuit considered a complaint arising out of a similar factual background[42] and alleging almost exactly the same indicia of scienter.[43] The *Svezzese* Court determined that even holistically, plaintiffs' allegations failed to meet the requisite standard of scienter, noting that "these allegations [were] in essence, allegations of accounting irregularities and violations." *Id.* As the Fourth Circuit concluded, "plaintiffs' efforts to bootstrap their allegations into a strong inference of scienter through the additive effect of the individual allegations" failed because "missing from the complaint [was]

---

[42] Like the contracts at issue in *Svezzese*, the Lake City Contract was a long-term contract subject to the percentage-of-completion method and was important to Orbital ATK's overall revenue. Like the defendant in *Svezzese*, Orbital ATK had to track costs closely on the Lake City Contract to ensure its profitability, and like the *Svezzese* defendant Orbital ATK and the individual defendants allegedly failed to estimate the costs of the Lake City Contract due to weaknesses in accounting problems. Orbital ATK also had to issue a significant restatement of its earnings due to the company's accounting failures. *See* 67 F. App'x at 170-71.

[43] In *Svezzese*, as in this case, plaintiffs alleged that defendant acted with the requisite scienter because (i) the company "lacked internal controls;" (ii) the company "violated simple accounting rules;" (iii) the company "violated its own internal revenue recognition policy;" (iv) the company issued a large restatement; (v) the company's "accounting 'fraud' occurred at its principal division;" and (vi) the company "routinely understated expenses in a number of ways." *Id.* at 173.

the one essential ingredient necessary to establish the strong inference—some indication that defendants acted with fraudulent intent or recklessness." *Id.* at 174.

The Complaint here is missing that same essential ingredient—some indication that defendants intentionally concealed the losses on the Lake City Contract or recklessly failed to recognize the losses. Instead, the allegations point more compellingly in the opposite direction; Thompson, Pierce, Larson, and DeYoung were simply too optimistic with respect to their cost reduction estimates for the Lake City Contract, and the loss was obscured because lower-level employees concealed the accurate figures and full production on the contract did not begin until fiscal year 2014. Indeed, the Fourth Circuit has recognized that simply because corporate executives are "in over [their] head[s]" with respect to an accounting problem does not mean that they commit fraud. *Yates*, 744 F.3d at 893.

In sum, the facts alleged in the Complaint tell the following story:

- Alliant bid aggressively to win the Lake City Contract.

- The individual defendants knew the bid was aggressive and understood that cost reductions would be necessary to achieve a profit.

- Orbital ATK was successful in making some cost reductions but was not able to achieve the magnitude of cost reductions necessary for the contract to be profitable.

- At the same time, individuals below the top executive level did not adhere to company accounting policies and inappropriately concealed from top management information about the Lake City Contract's cost overruns.

- Roughly two years later, the executives discovered the Lake City Contract accounting errors in a company-wide effort to enhance internal controls and restated Orbital ATK's earnings to account for the errors.

These facts fall short both individually and holistically of establishing a strong inference of scienter. As the Supreme Court has made clear, a § 10(b) claim survives a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as

compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc.*, 551 U.S. at 324. The facts alleged here may very well reflect an absence of care on the part of the defendants, but the facts do not warrant an inference that the defendants knew about or recklessly disregarded the errors in the Lake City Contract cost-reduction estimates. Put simply, the negligent or innocent inference is more compelling than the inference of scienter. Accordingly, plaintiffs' § 10(b) claims against Thompson, Pierce, Larson, and DeYoung must be dismissed, but plaintiffs should be given leave to amend if plaintiffs can state additional particularized facts that warrant a strong inference of scienter.

## IV.

The final issue with respect to plaintiffs' § 10(b) claims is whether Orbital ATK itself can be liable despite the dismissal of plaintiffs' claims against the individual defendants. As the Fourth Circuit stated in *Yates*, where a plaintiff "alleges corporate fraud, the plaintiff must allege facts that support a strong inference of scienter with respect to at least one authorized agent of the corporation." *Yates*, 744 F.3d at 885. Under this rule, plaintiffs fail to state a claim against Orbital ATK because plaintiffs' claims against the authorized agents—Thompson, Larson, and Pierce—must all be dismissed.

The fact that some lower-level employees may have acted with the requisite scienter in failing to disclose problems with the Lake City Contract does not alter this conclusion because plaintiffs do not allege that any of these employees made false or misleading statements. *See Mizzaro v. Home Depot*, 544 F.3d 1230, 1254–55 (11th Cir. 2008) (concluding that complaint failed to establish a strong inference of scienter with respect to a corporate defendant because

there were no allegations that unnamed officials "were both responsible for issuing the allegedly false public statements and were aware of the alleged fraud").[44]

Leave to amend, however, is appropriate. Plaintiffs allege that Orbital ATK fired Hollis M. Thompson, the company's Vice President of Financial Reporting and the principal accounting officer, on February 27, 2017, and that he signed several of the forms Orbital ATK submitted to the SEC. Hollis Thompson is not a defendant in this action, and it is not clear from plaintiffs' complaint that Thompson can be liable for all the allegedly false and misleading statements. Because Hollis Thompson appears to qualify as the kind of authorized agent whose statements could permit corporate liability, however, leave to amend is appropriate so that plaintiffs may have another chance to establish whether Orbital ATK itself is liable. *See In re Comput. Sci. Sec. Litig.*, 890 F. Supp. 2d 650, 665 (E.D. Va. 2012) (giving leave to amend to allow plaintiffs another chance to plead facts that would establish corporate liability where the "pleading deficiencies . . . might be remedied by the allegation of additional or more detailed facts").

## V.

Plaintiffs also bring claims under § 20(a) of the Exchange Act against Thompson, Pierce, and Larson based on their positions as controlling persons of Orbital ATK. Section 20(a) provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable." 15

---

[44] Corporate scienter can be established even where plaintiffs cannot name individual defendants where the company makes so dramatic a statement that the statement must have been "approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false." *Matrix*, 576 F.3d at 190 (quotation marks omitted). For instance, if "General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero," that allegation would be sufficient to establish corporate scienter without naming the individuals "who concocted and disseminated the fraud." *Id.* (quotation marks omitted). Orbital ATK's statements concerning the company's post-merger performance and the Lake City Contract are not so dramatic as to permit a strong inference of corporate scienter under this rule.

U.S.C.§ 78t(a). Accordingly, § 20(a) "liability is derivative of § 10(b)." *Yates*, 744 F.3d at 894 n.8. Because plaintiffs' § 10(b) claims against Thompson, Pierce, and Larson fail, their § 20(a) claims against these defendants also fail. *Id.*

In sum, plaintiffs' § 10(b) claims against Orbital ATK and the individual defendants, as well as their § 20(a) claims against Thompson, Pierce, and Larson, must be dismissed for failure to state a claim for relief. Plaintiffs must be given an opportunity to file an amended complaint, however, as they may yet be able to allege facts establishing a strong inference of scienter with respect to the company or to an individual officer.

Alexandria, Virginia
September 26, 2017

/s/

T. S. Ellis, III
United States District Judge

41