**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

**STEVEN KNURR, *et al.*,** )
    **Plaintiffs,** )
  )    **Case No. 1:16-cv-1031**
    **v.** )
  )
**ORBITAL ATK INC., *et al.*,** )
    **Defendants.** )
  )

## <u>MEMORANDUM OPINION II</u>

Plaintiffs in this federal securities class action allege claims under (i) § 10(b) and Rule

10b-5; (ii) § 14(a) and Rule 14a-9; and (iii) § 20(a) of the Securities Exchange Act of 1934

("Exchange Act"). Defendants seek threshold dismissal of claims under all three provisions, and

this memorandum opinion addresses the questions presented under § 14(a) and the related §

20(a) claims. Specifically, those questions are as follows:

> (1) whether the proxy statements alleged to violate § 14(a) of the Exchange Act are (i)
> statements of fact; or (ii) merely expressions of opinion; and, if those misrepresentations
> are expressions of opinion, whether the Complaint[1] alleges facts that warrant an inference
> that the defendants did not actually hold those opinions;
>
> (2) whether under § 14(a) of the Exchange Act plaintiffs must allege and prove facts
> showing that the defendants' proxy statement misrepresentations (i) were made with
> fraudulent intent or reckless disregard of the truth; or (ii) whether it is sufficient that the

---

[1] On August 12, 2016, named plaintiff Steven Knurr filed this action against Orbital ATK, Thompson, and Pierce individually and on behalf of other Orbital ATK stockholders. Thereafter, the Construction Laborers Pension Trust of Greater St. Louis ("St. Louis Laborers"), the Arkansas Teacher Retirement System, and two institutional investors filed motions for appointment as lead plaintiff and approval of the proposed lead plaintiff's choice of counsel. Following briefing and oral argument on these motions, a memorandum opinion and order issued on November 10, 2016 appointing (i) St. Louis Laborers as lead plaintiff, (ii) Robbins Geller Rudman & Dowd LLP as lead counsel, and (iii) Craig C. Reilly as liaison counsel. *See Knurr v. Orbital ATK, Inc.*, 220 F. Supp. 3d 653 (E.D. Va. 2016). St. Louis Laborers was then granted leave to file its own complaint, which it did on April 24, 2017. This complaint names Orbital ATK, Thompson, Pierce, DeYoung, and Larson and is the sole operative complaint in this action ("Complaint").

Complaint alleges facts that warrant an inference that the misstatements were made negligently;

(3) whether under § 14(a) of the Exchange Act, the Complaint alleges a claim against an authorized agent of the corporate defendant and thus adequately states a claim against the corporate defendant; and

(4) whether under § 20(a) of the Exchange Act, the Complaint alleges that the defendants had control over any person liable under § 14(a) of the Exchange Act.

These questions have been fully briefed and argued and are now ripe for resolution.

## I.

Before reciting the pertinent facts, it is important to identify the proper source of those facts. First, as the parties agree and as settled precedent requires, the facts recited here are taken chiefly from the Complaint's factual allegations, which must be accepted as true at this stage. *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 625 (4th Cir. 2008) (noting that at the motion to dismiss stage, "we must accept plaintiffs' factual allegations as true"). Defendants have also sought to have additional facts considered by attaching various exhibits to the motion to dismiss.[2] Only certain of these documents are appropriately considered at this stage.

Settled circuit authority permits courts to consider external documents in a motion to dismiss when they "are integral to and explicitly relied on in the complaint, and when the plaintiffs do not challenge the document's authenticity." *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606–07 (4th Cir. 2015) (quotation marks and brackets omitted). The SEC filings attached to defendants' dismissal motion, the transcripts of the August 10, 2016, November 8,

---

[2] Defendants' additional documents include: (1) Excerpts from a number of Orbital ATK's and Alliant's forms filed with the U.S. Securities and Exchange Commission ("SEC"), such as forms 10-K and 8-K; (2) Orbital Sciences' Schedule 14A form and Alliant's Form 424B3; (3) Form 4s for defendants Thompson and DeYoung for the period of May 28, 2015 to August 9, 2016 (the class period), which were filed with the SEC; (4) A chart summarizing Orbital ATK's historical stock prices; (5) Transcripts from Orbital ATK's earning conference calls held on (i) August 10, 2016, (ii) November 8, 2016, and (iii) March 8, 2017; (6) A transcript of Alliant's earnings conference call held on August 1, 2013; and (7) Analyst reports from (i) Barclays, dated August 10, 2016, (ii) KeyBanc Capital Markets, dated August 11, 2016, and (iii) Wells Fargo, dated August 23, 2016.

2016, and March 8, 2017 Orbital ATK conference calls, and the Wells Fargo and Barclays analyst reports are integral to or explicitly referenced in the Complaint, and plaintiffs do not challenge their authenticity.  Accordingly, these documents are appropriately considered at this stage.  Similarly, because the Fourth Circuit permits courts to take "judicial notice of published stock prices without converting a motion to dismiss into a motion for summary judgment," it is also appropriate to consider the chart summarizing Orbital ATK's historical stock prices.  *Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 655 (4th Cir. 2004).  By contrast, Alliant's August 1, 2013 conference call is not referenced in the Complaint, nor does the Complaint cite the KeyBank analyst report, so it is inappropriate to consider these documents at the motion to dismiss stage.

## II.

The corporate defendant, Orbital ATK, is an aerospace and defense company formed from the 2015 merger of Alliant Techsystems, Inc. ("Alliant") and Orbital Sciences Corporation ("Orbital Sciences").  With respect to § 14(a), the Complaint also names the following three individual defendants:

(1)  Defendant David W. Thompson, who served as Chairman of the Orbital Sciences Board, CEO, and President of Orbital Sciences prior to the merger;

(2) Defendant Garrett E. Pierce, who was Vice Chairman of the Orbital Sciences Board and CFO of Orbital Sciences prior to the merger; and

(3) Defendant Mark W. DeYoung, who was CEO and President of Alliant prior to the merger.

Prior to their merger, Orbital Sciences and Alliant were both publicly traded aerospace and defense companies that sold products such as rockets and satellites to NASA and the United States military.  Of particular importance to this case, Alliant entered into a major ammunition supply contract ("Lake City Contract") with the United States Army in 2000.  Alliant

manufactured billions of rounds of small caliber ammunition under this contract at the Lake City Plant in Independence, Missouri which accounted for 13% of Alliant's total revenues in fiscal year 2010. In fiscal year 2010, Alliant received a four-year renewal on the Lake City Contract. In August 2012, Alliant submitted a bid to the Army to retain the Lake City Contract beyond 2013. The Complaint alleges that Alliant was under pressure to retain the Lake City Contract because Alliant had recently lost a bid to renew another major multi-year ammunition Army contract to Alliant's competitor, BAE Systems PLC. Accordingly, the Complaint alleges that Alliant and DeYoung "aggressively bid" on the Lake City Contract renewal with a "low-ball bid." (Compl. ¶¶ 47, 38). Alliant and DeYoung's plan worked, as Alliant won the renewal of the Lake City Contract on September 28, 2012 for a seven-year term with a three-year extension option and production to begin on October 1, 2013.

Shortly after production began on the Lake City Contract, Orbital Sciences and Alliant announced they planned to merge to form Orbital ATK. As a result of the merger, Orbital Sciences shareholders would receive .449 shares of Alliant stock for each share they held of Orbital Sciences stock, and Alliant would change its name to Orbital ATK.

On December 17, 2014, Alliant and Orbital Sciences filed a joint proxy statement ("Joint Proxy Statement") with the SEC concerning the proposed merger. The Joint Proxy Statement contained a letter signed by DeYoung to Alliant shareholders, who had to approve the issuance of Alliant common stock to Orbital Sciences shareholders, and a second letter signed by Thompson to Orbital Sciences shareholders, who had to approve the merger agreement. Each company held a special shareholders meeting in January 2015, and in February, the shareholders of each company voted to approve the merger.

A little more than one year after the merger, Orbital ATK announced (i) that the company would not be able to file its quarterly report for second quarter 2016 on time; (ii) that the company's  previously issued quarterly and annual financial statements in fiscal year 2015, transition period 2015, and first quarter 2016 were no longer reliable; (iii) that the company would have to restate its financial statements because of material misstatements related to the Lake City Contract; and (iv) that the company's internal financial controls were ineffective and weak.  Orbital ATK ultimately filed two restatements with the SEC.  These restatements confirmed that Alliant had submitted a significantly low bid for the Lake City Contract and that although Orbital ATK had achieved some cost reductions, those reductions were not sufficient to achieve profitability over the life of the Lake City Contract.  Moreover, once misstatements in the Lake City Contract were corrected, it became clear that the costs of the Lake City Contract would exceed its revenues over the life of the contract, which meant that the entire anticipated forward loss should have been recorded when the loss became evident.  Orbital ATK determined that $32 million of the loss should have been evident when the contract was signed in the second quarter of fiscal 2013, and $342 million should have been evident in the second quarter of fiscal 2014.

After these restatements were issued, plaintiffs filed this action alleging, among other claims, that defendants made a series of misleading or false statements in the Joint Proxy Statement filed with the SEC and disseminated to shareholders of Orbital Sciences and Alliant. Specifically, the Complaint identifies four categories of misrepresentations: (i) statements regarding Alliant's financial results; (ii) statements regarding the Lake City Contract; (iii) statements regarding Alliant's internal controls; and (iv) statements regarding the fairness of the Exchange Ratio and the merger ("Fairness Statement").  These misrepresentations, plaintiffs

contend, led to the overvaluing of Alliant and affected the Exchange Ratio to the detriment of Orbital Sciences shareholders. Plaintiffs request damages to recover for losses suffered by Orbital Sciences shareholders. The following is a brief summary of each of the four categories of proxy statement misrepresentations and the ways in which the Complaint alleges they are misleading.

***Statements Regarding Alliant's Financial Results***

The Joint Proxy Statement included historical financial information for Alliant—namely, the financial results from fiscal years 2013, 2014 and the first half of 2015. The results from 2013 and 2014 were derived from audited consolidated financial statements, while the 2015 results were derived from Alliant's quarterly report on Form 10-Q.

The Complaint alleges that these statements were false and misleading because, as a result of the Lake City Contract losses, Alliant's Gross Profit, Operating Income and Earnings Per Share were substantially overstated. For example, the financial statements incorporated in the Joint Proxy Statement stated Gross Profit for the first half of fiscal year 2015 as $611 million. That value, however, was overstated by approximately $9 million.

***Statements Regarding the Lake City Contract***

The Joint Proxy Statement also incorporated by reference Alliant's 2014 Form 10-K. This 10-K Form described the size of Lake City's operations and the contributions of the Lake City Contract to Alliant's overall financial results. Specifically, the Form 10-K stated that the Lake City Contract contributed 14% to the total fiscal 2013 sales and 15% of the total fiscal 2012 sales. The Joint Proxy Statement stated that Alliant had experienced lower profit rates in that division, owing to the competitive bid on the contract

The Complaint alleges that these statements were false and misleading because Alliant was not deriving profits from the Lake City Contract but instead was incurring substantial losses on sales; bullets were sold at negative margins and a significant loss, not simply at a lower profit.

***Statements Regarding Alliant's Internal Controls***

The Joint Proxy Statement also incorporated various representations and warranties made by Alliant. Specifically, those warranties stated that Alliant maintained the disclosure procedures required by Rule 13a-15 or 15d-15 under the Exchange Act and that the company had not identified any material weaknesses in its internal controls. The Complaint alleges that the forms incorporated by reference in the Joint Proxy Statement contained similar misstatements about the nature of Alliant's internal controls.

The Complaint alleges that these statements were false and misleading because Alliant had failed to record forward loss on the Lake City Contract in violation of Generally Accepted Accounting Principles ("GAAP") and Alliant's accounting policy. As such, contrary to the representations in the Joint Proxy Statement, Alliant was suffering from material weaknesses in its accounting procedures.

***Fairness Statement***

Finally, the Joint Proxy Statement included a statement from the Orbital Sciences Board which noted that "[a]fter careful consideration . . . [the directors] determined that the transaction agreement and the merger transactions . . . are advisable, fair to and in the best interests of Orbital [Sciences] and its stockholders." (Compl. ¶ 261). The Complaint alleges that these statements concerning Orbital ATK's merger synergies were false and misleading. In particular, plaintiffs contend that because Alliant's financial results were based on accounting errors, the merger was not, in fact, advisable, fair to, or in the best interests of Orbital Sciences.

With respect to the Fairness Statement, defendants contend that this misrepresentation is not an actionable statement of fact under § 14(a) and is, instead, an expression of opinion. As to the other three categories of statements—regarding Alliant's financial results, the Lake City Contract, and Alliant's internal controls—defendants do not dispute at this stage that those misrepresentations are materially false and misleading statements of fact. With respect to these misrepresentations, defendants dispute whether the Complaint has alleged facts sufficient to show that defendants acted with the requisite state of mind in including the statements in the Joint Proxy Statement. These arguments are addressed in turn.

### III.

Section 14(a) of the Exchange Act makes it unlawful for any person "to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security" in violation of the rules and regulations prescribed by the Commission. 15 U.S.C. § 78n(a)(1). Pursuant to this prohibition, Rule 14a-9 provides that "no solicitation . . . shall be made by means of any proxy statement . . . containing any statement which, . . . is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading . . . ." 17 C.F.R. § 240.14a-9(a).

Thus, to establish a § 14(a) claim, plaintiffs must allege and prove: "(1) the proxy statement contained a material misrepresentation or omission (2) that caused the plaintiff injury and that (3) the proxy solicitation was an essential link in the accomplishment of the transaction." *Hayes v. Crown Centr. Petrol. Corp.*, 78 F. App'x 857, 861 (4th Cir. 2003) (per curiam) (unpublished) (citing *Gen. Elec. Co. v. Cathcart*, 980 F.2d 927, 932 (3rd Cir. 1992) (citing *Mills v. Elec. Auto-Lite Co*., 396 U.S. 375, 385 (1970))).

Neither § 14(a) nor the applicable regulations specify the culpable state of mind required for liability under § 14(a)—intentional fraud or negligence. And interestingly, both the Supreme Court and the Fourth Circuit have expressly declined to determine the state of mind of a defendant required to establish § 14(a) liability. *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 444 n.7 (1976) ("Our cases have not considered, and we have no occasion in this case to consider, what showing of culpability is required to establish the liability under § 14(a) . . . ."); *Hayes*, 78 F. App'x at 864 n.1 ("We note, however, that the Supreme Court has not determined whether it is necessary to demonstrate scienter to satisfy the "knowing" element of a Section 14(a) claim.").

## A.

The first question to address is whether the alleged misstatements are statements of fact or merely expressions of opinion. To establish liability under § 14(a), plaintiffs must allege and prove that a proxy statement contains "material misrepresentations or omissions," which arise from statements of fact or expressions of opinion. *Hayes*, 78 F. App'x at 86. Where the misrepresentations are statements of fact, the plaintiff need only plead that those facts are objectively false. By contrast, where the misrepresentations are expressions of opinion, plaintiffs must show those opinions are both objectively and subjectively false.

Defendants in this case do not contest at this stage that three categories of misrepresentations—(i) the statements about Alliant's financial results; (ii) the statements about the Lake City Contract performance; and (iii) the statements about Alliant's internal controls— are statements of fact, which the Complaint adequately alleges are false. By contrast, defendants contend that the fourth category of misrepresentation—the Fairness Statement—is an expression of opinion and that plaintiffs have failed to allege that the opinion is both objectively and

subjectively false as required to state a claim under § 14(a). Plaintiffs argue that the Fairness Statement expresses fact, not an opinion. Moreover, plaintiffs also contend that even if the statement is one of opinion, it meets the standards required to plead a material misrepresentation. To address these arguments, it is necessary first to resolve the question whether the Fairness Statement is a fact or an opinion.

The Supreme Court recently opined on the difference between fact and opinion pursuant to § 11 of the Securities Act of 1933 ("Securities Act"), which contains language similar to that of Rule 14a-9.[3] A fact "is a thing done or existing or an actual happening," whereas an opinion is "a belief, a view, or a sentiment which the mind forms of persons or things." *Omnicare Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1325 (2015) (internal citations and quotation marks omitted). The most important distinction between fact and opinion is that a statement of fact "expresses certainty about a thing, whereas a statement of opinion . . . does not." *Id.*

As plaintiffs rightly recognize, the Fairness Statement does express a degree of certainty about a thing. Instead of using words like "believe" or "think," the statement about the fairness of the merger says the directors "determined" that the transaction was fair and advisable "after careful consideration." (Compl. ¶ 261). By saying the directors "determined" that the merger was advisable, fair and in the best interest of stockholders, the directors expressed these notions as "things done or existing," not "beliefs or views." *See Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 605 n.4 (E.D. Va. 2015) (finding statements are not statements of

---

[3] Section 11 of the Securities Act provides: "In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security . . . [may] sue." 15 U.S.C. § 77k(a).

opinion because they "do not contain the words 'believe' or 'think' but instead suggest a greater sense of certainty").[4]

Importantly though, the subject concerning which the directors express certainty in the Fairness Statement is decidedly within the realm of opinion. Specifically, the directors determined that the merger was "fair," "advisable," and in the "best interest of shareholders." The fairness or advisability of a course of action is a matter of business judgment, not objective fact. *See Henry v. Champlain Enters., Inc.*, 445 F.3d 610, 619 (2d Cir. 2006) ("There is no universally infallible index of fair market value. There may be a range of prices with reasonable claims to being fair market value."). Plaintiffs argue that the accurate Lake City Contract financial results would have revealed that the merger was unfair. Yet, plaintiffs fail to identify an objective standard that defendants could have used in assessing the fairness or advisability of a merger. *See Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011). Thus, even had the Orbital Sciences Board known about and considered the Lake City Contract accounting errors, there is no guarantee the Board would have delivered a different opinion as to fairness.

In short, the Fairness Statement is plainly an expression of opinion and thus is not actionable unless facts are alleged that show the opinion is both (i) objectively false; and (ii) subjectively false—that is, the directors did not actually believe the statement they were making.

The starting point in assessing whether the Fairness Statement—an opinion—can still amount to a material § 14(a) misrepresentation is the standard the Supreme Court provided in *Virginia Bankshares v. Sandberg*. In *Virginia Bankshares*, minority shareholders brought § 14(a) claims against bank executives based on proxy solicitations in which the executives recommended a merger because the merger would give minority shareholders a "high" value for

---

[4] *See also In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 775-76 (E.D. Va. 2015).

their stock.  501 U.S. 1083, 1083 (1991).  The Supreme Court in that case addressed the standard

courts should apply in determining whether a statement of opinion is false and thus actionable

under § 14(a).  Specifically, an opinion can be false in two ways.  An opinion can be objectively

false—i.e., the opinion is "misleading about the stated subject matter"—and subjectively false—

i.e., the opinion is a "misstatement of the psychological fact of the speaker's belief in what he

says."  *Id.* at 1095; *see Ridler v. Hutchinson Tech. Inc.*, 216 F. Supp. 3d 982, 990 (D. Minn.

2016) ("A fairness opinion . . .  is subjectively false if the speaker does not, in fact, believe the

subject matter of the opinion to be fair.") (citations omitted).  In *Virginia Bankshares*, the Court

considered whether an opinion that is simply subjectively false is actionable and determined that

"disbelief or undisclosed motivation, standing alone, [is] insufficient to satisfy the element of

fact that must be established under § 14(a)."  *Virginia Bankshares*, 501 U.S. at 1096.

Although the Supreme Court did not directly address opinions that are objectively false

but subjectively true under § 14(a), other courts have found that those opinions are similarly not

actionable.[5]  Importantly, the Fourth Circuit has required plaintiffs pleading opinions as false

factual statements to "allege that the opinion expressed was different from the opinion actually

held by the speaker."  *Nolte v. Capital One Fin. Corp.*, 390 F.3d 311, 315 (4th Cir. 2004).

Moreover, the Supreme Court has recently suggested that an opinion under § 11 of the Securities

Act is only "an untrue statement of fact—namely, the fact of [the speaker's] own belief—if [the

speaker] kn[ows]" the statement is untrue.  *Omnicare*, 135 S. Ct. at 1326.

In sum, to survive a motion to dismiss, the Complaint must allege facts that warrant an

inference that the opinions in a proxy statement are both objectively false and subjectively

false—that is, the individuals making those statements did not actually believe them.

---

[5] *See also In re Neustar Sec.*, 83 F. Supp. 3d 671, 683 (E.D. Va. 2015); *In re Reliance Sec. Litig.*, 135 F. Supp. 2d
480, 515 (D. Del. 2001); *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1265 (N.D. Cal. 2000);
*Freedman v. Value Health, Inc.*, 958 F. Supp. 745, 752-53 (D. Conn. 1997).

These standards, applied here, compel the conclusion that plaintiffs have failed to demonstrate the Fairness Statement is a material misrepresentation as required under § 14(a). The Complaint alleges that the statement is objectively false—i.e., the merger was not fair—but fails to allege that the directors did not *sincerely believe* the merger was fair to Orbital Sciences shareholders. Indeed, plaintiffs expressly cabin their § 14(a) claims, asserting that Thompson and Pierce "lacked a reasonable basis" to conclude the merger was fair, not that those directors did not truly believe it was so. (Compl. ¶ 262(g)). To establish a claim under § 14(a) on the basis of this statement, plaintiffs would have to allege that the directors knew about the Lake City Contract accounting errors and as a result, did not truly believe the merger was fair or advisable. Plaintiffs have not alleged as much, and as such, this statement cannot support a § 14(a) claim.

As an alternative, plaintiffs maintain they have adequately alleged that the directors omitted facts necessary to ensure the Fairness Statement was not misleading. In *Omnicare v. Laborers District Council Construction Industry Pension Fund*, the Supreme Court described the ways an opinion could be misleading under § 11 of the Securities Act.[6] Beyond being subjectively and objectively false, an opinion can create liability under § 11 if the opinion "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself . . . ." *Omnicare*, 135 S.Ct. at 1329. For example, an opinion stating that a company's actions are legally compliant is misleading if: (i) there was no "meaningful legal inquiry" to support that opinion; (ii) the opinion was stated "in the face of [a] lawyer's contrary advice;" or (iii) the opinion was stated "with knowledge that the Government was taking the opposite view." *Id.* at

---

[6] As mentioned above, § 11 contains language similar to Rule 14a-9. *See supra* note 3.

1328-29. Importantly, these examples require either a total lack of inquiry or actual knowledge of contrary facts, neither of which exists in this case. Indeed, plaintiffs recognize that the directors conducted a nine-month inquiry into Alliant, and the Complaint expressly states that the Joint Proxy Statement claims "are based solely on negligence, and not on knowing or reckless conduct." (Compl. ¶¶ 61, 240).

In sum, the Fairness Statement in the Joint Proxy Statement is an opinion because the subject of the statement is not a matter of objective fact. To avoid threshold dismissal with respect to the Fairness Statement, plaintiffs must therefore plead facts which warrant an inference that the Fairness Statement was both objectively and subjectively false—that is, the directors did not sincerely hold the belief that the merger was fair. Because plaintiffs have not alleged facts that the directors did not sincerely believe the merger was fair, plaintiffs have not alleged the statement was subjectively false and thus, the Fairness Statement cannot support a claim under § 14(a). Accordingly, the motion to dismiss on this ground must be granted without prejudice and with leave to amend pursuant to Rule 11, Fed. R. Civ. P., if plaintiffs can allege facts that support an inference that the directors did not believe the merger was fair when the directors included the Fairness Statement in the Joint Proxy Statement.

**B.**

The next question is whether the Complaint alleges facts sufficient to show that defendants acted with the requisite state of mind in making the remaining three categories of misrepresentations in the Joint Proxy Statement. Specifically, plaintiffs claim the Joint Proxy Statement contained three additional sets of misrepresentations of material fact: (i) statements about Alliant's financial results; (ii) statements regarding the Lake City Contract; and (iii) statements about Alliant's internal controls and compliance with accounting procedures.

Defendants move to dismiss the claims based on these statements, arguing that plaintiffs have failed to allege that defendants acted with the required state of mind when they signed the Joint Proxy Statement containing the misrepresentations. Specifically, defendants assert that § 14(a) and the PSLRA require that plaintiffs plead facts that raise a strong inference of scienter and that plaintiffs here have failed to do so. In contrast, plaintiffs contend that the proper standard is negligence and that the PSLRA does not apply to § 14(a). As a result, plaintiffs argue that the allegations in the Complaint adequately plead a § 14(a) claim.

The threshold question to address before assessing the adequacy of plaintiffs' allegations is whether § 14(a) requires scienter or merely negligence. The Supreme Court has made clear that when interpreting a statute, "the starting point . . . is the language itself." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980). In this regard, "[i]f the statutory language is plain," a court "must enforce it according to its terms." *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015). At the same time, the Supreme Court has recently explained that statutory interpretation properly proceeds "with reference to the statutory context, 'structure, history, and purpose,'" as well as "common sense." *Abramski v. United States*, 134 S. Ct. 2259, 2267 (2014) (quoting *Maracich v. Spears*, 133 S. Ct. 2191, 2209 (2013)).

A plain text reading of § 14(a) with reference to the statutory context suggests the provision contemplates a negligence, not a scienter requirement. To begin with, neither the text of § 14(a) nor Rule 14a-9 refers to a specific state of mind. *See* 15 U.S.C. § 78(n); 17 C.F.R. § 240.14a-9. Importantly, where Congress has intended a scienter requirement, it has used words like "manipulative," "deceptive," "device," or "contrivance" to describe the state of mind required to establish liability, and the rules promulgated pursuant to those statutory provisions have used terms like "scheme" or "artifice to defraud." *See, e.g.*, 15 U.S.C. § 78(j)(b); 17 C.F.R.

§ 240.10b-5. As the Supreme Court has noted, terms like "'device,' 'scheme,' and 'artifice,' all connote knowing and intentional practices." *Aaron v. SEC*, 446 U.S. 680, 696 (1980). By contrast, the plain text in § 14(a) and Rule 14a-9 conspicuously excludes these words. And significantly, where Congress has omitted such fraud-like words in other areas of securities law, courts have uniformly applied negligence standards. For example, § 11 of the Securities Act, like § 14(a), "proscribes a type of disclosure or lack of it, i.e., false or misleading statements or omissions of material facts, . . . [and] enumerates specific classes of individuals who bear liability for failure to meet the required standard of disclosure." *Gould v. Am.-Hawaiian S.S. Co.*, 535 F.2d 761, 777 (3d Cir. 1976). It is well-established that § 11 claims do not require the buyer to prove that the defendant acted with any intent to deceive or defraud. *Omnicare*, 135 S. Ct. at 1323 (citing *Herman & Maclean v. Huddleston*, 459 U.S. 375, 381-82 (1983)). Similarly, § 17(a)(2) of the Securities Act prohibits any person from obtaining money or property "by means of any untrue statement of a material fact or any omission to state a material fact." 15 U.S.C. § 77q(a)(2). And because that section is "devoid of any suggestion whatsoever of a scienter requirement," scienter is not required under § 17(a)(2). *Aaron*, 446 U.S. at 696-97.

Finally, the majority of circuits to address the question whether § 14(a) requires negligence or fraud have found that § 14(a) requires only negligence as the requisite standard of culpability.[7]

---

[7] *See, e.g.*, *Beck v. Dobrowski*, 559 F.3d 680, 682 (7th Cir. 2009) (applying negligence standard); *Wilson v. Great Am. Indus., Inc.*, 855 F.2d 987, 995 (2d Cir. 1988) (same); *Herskowitz v. Nutri/System*, 857 F.2d 179, 190 (3d Cir. 1988) (same); *Gerstle v. Gamble–Skogmo, Inc.*, 478 F.2d 1281, 1300–01 (2d Cir. 1973) (same). *But cf. SEC v. Shanahan*, 646 F.3d 536, 547 (8th Cir. 2011) (applying scienter standard); *Adams v. Standard Knitting Mills, Inc.*, 623 F.2d 422, 428 (6th Cir. 1980) (same). The Sixth Circuit in *Adams v. Standard Knitting Mills, Inc.*, implied a scienter requirement from § 14(a), but the court itself cabined that conclusion, noting that "scienter should be an element of liability in private suits under the proxy provisions *as they apply to outside accountants*." 623 F.2d at 428 (emphasis added).

Seeking to avoid this result, defendants rely on the legislative history of the Exchange Act, pointing to one Senate Report that said Congress was focused on protecting investors from "unscrupulous corporate officials seeking to retain control of management by concealing and distorting facts." Senate Committee on Banking & Currency, S. Rep. No. 1455, 73d Cong., 2d Sess. 77 (1934). Legislative history, however, cannot trump plain text. As Justice Scalia has acknowledged, "[t]he Constitution gives legal effect to the 'Laws' Congress enacts [] not the objectives its Members aimed to achieve in voting for them." *Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 302 (2010) (Scalia, J., concurring). Put simply, if Congress wanted § 14(a) to require a showing of scienter, it would have included those fraud-related words not just in the legislative history, but in the text of the statute itself.

In sum, the plain text of § 14(a) of the Exchange Act interpreted, as it must be, with reference to the statutory context requires that a plaintiff show negligence to establish a claim under § 14(a).

Given that a negligence standard governs § 14(a) claims, the questions remain (i) whether the heightened pleading requirements of the PSLRA apply; and (ii) whether plaintiffs have pled facts adequate to state a claim. The PSLRA requires that "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(a). Determining whether an inference is strong requires "weigh[ing] [the inference] against the opposing inferences that may be drawn from the facts in their entirety." *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 624 (4th Cir. 2008). The inferences of a particular state of mind must be "at least as compelling as any opposing innocent inference." *Yates v. Mun. Morg. & Equity LLC*, 744 F.3d 874, 885 (4th Cir. 2014).

Courts, however, are split on whether negligence is a state of mind and thus whether the PSLRA requires plaintiffs to allege facts that create a strong inference of negligence under § 14(a).[8] Ultimately, resolving that question here is unnecessary because plaintiffs have successfully alleged defendants' negligence in making the three final categories of misstatements, even assuming the PSLRA heightened pleading standard were to apply. Defendants Pierce and Thompson are addressed first followed by defendants DeYoung and Orbital ATK.

The Complaint alleges sufficient facts to support a strong inference that former Orbital Sciences directors, Pierce and Thompson, were negligent in issuing the Joint Proxy Statement containing the misrepresentations about Alliant's financial results, internal controls, and the Lake City Contract. Specifically, plaintiffs demonstrate (i) that Pierce and Thompson, as Orbital Sciences directors, had a duty to investigate Alliant; (ii) that red flags existed signaling that Pierce and Thompson should look particularly at the Lake City Contract; and (iii) that had Pierce and Thompson inquired into the Lake City Contract, they would have discovered the accounting errors. Accordingly, plaintiffs have alleged a strong inference of negligence.

Plaintiffs have adequately alleged that Pierce and Thompson, as directors of Orbital Sciences, had a duty to investigate Alliant leading up to the merger. The parties in this case do not dispute that the Orbital Sciences directors should have conducted due diligence with respect to Alliant and ensured the accuracy of the proxy statements they signed in contemplation of the

---

[8] *Compare Beck v. Dobrowski*, 559 F.3d 680, 682 (7th Cir. 2009), *and Wilson v. Great Am. Indus. Inc.,* 855 F.2d 987, 995 (2d Cir. 1988) ("As a matter of law, the preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact is sufficient to satisfy the *Gerstle* negligence standard."), *with Little Gem Life Sciences LLC v. Orphan Medical, Inc.*, 537 F.3d 913, 917 (8th Cir. 2008); *Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674, 682 (9th Cir. 2005), *and Cal. Pub. Emps.' Ret. Sys. v Chubb Corp.,* 394 F.3d 126, 144-45 (3d Cir. 2004). In an unpublished opinion, the Fourth Circuit has also suggested that the PSLRA applies to § 14(a) claims. *See Hayes v. Crown Cent. Petrol. Corp.*, 78 F. App'x 857, 861 (4th Cir. 2003).

upcoming merger. *See In re JP Morgan Chase & Co. Sec. Litig.*, 2007 WL 4531794, at *8 (N.D. Ill. Dec. 18, 2007) (finding defendants, "as directors, had the opportunity and obligation to monitor and inquire into the details of [merger] negotiations"). Perhaps more importantly, the directors themselves, acknowledged that duty prior to the merger, touting their nine-month due diligence and the depth of their investigation into the merger. Where, as here, defendants owe duties to the corporation, failing to accomplish those duties can give rise to a strong inference of negligence.[9]

Plaintiffs strengthen the inference of negligence by pointing to several red flags that should have caused Pierce and Thompson to look more closely at the Lake City Contract, including the fact that the Lake City Contract was Alliant's largest source of revenue, was obtained through highly competitive bidding, was touted as a critical win, and was expected to see pricing declines with each delivery. These red flags concerning the Lake City Contract stand in stark contrast to cases where courts have dismissed § 14(a) complaints for failure to plead negligence because there is nothing to suggest the defendants should have examined a particular source more closely. *Compare Paskowitz v. Pac. Cap. Bancorp.*, 2009 WL 4911850, at *6 (C.D. Cal. Nov. 6, 2009) ("Given the relative obscurity of these studies—it would be difficult to conceive of any non-conclusory set of facts capable of plausibly suggesting that Pacific negligently failed to uncover and report these journals' findings.").

---

[9] *See, e.g.*, *City of Westland Police & Fire Ret. Sys. v. Sonic Sols.*, 2009 WL 942182, at *10 (N.D. Cal. Apr. 6, 2009) (finding a strong inference of negligence where a proxy statement failed to account for backdated options because "[d]efendants, as senior executives, Board members and Audit Committee members, had duties associated with administering and accounting the stock option plans, granting the stock options and approving Sonic's financial reports and proxy statements"); *In re Zoran Corp. Derivative Litig.*, 511 F. Supp. 2d 986, 1015-16 (N.D. Cal. 2007) (holding plaintiffs alleged a strong inference of negligence with respect to stock backdating where defendants were "charged with ensuring compliance with accounting standards and making certain that financial statements and proxy statements were accurate").

Not only does the Complaint allege that defendants should have looked more closely at the Lake City Contract, but the Complaint also alleges that had the defendants done so, they would have discovered the massive losses associated with the contract. Defendants' reliance on *McKesson* here is misplaced. That case stands for the proposition that if there is no way corporate officials could have known the information in question, those officials cannot be negligent in failing to include it in a proxy statement. *See In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1267 (N.D. Cal. 2000) (dismissing plaintiff's claims because there was no suggestion the directors "could have known, *even with reasonable diligence*," about the fraud (emphasis added)). That is sharply at contrast with what is alleged here. In this case, ample evidence suggests defendants could have discovered the losses associated with the Lake City Contract. To begin with, Thompson acknowledged that he had clear visibility into Alliant's finances "due to the fact that the Companies had known and worked closely together for many years prior to the merger." (Compl. ¶ 61). Further, the contract's losses were evident[10] and analysts discussing Orbital ATK's restatements suggested the problem "was not digging into [the Lake City Contract] enough in the due diligence process." (Compl. ¶ 139).

Defendants' arguments do not compel the opposite conclusion. Specifically, defendants argue that because neither Thompson nor Pierce was a member of the Alliant management team at the time of the Joint Proxy Statement, they had no direct knowledge about the Lake City Contract. But to plead and establish negligence does not require plaintiffs to demonstrate the defendants knew the proxy was false but rather that defendants failed to exercise reasonable care in assessing the accuracy of the proxy statement. *See Shanahan*, 646 F.3d at 547 (noting that finding negligence required considering whether "director exercised reasonable care in

---

[10] Specifically, Orbital ATK determined that the $31.5 million loss was evident from contract signing and that the $342 million loss became evidence at time of initial production in the second quarter of fiscal 2014.

overseeing the solicitation of proxies"). Thus, plaintiffs need only allege facts, as they have done here, that a prudent director would have looked more closely into the Lake City Contract and discovered the accounting errors, not that these directors knew of the errors.

Defendants also argue that even with due diligence, defendants could not have identified the losses because the data on production costs for the Lake City Contract only became available after the merger. This argument fails; it is essentially a disagreement with the allegations of the Complaint and thus a factual question not one related to the adequacy of pleading. Moreover, simply because defendants might not have been able to identify the *extent* of losses before the merger, does not mean defendants could not have identified the problem leading to and the potential for losses. Indeed, the red flags described above should have alerted the directors to the importance of the Lake City Contract projections, and the twelve-years' worth of historical cost data for the contract would have suggested the projections included in the proxy statement were flawed.

Finally, defendants contend that the Orbital Sciences directors were entitled to rely on Alliant's audited financial statements and were not negligent in failing to investigate those statements further. To support this argument, defendants rely exclusively on *McKesson*. Yet that decision is neither controlling nor apposite. In *McKesson*, there was "no suggestion in the complaint that Bear Stearns or McKesson could have known, even with reasonable diligence, that HBOC was engaged in massive accounting fraud" because the HBOC directors were affirmatively hiding the evidence the auditors sought. 126 F. Supp. 2d at 1267.[11] Here, by contrast, there are no allegations that the Small Caliber Division affirmatively hid information when the directors investigated the Lake City Contract—only that members of that division

---

[11] *See also Bond Opportunity Fund v. Unilab Corp.*, 2003 WL 21058251, at *10 (S.D.N.Y. May 9, 2003) (finding no inference of negligence because "Plaintiffs allege that due to BT Alex Brown's overreaching, the directors were affirmatively misled by BT Alex.Brown").

failed to report negative information.  Moreover, plaintiffs allege that the errors would have been discovered with greater diligence; indeed, the Complaint alleges that the potential losses from the Lake City Contract were "evident" at the time of contract signing.  (Compl. ¶ 61).  Defendants' arguments to the contrary present a factual dispute not a pleading flaw.

In sum, Thompson and Pierce had a duty to investigate the finances of the company they planned to merge with, and red flags like the size of the Lake City Contract and the aggressive bid suggested Thompson and Pierce should look closely at that contract in conducting their due diligence.  Had the directors done so, the Complaint alleges that the directors would have discovered the errors in the Lake City Contract projections and in turn, the flaws in Alliant's financial results and internal controls.  Accordingly, plaintiffs have successfully alleged a strong inference of negligence with respect to Defendants Thompson and Pierce.

The Complaint has also presented sufficient evidence to establish a strong inference of negligence on the part of former Alliant director, DeYoung.  As described above, the Complaint alleges that several red flags suggested the Lake City projections were not accurate.  DeYoung had more than a decade of experience in the ammunitions industry and with this contract in particular, and perhaps more importantly, he played an active role in the bidding process.  As such, the Complaint alleges that DeYoung knew the costs of production on the Lake City Contract exceeded the bid by hundreds of millions of dollars.  DeYoung accordingly should have looked more closely into the Lake City accounting prior to the merger, and had he done so, he would have discovered that the projections were erroneous.

Defendants attempt to argue DeYoung is not liable because he solicited proxies only from Alliant shareholders, who were not harmed by the merger.  This argument, however, carries no weight.  To begin with, the plain text of § 14(a) simply prohibits the solicitation of proxies in

contravention of rules and regulations established by the Commission; in doing so, the statute does not distinguish between shareholders in defining liability. *See* 15 U.S.C. § 78n. Rather than suggesting a limitation, this broad language suggests § 14(a) contemplated liability to all affected shareholders. Furthermore, courts have repeatedly found that even accountants or investment bankers, who seek no proxies at all, can be liable under § 14(a). *See, e.g.*, *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 232 (S.D.N.Y. 2004); *McKesson*, 126 F. Supp. 2d at 1266. As such, the fact that DeYoung did not solicit Orbital Sciences shareholders is immaterial under § 14(a), and for the reasons already noted, plaintiffs have adequately alleged a strong inference of negligence on DeYoung's part.

The final contested issue with respect to § 14(a) is whether plaintiffs have stated a claim for relief against the corporate defendant, Orbital ATK. It is undisputed that a complaint against a corporate defendant satisfies the PSLRA as long as the complaint "alleges facts giving rise to a strong inference that at least one corporate agent acted with the required state of mind." *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 189 (4th Cir. 2009). As the foregoing analysis demonstrates, the Complaint here has adequately alleged facts giving rise to a strong inference of negligence on the part of three agents of Orbital ATK, Thompson, Pierce, and DeYoung. Accordingly, the Complaint successfully states a claim against Orbital ATK under §14(a) of Exchange Act.

## IV.

Plaintiffs also bring claims under § 20(a) of the Exchange Act against Thompson, Pierce, and DeYoung. Section 20(a) provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable." 15 U.S.C. § 78t(a). A claim for controlling person liability under § 20(a) must

therefore "be based upon a primary violation of the securities laws." *Svezzese v. Duratek*, 67 F. App'x 169, 174 (4th Cir. 2003) (per curiam) (unpublished). Defendants contend that plaintiffs have failed to allege adequately a claim under § 14(a) and therefore the control person claims must be dismissed. As described above, however, plaintiffs have adequately alleged a § 14(a) claim against the defendants. Plaintiffs have also alleged that these defendants had positions of authority as officers and/or directors of Orbital Sciences and Alliant and that the defendants had the ability to control the activities of those corporations, including the issuance of the Joint Proxy Statement. *See City of St. Clair Shores Gen. Emps. Ret. Sys. v. Inland W. Retail Real Estate Tr., Inc.*, 635 F. Supp. 2d 783, 796 (N.D. Ill. 2009). Accordingly, the § 20(a) claims related to the § 14(a) violations can proceed.

In sum, plaintiffs have alleged facts that establish a strong inference of negligence on the part of Thompson, Pierce, and DeYoung in issuing a proxy statement with misrepresentations about Alliant's financial results, the Lake City Contract's operations, and Alliant's internal controls. As such, plaintiffs' § 14(a) claims against Orbital ATK and the individual defendants, as well as their § 20(a) claims against the individual defendants can proceed.

Alexandria, Virginia
September 26, 2017

T. S. Ellis, III
United States District Judge