1

                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
                        ALEXANDRIA DIVISION


------------------------------x
                              :
STEVEN KNURR, et al           :
                              :
                  Plaintiffs  :
                              :
          versus              : Civil Action Number
                              :
ORBITAL ATK INC., et al       : 1:16-CV-1031
                              :
                  Defendants.:
------------------------------x

                                    December 8, 2017

          The above-entitled Motion to Dismiss was
continued before the Honorable T.S. Ellis, III, United States
District Judge.

          THIS TRANSCRIPT REPRESENTS THE PRODUCT
          OF AN OFFICIAL REPORTER, ENGAGED BY THE
          COURT, WHO HAS PERSONALLY CERTIFIED THAT
          IT REPRESENTS TESTIMONY AND PROCEEDINGS OF
          THE CASE AS RECORDED.

2

1                   <u>A P P E A R A N C E S</u>

2  FOR THE PLAINTIFFS:

3           **Craig Crandall Reilly**
          Law Office of Craig C. Reilly
4           111 Oronoco St
          Alexandria, VA 22314
5

6           **James Edwin Barz**
          Robins Geller Rudman & Dowd LLP
          200 S. Wacker Dr.
7           31st Floor
          Chicago, IL 60606
8

9  FOR THE DEFENDANTS:

10          **Lyle Roberts**
         **George Anhang**
         Cooley LLP (DC)
11          1299 Pennsylvania Ave., NW
         Suite 700
12          Washington, DC 20004-2400

13          **Joshua Zev Rabinovitz**
         Kirkland & Ellis
14          300 North LaSalle
         Chicago, IL 60654
15

16

17

18

19

20

21      OFFICIAL UNITED STATES COURT REPORTER:

22          MS. TONIA M. HARRIS, RPR
         United States District Court
23          Eastern District of Virginia
         401 Courthouse Square
24          Tenth Floor
         Alexandria, VA 22314
25          703-646-1438

3

1                       **P R O C E E D I N G S**

2

3          THE DEPUTY CLERK:  Steven Knurr, et al. v. Orbital

4   ATK, Inc., et al., Civil Case Number 16-CV-1031.

5          THE COURT:  All right.  Who is here for the

6   plaintiffs?

7          MR. BARZ:  Good morning, Your Honor.  Jim Barz,

8   B-A-R-Z, on behalf of the plaintiffs.

9          MR. REILLY:  Also, liaison counsel for the

10  plaintiffs, Craig Reilly, Your Honor.

11         THE COURT:  Yes.  Good morning to both of you.  And

12  I'll tell you, Mr. Barz, Mr. Reilly is, of course, very

13  experienced in this court, knows it well.  However, you don't

14  always have to have counsel with you if -- you may make that

15  choice.  You and Mr. Reilly may make that choice.

16         You may decide, and Mr. Reilly may counsel you

17  always to have him here, which is sensible, but I give you

18  leave to ask the Court not to have liaison here.  It's up to

19  you.

20         MR. BARZ:  I appreciate that, Your Honor.  And in

21  certain matters, I may avail myself of that.  I find his

22  advice valuable and necessary.

23         THE COURT:  Yes, of course.  All right.  For the

24  defendants, who is here for the defendants?

25         MR. ROBERTS:  Yes, Your Honor.  Lyle Roberts with

4

1  the Cooley Firm on behalf of Orbital ATK and the individual

2  defendants, other than Mr. DeYoung.  And I'm joined today by

3  my colleague, George Anhang.

4          THE COURT:  All right.  And then who is here for the

5  new defendant, as it were?

6          MR. ROBERTS:  I -- I am, Your Honor.  Lyle Roberts

7  with Cooley representing Mr. Hollis Thompson.

8          THE COURT:  All right, well --

9          MR. RABINOVITZ:  And, Your Honor, my name is Joshua

10  Rabinovitz, and I'm here on behalf of Mark DeYoung, who is an

11  existing defendant.

12          THE COURT:  I see.  Right.  And -- well, refresh my

13  recollection, Mr. Rabinovitz, your client was a -- an ATK or

14  an Alliant employee?

15          MR. RABINOVITZ:  He was an officer of Alliant and

16  then a director of Orbital ATK.

17          THE COURT:  But he's no longer either of those?

18          MR. RABINOVITZ:  Correct, Your Honor.

19          THE COURT:  All right.  Thank you.  All right.  You

20  may be seated.

21          A brief recitation might be helpful in this regard.

22  This is not the first appearance of this case.  It's a

23  10b-5 -- essentially, 10b-5.  There was another claim in

24  there, a case involving an allegation of securities fraud

25  against the defendants.

1              In essence, the defendants are alleged to have made

2    fraudulent statements in their 10-Ks.  The essence of the

3    fraud is that they significantly understated what the profits

4    would be with respect to a contract that it had for

5    manufacturing small arms ammunition.

6              That -- was it Lake Charles contract?

7              MR. BARZ:  Lake City.

8              THE COURT:  Lake City.  And where is Lake City?

9              MR. BARZ:  Missouri.

10             MR. ROBERTS:  Yes, Your Honor, in Missouri.

11             THE COURT:  Missouri.  All right.  And we had a

12   first round in which there was a Motion to Dismiss filed by

13   the defendants.  I ruled on that by way of a written opinion

14   in which I granted the Motion to Dismiss as to the

15   individual -- all defendants, and gave the plaintiff leave to

16   amend the complaint.

17             I found that the complaint, although it was lengthy,

18   conveyed a lot of information in it, did not meet the

19   statutory requirement of alleging a strong scienter -- a

20   strong inference of scienter.  That is knowledge that the

21   10-Ks -- 10-KTs were false.

22             The amendment adds a defendant and some additional

23   allegations.  The defendant that's added was -- is someone who

24   had supervisory and accounting policy.  His name is Hollis

25   Thompson.

6

1          And you do represent Mr. Thompson?

2          MR. ROBERTS:  Yes, correct, Your Honor.

3          THE COURT:  All right.  So I have read the briefs

4    and thought about this.  I want to give you, first, an

5    unfettered opportunity to argue.  You shouldn't repeat what's

6    in -- don't need to repeat what's in your brief.  You may

7    repeat what you wish.  You may underscore what you think I

8    need to understand, but I have read the briefs.  And in the

9    interest of -- or a concession to the shortness of life, I ask

10   you to keep it reasonably focused.

11         So I'll hear first from the party with the burden,

12   which is the defendants.  And you may proceed.

13         MR. ROBERTS:  Good morning, Your Honor.  Thank you.

14   As Your Honor notes, all of the claims -- the securities fraud

15   claims against the individual defendants were dismissed.  The

16   plaintiffs are not challenging those dismissals.  And they

17   haven't added any new allegations concerning those individual

18   defendants in their amended complaint.  What they have done is

19   added a new defendant, Hollis Thompson.  And Hollis Thompson,

20   as Your Honor noted, was a vice president of Financial

21   Reporting and was the principal accounting officer of Orbital

22   ATK.

23         According to plaintiffs' new theory of the case,

24   Mr. Thompson is at the center of the alleged fraud because he

25   supposedly knew about an erroneous accounting policy and the

7

1    underestimation of costs associated with the Lake City

2    contract.

3              There was a reason, however, Your Honor, why that

4    theory was not in their original complaint.  And it's because

5    it simply doesn't make any sense.

6              First, Mr. Thompson worked for Orbital Sciences, not

7    Alliant Technology.  So he wasn't involved with the bidding or

8    the startup of the Lake City Contract, which took place prior

9    to the merger of the two companies.

10             Second, Mr. Thompson is not alleged to have and did

11   not have any supervisory role as to the Lake City operations.

12             Third, the erroneous accounting policy was developed

13   by Alliant, not Orbital Sciences.  And it was fully disclosed

14   to the company's investors.  To the extent that Mr. Thompson

15   has argued to have approved the erroneous policy, he wasn't

16   alone.  The auditors -- the auditors for both companies also

17   approved this erroneous policy.

18             Fourth, plaintiffs don't allege that Mr. Thompson

19   had any information about the cost estimates for the Lake City

20   contract that wasn't possessed by the other individual

21   defendants as to whom these claims have already been

22   dismissed.  Nor could they make that allegation given that

23   lower level employees didn't escalate negative information

24   about the Lake City contract to Orbital ATK's senior

25   management, which obviously included Hollis Thompson.  He's a

8

1   member of senior management, as the plaintiffs concede.

2          Finally, plaintiffs provide no motive for Hollis

3   Thompson to have defrauded the company's investors.  They

4   don't allege that he profited from the alleged fraud in any

5   way, not through stock sales, not through bonus compensation,

6   anything.

7          So I think on one side, Your Honor, we have a fairly

8   overwhelming inference of non-fraudulent conduct on the part

9   of Hollis Thompson.  Mr. Thompson was a member of senior

10  management.  But for the reasons I just cited, the scienter

11  allegations against him are actually weaker than the

12  allegations against the other individual defendants that this

13  Court has already dismissed from the case.

14         So the plaintiffs' response to this, I think, really

15  obvious and holistic conclusion about the strength of their

16  scienter allegations is that it should be overturned by the

17  fact that they've put in two additional allegations in their

18  amended complaint.

19         The first is that Hollis Thompson, again, approved

20  an erroneous accounting policy.  The second is that Hollis

21  Thompson was replaced by the -- as the company's principal

22  accounting officer after it issued the restatement, an issue

23  in this case.

24         As Fourth Circuit precedent so amply demonstrates

25  here --

9

1          THE COURT:  And the third allegation, that he's a

2     CPA or that he knows all about accounting.

3          MR. ROBERTS:  That's right, Your Honor.  I think

4     that's part of their allegations concerning the erroneous

5     accounting policy.

6          THE COURT:  All right.  Go on.

7          MR. ROBERTS:  So as Fourth Circuit precedent amply

8     demonstrates, these allegations simply don't move the scienter

9     pleading needle.

10          Let me turn just first briefly to this allegation

11     that you just pointed out about it proving the erroneous

12     accounting policy at Mr. Thompson's knowledge of accounting in

13     general.

14          As background, Your Honor, that policy involved

15     general administrative costs.  So what are those?  Those are

16     the indirect costs that are incurred in the general operation

17     and management of the business as a whole.  Prior to the

18     restatement, Orbital ATK did not consider such costs when it

19     calculated losses associated with the contract.

20          And when it issued its restatement, the company

21     informed investors that the policy had been incorrect and that

22     these indirect costs should have been included and will be

23     included going forward.

24          But here is the rub, Your Honor.  The existence and

25     use of the erroneous accounting policy was public knowledge.

1          Orbital ATK accurately disclosed the policy it was

2   using.  And the company's investors therefore understood that

3   the company was not considering these indirect costs when it

4   was making these accounting deliberations.

5          THE COURT:  When you say "disclosed," do you mean in

6   the 10-Ks?

7          MR. ROBERTS:  Correct, Your Honor.

8          THE COURT:  All right.  Go on.

9          MR. ROBERTS:  Under these circumstances, this Court

10  has already held in other cases and in this case.  This was

11  not a hidden red flag that could contribute to an inference of

12  scienter as to Mr. Thompson.

13         More fundamentally, Your Honor, plaintiffs' argument

14  is that the Court should infer that because one of the

15  accounting policies was incorrect and because Mr. Thompson was

16  an accountant, he must have known that this policy was

17  incorrect.

18         As a factual matter, Your Honor, I think that's

19  beggar's belief, because it's uncontested that the Orbital --

20  Orbital ATK's outside auditors also didn't recognize this

21  error.  So it's hard to understand how Mr. Thompson must have

22  known about an error that the outside auditors didn't pick up

23  on either.

24         Moreover, as a legal matter, courts have routinely

25  rejected the assertion that GAAP violations can create strong

11

1   inference of scienter.  And it's with good reason, Your Honor,

2   because GAAP is very complicated.  There are 19 different GAAP

3   sources.  Sources are often unclear.  Even very experienced

4   accounting professionals make mistakes when it comes to

5   interpreting GAAP.  And that's a far cry -- making a mistake

6   in doing that is a far cry from deceiving -- trying to deceive

7   investors.

8           I think, Your Honor, what's really going on here is,

9   at best, the plaintiffs are asking the Court to do something

10  that the Fourth Circuit actually just rejected a few weeks ago

11  in its *PowerSecure* decision, which we've provided to the

12  Court.

13          As the Fourth Circuit explained in that decision,

14  under Fourth Circuit precedent, a plaintiff cannot allege

15  facts that permit an inference that the defendant knew his

16  statement was false, and then ask the Court to infer from that

17  inference that the defendant acted with scienter.

18          Similarly, that's what plaintiffs are trying to do

19  here.  They're asking Your Honor to infer that because Mr.

20  Thompson knows about accounting and because he was in senior

21  management, he must have known that the accounting policy was

22  erroneous.  And then the Court should then infer that he

23  approved this erroneous accounting policy to perpetuate a

24  fraud on the company's investors.

25          And we think, Your Honor, that just as in

1   *PowerSecure,* this Court should decline that invitation.  And I

2   would just quote what the Fourth Circuit said here in terms of

3   analyzing this sort of thing.  It said, "Stacking inference

4   upon inference in this manner violates the PSRA's mandate that

5   the strong inference of scienter be supported by facts, not

6   other inferences."  And that's what going on here.

7           When you make a must have known allegation, Your

8   Honor, you're just asking the Court to infer something and

9   then infer from that that there is scienter.

10          Just turning briefly to the other scienter

11  allegation they made here, Your Honor, Mr. Thompson's

12  replacement as the principal accounting officer following the

13  restatement, that's similarly deficient.

14          Your Honor, I think it's helpful here to begin with

15  exactly what the company actually said.  On February 27, 2017,

16  the company's board of directors elected Chris A. Voci as the

17  company's vice president and controller.  And this is what

18  they said in their AK:  Mr. Voci replaced Hollis Thompson as

19  the company's principal accounting officer.

20          So based on this one-line disclosure, plaintiffs

21  contend not only did Orbital ATK terminate -- that's their

22  word -- Hollis Thompson, but the company did so because he

23  knew about or recklessly disregarded the true costs associated

24  with the Lake City contract.

25          There's no factual support for those contentions,

13

1   Your Honor.

2          Hollis Thompson was not one of the lower level

3   employees that the company disclosed its suppressed

4   information.  To the contrary, he's a member of senior

5   management.  He's the person the information is

6   being suppressed from.  And --

7          THE COURT:  And I think you pointed out that he

8   wasn't around when these lower people were concealing

9   information.

10         MR. ROBERTS:  Well, certainly for a large portion of

11  that period, Your Honor, because he is at Orbital Sciences.

12  He only comes on board when the companies merge in 2015.

13         And the other thing that the plaintiffs point to is

14  a June 30, 2017 presentation to investors.  And that also

15  doesn't suggest that Hollis Thompson acted inappropriately.

16  That presentation, which we provided to the Court in full, so

17  the Court could review it, has a section on causes of

18  the restatement --

19         THE COURT:  You're not arguing that he acted

20  appropriately or inappropriately.  You're saying that doesn't

21  warrant an inference that he acted fraudulently.

22         MR. ROBERTS:  That's correct, Your Honor.

23         THE COURT:  All right.

24         MR. ROBERTS:  And certainly there is a section in

25  that presentation that talks about causes of the restatement,

14

1    and I assure you that Hollis Thompson's name does not show up

2    in that section.  He's -- that is not something the company

3    did despite the way the plaintiffs attempt to characterize

4    that document in their papers.

5              So, again, I think, Your Honor, without any facts to

6    support this theory about Hollis Thompson's supposed

7    termination, again, it's just an impermissible stack of

8    inferences that the plaintiffs are asking the Court to draw

9    here.

10             But, Your Honor, I would note something, even if the

11   plaintiffs were correct here, even if they were right that

12   Hollis Thompson was terminated as a result of the restatement,

13   the Fourth Circuit has made it clear that this would be

14   insufficient to establish an inference of scienter.

15             And this is the *Yates* case, Your Honor, and the

16   Fourth Circuit really couldn't have been clearer about this.

17   The Fourth Circuit stated that where a corporate official

18   leaves the company, before or slightly after a financial

19   restatement, the reasonable assumption -- quoting now -- the

20   reasonable assumption is that this occurred because the

21   company faced substantial accounting challenges, not that the

22   officer participated in a fraud and plaintiffs have the burden

23   of alleging facts to the contrary.

24             And that rule makes perfect sense, Your Honor.

25   There's a reason why the Fourth Circuit has adopted it.  It

1   makes perfect sense because, of course, companies have a

2   shuffling in their management when they announce bad news, and

3   there is a large stock price decline.  That happens all the

4   time.  If we allowed plaintiffs to stand up and say the fact

5   that's -- an officer has been replaced as the principal

6   accounting officer is now evidence of scienter that can create

7   inference of fraudulent intent.  We would have -- these cases

8   would go forward all the time.  They don't because that's not

9   sufficient and Fourth Circuit is clear it's not sufficient.

10          So, Your Honor, in sum, I would say neither of

11  plaintiffs' new scienter allegations provide any support for

12  the inference that Hollis Thompson intentionally concealed the

13  losses on the Lake City contract or with severe recklessness

14  failed to recognize those losses.

15          And that, Your Honor, is what you described

16  correcting as the "missing essential ingredient" as to the

17  claims against the other individual defendants.  And it's

18  missing as to Hollis Thompson as well.

19          So, consequently, when we look at all of this

20  holistically as, of course, the Court is required to do,

21  plaintiffs' allegations don't support a compelling inference

22  that Hollis Thompson intentionally or recklessly deceived

23  Orbital ATK's investors.  And the Court should dismiss these

24  newly discovered claims just as it dismissed the claims

25  against the other individual defendants here.

16

1          Your Honor, I'll just take a brief moment on

2    corporate scienter, which is something that the plaintiffs

3    have raised again.

4          I would note, Your Honor, that this issue has been

5    argued extensively before this court.  It was argued in

6    Computer Sciences case.  This court came to a decision.  Your

7    Honor --

8          THE COURT:  Yes, but tell me about what other courts

9    now say about it.  I know that I have said something about it

10   in the past, but we live in a dynamic age.  I have -- I'm in a

11   age now where I reminisce a good deal.  Reminiscing is more

12   profitable at my age than looking ahead.

13         I remember as a young lawyer attending an argument

14   in London at the House of Lords, which then was essentially

15   their Supreme Court.  Everything has changed now.  But it was

16   an antitrust case.  And the argument went on for almost six

17   weeks.  I was only there for about two.  Wonderful advocacy.

18   Very articulate.  No written briefs at all.  They mentioned

19   cases, and then they and the judges who were dressed in

20   regular suits would march up to the bookcase, they'd pull

21   books out and together they would pour over the books.

22   Counsel were robed and wigged.  And they would do it all from

23   memory.  The world has changed.

24         I used to -- when I first went on the bench 30-plus

25   years ago, there were no -- there were some computers, but

17

1   what a judge said was not recorded forever, in an -- in an

2   easily accessible way.  Now, you and your opponents have been

3   able to delve into everything I've written in the past 30

4   years.  So I know I've written on this.  I think it's better

5   today than it was then.  It causes me to try to be a bit more

6   careful about what I say in these opinions.

7          But this issue of corporate liability boils down to

8   this, and I do very much want to hear what both of you have to

9   say on this.

10          What we do know from the complaint, and I think it's

11  conceded by the defendants is that Orbital, after the merger,

12  and really before with Alliance, but we do know that some

13  folks down the corporate ladder concealed information and did

14  not report to the more senior people.

15          The question is:  If the senior people cannot be

16  accused of scienter or cannot be accused of fraud with the

17  requisite allegations of scienter, can the corporations still

18  be held accountable under 10b-5, because the corporation, in

19  effect, signed 10-Ks and someone, perhaps down farther on the

20  ladder, didn't say what they should have said to the upper

21  people and so, the -- the plaintiff would say the 10-K

22  operated as a fraud on investors.

23          So now the question is, let's assume, hypothetically

24  that the complaint cannot allege scienter with the requisite

25  strength -- and let's be clear about the strength.  The

18

1    strength is -- it has to be a strong inference of scienter,

2    but then in the *Tellabs* case, the Supreme Court defined that

3    as being an inference that is no less compelling than the

4    opposite inference.  Amusing to me.

5            But in any event, I see it as an attempt to erase

6    what Congress -- but in any event, the law is the law.  And I

7    must enforce it or apply it regardless of what my own personal

8    views are.  And I really don't have personal views about that.

9    I have lots of other things I prefer to think about.

10           But in any event, I want to know, let's assume that

11   there isn't a high corporate executive who signed the 10-Ks

12   and everything that could be accused of having the strong --

13   or having accused -- being -- having facts that would warrant

14   accusing that person of having a strong scienter, why

15   shouldn't the corporation nonetheless have to answer for the

16   false information that was in the 10-Ks?

17           MR. ROBERTS:  Well, Your Honor --

18           THE COURT:  Never mind what I've said in the past.

19           MR. ROBERTS:  I won't.  The good news, Your Honor,

20   that as -- as you say, the law does evolve and what we have

21   now is a Supreme Court decision that answers that question.

22           THE COURT:  All right.

23           MR. ROBERTS:  So I think -- I think -- I think

24   that's the short way of putting it.  And let me expand on it a

25   little bit.

19

1          The holding that Your Honor had made previously was

2   that corporate liability for securities fraud depends on at

3   least one of its agents making a false or misleading statement

4   with scienter.

5          That holding is consistent with the general

6   principals of corporate liability.  It's based really on two

7   simple premises.  First, as the Fourth Circuit has repeatedly

8   said, only the scienter of employees who act with the

9   necessary scienter can be imputed to a corporation.  In other

10  words, as the Second Circuit held in its *Dynex* decision -- and

11  I'm quoting here, Your Honor -- "To prove liability against a

12  corporation, of course, the plaintiff must prove that an agent

13  of the corporation committed a culpable act with the requisite

14  scienter."  What's the culpable act?

15         THE COURT:  Well, didn't these lower people commit

16  an act?

17         MR. ROBERTS:  A culpable act, Your Honor, and the

18  act has to be the securities fraud.  There -- it must be where

19  they were liable for securities fraud --

20         THE COURT:  So most of these people knew, I mean, as

21  they might well know that the corporation has to report the

22  figures that they are reporting.  And so they know that 10-Ks,

23  in effect, have to be signed.

24         MR. ROBERTS:  But the Supreme Court answered the

25  question, Your Honor, whether that type of employee can be

1    culpable for securities fraud.  What the Supreme Court said in

2    *Janus Capital Group v. First Derivative Traders* is that the

3    only people who engage in a culpable act for purposes of

4    securities fraud are those who make a misstatement by the

5    possessing ultimate authority over that statement.

6              That's the -- that's the Supreme Court limitations.

7    The Supreme Court has decided --

8              THE COURT:  That sounds consistent with what I've

9    said in the past.

10             MR. ROBERTS:  It -- absolutely consistent, Your

11   Honor.  So the Supreme Court has limited the scope of what

12   kind of corporate officials can be liable for securities

13   fraud.

14             And so having made that limitation, it cannot be at

15   the lower level -- level place --

16             THE COURT:  So the corporation has -- is not subject

17   to being called to answer for making a false statement in its

18   10-Ks just because the people who made the statement didn't

19   know the facts and people farther down failed to disclose --

20   deliberately failed to disclose by concealing the facts that

21   would have alerted the -- the signing officials?

22             MR. ROBERTS:  Well, Your Honor, if -- if we had a

23   different type of statute we were talking about.  If we were

24   talking about a negligence-based statute, a statute for, you

25   know, mismanagement, all of those things might be possible,

21

1   but what we're talking about here is securities fraud.  So for

2   purposes of securities fraud, you have to have one individual

3   who both engages in the act and has the requisite mental

4   state.  That's simply just clear in the laws.  The Supreme

5   Court has made it pretty clear in *Janus* as well.  So a

6   different type of claim perhaps, but not this type of claim.

7            THE COURT:  Well, we might all think that having a

8   negligent standard would be appropriate, but I have to tell

9   you if we had a negligent standard for corporate people, we'd

10  have to open new courthouses and appoint hundreds of new

11  judges.

12           MR. ROBERTS:  You're absolutely right, Your Honor.

13  So, Your Honor --

14           THE COURT:  Anything else?

15           MR. ROBERTS:  Well, based on this combination of

16  what circuit courts have said, what Supreme Court has said in

17  *Janus* only the scienter of individuals who make the

18  statement -- who have ultimate authority over the statements

19  that are alleged, have been false or misleading, only their

20  scienter can be imputed on the company.  And that's clearly

21  not what we have here.  These lower level employees didn't

22  have ultimate authority over the public disclosures at issue.

23           And I would just note, Your Honor, that the -- what

24  the plaintiffs have done here to try to overcome that is

25  they've cited a pre-*Janus* case called *Southland* from the Fifth

22

1    Circuit.  And they've said, well, in that case the Court found

2    that individuals who furnished information, that gets folded

3    into public statements, their scienter can be imputed to the

4    company.

5            And, Your Honor, I would say that two things about

6    the *Southland* decision.  One, the South -- what the Fifth

7    Circuit said in *Southland* was that its holding was consistent

8    with the common law rules of vicarious liability.  And under

9    those common law rules, only the scienter of employees who

10   commit a torte.  Again, it's committing a culpable act, can be

11   imputed to the corporation.

12           Now, *Southland* was decided before *Janus*.  I think

13   that's very important here.  So clearly to the extent that the

14   Fifth Circuit thought that furnishing information was a way of

15   making a statement and there can be liability for an

16   individual who does that under the securities fraud laws, that

17   is no longer true now that the Supreme Court has decided *Janus*

18   and made this limitation.

19           So I don't think *Southland* provides any reason for

20   this Court to depart from its prior rulings.  And indeed, as I

21   noted repeatedly now, I think *Janus* makes it clear that this

22   Court shouldn't depart from its prior rulings on this -- on

23   this issue.

24           The only other thing I would add, Your Honor, before

25   sitting down is to say that the plaintiffs securities fraud

1   claims against the other individual defendants:  Thompson,

2   Pierce, Larson and DeYoung, should now, I think, be dismissed

3   with prejudice.  This court dismissed those claims of leave to

4   amend, but plaintiffs haven't had any new allegations

5   concerning those individuals.  And as a result, there's really

6   no reason for those claims to remain in the case no matter

7   what the Court otherwise decides on this motion.

8           THE COURT:  Mr. Rabinovitz, I don't think I need to

9   hear from you since nothing in the amended complaint relates

10  to your client.

11          MR. RABINOVITZ:  I agree, Your Honor.

12          THE COURT:  And you would echo what Mr. Roberts just

13  said?

14          MR. RABINOVITZ:  That's correct, Your Honor.

15          THE COURT:  All right.  Mr. Barz, I'll hear from you

16  now, sir.

17          MR. BARZ:  Thank you, Your Honor.

18          I'll start where he ended so we can continue the

19  discussion of corporate scienter.  And I'll tell you, Your

20  Honor, what he's asking you to hold, no other Court has ever

21  held.

22          We've cited several cases rejecting the arguments he

23  just made including that *Janus* somehow speaks to this issue.

24  The Supreme Court decision of --

25          THE COURT:  A Court that considers this issue in the

24

1  light of the *Janus*?

2         MR. BARZ:  Yes, I've cited --

3         THE COURT:  Which court does that?

4         MR. BARZ:  Well, I've cited at least two district

5  courts, which is the *Lee v. Active Power* out of the southern

6  district of Texas.  And I've cited Judge Pauly of the Southern

7  District of New York in *Pennsylvania Public Schools v. Bank of*

8  *America*.  Both of those district court judges expressly said

9  *Janus* has no bearing on this issue.  And I'll explain why.

10         The Sixth Circuit decision that I make here, by the

11  way, which says "furnishing information is enough" was decided

12  after *Janus*.  It didn't mention *Janus*.  And the reason is, is

13  because it doesn't apply.

14         *Janus* dealt with whether a third party, a supplier,

15  could be liable for the statements in the 10-K.  And the Court

16  held "no, that it was not a maker of those false and

17  misleading statements.

18         The *Janus* Court doesn't even deal with scienter,

19  much less corporate scienter.  In fact, courts that have

20  interpreted *Janus* has said it doesn't apply to corporate

21  insiders even with regard to who makes the statements.

22  There's a debate over that.  The word "furnish, it's not in

23  *Janus* at all.  Scienter, it's not even -- what was on appeal.

24  It's completely irrelevant.

25         *Janus* would only apply if we were trying to sue

25

1  those lower level people.  *Janus* would say, they didn't make

2  those statements if they didn't have ultimate authority over

3  them.  What *Janus* does not say is that the corporation, as

4  Your Honor notes, that's an actor.  That's a speaker.  The

5  corporation made those statements.  The question that we're

6  dealing with, which was not at all addressed in *Janus* -- it's

7  not mentioned, it's not addressed at all -- is whose scienter

8  can be attributed to the corporation.  And what we're arguing

9  and what we've cited several cases that support, is that it's

10  either the person that says it, or the person that hands them

11  the data that goes into the 10-K and then they repeat it.

12       THE COURT:  So you -- you believe that the Fifth

13  Circuit case correctly states the law and that *Janus* did not

14  either cite or disapprove of the Fifth Circuit case?

15       MR. BARZ:  Correct.  And what's important is the

16  Fourth Circuit cites the Fifth Circuit case prior to *Janus*.

17  Which says, if you furnish information, that's enough.  Now

18  since *Janus,* the Sixth Circuit has taken a look at the issue

19  and they've explicitly held that you're either the speaker or

20  you furnish information.

21       Now, this new argument that somehow the Sixth

22  Circuit got it wrong and the Fifth Circuit got it wrong

23  because of *Janus* has been raised twice, to my knowledge, in

24  the two cases I cited and rejected both times.  They can't

25  cite you a single case that supports them.

1          The only case they cite is your decision from

2     Computer Sciences, which predated all of this.

3          Here is my response on that:  One, I don't believe

4     the argument was squarely presented to Your Honor.  You won't

5     find the word "furnish information" in your opinion.

6          THE COURT:  That's a kind way of putting it.

7          MR. BARZ:  Well, I think it's fair.  I don't think

8     you have to say that I was wrong there.  I don't see the word

9     "furnish information" anywhere in that opinion.  What I see is

10    a debate about whose scienter can be attributed to the

11    company, but Court's can only --

12         THE COURT:  Well, simply facts that were not

13    presented to me.

14         MR. BARZ:  Courts can only rule on the arguments

15    that are presented.  We've presented it here and we've given

16    you the overwhelming authority.  And I think if you side with

17    us on that, then clearly, you know -- and the only thing I'll

18    point -- they try to raise some new arguments in their reply

19    brief that weren't squarely addressed, I think those are

20    waived.  The issue here is whether you believe, as a matter of

21    law, furnishing information is enough.  We argue that it is.

22    They are argue that it's not.  We've got all the law on our

23    side.  They have none.

24         Let me back up now, if you will, to the principal

25    accounting officer, unless you'd like me to address anything

27

1    else.

2              THE COURT:  Do it quickly.

3              MR. BARZ:  Okay.  So, Your Honor, the last time we

4    were here, and we argued this case in here, and I read your

5    opinion.  And I understand that you found that we hadn't done

6    enough to meet our burden of pleading a strong inference of

7    scienter.  What I didn't get from any of that, either the

8    argument that day or the opinion, is that we were, you know,

9    not even close.

10             And what I think changes the analysis here now is

11   that we're dealing with the principal accounting officer.

12   This is the company expert on GAAP.  The company said it

13   follows the COSO framework from the Treadway Commission, which

14   we've cited those materials.  So when you designate someone as

15   your principal accounting officer, that means this is our

16   in-house expert on GAAP.  So I think all those allegations we

17   made before and argued before, which I'm not going to repeat,

18   carry extra force as applied to this individual.

19             When you're dealing with an accounting restatement

20   and I have brought in a salesmen as a defendant, you might

21   look at it one way.  But when you bring in the top accountant,

22   you look at the other.  That's called common sense, juries are

23   instructed they're allowed to use it in their cases.  It's not

24   forbidden in the Fourth Circuit either.

25             The second thing is we've added additional facts

28

1   about him.  And what I think this Court has got to be careful

2   with is they dispute those facts, but they're not allowed to.

3           You'd have to convert it into a motion for a summary

4   judgment.  And there's two critical facts that they dispute.

5           Before I get to that, let me just frame it.  With

6   the one thing --

7           THE COURT:  Do it quickly.

8           MR. BARZ:  -- we do agree on, is that the Fourth

9   Circuit in *Zak v. Chelsea Therapeutics*, and they cite this

10  case in their reply brief for the exact same point -- reversed

11  the district court in a securities fraud case because it had

12  failed to construe the documents in the light most favorable

13  to the plaintiffs.

14          So we've submitted what's new.  What we didn't have

15  when we were before you last time because it came out two

16  weeks after our oral argument.

17          Is the Exhibit 8 -- it's Docket 83, Exhibit 25 to

18  their motion.  And it's the company's presentation to

19  investors.

20          THE COURT:  Yes, he referred to that in his

21  argument.

22          MR. BARZ:  It's an update on the restatement.  And

23  it says that part of the remediation they took was to

24  terminate the responsible individuals.  It also -- in this

25  document, as we've walked it through, it says that one of

1    those individuals was upgrading the principal accounting

2    officer.  And they referred to doing that based on his

3    professionalism.

4           Now, we think that is a scathing indictment from the

5    company for an individual.  This wasn't an individual that

6    left, and they said he's gone on for a better job.  This

7    wasn't an individual that left, the company thanked him for

8    his service, which you typically always see when high execs

9    leave companies.  Instead, they issued a scathing document

10   that includes him with all the other guys that were fired.

11   And we think it makes sense, and it helped us look at these

12   allegations in a new light, because there's two parts to this

13   restatement.

14          There's the was it realistic to believe that you

15   could cut cost that much.  And they argued that when it comes

16   to estimates, it could be tough, maybe not all the information

17   was passed along.  But there is a second piece of the

18   restatement, Your Honor.  They said that part of the reason

19   they needed to restate is they weren't counting all the costs.

20   That's not projections into the future.  That's not, "well, I

21   thought I could get it done, maybe it was unrealistic."

22   That's just saying, we're not going to count those.

23          This is the individual that came up with that policy

24   that they admitted at the end they needed to fix and then they

25   fired the guy.  We think that's compelling.  Not counting all

1   your costs is indefensible when you are the in-house expert on

2   GAAP.  They've cited cases with restatements that deal with

3   complex new rules.  They keep mentioning the *Yates* case.

4   *Yates* was a complex new rule dealing with variable interest

5   entities.  That's calculus for accountants.

6          Counting your overhead, that's accounting 101.

7   There's been no change in the accounting rules that they've

8   cited that we're aware of, that said you used to not count

9   them, now you have to.  They certainly didn't say that's the

10  case.  They said we were doing it wrong, we're now fixing it

11  and going forward.  And we've got a new principal accounting

12  officer.

13         Now, to get around this, they invent a fact.  They

14  say that not just one, but two accounting firms explicitly

15  approved doing it that way.  Where is the evidence of that?

16  There's no evidence of that.  They -- the only evidence they

17  offer for that is they say the policy was fully disclosed.

18  Auditors don't audit every little thing you do.  They can't be

19  there 365 days a year.  They look at the financial statements

20  as a whole.

21         There is no opinion they can give you that says, "We

22  approve the exclusion of general and administrative expenses

23  from the calculation of costs under the Lake City contract."

24  They can't cite it because it doesn't exist.

25         Now, but they want you to assume, for the purpose of

31

1 this motion, that it was approved by the auditors before and

2 the basis they give you is they claim that it was clearly

3 disclosed in the 10-K.

4        Now, we didn't attach the 10-K and they didn't

5 attach the 10-K.  They say it was disclosed but they didn't

6 give it to you.  I would like to give it to you now.  I would

7 like to give it to you after this.  But I think if you're

8 going to go and dispute the facts of my motion because I've

9 alleged to the opposite.  I said they never disclosed this --

10        THE COURT:  Well, I can consider under Rule 12 the

11 10-Ks.  And it probably won't surprise you to know that we

12 have them.

13        MR. BARZ:  I invite you to.

14        THE COURT:  All right.

15        MR. BARZ:  And I want to point you to the 10-K for

16 the transition period April 1st, 2015 to December 31st, 2015.

17        THE COURT:  Is that one of the 10-Ks that's at

18 issue?

19        MR. BARZ:  That's one of the false and misleading

20 ones before they corrected it.

21        THE COURT:  All right.  Show it to counsel.

22        And hand that to the court security officer.  All

23 right.

24        MR. BARZ:  And I turn everyone's attention to page

25 32.  So we've got to read this disclosure in context.  It

32

1    says:  Profits expected to be realized -- this is their

2    policy -- on contracts, are based on management's estimates.

3    Now, that's interesting because we've heard a lot about it was

4    all the low level guys, but that's not what they told

5    investors.  They said:  Profits expected to be realized on

6    contracts are based on management's estimates of total

7    contracts sales value and costs at completion.  Total sales

8    and costs.  Not some costs.  Not other costs.

9        Look at what they say in the next paragraph:

10   Changes in contract estimates occur for a variety of reasons

11   including changes in -- and they list several items.  The last

12   one is:  Contract overhead costs over the performance period.

13       Well, wait a minute.  They just said that we told

14   everybody we didn't include the general administrative

15   overhead costs in calculating the profits in Lake City.  It is

16   not at all accurate.  The fairest reading of this reference to

17   total costs and changes in overhead costs can affect our

18   estimates is that they are including them.  And they changed

19   this language to explicitly say we weren't doing it, now we

20   are.

21       So if the auditors approved them doing it, why did

22   they make them change it?  It makes no sense at all.  I mean,

23   I don't even understand that argument that the auditor said we

24   could exclude those costs, but yet they changed it in the end

25   and restated.

33

1            So in any event, if you're going to dispute the

2     facts, look at the document and apply the Fourth Circuit

3     standard that you've got to read these things in the light

4     most favorable to the plaintiffs at this stage.

5            THE COURT:  All right.  Thank you.

6            MR. BARZ:  Thank you.

7            THE COURT:  Do you have more than a minute and a

8     half?

9            MR. ROBERTS:  I'll try to be as brief as I can, Your

10    Honor.  I'll take those points in reverse order very quickly.

11           THE COURT:  Yes, very quickly.

12           MR. ROBERTS:  On the issue of what does the 10-K say

13    about the accounting policy, Your Honor, I can only say that

14    my esteemed opponent here reading of is just completely wrong

15    as a matter of accounting.  I mean, it's quite simple.  The

16    company disclosed that the entire amount of the estimated

17    gross margin loss is charged to cost to sales.  Gross margin

18    loss is a term, you can easily find it on the internet, gross

19    margin doesn't include company wide costs.  So when it said

20    that, it was clearly telling people it wasn't including

21    company wide costs as part of its calculation.  And I'll leave

22    that there.

23           On the issue, Your Honor, of this restatement

24    presentation, we provided it to the Court as an exhibit to our

25    motion here.  Again, this is a kind of gross misuse of the

34

1    documents.  I would note that the --

2             THE COURT:  Well, of course, it's referred to in the

3    amended complaint.

4             MR. ROBERTS:  It is.

5             THE COURT:  So I'm entitled to consider it.  Go on.

6             MR. ROBERTS:  You absolutely are, Your Honor, but --

7    but what I'm suggesting here is that plaintiffs have grossly

8    distorted what this document says.  We've provided it to the

9    Court.  It's clear.  There's a page in it.  I have it right

10   here.  I'm happy to hand it up, Your Honor, if it would be

11   helpful.

12            THE COURT:  All right.  You may do so.  Show it to

13   opposing counsel, first.

14            MR. ROBERTS:  Of course.

15            THE COURT:  Yes.

16            MR. ROBERTS:  Mr. Barz just argued that this

17   document clearly says that Mr. Thompson was fired as a result

18   of the restatement.  It says nothing like that.  If you look

19   at first tab, Your Honor, this page called "Background" is the

20   only mention of Mr. Thompson at all in this entire document.

21            In this page background, it says, down at the final

22   bullet point, "Since 2015..."  that would be, of course, prior

23   to the restatement.  So this is going back now prior to the

24   restatement.  "Orbital ATK has upgraded its finance

25   organization."  That says that includes a new principal

1  accounting officer.  That's it.  There's no reference here to

2  the restatement, that Mr. Thompson is somehow responsible for

3  it, that he's being let go because of actions related to the

4  restatement.  Nothing like that, Your Honor.  Nothing.

5         And so for Mr. Barz to stand up here today and say

6  that this document shows that is just outrageous.  I don't

7  have any other way to put it.  So I will leave that there.

8         And then, Your Honor, one final point and I'll sit

9  down.  And this goes to this issue of corporate scienter.  So

10  Mr. Barz suggested that there haven't been courts that have

11  addressed this.  Well, that's because, of course, *Janus* is a

12  quite new decision.  In terms of these couple of district

13  courts that have addressed this issue, he said something quite

14  telling, of course, he said *Lee v. Active Power*, is the

15  northern district of Texas case.  So what that case simply

16  says is, well, until the Fifth Circuit changes its mind about

17  who makes a misstatement, we're going to continue to find that

18  furnishing information is enough.  Of course, this furnish

19  information standard has never been adopted by the Fourth

20  Circuit.  This is -- this is -- this is an invention from

21  other courts, not this court.

22         And the -- the key here, I think the way to think of

23  this is very simply, Your Honor, is the question is who can be

24  liable for making a misstatement?  Can lower level employees

25  be liable for that?  They can't.  The Supreme Court has

1  answered that question.  The only people who make the

2  misstatement are the people who have ultimate authority over

3  it.

4          So the Courts are consistent.  The issue is who

5  makes the statement and then you can impute their scienter to

6  the company.

7          THE COURT:  All right.

8          MR. ROBERTS:  The lower level employees here didn't

9  make any statements.

10          THE COURT:  Thank you.

11          MR. ROBERTS:  Thank you, Your Honor.

12          THE COURT:  The reference to the Texas case causes

13  me to have another reminiscence, which I will keep to 30

14  seconds.

15          One of the first arguments I made in the Federal

16  District Court in Norfolk involved a Pullman conductor in a

17  FELA case.  And my position on behalf of the railroad, which

18  was Mr. Powell's client, as he then was, I've worked for

19  Mr. Powell as he then was.  And I argued to the judge, who is

20  no longer in this vale of tears.  I said that the Supreme

21  Court had said that there was no liability.  And the judge

22  said, "Well, that may be what the Supreme Court said, but what

23  did the Fourth Circuit say?"

24          And I kind of looked around.  I actually had a

25  family member in the courtroom, so it was a little

37

1   embarrassing.  And so I looked around and I thought and I

2   said, "Well, the Fourth Circuit did say that."  And then I

3   heard one of the more remarkable statements from the bench I'd

4   ever heard.  He said to me, "Well, it appears they did say it,

5   but I don't think they meant it."

6          Well, I will say that about four or five weeks later

7   an opinion came out that did apply the appropriate standard

8   from the Supreme Court and the Fourth Circuit.

9          So you-all can hope that in the next few weeks, as I

10  consider what you've said, that the light will finally dawn on

11  me in the right way, whether it's for the plaintiff or the

12  defendants.

13         Thank you for your arguments.  They've been very

14  helpful.  I'll take them under advisement.

15         MR. BARZ:  Thank you, Your Honor.

16         MR. ROBERTS:  Thank you, Your Honor.

17

18         **(Proceedings adjourned at 11:17 a.m.)**

19

20

21

22

23

24

25

1          CERTIFICATE OF REPORTER

2

3          I, Tonia Harris, an Official Court Reporter for

4     the Eastern District of Virginia, do hereby certify that I

5     reported by machine shorthand, in my official capacity, the

6     proceedings had and testimony adduced upon the Motion to

7     dismiss in the case of the **STEVEN KNURR, et al versus**

8     **ORBITAL ATK INC., et al**, Civil Action Number 1:16-CV-1031,

9     in said court on the 8th day of December, 2017.

10         I further certify that the foregoing 38 pages

11    constitute the official transcript of said proceedings, as

12    taken from my machine shorthand notes, my computer realtime

13    display, together with the backup tape recording of said

14    proceedings to the best of my ability.

15         In witness whereof, I have hereto subscribed my

16    name, this the December 13, 2017.

17

18

19

20

21    _____
      Tonia M. Harris, RPR
22    Official Court Reporter

23

24

25

                                                            38