**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| **STEVEN KNURR,** *et al.*, | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No. 1:16-cv-1031** |
| **v.** | ) | |
| | ) | |
| **ORBITAL ATK INC.,** *et al.*, | ) | |
| **Defendants.** | ) | |
| | ) | |

## <u>MEMORANDUM OPINION</u>

This is the second chapter in this federal securities fraud saga. The first chapter ended with the dismissal in part of the original complaint ("OC"). Specifically, the § 10(b) claim in the OC was dismissed with leave to amend because the facts alleged therein did not give rise to the statutorily required "strong inference" of scienter. *Knurr v. Orbital ATK* ("Knurr I"), 272 F. Supp. 3d 784, 813 (E.D. Va. 2017) (granting motion to dismiss with respect to § 10(b) claims). The § 14(a) claim, however, passed threshold muster. *Knurr v. Orbital ATK* ("Knurr II"), 276 F. Supp. 3d 527, 544 (E.D. Va. 2017) (denying motion to dismiss with respect to § 14(a) claims).

Plaintiffs then filed an amended complaint ("AC"), alleging essentially the same facts as alleged in the OC, but adding an additional individual defendant and adding some allegations relating to this new individual defendant. Defendants now seek dismissal of the AC, arguing that the AC fails to remedy the OC's fatal flaw inasmuch as the AC still does not allege facts that give rise to a "strong inference" of scienter, as required by the Private Securities Litigation Reform Act ("PLSRA").[1] These issues have been fully briefed and argued and are now ripe for disposition.

---

[1] 15 U.S.C. § 78u-4(2)(A).

**I.**[2]

The facts recited here are derived from the AC, and as required, these facts are assumed to be true for purposes of this motion. *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 625 (4th Cir. 2008) (noting that at the motion to dismiss stage, "we must accept plaintiffs' factual allegations as true"). Because most of the facts in the AC are facts contained in the OC and set forth in some detail in *Knurr I*, they are only briefly summarized here. More detail is provided here with respect to the additional allegations in the AC relating to the new individual defendant.

Plaintiffs filed the OC in this matter on April 24, 2017, asserting claims pursuant to §§ 10(b), 14(a), and 20(a) of the Securities and Exchange Act of 1934 ("Exchange Act") against corporate defendant Orbital ATK and several individual defendants, including David Thompson, Garrett Pierce, Blake Larson, and Mark DeYoung. Corporate defendant, Orbital ATK, is an aerospace and defense company headquartered in Dulles, Virginia. Orbital ATK was formed as a result of the February 2015 merger between two companies—Orbital Sciences Corporation ("Orbital Sciences") and Alliant Techsystems, Inc. ("Alliant"). The aforementioned individual defendants were corporate officers of Alliant, Orbital Sciences, and Orbital ATK. The OC alleged that the individual defendants, and by extension Orbital ATK, made a series of false and misleading statements in various SEC filings, conference calls, and investor meetings with respect to merger synergies, the performance of a major ammunition contract with the United States Army (the "Lake City Contract"),[3] Orbital ATK's overall financial performance, and Orbital ATK's internal controls. Specifically, the OC focused on the defendants' failure to

---

[2] For a full recitation of the factual allegations in the OC, see *Knurr I*, 272 F. Supp. 3d at 789-97.

[3] Orbital ATK's predecessor, Alliant, originally entered into the Lake City Contract in 2000. Alliant manufactured billions of rounds of small caliber ammunition under this contract, which accounted for 13% of Alliant's total revenues in fiscal year 2010. Before the merger of Alliant and Orbital Sciences, Alliant submitted an aggressive bid and won the renewal of the Lake City Contract for an additional seven-year term with a three-year extension option with production under the renewed contract to begin in 2013.

disclose substantial cost overruns on the Lake City Contract and the defendants' corresponding failure to record estimated contract losses as soon as those losses became evident. These overruns and losses eventually led Orbital ATK to issue two restatements of earnings which revealed that, in contrast to the defendants' statements, Orbital ATK had suffered a $375 million loss on the Lake City Contract. The restatements also disclosed two causes of the misstatements: (1) a flawed accounting methodology that excluded general and administrative costs from forward loss measurements; and (2) weaknesses in Orbital ATK's internal controls, which allowed lower-level management to suppress information related to overruns from higher-level corporate officers.[4]

The OC also alleged that the individual defendants and Orbital ATK made these misleading statements with the requisite scienter. Specifically, the OC pointed to several indicia as establishing the required strong inference of scienter:

> (1) defendants' senior positions with Orbital ATK and corresponding awareness of, responsibility for and control over the Lake City Contract and other subjects of the misleading statements;

> (2) multiple "red flags" indicating that the Lake City Contract was operating at a loss;

> (3) the simplicity of the "percentage-of-completion" accounting method for the Lake City Contract and defendants' years of experience in using this method for long-term government contracts;

> (4) the sheer magnitude of the restatement;

> (5) the departure of key employees, particularly DeYoung, government investigations, and defendants' false SOX certifications; and

---

[4] For example, one of the restatements, the Amended Form 10-K, reported that an internal investigation revealed that certain personnel in the Small Caliber Systems Division and the Defense Systems Group failed to adhere to company standards with respect to the Lake City Contract. In particular, (i) there was likely a "bias toward maintaining a targeted profit rate;" (ii) there was, in some cases, an "inappropriate use of management reserves to maintain the targeted profit rate;" (iii) "some members of the Small Caliber Systems Division finance staff failed to follow up and inquire further into indications that cost overruns were occurring;" and (iv) "negative information was suppressed, and concerns at the Small Caliber Systems Division about cost overruns were not escalated appropriately" to higher-level company management and finance staff, the Audit Committee, the Board of Directors, or the independent accounting firm.

(6) defendants' motives, namely defendants' profit from incentive compensation or stock sales and desire to complete the merger and make it appear successful.

On May 30, 2017, defendants filed a motion to dismiss the OC, arguing that the facts alleged therein did not give rise to the "strong inference" of scienter required by the PSLRA. An Order and two Memorandum Opinions issued on September 26, 2017, granting in part and denying in part the motion to dismiss. Specifically, the motion to dismiss the § 10(b) claim was granted and that claim was dismissed with leave to plaintiffs to amend while the motion to dismiss the § 14(a) claim was denied.[5]

Shortly thereafter, plaintiffs filed the AC at issue here, realleging the § 10(b) claims and adding a new individual defendant, Hollis Thompson. Defendant Hollis Thompson ("Hollis Thompson") is a Certified Public Accountant ("CPA") with a bachelor's degree in accounting. Before joining Orbital Sciences, Hollis Thompson worked as an audit manager at Arthur Andersen & Co. At Orbital Sciences, Hollis Thompson worked as Controller from 1998 until 2003 and then served as Principal Accounting Officer ("PAO") from 2003 until the merger in 2015. After the merger, Hollis Thompson served as Vice President of Financial Reporting and PAO of Orbital ATK. In this role, Hollis Thompson approved Orbital ATK's accounting practices and oversaw all financial reporting and controls. In particular, the AC alleges that Hollis Thompson approved the accounting methodology that excluded general and administrative costs from Orbital ATK's loss calculations, and in so doing, contributed to Orbital ATK's failure to record forward losses on the Lake City Contract when those losses became evident.

---

[5] With respect to defendants' motion to dismiss plaintiffs' § 14(a) claims, defendants argued that to state a claim under § 14(a), plaintiffs must establish that defendants made misleading statements in a joint proxy with scienter, and not merely with negligence. Because *Knurr II* held that § 14(a) requires only that a plaintiff show negligence to establish a claim under § 14(a), defendants' motion to dismiss was denied. *See Knurr II*, 276 F. Supp. 3d at 544.

The AC also alleges that Hollis Thompson made several false and misleading statements with respect to the financial success of Orbital ATK after the merger. Specifically, the AC alleges that Hollis Thompson signed Orbital ATK's 2015 Form 10-K and Orbital ATK's Form 10-KT for the transition period from April 1, 2015 to December 31, 2015 ("2015 Form 10-KT"), both of which allegedly contained material misrepresentations regarding the performance of the Lake City Contract, Orbital ATK's overall financial performance, and Orbital ATK's internal controls. On February 27, 2017, one day after Orbital ATK issued its Amended 2015 Form 10-KT, defendant was replaced as PAO.[6]

On October 24, 2017, defendants filed the motion to dismiss the AC at issue here, arguing that the AC, like the OC, fails to allege facts that warrant a strong inference of scienter with respect to Hollis Thompson and that the § 10(b) claim against Orbital ATK cannot survive without a claim against an individual defendant. In response, plaintiffs contend that the AC satisfies the PSLRA requirement to allege facts to establish a strong inference of scienter as to Hollis Thompson and that even assuming plaintiffs cannot state a claim against Hollis Thompson, the § 10(b) claim against Orbital ATK survives because lower-level employees in the Small Caliber Systems Division intentionally concealed the Lake City Contract cost overruns. As such, there are two questions presented by defendants' motion to dismiss the AC:

> (1) whether plaintiffs have alleged facts in the AC that warrant, as the PSLRA requires, a "strong inference" of scienter that Hollis Thompson intentionally concealed or recklessly ignored significant losses on a government contract; and

> (2) whether plaintiffs can state a § 10(b) claim against a corporate defendant based on the scienter of lower-level employees who did not make the misleading statement, but merely furnished inaccurate information to higher-level employees who signed the 10-Ks.

These questions have been fully briefed and argued and are now ripe for disposition.

---

[6] The AC also realleges to preserve for appeal the § 10(b) claims that were dismissed against individual defendants Thompson, Pierce, Larson, and DeYoung.

## II.

Section 10(b) of the Exchange Act prohibits the use of "any manipulative or deceptive device or contrivance" in connection with the sale of securities "in contravention of [the] rules and regulations" prescribed by the SEC. 15 U.S.C. § 78j(b). The elements of a § 10(b) claim are well-established: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase of a sale or security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008).

Defendants' motion to dismiss the § 10(b) claim against Hollis Thompson focuses exclusively on the second element, namely the required "strong inference" of scienter. Fourth Circuit precedent makes clear that "to establish scienter, a plaintiff must prove defendant acted with 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 884 (4th Cir. 2014) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007)). As such, at the pleading stage, the plaintiff must allege that defendants "either knowingly or recklessly defrauded investors[.]" *Id* .at 885.[7] At the same time, because the PSLRA "imposes a heightened pleading standard on fraud allegations in private securities complaints," general allegations of scienter are not sufficient. *Id.* at 885.[8] Instead, the complaint must "state with particularity facts giving rise to a *strong inference* that the defendant acted with [the requisite scienter]." 15 U.S.C. § 78u-4(b)(1)(B), (2)(A) (emphasis added). In this regard, the Supreme Court has made clear that "in determining whether the

---

[7] A "reckless act is one that is so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* at 884 (quotation marks omitted).

[8] The Supreme Court has recognized that Congress imposed the heightened "strong inference" pleading standard in the PSLRA with twin goals: "to curb frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims." *Tellabs, Inc.*, 551 U.S. at 322.

pleaded facts give rise to a 'strong' inference of scienter, [a] court must take into account plausible opposing inferences." *Tellabs, Inc*, 551 U.S. at 323. A complaint survives a dismissal motion "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

The AC realleges the same facts and indicia of fraud contained in the OC in an attempt to establish a strong inference that defendant Hollis Thompson, and by extension Orbital ATK, acted with the requisite scienter in making the aforementioned misleading statements. The AC also alleges additional indicia unique to Hollis Thompson, including: (1) that in his role as Orbital ATK's PAO, defendant developed and approved what proved to be a flawed accounting practice that contributed to the Lake City Contract errors; (2) that in his role as PAO, defendant was responsible for overseeing all financial reporting and accounting practices; and (3) that defendant was replaced as PAO immediately following the restatement of earnings in February 2017. Because *Knurr I* held that the previously alleged indicia were not sufficient to warrant a strong inference of scienter as to the other individual defendants,[9] the central question is whether these three additional indicia, viewed individually or together with all of the other indicia, establish the requisite strong inference of scienter with respect to Hollis Thompson.

To answer this question, these three allegations are evaluated first in light of "context and common sense" to determine whether they give "rise to an inference of scienter and, if so, the strength of that inference." *Yates*, 744 F.3d at 885. From there, Fourth Circuit precedent requires consideration of "whether a reasonable person would regard the inference that defendant[] knowingly or recklessly misstated or omitted material information at least as strong as the inference that [the defendant] [was] merely negligent with respect to those statements."

---

[9] *See Knurr I*, 272 F. Supp. 3d at 811 ("The innocent inferences from these allegations taken as a whole are ultimately more compelling than the malicious ones.").

*Id.* at 893 (quoting *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 187 (4th Cir. 2009)).  In this respect, the AC is "evaluate[d] . . . holistically, recognizing that allegations of scienter that would not independently create a strong inference of scienter might [complement] each other to create an inference of sufficient strength to satisfy the PSLRA."  *Id.* (quotation marks omitted).

## A.

The AC's first allegation arises out of Hollis Thompson's role as Orbital ATK's PAO and his responsibility in this role for accounting practices within the company.  Specifically, the AC alleges that Hollis Thompson knowingly developed and approved an accounting methodology that violated Generally Accepted Accounting Principles ("GAAP") and contributed to the Lake City Contract accounting errors.  Plaintiffs argue that given Hollis Thompson's background as a CPA and his experience with Orbital ATK, he knew or recklessly disregarded the fact that the accounting practice he approved—which excluded general and administrative costs from forward loss measurements—violated GAAP.  Based on this inference, the AC further alleges that Hollis Thompson knew the costs on the Lake City Contract were vastly understated and consequently that Orbital ATK's SEC filings were false and misleading.

This allegation fails to establish any inference of scienter, let alone the strong inference required under the PSLRA, for two primary reasons: (1) Orbital ATK publicly disclosed this accounting practice in all of its SEC filings; and (2) the AC fails to allege adequately that Hollis Thompson knew the accounting methodology violated GAAP.

To begin with, Orbital ATK publicly disclosed this practice of not including general and administrative costs in forward loss measurements in each of its SEC filings throughout 2015, including the 2015 Form 10K and the 2015 Form 10-KT signed by Hollis Thompson.

Specifically, both the 2015 Form 10K and the 2015 Form 10-KT stated: "In the period in which it is determined that a loss will be incurred on a contract, the entire amount of the estimated gross margin loss is charged to cost of sales." Because it is well-known that gross margin loss includes only cost of goods sold, and not general and administrative costs,[10] all of the relevant 10-K Forms made clear that general and administrative costs were not charged to cost of sales. The June 30, 2017 investor presentation relied on by plaintiffs confirms this conclusion, as the presentation states that the restatement was caused, in part, by the "application of a prior accounting policy" which was "fully disclosed in 10-Ks." Orbital ATK's public statements thus make clear that Orbital ATK repeatedly disclosed to the public that the company was using an accounting practice that did not take into account general and administrative costs in measuring forward loss.

Where, as here, red flags, such as flawed accounting methodologies, are public knowledge, this fact negates or significantly undercuts any inference of scienter. *See Owens v. Jastrow*, 789 F.3d 529, 540 (5th Cir. 2015) (noting that the fact that "the red flags were disclosed to the public" "negates the inference that defendants acted with scienter").[11] Put simply, it strains credulity to believe that Hollis Thompson would report publicly an accounting methodology that was used with his approval if he intended the use of that accounting practice to be fraudulent. Were an individual engaging in behavior he or she knew was fraudulent, one would expect to see attempts to conceal that behavior, not widespread public reporting thereof. To argue that a publicly reported accounting practice is fraudulent is to adopt the unsupportable

---

[10] *See Gross Margin,* Investopedia*,* http://www.investopedia.com/terms/g/grossmargin.asp (Nov. 13, 2017) ("Gross margin is a company's total sales revenue minus its cost of goods sold (COGS), divided by total sales revenue, expressed as a percentage.").

[11] *See also Fire & Police Pension Ass'n of Colorado v. Abiomed, Inc.*, 778 F.3d 228, 244 (1st Cir. 2015) (concluding that a company's disclosures of its correspondence with the FDA "undercut any inference of scienter"); *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1211 (11th Cir. 2001) (concluding that disclosures of red flags "significantly undermine[d] any hint of fraud").

conclusion that you can deceive the public while simultaneously telling the public exactly what you are doing.

In sum, Hollis Thompson's approval of an accounting methodology that excluded general and administrative costs from forward loss measurements does not give rise to the required strong inference of scienter. Indeed, this fact does not give rise to any inference of scienter and certainly does not raise an inference of scienter that is at least as cogent and compelling as the innocent inference that Hollis Thompson's approval of the policy was, at most, negligent or ill-advised.

Next, the AC also fails adequately to allege that Hollis Thompson knew that this accounting practice violated GAAP. Fourth Circuit precedent makes clear that "[t]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter." *Yates*, 744 F.3d at 887 (quotation marks and brackets omitted)). Instead, to satisfy the PSLRA, plaintiffs must allege additional details about the defendants' awareness of the GAAP violations and fraudulent intent to mislead investors. *See In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1113 (10th Cir. 2015) (holding that allegations of GAAP violations are not sufficient to establish a strong inference of scienter unless they are "coupled with evidence that the violations or irregularities were the result of defendant's fraudulent intent to mislead investors"). Plaintiffs attempt to meet this standard by arguing that the GAAP violations here were so obvious that any accounting professional with Hollis Thompson's training and experience must have known that the methodology violated GAAP.

This allegation, however, is not sufficient to support the required strong inference of scienter because, as courts have noted, allegations of GAAP violations, even when committed by experienced accounting professionals, do not, without more, establish a strong inference of

scienter. This is so because as the Eight Circuit has recognized, GAAP itself is "far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions." *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 890 (8th Cir. 2002) (citation omitted). Indeed, "[t]here are 19 different GAAP sources, any number of which might present conflicting treatments of a particular accounting question." *Id.* (quotations and citation omitted). Thus, courts have acknowledged that even accounting professionals can misinterpret and reach differing conclusions with respect to the application of GAAP. *See Okla. Firefighters Pension & Ret. Sys. v. Ixia*, 2015 WL 1775221, at *33 (C.D. Cal. Apr. 14, 2015) ("Accounting professionals deal with a myriad of detailed rules and standards; mere experience in the field might not suffice to alert one to misapplication of a rule with which one was not familiar."). And notably in this case, all accounting officials who reviewed the use of this accounting methodology—including Alliant officers and independent auditors—seemed to reach the same conclusion, namely that the accounting practice was *not* a violation of GAAP. Specifically, Alliant had used the same practice prior to its merger with Orbital Sciences and had reported that practice in its SEC filings. AC ¶ 274. After the merger, independent auditors expressly approved Orbital ATK the accounting methodologies, including the practice of excluding general and administrative costs from forward loss measurements. Significantly, these auditors did not note any GAAP violations in their audits prior to the restatements at issue. Where, as here, independent accounting professionals approve a particular practice, courts have reasonably concluded that it is even less likely that any one individual with accounting experience would necessarily be aware of GAAP violations. *See, e.g., In re KLX, Inc. Sec. Litig.*, 232 F. Supp. 3d 1269, 1282 (S.D. Fla. 2017).[12]

---

[12] *See also In re Iconix Brand Grp. Inc.*, 2017 WL 4898228, at *19 (S.D.N.Y. Oct. 25, 2017) (noting that the fact that auditors "did not detect, observe, or otherwise note any improprieties in Iconix's financial accounting—over three consecutive audit years—is significant"); *Proter v. Medifast Inc.*, 2013 WL 1316034, at *15 (D. Md. Mar. 28, 2013) ("[I]t cannot be at once the case that the accounting errors were simple, clear-cut determinations and, at the

In sum, the AC's allegation based on Hollis Thompson's approval of an accounting methodology that allegedly violated GAAP fails to establish a strong inference of scienter because Orbital ATK publicly disclosed the accounting practice at issue, and the AC does not contain the requisite details concerning Hollis Thompson's particular exposure to, and awareness of, the flaws in the practice. The more cogent and compelling inference is the innocent one, namely that Hollis Thompson reasonably believed that Alliant's legacy accounting methodology was fully compliant with GAAP, or at worst, was negligent in adopting the practice, and that Hollis Thompson did not discover potential flaws in the methodology until the need for a restatement became apparent. Thus, these allegations based on Hollis Thompson's expertise as an accountant fail to raise the strong inference of knowing or reckless conduct required to establish scienter.

**B.**

The second allegation in the AC that plaintiffs contend establishes the requisite strong inference of scienter also relates to Hollis Thompson's role as PAO. In particular, the AC alleges that as PAO, Hollis Thompson had day-to-day responsibility for Orbital ATK's accounting department and was directly responsible for supervising financial reporting. This allegation similarly fails to support a strong inference of scienter. In essence, the AC alleges that because Hollis Thompson was directly responsible for overseeing financial reporting and accounting, he must have known or recklessly disregarded the incorrect cost estimates with respect to the Lake City Contract.[13] This allegation about Hollis Thompson's corporate

---

same time, that the Company's auditors repeatedly failed to discover these 'obvious' errors"); *In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323, 341 (W.D.N.Y. 2008) ("It is noteworthy that [defendant's] outside auditors did not question [defendant's] accounting practices.").

[13] Specifically, the AC notes that in his role as PAO, Hollis Thompson's "actions especially influence[d] employees who perform[ed] the accounting function." AC ¶ 220. As PAO, Hollis Thompson was required to be "familiar with the company's financial position and operations" and therefore would be able to "identify unusual situations caused

responsibility is essentially the same as the allegations in the OC relating to the corporate positions of the other individual defendants. To be sure, the AC alleges that Hollis Thompson had a more direct role than the other individual defendants in overseeing the accounting and financial reporting practices that contributed to the need for a restatement of earnings. But this general allegation based on a corporate position fails to rescue plaintiffs' complaint because the Fourth Circuit has made clear that general allegations based on corporate positions are insufficient to satisfy the PSLRA's particularity requirement. *Yates*, 744 F.3d at 890 (concluding that an individual's status as a senior executive is not sufficient, without more detailed allegations, to satisfy the PLSRA pleading requirements). Instead, plaintiffs must allege "additional detailed allegations establishing the defendants' *actual exposure* to the accounting problem." *Id.* (emphasis added).[14] In this regard, district courts have found that complaints establish the requisite strong inference of scienter with respect to senior executives where those complaints allege facts demonstrating the senior executives' awareness of the specific problems about which those senior executives made false statements.[15] The AC includes no such allegations.

---

by fraudulent financial reporting perpetrated at the divisional level." *Id.* Also, as PAO, Hollis Thompson "help[ed] set the tone of the organization's ethical conduct" and was "directly responsible for the financial statements," meaning he "c[ould] . . . take authoritative action to correct them if necessary." *Id.* Moreover, as a financial executive (Vice President of Financial Reporting), Hollis Thompson's responsibilities included overseeing the accounting departments at the corporate, group, and divisional levels.

[14] *See also Brophy v. Jiangbo Pharm.*, 781 F.3d 1296, 1306 (11th Cir. 2015) ("The seriousness of Jiangbo's errors and [the defendant's] proximity to those errors [as CFO] at most imply negligence, which is not enough to establish scienter."); *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008) ("Allegations regarding management's role in a corporate structure and the importance of the corporate information about which management made false or misleading statements may also create a strong inference of scienter when made in conjunction with detailed and specific allegations about management's exposure to factual information within the company."); *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 282 (3d Cir. 2006) ("A pleading of scienter sufficient to satisfy Rule 9(b) may not rest on a bare inference that a defendant must have had knowledge of the facts or must have known of the fraud given his or her position in the company." (quotation marks omitted)).

[15] For example, in *In re Genworth Financial Inc. Securities Litigation*, 103 F. Supp. 3d 759, 767 (E.D. Va. 2015), plaintiffs alleged (1) that defendants admitted to making misstatements about when they last conducted a review; (2) that defendants knew that "industry experts had identified adverse trends in claim data between 2010 and 2013 that were not accounted for in" the company's reserves and (3) that defendants knew that the average length for the

The AC, apart from describing Hollis Thompson's role in overseeing accounting practices, fails to allege any additional facts concerning Hollis Thompson's knowledge of whether the costs of production on the Lake City Contract were being properly reported by lower-level employees. Monitoring company operations, discussing company business on conference calls, and signing off on financial statements are all part and parcel of the role of a senior executive and do not, without more, support an inference of actual exposure to a problem, as required to establish scienter. *Yates*, 744 F.3d at 890.[16] And notably in this case, the AC acknowledges that lower-level employees in the Small Caliber and Defense Systems Divisions failed to report the true cost of production to their superiors, including the corporate officers who signed the 10Ks. There is nothing to suggest that although this cost information was not accurately reported, Hollis Thompson was nonetheless aware of this information and deliberately concealed it with the intent to defraud investors.

In sum, the AC's allegations concerning Hollis Thompson's role in the oversight of accounting and financial reporting, when viewed in light of context and common sense, do not establish a strong inference of scienter. Rather, the allegations point more persuasively to an innocent interpretation: lower-level employees in the Small Caliber Systems Division suppressed

---

company's claims was actually longer than the figure used internally to calculate the reserves. *Id.* at 783–84. Similarly, in *Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593 (E.D. Va. 2015), plaintiffs alleged that defendants misrepresented that their high profit margins were due to the use of legitimate, low-cost wood sourcing initiatives when, in reality, the company had high profit margins because of cheap, illegally harvested wood that violated safety standards. *Id.* at 598. In concluding that plaintiffs there satisfied the scienter requirement, the court relied on multiple allegations that defendants were more intimately involved in importing the cheap wood than merely overseeing it, namely (1) the company hired two of the individual defendants specifically for the purpose of importing the Chinese wood; (2) the defendants publicly bragged about inspecting the Chinese mills; (3) defendants repeatedly assured investors that they had employees at the mills to control quality; and (4) the company conducted "stringent testing" of the wood to ensure quality and safety. *Id.* at 607.

[16] *See also In re Criimi Mae, Inc. Sec. Litig.*, 94 F. Supp. 2d 652, 661 (D. Md. 2000) (concluding that allegations that defendants signed the company's public filings with the SEC, held executive positions in the company, were responsible for the company's operations, had "extensive experience in and knowledge of the real estate finance industry," and "their access to information about the company's financial dealings" were insufficient to "raise a strong inference of scienter").

negative information, and Hollis Thompson was, at most, negligent in failing to detect the weaknesses in the internal controls that permitted this suppression of information.

## C.

The AC focuses next on the replacement of Hollis Thompson as PAO on the first business day following the issuance of the Amended 2015 Form 10-KT. Specifically, the AC cites to an investor presentation filed with the SEC on July 30, 2017. In that presentation, Orbital ATK provided an update on the restatement and disclosed that the company was taking steps to "[u]grade[] experience and professionalism of personnel in [its] finance organization." In describing these upgrades, the presentation disclosed that it added a "new Controller and Principal Accounting Officer." Plaintiffs argue that Hollis Thompson's replacement, immediately following the issuance of the restatement, as part of an effort to upgrade "professionalism" in the financial organization, supports a strong inference of scienter.

This argument fails as these allegations do not warrant a strong inference of scienter when compared to plausible opposing innocent inferences. It is undisputed that, in some cases, departures in proximity to restatements can contribute to a finding of a strong inference of scienter. *See Zucco Partners*, 5 *LLC v. Digimarc Corp.,* 552 F.3d 981, 1002 (9th Cir. 2009) (noting that "resignations, terminations, and other allegations of corporate reshuffling may in some circumstances be indicative of scienter"). But the Fourth Circuit has made equally clear that where, as here, a termination or resignation "occurs slightly before or after the defendant corporation issues a restatement, a plaintiff must plead facts refuting the reasonable assumption that the resignation occurred as a result of the restatement's issuance itself in order for a resignation to be strongly indicative of scienter." *Yates*, 774 F.3d 889 (quoting *Zucco Partners*, 552 F.3d at 991, 1002).

Here, plaintiff has failed to plead particularized facts refuting the reasonable assumption that Hollis Thompson was replaced as PAO, not because he knew about or recklessly disregarded the malfeasance of lower-level employees, but because the restatement occurred on his watch. Put another way, Hollis Thompson was, in effect, the captain of the ship and as such, he was responsible for, and should have anticipated, the restatement. *See In re U.S. Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1067 (N.D. Cal. 2002) (finding that departure of personnel did not support inference of scienter on the part of those personnel because "after a restatement of earnings and subsequent loan default, it is unremarkable that the Company would seek to change its management team"). The AC alleges only that Hollis Thompson was replaced as PAO following the filing of the Amended 2015 Form 10-KT because "the disclosed findings [in the restatement] trace[d] to areas for which Hollis Thompson was responsible." AC ¶¶ 151, 216.[17] These allegations, rather than disclosing malevolent or fraudulent behavior, support an innocent and natural explanation for Hollis Thompson's replacement, namely that Hollis Thompson was replaced because he was the captain of the ship; he was responsible for overseeing financial reporting and for establishing internal controls, and those controls clearly failed when lower-level employees were able to report unrealistic cost estimates. In other words, the allegations in the AC more compellingly support the inference that Hollis Thompson was replaced because he was responsible for the areas where issues arose, not because he knew about or deliberately caused those problems. Because this opposing inference is more compelling, Hollis Thompson's departure does not establish the requisite strong inference of scienter.

In sum, the additional allegations with respect to Hollis Thompson—that Hollis Thompson approved a flawed accounting methodology, was responsible for overseeing

---

[17] *See also id.* ¶ 218 ("As PAO and Vice President of Financial Reporting with signature authority for the financial statements, Hollis Thompson had responsibility for ensuring the Company had appropriate controls over financial reporting, including sufficient and competent accounting staff.").

accounting practices, and was replaced as PAO immediately following the restatements—do not independently establish the requisite strong inference of scienter with respect to Hollis Thompson.

## D.

Although these additional allegations do not independently create a strong inference of scienter, this conclusion does not end the inquiry because, as Fourth Circuit precedent requires, the complaint must be "evaluate[d] . . . holistically, recognizing that allegations of scienter that would not independently create a strong inference of scienter might [complement] each other to create an inference of sufficient strength to satisfy the PSLRA." *Yates*, 744 F.3d at 893 (quotation marks omitted). In this regard, any inference of scienter must be weighed against opposing inferences to determine "whether a reasonable person would regard the inference that defendant[] knowingly or recklessly misstated or omitted material information at least as strong as the inference that [the defendant] [was] merely negligent with respect to those statements." *Id.* (quoting *Matrix Capital*, 576 F.3d at 187). It is also important to note that this holistic analysis is not a quantitative one; that is, this analysis does not require assigning a quantitative value to each of the allegations of scienter and then summing these values and comparing the sum to a quantitative value of opposing inferences. This holistic analysis is inherently a qualitative, not a quantitative calculus. *Cf. Knurr I*, 272 F. Supp. 3d at 810 n. 40 (rejecting the argument that facts that independently raise an inference of scienter equal to zero necessarily add up to an inference of scienter equal to zero when considered holistically).

Before conducting this holistic analysis, it is important to summarize the factual allegations against Hollis Thompson. As discussed in *Knurr I*, there is no question that the Lake City Contract was important to Orbital ATK's overall business. *See id.* at 811. The allegations

in the AC also make clear that Alliant had significant experience in manufacturing ammunition, that Alliant won the Lake City Contract through an aggressive bid, and that the contract's profitability hinged on ambitious cuts to production costs. *Id.* Moreover, flaws in Orbital ATK's accounting methodology and the provision of unrealistic cost estimates by lower-level employees ultimately necessitated several restatements of earnings. *Id.* Hollis Thompson, as PAO, was the senior corporate official charged with direct oversight of these accounting policies and financial controls and was removed from his position as PAO immediately following the February 27, 2017 restatement of earnings.

As with the other individual defendants, any inference of scienter from these factual allegations is significantly less compelling than the opposing innocent inference. Rather than leading a reasonable person to believe that Hollis Thompson knew or was reckless in disregarding the flaws in the Lake City Contract estimates, these allegations support the inference that Hollis Thompson was at most ill-advised or negligent in his supervision of his department. Indeed, the factual allegations point most persuasively to the following explanation: when Hollis Thompson became PAO, he implemented Alliant's legacy accounting practice, which had been repeatedly approved by independent auditors, without knowing that practice would contribute to a large understatement of the forward loss measurement on the Lake City Contract. Weaknesses in internal controls, which Hollis Thompson was, at most, negligent in failing to detect, further compounded this problem by allowing lower-level employees to suppress the true costs of production from corporate officials who signed the SEC filings. Although Hollis Thompson, like the other corporate officials, knew the Lake City Contract bid was aggressive, he was optimistic about the Contract's projections given the information he received from his department. Once the errors were discovered, Hollis Thompson was replaced

as PAO because, as captain of the accounting ship, he failed to detect and to correct errors in Orbital ATK's accounting and financial practices. This narrative of negligence is cogent and ultimately more compelling than any inference of scienter. Accordingly, plaintiffs' § 10(b) claim against Hollis Thompson must be dismissed.

## III.

Given that the AC has not adequately alleged facts that warrant a strong inference of scienter with respect to any individual defendants, the question remains whether the claims against Orbital ATK can survive. Plaintiffs argue that corporate liability is adequately pled where the allegations in the complaint support an inference of scienter as to lower-level employees who furnish information for a false or misleading statement, even if those facts do not support an inference of scienter on the part of the senior executives who ultimately make the false or misleading statement. Defendants contend that to sustain a § 10(b) claim, the corporate officer who made the materially false or misleading statement must also possess the requisite scienter. In other words, the dispute here is whether § 10(b) and the PSLRA require that the corporate agent who makes the false or misleading statement must also possess the requisite fraudulent intent.

Analysis properly begins with the text of § 10(b) of the Exchange Act, which prohibits, in relevant part, the use of "any manipulative or deceptive device or contrivance in contravention" of rules promulgated by the SEC. 15 U.S.C. § 78j(b). Although this text does not explicitly address whether or how § 10(b) is applicable to corporations as distinct from individual agents, courts have read the statute to embrace common law rules of agency and in so doing to impose §

10(b) liability on corporations based on the conduct of their agents.[18]  Courts are split, however, on the question presented here, namely whether a § 10(b) violation requires the corporate officer who signs the false statement to possess the requisite scienter or whether a corporation can be liable if a lower-level employee who did not make or sign the statement possesses the requisite mental state.[19]

Common law agency principles, applied here, point persuasively to the conclusion that a corporate defendant can be liable if an agent provides false information to the corporation and its officers intending that the corporation make a false or misleading statement, in violation of § 10(b) of the Exchange Act.  The Restatement (Second) of Agency provides that where an "agent consciously and purposely fails to reveal [] information [to the principal], the principal may be liable because, under the circumstances, the conduct of the agent has the same effect as if the agent had personally acted and were himself guilty of the fraudulent or other tortious conduct." Restatement (Second) of Agency § 268 cmt. d.  The following example illustrates this point more concretely and is on all fours with the facts in this case:

> P, in the business of buying and selling horses, employs A as manager, part of A's duties being to report to P the qualities of horses which P has to sell. A fails to report that one of the horses is vicious. In a sale to T, P innocently represents that the horse is gentle. P is

---

[18] *In re Atlantic Financial Mgmt. Inc.*, 784 F.2d 29 (1st Cir. 1986); *Marbury Management, Inc. v. Kohn*, 629 F.2d 705, 712–16 (2d Cir.), *cert. denied*, 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980); *John Hopkins University v. Hutton*, 422 F.2d 1124, 1130 (4th Cir.1970), *cert. denied after later appeal*, 416 U.S. 916, 94 S.Ct. 1622, 40 L.Ed.2d 118 (1974); *Paul F. Newton & Co. v. Texas Commerce Bank*, 630 F.2d 1111, 1118–19 (5th Cir.1980); *Holloway v. Howerdd*, 536 F.2d 690, 694–95 (6th Cir.1976); *Fey v. Walston & Co., Inc.*, 493 F.2d 1036, 1051–52 (7th Cir.1974); *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1577 (9th Cir. 1990); *Kerbs v. Fall River Industries, Inc*., 502 F.2d 731, 740–41 (10th Cir.1974); c*f. Am. Soc'y Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 568, 102 S.Ct. 1935, 1943, 72 L.Ed.2d 330 (1982) (citing with approval *Holloway*, 536 F.2d 690; *Kerbs*, 502 F.2d 731).

[19] *Compare In re Computer Sciences Corp.*. 890 F. Supp. 2d 650, 664 (E.D. Va. 2012) ("[P]recedent points persuasively to the conclusion that in order for a corporation to be liable for securities fraud, 'at least one corporate agent' must have 'acted with the required state of mind[.]' *i.e.*, made a false or misleading statement of material fact with scienter."), *with In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 516 (S.D.N.Y. 2009) (finding that, for the purposes of corporate liability, "the individual making an alleged misstatement and the one with scienter do not have to be one and the same").

liable in an action for fraud if, but only if, A had intended P to make the misrepresentation.

*Id.* § 275 cmt. b.  In other words, the principal is liable for the misrepresentation even though the principal did not have scienter because the agent had scienter and intended the principal to make the misrepresentation.

This hypothetical matches this case.  Here, P is the corporation, and A is the Small Caliber Systems Division manager whose duty it is to report Lake City Contract cost estimates to the corporation and its higher level officials.  The Restatement's illustration suggests that the corporation could be liable if the Small Caliber Systems Division manager intended that Orbital ATK misrepresent Lake City Contract earnings and estimates, even assuming Orbital ATK's corporate officers who signed the 10-Ks did not know the statements were fraudulent.  The reason for this result is simple: Under these circumstances, the conduct of the Small Caliber Systems Division manager in disclosing false information to Orbital ATK's corporate officers, with the intent that those officers rely on that information, has the same effect on stockholders and the market as if the manager personally made the misrepresentations or as if the corporate officers made the misrepresentations with fraudulent intent.  In sum, common law principles of agency suggest that corporations can be held liable for § 10(b) violations where a lower-level corporate agent knowingly and intentionally furnishes false information to a corporate officer for inclusion in a public statement.

In this respect, the conclusion reached here finds further support in the purposes and the goals of the Exchange Act.  The Supreme Court has made clear that the Exchange Act is "remedial legislation," the central purpose of which "is to protect investors through the requirement of full disclosure by issuers of securities[.]" *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967).  In this regard, the Exchange Act seeks to "substitute a philosophy of full disclosure

for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186 (1963)). To require that both scienter and the act of making a misrepresentation exist in the same corporate agent would undermine this purpose by permitting corporations to evade the Exchange Act's requirements with ease. Specifically, a corporation could successfully escape liability "in situations where a corporate policy, procedure, or *sub rosa* encouragement of illegal or tortious behavior" causes lower-level employees to furnish fraudulent information to corporate officers for dissemination to the public. *In re Omnicare*, *Inc. Sec. Litig.*, 769 F.3d 455, 475 (6th Cir. 2014) (quoting Patricia S. Abril & Ann Morales Olazábal, *The Locus of Corporate Scienter*, 2006 Colum. Bus. L. Rev. 81, 113–14 (2006)). This result would be inconsistent with the Exchange Act's remedial purposes.

This conclusion similarly accords with the weight of circuit authority on this question. Although the Fourth Circuit has not squarely resolved the question presented here, the Fourth Circuit, as well as the Seventh and the Eleventh Circuits, have cited with approval the Fifth Circuit's opinion in *Southland Secs. Corp. v. INSpire Ins. Solutions, Inc.*[20] in discussing scienter requirements with respect to corporate defendants. *See Teachers' Ret. Sys. of LA v. Hunter*, 477 F.3d 162, 184 (4th Cir. 2007) ("[I]f the defendant is a corporation, the plaintiff must allege facts that support a strong inference of scienter with respect to at least one authorized agent of the corporation, since corporate liability derives from the actions of its agents." (citing *Southland Secs. Corp.*, 365 F.3d at 363-67)); *see also Matrix*, 576 F.3d at 189.[21] In *Southland*, the Fifth Circuit declined to limit corporate scienter to the scienter of authorized agents of a corporation

---

[20] 365 F.3d 353 (5th Cir. 2004).

[21] The Seventh and Eleventh Circuits have also cited the *Southland* test in their discussions of the scienter of corporate defendants. *See Makor Issues & Rights, Ltd v. Tellabs Inc.* ("Tellabs II"), 513 F.3d 702, 708 (7th Cir. 2008); *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1254 (11th Cir. 2008).

who actually make or issue a material misstatement. Instead, the Fifth Circuit found it appropriate "to look to the state of mind of the individual corporate official or officials who . . . order or approve [the statement] or its making or issuance, or who furnish information or language for inclusion therein, or the like [.]" *Southland Secs. Corp.*, 365 F.3d at 366. The Sixth Circuit adopted similar reasoning in *In re Omnicare*, *Inc. Securities Litigation*, holding that the state of mind of any of the following is probative for purposes of establishing corporate scienter:

> a. The individual agent who uttered or issued the misrepresentation;
>
> b. Any individual agent who authorized, requested, commanded, furnished information for, prepared (including suggesting or contributing language for inclusion therein or omission therefrom), reviewed, or approved the statement in which the misrepresentation was made before its utterance or issuance;
>
> c. Any high managerial agent or member of the board of directors who ratified, recklessly disregarded, or tolerated the misrepresentation after its utterance or issuance . . . .

*In re Omnicare, Inc. Sec. Litig.*, 769 F.3d at 476 (citing Patricia S. Abril & Ann Morales Olazábal, *The Locus of Corporate Scienter*, 2006 Colum. Bus. L. Rev. 81, 135 (2006)). The Fifth and the Sixth Circuits have thus concluded that where, as here, a corporate agent fraudulently causes a misrepresentation the corporation can be liable in the event even if the corporate agent does not actually make the misrepresentation.

Defendants' arguments to the contrary are unpersuasive. Defendants first argue that the Fifth Circuit's decision in *Southland* was abrogated by the Supreme Court's ruling in *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), but that is plainly not the case. Importantly, *Janus* did not address the question presented here, namely which agent's scienter is relevant for the purposes of corporate scienter; rather, *Janus* determined what it means to "make" a statement under § 10(b). *Janus Capital Grp.*, 564 U.S. at 142-43. Defendants nonetheless argue that the *Southland* court assumed that employees who furnish information for

a misleading statement could be held liable pursuant to § 10(b), and because those employees could be said to have individually committed a § 10(b) violation, the corporation could be vicariously liable. Based on these assumptions about the basis for the *Southland* court's decision, defendants argue that the *Southland* holding no longer applies because the Supreme Court has made clear that a person or entity who simply furnishes information for a statement is not individually liable for a § 10(b) violation.

But defendants' interpretation of *Southland* mischaracterizes the Fifth Circuit's reasoning in that case. Nowhere in the *Southland* opinion does the court base its test for corporate scienter on a view of which corporate agents can be held individually liable under § 10(b). Instead, the *Southland* court applies general rules of common law including those rules embodied in the Restatement (Second) of Agency. *Southland Secs. Corp.*, 365 F.3d at 366 (noting that its conclusion is consistent with the general common law rule contained in the Restatement (Second) of Agency). And, as described above, these common law rules provide that the intent of an agent can be imputed to the principal if the agent fails to provide information to the principal, intending the principal to misrepresent that information to third parties. Because *Janus* does not purport to alter common law rules of agency, *Southland*'s reasoning has not been disrupted and continues to be applicable here.

Nor have defendants identified any decision holding that *Southland* was abrogated by the Supreme Court's ruling in *Janus*. Indeed, the only two courts to have squarely addressed the issue have held that *Southland*'s reasoning survived *Janus*. *See Lee v. Active Power*, 29 F. Supp. 3d 876 (W.D. Tex. 2014); *Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 372 (S.D.N.Y. 2012). And, importantly, the Sixth Circuit's decision holding that courts must consider the scienter of agents who furnish information for misleading statements for the

purposes of § 10(b) corporate liability was issued in 2014, several years after the *Janus* ruling. *In re Omnicare Inc.*, 769 F.3d at 476. These post-*Janus* decisions reinforce the fact that *Southland*'s standard survives the Supreme Court's decision in *Janus*.

Next, defendants rely on *In re Computer Sciences* where this Court concluded in one paragraph that pertinent Fourth Circuit authority points to the conclusion that "corporate liability for securities fraud depends on at least one of [a corporation's] agents making a false or misleading statement with scienter." *In re Comput. Sci. Corp.*, 890 F. Supp. 2d 650, 664 (E.D. Va. 2012). But a deeper analysis of the question reveals that this decision was incorrect.

To begin with, as described above, the Fourth Circuit has not actually decided the question presented here and instead has cited to relevant precedent in other circuits in its discussions of corporate scienter. *See Hunter*, 477 F.3d at 184. The *In re Computer Sciences* opinion assesses this precedent from other circuits at a high level and concludes that the Second, Fifth, Seventh and Eleventh Circuits all concur that the same agent must make the misleading statement and possess the requisite scienter for the corporation to be liable. This conclusion mischaracterizes the holdings in these cases. As described above, the Fifth Circuit determined that the scienter of a corporate agent who *causes a misleading statement to be made* is relevant and may be imputed to the corporation for purposes of corporate liability, even where that individual does not himself make the statement. *See, e.g.*, *Southland Secs. Corp.*, 365 F.3d at 366. Similarly, the Seventh and the Eleventh Circuit decisions cite with approval this Fifth Circuit test in their discussions of corporate scienter. *See Tellabs II*, 513 F.3d at 708; *Mizzaro*, 544 F.3d at 1254.[22] Finally, as the *In re Computer Sciences* opinion notes, the Second Circuit

---

[22] Although both circuits cite the *Southland* test, the Seventh Circuit did not address the question presented here because the question here was not explicitly raised in that case, *see Tellabs II*, 513 F.3d at 708, and the Eleventh Circuit dismissed the complaint because the complaint did not allege that any corporate agent, apart from the

25

has stated that "[t]o prove liability against a corporation, of course, a plaintiff must prove that an agent of the corporation committed a culpable act with the requisite scienter[,]" but the Second Circuit has not specified that the "culpable act" must necessarily be an act that violates the Exchange Act. This more comprehensive analysis of relevant precedent discloses that, in contrast to the decision in *In re Computer Sciences*, circuit authority suggests that the scienter of lower-level employees can be imputed to the corporation for the purposes of securities fraud where those employees cause the corporation or its officers to make a misleading statement in SEC filings.

In sum, common law principles of agency, the purposes of the Exchange Act, and precedent from this circuit and elsewhere warrant the conclusion that the scienter of a lower-level employee can be imputed to the corporation for the purposes of corporate liability under § 10(b) where, as here, that lower-level employee fraudulently furnishes information for a public statement and in so doing, intends to cause, and causes, a corporate officer to make a misrepresentation to investors.

These principles, applied here, point persuasively to the conclusion that the AC has adequately stated a § 10(b) claim against the Orbital ATK despite the dismissal of the § 10(b) claims against the individual corporate officers who signed the 10-Ks. The AC alleges, and Orbital ATK's 2015 Amended Form 10-KT confirms, that an internal investigation by the Audit Committee revealed that "personnel at the Small Caliber Systems Division and, in some cases, Defense Systems Group, acted inappropriately[.]" AC ¶ 210. In particular, the Small Caliber Systems Division had "a bias toward maintaining a targeted profit rate," which led to "inappropriate use of management reserves to maintain the targeted profit rate," and failures to

---

individual defendants, was aware of the fraud and was responsible for the misleading statements in some way, *Mizzaro*, 544 F.3d at 1254.

"follow up and inquire further into indicators that cost overruns were occurring." *Id.* Moreover, the Amended Form 10-KT discloses that the Small Caliber Systems Division management actively "suppress[ed] information . . . related to cost overruns and the override of certain controls due to pressure to achieve cost savings and maintained a targeted profit rate." *Id.* ¶ 190. The AC thus specifically alleges that lower-level employees in the Small Caliber Systems Division acted with the requisite fraudulent intent when they furnished false information on Lake City Contract cost overruns and profit rates to corporate officers for inclusion in SEC filings and other public reports. Because the AC alleges facts that warrant a strong inference of scienter with respect to lower-level employees who furnished information for misleading statements, plaintiffs have adequately stated a § 10(b) claim against the corporate defendant and defendants' motion to dismiss in this regard must be denied.

## IV.

In sum, plaintiffs have failed adequately to allege facts supporting a strong inference of scienter with respect to individual defendant Hollis Thompson but has adequately stated a § 10(b) claim against corporate defendant Orbital ATK. Accordingly, defendants' motion to dismiss must be granted with respect to plaintiffs' §10(b) claim against Hollis Thompson and denied with respect to plaintiffs' § 10(b) claim against Orbital ATK.

An appropriate Order will issue.

Alexandria, Virginia
March 2, 2018

/s/

T. S. Ellis, III
United States District Judge