# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT FOR THE
### EASTERN DISTRICT OF VIRGINIA
#### (Alexandria Division)

| | |
|---|---|
| STEVEN KNURR, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> ORBITAL ATK, INC., et al., <br><br> Defendants. | Civil Action No.  1:16-cv-01031-TSE-MSN <br><br> <u>CLASS ACTION</u> |

## ORBITAL ATK, INC.'S FIRST RESPONSES TO
## PLAINTIFFS' FIRST SET OF INTERROGATORIES

**PROPOUNDING PARTY:**   **CONSTRUCTION LABORERS PENSION TRUST OF GREATER ST. LOUIS AND WAYNE COUNTY EMPLOYEES RETIREMENT SYSTEM**

**RESPONDING PARTY:**   **ORBITAL ATK, INC.**

**SET NUMBER:**   **ONE**

Defendant Orbital ATK, Inc. ("Defendant" or the "Company"), hereby responds to Plaintiffs' First Set of Interrogatories to Orbital ATK.[1]

Defendant's gathering, review and production of relevant documents in this case has not been completed, and there may be documents or information relating to the matters that are the subject of these Interrogatories that have not yet been gathered and reviewed.  Defendant expressly reserves the right to revise, correct, clarify, supplement, or amend these responses, and its Objections to Plaintiff's First Set of Interrogatories dated March 21, 2018 ("Objections"), at a

---

[1] Pursuant to an agreement between the parties, these First Responses address Interrogatories 1, 2, 3, 5, 6, 8, 10, 12, and 15.  The Company will be responding to Interrogatories 4, 7, 9, 11, 13 and 14 on April 12, 2018.

later time.  Defendant reserves all objections to the admissibility of any information supplied

herein.  The fact that Defendants supply any information in response to any of Plaintiffs'

Interrogatories does not constitute any admission by Defendant that such information is relevant,

material, admissible in evidence, or reasonably calculated to lead to the discovery of admissible

evidence or proportional to the needs of this litigation.  Defendant reserves its right to object to

further inquiry with respect to the subject matter of any discovery request or the use of any

information contained herein for any purpose.  All responses are made subject to and without

waiver of Defendant's Objections.

**INTERROGATORY NO. 1:**

Identify the basis for and facts supporting the conclusions of the Audit Committee and

senior management, as reported in the 2015 Form 10-KT/A, that: "(a) there likely was a bias

toward maintaining a targeted profit rate; (b) in some cases, there appears to have been

inappropriate use of management reserves to maintain the targeted profit rate; (c) some members

of the Small Caliber Systems Division finance staff failed to follow up and inquire further into

indicators that cost overruns were occurring . . .; and (d) negative information was suppressed, and

concerns at the Small Caliber Systems Division about cost overruns were not escalated

appropriately to higher-level Company management or finance staff, nor were they communicated

to the Audit Committee, the Board of Directors or the independent registered public accounting

firms."

**RESPONSE TO INTERROGATORY NO. 1(a):**

Subject to and without waiver of Defendant's Objections, Defendant provides the

following key facts supporting the referenced statement:

A projected profit percentage (EBIT) of 3.9% was built in to the final proposal for the

Lake City Contract.  Lake City personnel considered this 3.9% figure to be an important metric for the Contract from the Contract's outset.  The 3.9% figure arose most often during quarterly Estimate at Completion ("EAC") reviews for the Contract.[2]  The EAC team was focused on keeping costs down so that they could hold to the 3.9% EBIT, using management reserve ("MR") when necessary, to meet the objective.  This bias led the Lake City team, when faced with the choice of whether to use management reserve or adjust the EBIT number, to choose to use MR.  Despite the importance of the 3.9% EBIT to Lake City personnel, the Company is not aware of any evidence that any Lake City personnel falsified the EBIT number or intentionally misled any corporate-level personnel or any auditors, and none of the foregoing should be read to indicate otherwise.  In fact, by the fourth quarter of fiscal 2015, the EBIT number in the EAC had been reduced to 1.8%.  In addition, certain Lake City personnel were confident that the cost reductions required to achieve the projected EBIT were possible because cost reductions had been achieved under predecessor contracts at the Lake City facility, and because Alliant had successfully achieved cost cutting at its Radford facility.

Further, due to issues related to the Costpoint enterprise resource planning ("ERP") software system at Lake City, Lake City personnel were operating with incomplete cost information.   On or about April 2014, a suite of software systems, including Costpoint, were implemented across Lake City and the Small Caliber Systems Division.  The team that implemented Costpoint was disbanded two to three weeks after the system went live; in retrospect, there was not enough time to provide sufficient training and change management to Costpoint users prior to the implementation team disbanding, resulting in a failure to completely

---

[2] The EAC consisted of incurred-to-date ("ITD") costs plus the forecasted costs based on the estimated costs to complete ("ETC").

adopt the Costpoint system.  Lack of Costpoint expertise led Lake City personnel to rely on legacy non-enterprise systems and spreadsheets, causing the Small Caliber Systems Division team to lose confidence in the numbers coming out of the system and lose visibility into the real performance of the business.  For example, due to Costpoint implementation errors, certain costs that should have been classified as finished goods costs were instead classified as raw materials costs or work-in-process costs.  The EAC used finished goods costs as the basis for ITD costs, so this misclassification of finished goods costs understated the costs incurred to date, and made it seem as though the Lake City facility was experiencing greater cost efficiencies than was the reality.  By the end of the second quarter of the 2016 fiscal year, the Lake City EAC calculation inadvertently excluded approximately $67 million in costs that should have been included in ITD costs.

Lack of Costpoint expertise also resulted in certain system controls, which would have revealed problems with the EAC at an earlier time, not being used.  In addition, a number of accounting responsibilities were transferred from Lake City to Alliant's central Financial Shared Services (FSS) group after Costpoint went live.  The responsibilities among Lake City and FSS personnel were not well defined.  For example, the reconciliation of unbilled receivables was transferred to FSS, but FSS did not perform a detailed review of the components of the unbilled receivables.  Rather, the reconciliation simply consisted of a roll forward. Costpoint implementation issues impacted management's ability to understand contract performance accurately and contributed to the loss not being identified sooner.

In addition, pursuant to Fed. R. Civ. P. 33(d), Defendant directs Plaintiffs to documents produced responsive to Proposed Search Terms 4, 27, 30, 58, 60, 68, 85, 92, 109, and 112-15 in Attachment A to Defendant's Proposal re Scope of Discovery, dated March 29, 2018.

**RESPONSE TO INTERROGATORY NO. 1(b):**

Subject to and without waiver of Defendant's Objections, Defendant provides the following key facts supporting the referenced statement:

"Management reserve" (sometimes referred to as "management risk") is an allowance established to cover the best estimate of additional costs that may arise during the performance of a contract.  MR is an estimate, specific to each project or contract, used to account for potential risks and is incorporated into the EAC calculations to form a best estimate.  It is customary to use MR to cover cost overruns incurred during the course of production under a contract to the extent that the event the MR is related to is realized.  However, with respect to the Lake City Contract, MR was used to maintain the 3.9% EBIT figure (see Response to Interrogatory 1(a)) beginning with production for the first delivery order, regardless of whether specific risks identified at the time of bidding had materialized.

In addition, pursuant to Fed. R. Civ. P. 33(d), Defendant directs Plaintiffs to documents produced responsive to Proposed Search Term 19 in Attachment A to Defendant's Proposal re Scope of Discovery, dated March 29, 2018.

**RESPONSE TO INTERROGATORY NO. 1(c):**

Subject to and without waiver of Defendant's Objections, Defendant provides the following key facts supporting the referenced statement:

At the outset of the Lake City Contract, the Lake City team generally believed that the cost reductions required to meet the projected 3.9% EBIT (see Response to Interrogatory 1(a)) were achievable.  After production on the Contract began, several members of the Lake City team were in the position to make inquiries on indicators that the contract was not performing as

expected.  However, these individuals did not take the actions necessary to detect these issues.

For example:

- During several quarterly EAC reviews, the team was close to achieving cost-cutting targets, but did not actually achieve them, and team members, while aware of these individual shortfalls, did not step back to see the aggregate effect that multiple such near-misses were likely to have on the long-term profitability of the contract.
- When team members disagreed with figures in EAC packages, they generally did not escalate those disagreements further up the chain of supervision.
- When team members disagreed with the use of MR to maintain the 3.9% EBIT, they generally did not make efforts to escalate those concerns.
- When a departing employee sent an email to certain team members listing Lake City processes that, in his view, needed to be changed, the team members did not follow up on the issues identified.  These processes included bringing in a Costpoint consultant to assist with various finance processes, including inventory and reconciliation of various ledgers.

In addition, pursuant to Fed. R. Civ. P. 33(d), Defendant directs Plaintiffs to documents produced responsive to Proposed Search Terms 2-5, 8, 11, 18-19, 25, 29, 33-34, 36, 40, 42, 43, 60, 68, 73, 75, 81-82, 92, 100, 106-09, and 112-13  in Attachment A to Defendant's Proposal re Scope of Discovery, dated March 29, 2018.

**RESPONSE TO INTERROGATORY NO. 1(d):**

Subject to and without waiver of Defendant's Objections, Defendant provides the following key facts supporting the referenced statement:

Given the importance of the 3.9% EBIT figure (see Response to Interrogatory 1(a)), some Lake City team members felt pressure to present only positive information and results related to the Contract.  The employees did not feel that their jobs were at stake, but several team members did feel that their managers at the Small Caliber Systems Division and Defense Systems Group level had difficulty understanding or accepting information that ran contrary to their expectations for the Contract.  (The Company is not aware of any evidence that any of this pressure came from the corporate level.)  Part of this difficulty was due to the faulty Costpoint data that the

Lake City team was relying on for the quarterly EACs (see Response to Interrogatory 1(a).

Because the Lake City team members did not have a full picture of the cost overruns related to

the Contract, they were not always armed with sufficient data to convince their managers that

there was a problem, and in some instances, their immediate management did not believe the

figures being presented to them.

In addition, pursuant to Fed. R. Civ. P. 33(d), Defendant directs Plaintiffs to documents

produced responsive to Proposed Search Terms 16, 56, 70, 71, and 74  in Attachment A to

Defendant's Proposal re Scope of Discovery, dated March 29, 2018.

**INTERROGATORY NO. 2:**

Identify, and describe the roles and responsibilities of, all persons or entities that "acted

inappropriately," "failed to adhere to the high standards established in the Company's policies and

expected by senior management and the Board of Directors," are "no longer employed by the

Company," or "receive[d] appropriate training, adverse compensation action and additional

supervision," as reported in the 2015 Form 10-KT/A.

**RESPONSE TO INTERROGATORY NO. 2:**

Subject to and without waiver of Defendant's Objections, Defendant responds as follows:

The following individuals were separated from the Company in January 2017 and did not

receive annual bonuses for 2016.  These individuals received additional oversight during the

Restatement effort and were walled off from the underlying accounting in that effort:

- Kent Holiday (Vice President/General Manager; Small Caliber Systems),
- Mike Pugliese (Director, Finance; Small Caliber Systems),
- Brian Snow (Manager, Finance, Small Caliber Systems), and
- Kevin Bristow (Principal Accountant, Small Caliber Systems [Jan. 2016 – Jan. 2017], Cost Analysis Accountant IV [Oct. 2013 – Jan. 2016], Manager, Financial Analysis [2011 – Oct. 2013]).

Further, Mike Kahn (Executive Vice President & President, Defense Group) received adverse compensation action (50% reduction in 2016 annual bonus) and additional supervision, and received, and is continuing to receive, appropriate training.  Gary DiSalvo (Senior Director, Finance; Head of Finance for Small Caliber Systems Division), who retired in April 2016, did not receive an annual bonus for 2016.

In addition to action taken with respect to these individuals, the Company's remediation efforts included the following:

- The discretionary portion of 2016 annual bonuses within the Defense Systems Group's operational objectives was eliminated for all members of the Group's leadership team.
- Reconciliation training for the preparers and reviewers of reconciliations at the FSS (See response to Interrogatory 8).
- Training on ASC 606 for all relevant Defense Systems Group accounting personnel.
- Company-wide technical accounting training and SOX training for all relevant accounting personnel.

In addition, pursuant to Fed. R. Civ. P. 33(d), Defendant directs Plaintiffs to documents produced responsive to Proposed Search Terms 15, 16, 30, 35, 56, 70, 71, 74, 98, and 101 in Attachment A to Defendant's Proposal re Scope of Discovery, dated March 29, 2018.

**INTERROGATORY NO. 3:**

Identify and describe all "negative information [that] was suppressed" and all "concerns at the Small Caliber Systems Division about cost overruns [that] were not escalated appropriately to higher-level Company management or finance staff," as reported in the 2015 Form 10-KT/A.

**RESPONSE TO INTERROGATORY NO. 3:**

Subject to and without waiver of Defendant's Objections, and in addition to the Response to Interrogatory 1(d), which asks a similar question, Defendant provides the following key facts supporting the referenced statement:

To be profitable, the Lake City Contract required significant cost reductions.  As discussed in the Response to Interrogatory 1(c), certain individuals were aware of shortcomings in achieving the required cost reductions, but did not escalate these concerns.[3]  The following chart summarizes the Company's understanding, at the time that the issues surrounding Lake City were publicly disclosed in August 2016, of the cost reductions that had been assumed at the time of bidding for the Lake City Contract compared to what would actually be achieved (all figures in millions of dollars):

| Cost Category | Assumed Cost Reductions at Bid | Actual/Projected Reductions[4] | Difference |
|---|---|---|---|
| Labor | 125 | 70 | 55 |
| Materials | 279 | 233 | 46 |
| Overhead | 464 | 251 | 213 |
| Other | 82 | 38 | 44 |
| Total | 950 | 592 | 358 |

Key categories of cost overruns included the following:

- Reductions in force took much longer than expected due to unionization efforts. Specifically, Alliant had initially planned to make reductions to factory labor, as well as freeze or lower certain wages, starting in July 2013.  However, in the summer of 2013, Alliant received notice from the National Labor Relations Board that a petition was successfully obtained with the signatures from their wage employees to show interest to establish a union.  The vote was held in November 2013.  Reductions in force were delayed so as not to negatively impact the relationship between employees and management pending the union vote.  The outcome of the November 2013 vote was pro-

---

[3] To be clear, Defendant is not stating that all of the underlying facts discussed in this Response (e.g. the unionization efforts at Lake City) were unknown to management at the corporate level. Rather, what was not communicated to corporate management was the aggregate impact that these cost overruns were having on the long-term profitability of the Lake City Contract (in part because Lake City personnel did not themselves have a complete understanding of the costs associated with the Contract – see Response to Interrogatory 1(a)).

[4] These figures consisted of cost reductions actually achieved as of August 2016, plus the Company's projections of future cost reductions, also as of August 2016, over the remaining life of the contract.

union.  As a result of the outcome of the vote, Alliant was prohibited by law to make any reductions in force or adjustments to compensation or benefits until a contract was completed.  The contract acceptance vote was not held until June 2015.  Consequently, there was a two-year delay in Alliant/Orbital ATK's efforts to reduce labor costs.

- The U.S. Army abruptly changed its requirements for the materials that could be used to establish a waterproof seal between the bullet and cartridge case for 5.56 caliber ammunition,[5] requiring Lake City to dispose of materials already produced with the previously-approved solvent incorporated and spend time researching, developing, and testing an acceptable replacement solvent.

- Round mix: At the time the RFP for the Lake City Contract was issued, the U.S. Army projected that approximately 50% of the 5.56 caliber ammunition it would order would be M855A1 rounds.  The A1 round is designed for warfare and penetration and is more expensive to produce than cheaper rounds used for training purposes.  The A1 round was also assumed to be more profitable, so a higher A1 mix would absorb more overhead costs than other rounds.  Troop levels in Afghanistan and Iraq were dramatically reduced in 2013-2014.  While overall volumes did not decline, the mix of A1 rounds ordered by the Army during the first four DOs was approximately 325 million fewer rounds than originally projected.

- In (Alliant) fiscal year 2015, commercial ammunition volumes declined relative to 2014 and 2013.  As a result, less overhead costs were absorbed by commercial sales.

- Automation updates to the Lake City facility were not as effective as predicted.  Specifically the Lake City team had planned to remove the high cost and manual gauge and weigh process but ultimately could not receive approval from the US Army to modify the quality control process.  Further, the Lake City team made significant assumptions regarding the ability to automate a number of manual packing processes, resulting in corresponding cost reductions, but these cost-saving updates were not completely achieved either.

- In October 2016, the price of gunpowder increased by approximately $1 per pound, and gunpowder pricing has continued to escalate.

- In addition, the Company experienced quality issues with materials provided by certain vendors, including bandoleers.

In addition, pursuant to Fed. R. Civ. P. 33(d), Defendant directs Plaintiffs to documents

produced responsive to Proposed Search Term 23  in Attachment A to Defendant's Proposal re

Scope of Discovery, dated March 29, 2018.

---

[5] The overwhelming majority of the ammunition produced under the Lake City contract was 5.56 caliber.

**INTERROGATORY NO. 5:**

Identify the basis for and facts supporting the statement in the 2015 Form 10-KT/A that "$31.5 [million] of the loss was evident at [the Lake City] contract signing (second quarter of fiscal 2013) and $342 [million] became evident at the time of initial production (second quarter of fiscal 2014)."

**RESPONSE TO INTERROGATORY NO. 5:**

Subject to and without waiver of Defendant's Objections, Defendant provides the following key facts supporting the referenced statement:

The process by which the Company determined that G&A costs should be included in the measurement of forward losses (the "Revised Policy") is described in the Response to Interrogatory 8.  Once the Company made that determination, it calculated the losses to be recognized at the time of the signing of the Lake City Contract (third quarter of 2012) and at the time of first production (third quarter of 2013).  The Contract is comprised of ten delivery orders ("DO"), awarded annually on October 1.  At the time of the award of the Contract, Alliant was contracted for DOs 1-7 and DOs 8-10 were part of an optional 3-year extension that the Company, at its discretion, could reject.  The Company therefore considered only DOs 1-7 in determining the magnitude of the forward loss.

At the time of the award, DO 1 was funded.  After applying the Revised Policy, DOs 2-3 were projected to be in a profit position at the time of the award, and DOs 4-7 were projected to be in a loss position at the time of the award.  When the Company aggregated the projected EBIT at the time of the award for DOs 1 and 4-7, this resulted in a loss of approximately $31.5 million.[6]

---

[6] ASC 605-35-25-47 states that individual segments shall be considered separately in

Between the time of the contract award and the time of first production, the Lake City team was working on cutting costs, but those efforts were behind schedule. Therefore, when applying the Revised Policy to the facts known at the time of first production, the Company determined that all seven DOs were in a loss position. When aggregating the losses from all seven DOs, the Company arrived at an estimated loss position of approximately $373.5 million at the time of first production. Subtracting the approximately $31.5 million to be realized in fiscal year 2013, this left approximately $342 million in forward losses to be recognized in fiscal 2014.

**INTERROGATORY NO. 6:**

Identify the basis for and facts supporting Orbital ATK's or Alliant's determination that general and administrative costs could be excluded from the measurement of forward losses on long-term contracts, and identify and describe the roles and responsibilities of all persons or entities involved in this determination.

**RESPONSE TO INTERROGATORY NO. 6:**

Subject to and without waiver of Defendant's Objections, Defendant responds as follows:

Interrogatory 6 appears to be based on the assumption that there was a specific, affirmative "determination" that "general and administrative costs could be excluded from the measurement of forward losses on long-term contracts." However, the treatment of general and administrative costs was simply a preexisting ordinary-course historical practice of both Alliant and Orbital Sciences that was continued by the combined Company. This practice was clearly disclosed as a significant accounting policy in the audited footnotes of the financial statements of

---

determining the need for a provision for a loss. Since, DO 2 and 3 were projected to be in a profit position at the time of the award even under the Revised Policy, they were not included in calculation of forward losses at contract signing.

the Company, including in Orbital ATK's original 10-K for the 2015 fiscal year,[7] Alliant's 10-K

for the 2013 fiscal year,[8] and Orbital Sciences' 10-K for the 2013 fiscal year.[9]  Consequently, the

management and auditors of Orbital ATK, Alliant, and Orbital Sciences approved of these

accounting policies through their review and - in the case of the auditors - their audit, of such

financial statements and related footnotes.  The Company's external independent auditors

expressed an unqualified opinion on the Company's financial statements, and accordingly, the

accompanying footnotes and accounting policy disclosures, thereby ratifying the use of such

accounting policies.  However, Defendant is not aware of any specific, affirmative

"determination" regarding this aspect of the companies' accounting policies at any time between

February 1, 2012 and the events described in the Response to Interrogatory 8.

Notwithstanding the foregoing, the individuals responsible for accounting policies related

to long-term contracts at Alliant, Orbital Sciences, and the Company between February 2012 and

August 2016 were as follows:

- Garrret E. Pierce, Chief Financial Officer, Orbital Sciences and Orbital ATK

---

[7] "In the period in which it is determined that a loss will be incurred on a contract, the entire amount of the estimated gross margin loss is charged to cost of sales. Changes in estimates of contract sales, costs, or profits are recognized using the cumulative catch-up method of accounting. This method recognizes in the current period the cumulative effect of the changes on current or prior periods. The effect of the changes on future periods of contract performance is recognized as if the revised estimate had been used since contract inception."  Orbital ATK 10-K 3/31/2015, p. 62.

[8] "In the period in which it is determined that a loss will be incurred on a contract, the entire amount of the estimated gross margin loss is charged to cost of sales. Changes in estimates of contract sales, costs, or profits are recognized using the cumulative catch-up method of accounting. This method recognizes in the current period the cumulative effect of the changes on current or prior periods. The effect of the changes on future periods of contract performance is recognized as if the revised estimate had been used since contract inception." Alliant Techsystems 10-K 03/31/2013, p. 54.

[9] "In the event cost estimates indicate a loss on a contract, the total amount of such loss, excluding general and administrative expense, is recorded in the period in which the loss is first estimated." Orbital Sciences Corporation 10-K 12/31/2013, p. 29.

- Neil Cohen, Chief Financial Officer, Alliant Techsystems Inc. (renamed Orbital ATK)
- Hollis M. Thompson, Vice President and Controller, Orbital Sciences, Vice President, Finance, Orbital ATK
- Wayde Heirigs, Vice President, Chief Accountant, Alliant Techsystems Inc.

These individuals carried out the standard responsibilities associated with the CFO, controller and chief accounting positions at publicly-traded corporations.

**INTERROGATORY NO. 8:**

Identify and describe when You first determined that the Lake City Contract should be recorded as a "forward loss," including a description of the facts and information that formed the basis of that determination.

**RESPONSE TO INTERROGATORY NO. 8:**

Subject to and without waiver of Defendant's Objections, Defendant responds as follows:

Following the Merger, the Company was undergoing various efforts to better manage the effective use of its current assets, including an enterprise business optimization program, a working capital efficiency initiative, and efforts to enhance accounting controls and oversight.

As part of these efforts, a balance sheet and related unbilled receivable balance review of the first quarter end unbilled balance at April 2, 2016, which commenced in earnest in May 2016, indicated that the Lake City contract had experienced a buildup of approximately $15 million per quarter in unbilled receivables.  Further, the total Lake City unbilled balance had grown to approximately $177 million by May 2016.  Company management then began a preliminary review, using Chapter 4 of the AICPA Audit and Accounting Guide Federal Government Contractors, to develop a program to audit and assess the Lake City Contract. Company management's review included the following steps:

- Review of available documents, including the initial Lake City bid, cost savings reviews, and EAC reviews;

- Review of the Lake City Contract itself to understand key payment terms related to progress and final billings;

- Review of key EAC controls to ensure the EAC was accurate, including reconciling historical cost to the general ledger;

- Review of the unbilled receivable reconciliation controls to ensure the unbilled balance was appropriately reconciled;

- Review of key IT Costpoint controls to ensure revenue recognition formulas were appropriate and system controls were utilized;

- Assessment and comparison of the historical performance based on incurred-to-date (ITD) cost against the forecasted costs based on the estimated costs to complete (ETC).

The Company's preliminary review lasted from approximately May 2016 to July 2016. At the end of this period, the Company determined that the accounting for the Lake City Contract was potentially misstated.  Therefore, Company management engaged with its then-current external auditor PricewaterhouseCoopers LLC ("PwC") and its predecessor auditor Deloitte LLP ("Deloitte") to review the Company's findings and commenced  a thorough bottoms-up review on or about July 2016 of the Lake City EAC (the "Management Review").

As part of the Management Review, the Company consulted relevant accounting authority, including the following Financial Accounting Standards Board's (FASB) Accounting Standards Codifications (ASC), and section of the AICPA Audit and Accounting Guide Federal Government Contractors ("AICPA Guide"):

I.     ASC 605-35-25-45, which provides guidance on Provisions for Losses on Contracts, states "for a contract on which a loss is anticipated, GAAP requires recognition of the entire anticipated loss as soon as the loss becomes evident."

II.    ASC 605-35-25-49, which explains that "the costs used in arriving at the estimated loss on a contract shall include all costs of the type allocable to contracts under paragraph 605-35-25-37."

   a.    ASC 605-35-25-37 states "A contracting entity shall apply the following general principles in accounting for costs of construction-type and those production-type contracts covered by this Subtopic. The principles are consistent with generally accepted accounting principles (GAAP) for inventory and production costs in other areas, and their application requires the exercise of judgment.

15

i.      All direct costs, such as material, labor, and subcontracting costs, shall be included in contract costs.

ii.      Indirect costs allocable to contracts include the costs of indirect labor, contract supervision, tools and equipment, supplies, quality control and inspection, insurance, repairs and maintenance, depreciation and amortization, and, in some circumstances, support costs, such as central preparation and processing of payrolls. Methods of allocating indirect costs should be systematic and rational. They include, for example, allocations based on direct labor costs, direct labor hours, or a combination of direct labor and material costs.  The appropriateness of allocations of indirect costs and of the methods of allocation depend on the circumstances and involve judgment.

iii.      General and administrative costs ordinarily shall be charged to expense as incurred but may be accounted for as contract costs under the completed-contract method of accounting as discussed in paragraph 605-35-25-99.

iv.      Selling costs shall be excluded from contract costs and charged to expense as incurred unless they meet the criteria for pre-contract costs in paragraph 605-35-25-41.

v.      Costs under cost-type contracts shall be charged to contract costs in conformity with GAAP in the same manner as costs under other types of contracts because unrealistic profit margins may result in circumstances in which reimbursable cost accumulations omit substantial contract costs (with a resulting larger fee) or include substantial unallocable general and administrative costs (with a resulting smaller fee).

vi.      In computing estimated gross profit or providing for losses on contracts, estimates of cost to complete shall reflect all of the types of costs included in contract costs.[10]

vii.      Inventoriable costs shall not be carried at amounts that, when added to the estimated cost to complete, are greater than the estimated realizable value of the related contracts."

**III.**      AICPA Guide section 3.35, Provision for Anticipated Losses on Contracts, which states, in relevant part:

a.      Losses on contracts are required to be "accrued when the losses become evident, regardless of the method of accounting for the contract.  If the range of loss is estimated but no amount within the range is a better estimate than any other amount, the minimum amount in the range should be accrued."

b.      Losses on contracts are required to be "computed on the basis of the total estimated cost to complete the contract and should reflect all elements of costs included in contract costs in conformity with paragraph .72 of SOP 81-1."

---

[10] The Company had historically allocated G&A costs to contracts.

During the Management Review, the Company consulted with both PwC and Deloitte for their feedback on the issue.  After consultation with their respective National Offices, both firms determined that inclusion of general and administrative expenses is the correct method of measuring provision for losses for the Company, despite having signed off on the prior financial statements which disclosed the historical policy. As a result of the foregoing, on or about September 2016, the Company determined that its historical policy was a misapplication of GAAP and that when measuring a forward loss the G&A cost should be included as a cost in the measurement of the forward loss.  After this determination was made, the Company calculated the losses on the Lake City Contract as described in the Response to Interrogatory 5.

Roughly concurrent with the Management Review, the Company tasked outside counsel (in partnership with counsel for the Audit Committee) to conduct a separate Internal Investigation (the "Internal Investigation").[11]

**INTERROGATORY NO. 10:**

Identify and describe the process by which You or Your Board of Directors determined that Orbital ATK would retain the Lake City Contract after the Merger, including all reports or analyses prepared regarding the Lake City Contract.

**RESPONSE TO INTERROGATORY NO. 10:**

Subject to and without waiver of Defendant's Objections, Defendant responds as follows:

As of April 2012, Alliant consisted of three groups – Aerospace, Defense, and Sporting. Though both the Defense and Sporting Groups manufactured and sold ammunition, the Defense Group possessed assets and personnel related to government defense contracting, while the assets

---

[11] Consistent with its Objections, Defendant is not disclosing information and documents related to the Internal Investigation insofar as they are protected by the work product doctrine or applicable privileges.

and personnel in the Sporting Group were focused on retail sales to civilians.

As discussed in the Joint Proxy, prior to the beginning of discussion with Orbital Sciences about a potential merger, Alliant had repeatedly considered spinning off its Sporting Group into a separate business.[12]   Alliant believed that separating the Sporting business would allow each remaining company to have a more focused business, and would have multiple benefits for management, employees, customers, and stockholders.[13]

As discussed in the Joint Proxy, Alliant and Orbital Sciences considered a number of possible business combinations, all involving various combinations of Orbital Sciences and a portion or all of Alliant's Aerospace and/or Defense Groups.[14]   It was eventually determined that there were significant potential synergies in combining Orbital Sciences' business with 100% of Alliant's Aerospace and Defense Groups.[15]   At no time did either company give serious consideration to including Alliant's Sporting Group in the merged company.

Ultimately, Alliant proposed a structure wherein its Aerospace Group and the entire Defense Group, including its Small Caliber Systems (Lake City) and Armament Systems Divisions, would combine with Orbital Sciences.  The rationale for including the Small Caliber Systems and Armament Systems Divisions was to free the Sporting Group, as an independent business, from much of the burden associated with government contracting compliance requirements and other limitations imposed by the defense industry and allow it to focus on commercial business.  As a result, the Lake City Contract, comprising a large percentage of the Small Caliber Systems Division's revenue, and the responsibility for operating the Lake City

---

[12] Joint Proxy at 60.

[13] See Joint Proxy at 76 (discussing spin-off benefits).

[14] Joint Proxy at 60-67.

[15] Joint Proxy at 66-67.

Army Ammunition Plant, would remain with the Defense Group and the Company whose expertise was in government defense contracting.[16]  This decision was not unique to the Lake City Contract – as disclosed in the Joint Proxy, all contracts "used or held for use primarily in, or that arise primarily out of, the operation or conduct of the ATK Sporting business" were transferred to Vista, and all other contracts remained with the merged Company.[17]

**INTERROGATORY NO. 12:**

Identify, and describe the roles and responsibilities of, all persons or entities involved in:

(a)    the preparation of any reviews, projections, forecasts, audits, or analyses of costs and revenues associated with the Lake City Contract, including persons or entities that provided information that was used or relied on in preparing these reviews, projections, forecasts, audits, or analyses;

(b)    identifying the need for the Restatement, as announced in August 2016; and

(c)    the Internal Investigation, including all persons interviewed as part of the Internal Investigation.

**RESPONSE TO INTERROGATORY NO. 12(a):**

Subject to and without waiver of Defendant's Objections, Defendant responds as follows:

The primary Lake City personnel involved in the listed activities prior to the discovery of the issues described in the Response to Interrogatory 8 were Kent Holiday, Michael Pugliese, Gary

---

[16] As noted in the Response to Interrogatory 3, ammunition produced in excess of the U.S. government's requirements is sold commercially, and the combined Company entered into a requirements contract to sell Vista its requirements for 5.56, 7.62, and 50 caliber rounds, subject to the priority rights of the U.S. government.  See also Joint Proxy at 161.  However, these commercial sales were a relatively small piece of Lake City's production volume, and the Defense Group's expertise in government contracting and compliance was necessary to service the Lake City Contract.

[17] Joint Proxy at 137.

DiSalvo, Gail Overly (Senior Finance Manager), Cindy Jones (Principal Cost Estimator/Cost Analyst Accountant), Brian Snow, and Kevin Bristow.   Mr. Holiday was the General Manager in charge of operations at the Small Caliber Systems Division.   Mr. Pugliese functioned as the Director of Finance directly below Mr. Holiday until mid-2015, when Mr. DiSalvo assumed this role.  The remaining individuals worked directly or indirectly under Mr. Pugliese and Mr. DiSalvo. Mr. Bristow coordinated the EAC process described in the Response to Interrogatory 1 and was also involved in cost analysis.  Mr. Snow was involved in EAC forecasting, cash management, and monthly operations reporting.  Ms. Jones' role involved revenue recognition and upgrades to the group's accounting systems.  Ms. Overly's role involved revenue recognition and cost cutting.

In addition, Doug Lien joined the Lake City team in May 2016.  Mr. Lien's primary role was to review the unbilled receivable balance (see Responses to Interrogatories 8 and 12(b)).

PwC was the Company's external auditor for the 9-month transition period ended December 31, 2015 and the year ended December 31, 2016.  Deloitte was Alliant and Orbital ATK's external auditor for the fiscal year ended March 31, 2015, 2014 and 2013.

RESPONSE TO INTERROGATORY NO. 12(b):

Subject to and without waiver of Defendant's Objections, Defendant responds as follows:

The key individuals involved in identifying the need for the Restatement included Chief Executive Officer Dave Thompson, Chief Financial Officer Garrett Pierce, and Chief Operating Officer Blake Larson.  The Company's executive leadership team selected the Senior Vice President of Finance Ken Sharp to oversee the Management Review that ultimately identified and quantified the Lake City issues and led to the subsequent Restatement efforts.  John Casper and Jim Nichols from the Defense Group and Doug Lien, Director of Finance at Lake City, were heavily involved in reviewing the Lake City Division operations to assess the performance and

provide key inputs into the EAC process.

**RESPONSE TO INTERROGATORY NO. 12(c):**

Subject to and without waiver of Defendant's Objections, Defendant responds as follows:

The Internal Investigation was conducted by outside counsel for the Company, Hogan Lovells US LLP, along with independent counsel for the Audit Committee,[18]  Dickinson Wright PLLC, and forensic accountants with Alvarez & Marshal Disputes and Investigations, LLC, working under the direction of outside counsel.  These entities consulted with PwC and Deloitte concerning the objectives, structure, and process of the Investigation.

Consistent with Defendant's Objections, Defendant declines to identify the identities of those individuals interviewed as part of the Internal Investigation.

**INTERROGATORY NO. 15:**

Identify each person that provided documents or information used in responding to any discovery request served by Plaintiffs on Orbital ATK.

**RESPONSE TO INTERROGATORY NO. 15:**

Subject to and without waiver of Defendant's Objections, Defendant responds as follows:

The individuals that have provided documents or information in responding to Plaintiffs' discovery requests are the individuals listed in Attachment A to Defendant's Proposal re Scope of Discovery, dated March 29, 2018, along with James S. Black, Vice President and Deputy General Counsel, Orbital ATK.

---

[18] The Audit Committee was entirely composed of outside directors: Douglas L. Maine (Chair), Robert M. Hanisee, Kevin P. Chilton, Ronald T. Kadish, Martin C. Faga, and Roman Martinez IV.

Dated:  April 6, 2018
        Washington, D.C.

Respectfully submitted,


SHEARMAN & STERLING


 */s/ Lyle Roberts*
Lyle Roberts (Va. Bar No. 45808)
401 9th Street, N.W., #800
Washington, DC 20004
Telephone: (202) 508-8108
Facsimile: (202) 508-8100
lyle.roberts@shearman.com


COOLEY LLP
George E. Anhang (pro hac vice)
Daniel Sachs (pro hac vice)
1299 Pennsylvania Avenue, N.W., Suite 700
Washington, DC 20004-2400
Telephone: (202) 842-7800
Facsimile: (202) 842-7899
ganhang@cooley.com
dsachs@cooley.com

*Counsel for Defendants Orbital ATK, Inc.,
David W. Thompson, Garrett E. Pierce,
Blake E. Larson, and Hollis Thompson*

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of April 2018 a true and correct copy of the foregoing

was served via e-mail on all counsel of record.

**THE OFFICE OF CRAIG C. REILLY**
Craig C. Reilly
111 Oronoco Street
Alexandria, VA 22314
Telephone: (703) 549-5354
Facsimile: (703) 549-2604
craig.reilly@ccreillylaw.com
*Liaison Counsel*

**ROBBINS GELLER RUDMAN & DOWD LLP**
James E. Barz
Frank A. Richter
200 South Wacker Dr., 31st Floor
Chicago, IL 60606
Telephone: (312) 674-4674
Facsimile: (312) 674-4676
jbarz@rgrdlaw.com
frichter@rgrdlaw.com

Samuel H. Rudman
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: (631) 367-7100
Facsimile: (631) 367-1173
srudman@rgrdlaw.com

Kathleen B Douglas
Maureen E. Mueller
120 E. Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: (561) 750-3000
Facsimile: (561) 750-3364
kdouglas@rgrdlaw.com
mmueller@rgrdlaw.com

**KIRKLAND & ELLIS**
Michael A. Petrino
655 Fifteenth St., NW
Washington, DC 20005
Telephone: (202) 879-5000
michael.petrino@kirkland.com

Shireen A. Barday
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-6418
Facsimile: (212) 446-6460
shireen.barday@kirkland.com

Joshua Z. Rabinowitz
300 N. LaSalle St.
Chicago, IL 60654
Telephone:  (312) 862-2284
Facsimile: (312) 862-2200
jrabinovitz@kirkland.com
*Counsel for Defendant Mark DeYoung*

23

_/s/ Lyle Roberts_
Lyle Roberts (Va. Bar No. 45808)
**SHEARMAN & STERLING**
401 9th Street, N.W., #800
Washington, DC 20004
Telephone: (202) 508-8108
Facsimile: (202) 508-8100
lyle.roberts@shearman.com