# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

| | |
|---|---|
| STEVEN KNURR, Individually and on Behalf of All Others Similarly Situated,<br><br>　　　　　　Plaintiffs,<br><br>v.<br><br>ORBITAL ATK, INC., et al.,<br><br>　　　　　　Defendants. | Civil Action No. 1:16-cv-01031-TSE-MSN<br><br>CLASS ACTION |

**ORBITAL ATK, INC.'S SECOND RESPONSES TO
PLAINTIFFS' FIRST SET OF INTERROGATORIES**

**PROPOUNDING PARTY:** CONSTRUCTION LABORERS PENSION TRUST OF GREATER ST. LOUIS AND WAYNE COUNTY EMPLOYEES RETIREMENT SYSTEM

**RESPONDING PARTY:** ORBITAL ATK, INC.

**SET NUMBER:** ONE

　　　Defendant Orbital ATK, Inc. ("Defendant" or the "Company"), hereby responds to Plaintiffs' First Set of Interrogatories to Orbital ATK.[1]

　　　Defendant's gathering, review and production of relevant documents in this case has not been completed, and there may be documents or information relating to the matters that are the subject of these Interrogatories that have not yet been gathered and reviewed. Defendant expressly reserves the right to revise, correct, clarify, supplement, or amend these Responses, and its Objections to Plaintiff's First Set of Interrogatories dated March 21, 2018 ("Objections"), at a later time. Defendant reserves all objections to the admissibility of any information supplied

---

[1] The Company provided its First Responses to these Interrogatories on April 6, 2018.

1

herein. The fact that Defendant supplies any information in response to any of Plaintiffs' Interrogatories does not constitute any admission by Defendant that such information is relevant, material, admissible in evidence, or reasonably calculated to lead to the discovery of admissible evidence or proportional to the needs of this litigation. Defendant reserves its right to object to further inquiry with respect to the subject matter of any discovery request or the use of any information contained herein for any purpose. All responses are made subject to and without waiver of Defendant's Objections.

**INTERROGATORY NO. 4:**

Identify and describe the diligence performed by Orbital Sciences or Alliant in connection with the Merger, including all diligence performed to evaluate the fairness of the Exchange Ratio and the Lake City Contract.

**RESPONSE TO INTERROGATORY NO. 4:**

Subject to and without waiver of Defendant's Objections, Defendant responds as follows:

A description of Alliant's and Orbital Sciences' diligence efforts can be found in the following sections of the Joint Proxy, which are incorporated herein by reference: "Background of the Merger" (pp. 59-75), "ATK's Reasons for the Merger; Recommendation of the ATK Board of Directors" (pp. 75-79), "Orbital's Reasons for the Merger; Recommendation of the Orbital Board of Directors" (pp. 79-83), "Opinion of ATK's Financial Advisor" (pp. 83-92), "Opinion of Orbital's Financial Advisor" (pp. 92-99), "Certain ATK Forecasts" (pp. 122-28), and "Certain Orbital Forecasts" (pp. 128-32).

In addition to the foregoing, Defendant responds as follows: on or about February 10, 2014, Alliant and Orbital Sciences held a due diligence kick-off meeting, and began to exchange numerous documents shortly thereafter. The documents exchanged during due diligence

concerned standard due diligence issues, including, but not limited to, corporate structure and organization, historical financial information, key customer and vendor contracts, environmental liabilities, labor costs and pension liabilities, ongoing litigation, business and strategic plans, and compliance practices and procedures (FCPA, DCAA/DCMA, etc.).[2]

Orbital Sciences was assisted in its diligence efforts by PwC, Citi, Hogan Lovells US LLP, and Environmental Resources Management. These efforts were substantially complete in mid-April 2014.

Orbital Sciences' outside auditors and internal accounting personnel conducted standard accounting, contract, and business diligence with respect to the contract with the U.S. Army to produce ammunition at the Lake City facility ("Lake City Contract"), including a review of the Contract documents themselves (base contract, and delivery orders), contracts briefs – summaries of the relevant contract terms and obligations from a government contracting perspective – and reviews of the most recent quarterly EACs and other reporting related to the Contract. Orbital Sciences leadership also was verbally briefed on the Lake City facility and the contractual commitments associated with that location. Key potential risk and opportunity areas noted by Orbital Sciences during due diligence with respect to the Lake City Contract are described below. Despite these potential risk areas, Orbital Sciences did not identify any material adverse conditions during due diligence.

Orbital Sciences identified seven top risk and opportunity areas during due diligence, one of which related to the Lake City Contract, specifically the unionization efforts at the Lake City

---

[2] As communicated to Plaintiffs during the meet & confer process, Defendant's production in this case has included and will include relevant, nonprivileged documents in its possession, custody, or control exchanged during due diligence.

3

facility.[3] In November 2013, Alliant employees at Lake City narrowly voted in favor of representation by the International Association of Machinists and Aerospace Workers (IAW). As of mid-April 2014, negotiations between Alliant and IAW were just beginning, so the final economics of the contract were unknown, but the companies anticipated that negotiations would last until approximately November 2014 and that the negotiations would ultimately result in a compromise that kept employee wages and benefits as-is in exchange for job stability.

Additional issues related to the Lake City Contract that were identified in due diligence, but did not rise to the level of material adverse conditions or one of the seven top risk/opportunity areas identified with respect to the Merger overall, included the following:

- As described in the Response to Interrogatory 3, the U.S. Army abruptly changed its requirements for the materials that could be used to establish a waterproof seal between the bullet and cartridge case for 5.56 caliber ammunition. Orbital Sciences noted that the Army had issued a cure notice, but that termination of the Lake City Contract on this basis was unlikely.
- Orbital Sciences noted that significant investment into the Lake City facility was required as part of the Lake City Contract, but noted that these investments had been accounted for in the relevant financial projections and valuations.
- Orbital Sciences noted that the Lake City Contract had been "aggressively bid," and that efforts to automate the manual gauge and weigh process, described in the Response to Interrogatory 3, were behind schedule.

**INTERROGATORY NO. 7:**

Identify the basis for and facts supporting the statement by Blake E. Larson on August 10,

---

[3] As noted in the Response to Interrogatory 11, the combined Company entered into a requirements contract to sell Vista Outdoor its requirements for 5.56, 7.62, and 50 caliber rounds, subject to the priority rights of the U.S. government. See also Joint Proxy at 161. Orbital Sciences listed this supply agreement as a potential risk/opportunity because of the volatility in demand for commercial ammunition, though it expected continued demand for high quality ammunition from Vista Outdoor and other commercial retailers. The other risk/opportunity areas were related to certain Aerospace Division contracts, environmental liabilities primarily connected to facilities other than Lake City, expected costs and recovery from unrelated litigation, pension costs, and potential employee turnover.

2016 that Lake City had achieved "one-half to two-thirds of the objective cost reduction that the bid anticipated," including all analyses or support for the anticipated and actual "objective cost reduction."

**RESPONSE TO INTERROGATORY NO. 7:**

Subject to and without waiver of Defendant's Objections, Defendant provides the following key facts supporting the referenced statement:

Defendant's Response to Interrogatory 3 lists the cost reductions that were anticipated at the time of bidding compared to the Company's projections as of August 2016, and lists key categories of cost overruns that caused the actual cost reductions to fall short of the initial projections. As noted in that Response, at the time that Mr. Larson made the referenced statement, the Company believed that $592 million in cost reductions were achievable over the life of the contract, compared to $950 million in projected cost reductions, i.e., approximately 62%.

**INTERROGATORY NO. 9:**

Identify and describe the process by which You determined the Exchange Ratio for converting Orbital Sciences common stock to Orbital ATK common stock in connection with the Merger, including all financial information that was considered in making this determination, and identify and describe the roles and responsibilities of all persons or entities that were responsible for determining the Exchange Ratio or evaluating its fairness.

**RESPONSE TO INTERROGATORY NO. 9:**

Subject to and without waiver of Defendant's Objections, Defendant responds as follows:

The roles and responsibilities of the individuals involved in planning the Merger are described in the "Background of the Merger" section of the Joint Proxy (pp. 59-75), and the

5

specific individuals involved in negotiating the transaction structure and proposed equity split are listed on page 67 of the Joint Proxy. As noted in the Joint Proxy, the Exchange Ratio was a negotiated figure, informed by financial information exchanged by the companies during due diligence[4] and the debt being assumed by the combined Company.

      BofA Merrill Lynch analyzed the fairness of the Exchange Ratio for Alliant, and Citigroup Global Markets Inc. analyzed the fairness of the Exchange Ratio for Orbital Sciences. These fairness opinions were attached as Annex B and Annex C, respectively, to the Joint Proxy, and were explained further on pages 83-99 of the Joint Proxy. These fairness opinions explain the process by which the fairness of the Exchange Ratio was evaluated and the information considered in making the fairness determination. Specifically, BofA Merrill Lynch and Citigroup conducted selected public companies analyses of Alliant's Aerospace and Defense Divisions and of Orbital Sciences in order to evaluate the companies on a relative basis based on public market trading multiples of selected companies in the aerospace and defense industry, including analysis of estimated EBITDA multiples. BofA Merrill Lynch and Citigroup used these estimated EBITDA multiples to calculate several different implied enterprise value reference ranges (based on estimates for calendar years 2014 and 2015 under several different assumptions and adjustments, as described on pages 88-90 and 96-98 of the Joint Proxy) for each company. After adjusting these reference ranges for the debt and cash to be contributed by each company in the Merger, BofA Merrill Lynch and Citigroup compared these reference ranges to the Exchange Ratio provided for in the Merger. BofA Merrill Lynch ultimately concluded that "the Exchange Ratio provided for in the Merger is fair, from a financial point of view, to ATK,"

---

[4] As noted in the Response to Interrogatory 4, Defendant's production in this case has included and will include relevant, nonprivileged documents in its possession, custody, or control exchanged during this due diligence process.

6

and Citigroup concluded that "the Exchange Ratio is fair, from a financial point of view, to the holders of Orbital Common Stock."

**INTERROGATORY NO. 11:**

Identify and describe how and why Your accounting policies and procedures regarding long-term government contracts were determined or changed, including the persons or entities involved in those determinations or changes, and all communications with external auditors regarding such determinations or changes.

**RESPONSE TO INTERROGATORY NO. 11:**

Subject to and without waiver of Defendant's Objections, Defendant responds as follows:

<u>Changes to Accounting Policies</u>

Consistent with Defendant's Objections, Defendant will respond to this Interrogatory with information regarding the accounting policy that was changed due to the discovery of issues surrounding Lake City, and the subsequent Management Review and Restatement, and will not respond as to unrelated accounting policies.

The basis for the decision to change the Company policy regarding the inclusion of G&A expenses when measuring forward losses is described in the Response to Interrogatory 8.

<u>Changes to Other "Procedures"</u>

Regarding changes to "procedures" other than formal accounting policies, key Company remediation efforts are described in the Response to Interrogatory 2. Consistent with its Objections, Defendant will not list each and every of the numerous individual changes to Company procedures since the Merger and the Restatement. Instead, the Company responds by listing the following programs:[5]

---

[5] The fact that a particular program or change is listed in response to this Interrogatory should not

- SOX Improvement Program - to consolidate all controls, identify key controls and ensure, from a risk-based approach, that controls exist to address any risk related to a specific account. The team, which included outside accounting experts went business site by business site to better understand the risks and the processes in place, and to ensure each control had a proper owner. As part of this effort, the Company made four new hires (a SOX Director and three employees in support).
- Small Caliber Systems Division Enhancement and Improvement Program - comprised of eight areas of focus: Finance Team, Organizational Enhancements, Financial Process Improvement, Operational Improvement, Costpoint System Improvements, EAC Improvements, Other Related Actions, and Working Capital Management.
- Financial Reporting Improvement Program. This program includes:
  - A quarterly training program for accounting personnel including development and execution of account reconciliation training.
  - Initial accounting assessment of all significant new contracts, which includes an assessment of the bid package, contract options, and any non-standard features.
  - Review of the Company's unbilled reconciliation process to ensure that reconciliations are standardized and meet the Company's control objectives.
  - Regular Costpoint training to accounting and finance personnel, and development of standards, processes and monitoring for Costpoint accounting use to ensure best practices are followed, including revenue recognition ceilings, automated revenue recognition, centralized project setup, and maximizing use of automated controls.
  - Standardization of the EAC process and reporting, including the use of standardized templates and expected level of detail, as well as a look back analysis to compare actual performance to initial estimates. In addition, the Company is implementing a full cost model for EACs for the Lake City Contract and all other contracts that are currently using a finished goods EAC approach.
  - Creation of a delivery assurance council to ensure application of best practices across Company groups and address any delivery concerns.
  - Creation of a bid look back review with an independent team led by operations personnel and including finance personnel.
  - Internal Audit: Standardization of the methodology/definitions for rating the severity of findings and ensuring remedial actions, if any, are approved by appropriate members of management.

The key individuals and entities involved in these decisions included Chief Executive

---

be read to indicate that such program or change was made, in whole or in part, due to issues surrounding the Lake City Contract as opposed to the Company's overall post-Merger efforts described in the first full paragraph of the Response to Interrogatory 8.

Officer Dave Thompson, Chief Financial Officer Garrett Pierce, Chief Operating Officer Blake Larson, former Vice President of Finance Hollis Thompson, Senior Vice President of Finance Ken Sharp, Controller Chris Voci, Lake City Director of Finance Doug Lien, Vice President/General Manager, Small Caliber Systems Jim Nichols, Jamie Musson (current head of the Company's SOX compliance team), PwC, and Deloitte.[6] In addition, KPMG assisted with the SOX Improvement Program.

With respect to the request for "all communications with external auditors," pursuant to Fed. R. Civ. P. 33(d), Defendant directs Plaintiffs to Defendant's document production, and specifically documents with "@pwc.com," or "@deloitte.com" in the "From," "To," "CC," or "BCC" metadata fields produced responsive to Proposed Search Terms 36, 37, 55, 85, 99, 100, 104, and 111 in Attachment A to Defendant's Proposal re Scope of Discovery, dated March 29, 2018.[7]

**INTERROGATORY NO. 13:**

Identify the basis for and facts supporting David W. Thompson's statement on April 29, 2014 that You expected the merger to result in "up to $200 million in annual revenue synergies, and up to $100 million in cost synergies which we estimate can be realized by the end of … 2016."

**RESPONSE TO INTERROGATORY NO. 13:**

Consistent with its Objections, Defendant responds that this Interrogatory is not relevant to the claims and defenses in this action, because there were no projected revenue or cost

---

[6] Ms. Musson and Mr. Voci did not become involved in these efforts until after the discovery of the issues described in the Response to Interrogatory 8.

[7] Consistent with its Objections to these Interrogatories and its Objections to Plaintiffs' First Request for Production of Documents, Defendant is not producing communications to auditors to the extent those communications are privileged.

9

synergies related to the Lake City Contract. The revenue and cost synergies projected prior to the Merger were based on the combining of complimentary assets of Alliant's Aerospace and Defense Groups with Orbital Sciences' business, which primarily consisted of the development and manufacture of rockets and space systems. While many pieces of the two companies' businesses were complimentary and could be expected to yield synergies when combined, this was not the case with the Lake City Contract. Orbital Sciences did not have any assets or business related to the manufacturing of small caliber ammunition, and there were therefore no complimentary assets to combine or collective business opportunities that might be achieved in order to realize revenue synergies on the Lake City Contract. Similarly, there were no cost synergies with respect to the Contract that could be achieved from combining the two companies' businesses given the absence of redundancies related to small caliber ammunition that could be eliminated within the two companies or other efficiencies that could be achieved in this area through a combination of the companies. Further, Alliant had already planned a series of aggressive cost-cutting measures at the time that the Lake City Contract was bid in 2012 (see Responses to Interrogatories 3 and 7), and there were no additional cost-cutting measures identified two years later in connection with the Merger.

Defendant therefore stands on its objections with respect to this Interrogatory.

**INTERROGATORY NO. 14:**

Explain the basis for and facts supporting each and every defense and counterclaim asserted in Defendants' answer to the Amended Complaint in this action.

**RESPONSE TO INTERROGATORY NO. 14:**

Subject to and without waiver of Defendant's Objections, Defendant responds as follows:

As noted in its Objections, Defendant has not filed any counterclaims in this action. With respect to the affirmative defenses, as noted in its Objections, Defendant's investigation of the factual issues raised in this litigation is continuing and has not yet been completed. Defendant's responses are made without prejudice to Defendant's rights to amend, supplement, modify, or withdraw these responses. (In particular, Defendant only began to receive responses to its discovery requests to Plaintiffs a few hours before submission of these Second Responses.) To the extent that no specific response is listed for a particular defense, the lack of response at this time should not be read to indicate that Defendants will not have any basis or support for that defense by the time that discovery in this litigation closes. To the extent these responses list bases and support for Defendant's defenses, no response should be read to indicate that the listed information constitutes the only bases and support for these defenses. Defendant responds only on its own behalf with respect to defenses that it asserted in relation to claims asserted against it (to the extent those claims were permitted to proceed pursuant to the Court's decisions and orders), and not on behalf of any party to this litigation to which Plaintiffs' Interrogatories were not addressed.

| Affirmative Defense Number(s) | Defendant's Response |
|---|---|
| 1, 2, 35 | Defendant's basis and support for these defenses include the facts and arguments set forth in its briefing on its two Motions to Dismiss, ECF Nos. 67-69, 72, 81-83, and 86. |
| 3, 30 | Defendant's basis and support for these defenses include that, to the Company's knowledge, there is no evidence that any relevant individual made any untrue statement of material fact or omitted to state material facts necessary to make any statements not misleading in the manner alleged. |
| 4 | Defendant's basis and support for this defense include that, to the Company's knowledge, there is no evidence that any relevant individual employed any devices, schemes, or artifices to defraud or engaged in any acts, practices, or courses of business that operated or would operate as a fraud or deceit on any person in the manner alleged. |

| Affirmative Defense Number(s) | Defendant's Response |
|---|---|
| 5 | Defendant's basis and support for this defense include that, as reported in the Restatement and described further in the Company's Response to Interrogatory 1, "concerns at the Small Caliber Systems Division about cost overruns were not escalated appropriately to higher-level Company management or finance staff, nor were they communicated to the Audit Committee, the Board of Directors or the independent registered public accounting firms." Because these concerns were not escalated, the Company's corporate-level leadership did not know, and could not have known with the exercise of reasonable care, that the Lake City Contract was in a forward loss position prior to the events described in the Company's Responses to Interrogatories 5 and 8. |
| 6, 7, 13, 14 | Defendant's basis and support for these defenses include that, as discussed in the Court's September 26, 2017 Orders on Defendants' Motion to Dismiss Plaintiffs' Complaint and the Court's March 2, 2018 Order on Defendants' Motion to Dismiss Plaintiffs' Amended Complaint, the Amended Complaint does not adequately plead that any Individual Defendant acted with scienter that may be imputed to the Company. In addition, the basis and support for these defenses include that there is no evidence to the Company's knowledge that any other Company employee acted with scienter, falsified accounting data, or otherwise intentionally misled any corporate-level personnel or any auditors. |
| 8 | Defendant's basis and support for this defense include that, to the Company's knowledge, there is no evidence that any relevant individual acted negligently in the manner alleged. |
| 9 | Defendant's basis and support for this defense include that, to the Company's knowledge, there is no evidence that any relevant individual engaged in or participated in any wrongful conduct in the manner alleged. |
| 16, 18 | Consistent with its Objections, Defendant will respond with a representative sample, rather than an exhaustive catalog, of facts supporting these defenses. Defendant's basis and support for this defense include that, for example, page 7 of the Form 8-K filed May 28, 2015; pages 10-11 of the Form 8-K filed February 29, 2016; pages 10-22 and 31-32 of the Form 10-K filed June 1, 2015, and pages 10-20 and 29-30 of the Form 10-KT filed March 15, 2016 contained cautionary language and risk disclosures. |
| 19 | Defendant's basis and support for this defense include the cited statutory language and the basis and support set forth in its response with respect to Affirmative Defenses 16 and 18. In addition, the basis and support for this defense include that no statements alleged to be false or misleading by Plaintiffs were made with actual knowledge by the officer making such statements that the statement was false or misleading. |
| 21 | Defendant's basis and support for this defense include that, as noted with respect to Affirmative Defenses 5 and 6, the Court's September 26, 2017 Orders on Defendants' Motion to Dismiss Plaintiffs' Complaint and the Court's March 2, |

| Affirmative Defense Number(s) | Defendant's Response |
|---|---|
|  | 2018 Order on Defendants' Motion to Dismiss Plaintiffs' Amended Complaint state that the Amended Complaint does not adequately plead that any Individual Defendant acted with scienter that may be imputed to the Company. In addition, the basis and support for this defense include that there is no evidence to the Company's knowledge that any other Company employee acted with scienter, falsified accounting data, or otherwise intentionally misled any corporate-level personnel or any auditors. However, even assuming *arguendo* that one or more lower-level employees acted with scienter, the Company's position includes that all of Plaintiffs' claims require scienter as an element, and that the scienter (if any) of lower-level Small Caliber Systems Division employees may not be imputed to the Company. See, e.g., ECF No. 68 at 30-36; ECF No. 82 at 16-19. |
| 22, 32 | No response is required or being provided with respect to these defenses inasmuch as the Company itself is not directly asserting these defenses as to the claims that the Court permitted to proceed against the Company itself. |
| 23, 36 | Defendant's basis and support for this defense include the cited statutory language. |
| 29, 31 | Defendant's basis and support for this defense include that, to the Company's knowledge, there is no evidence that any relevant individual breached any duties in the manner alleged, including duties of disclosure, owed to Plaintiffs. |
| 39 | Defendant's basis and support for this defense include that on September 26, 2017, the Court granted Defendants' Motion to Dismiss regarding Plaintiffs' 10(b) claims and related 20(a) claims, and stated that "The motion to dismiss the 14(a) claims is GRANTED with respect to the statements regarding the fairness of the Exchange Ratio . . ." ECF No. 77. On March 2, 2018, after dismissing Plaintiffs' fraud claim against Hollis Thompson, the Court stated that the remaining claims in the litigation were "plaintiffs' 10(b) claim against Orbital ATK and plaintiffs' 14(a) claims against the individual and corporate defendants." |
| 41 | The Amended Complaint requests "any injunctive or other equitable relief, that may be deemed just and proper by the Court," but does not articulate any specific injunctive relief sought. Defendant reserves the right to supplement this response if Plaintiffs later request specific injunctive relief. |

Dated: April 12, 2018
       Washington, D.C.

Respectfully submitted,

**SHEARMAN & STERLING**

  /s/ Lyle Roberts
Lyle Roberts (Va. Bar No. 45808)
401 9th Street, N.W., #800
Washington, DC 20004
Telephone: (202) 508-8108
Facsimile: (202) 508-8100
lyle.roberts@shearman.com

**COOLEY LLP**
George E. Anhang (pro hac vice)
Daniel Sachs (pro hac vice)
1299 Pennsylvania Avenue, N.W., Suite 700
Washington, DC 20004-2400
Telephone: (202) 842-7800
Facsimile: (202) 842-7899
ganhang@cooley.com
dsachs@cooley.com

*Counsel for Defendants Orbital ATK, Inc., David W. Thompson, Garrett E. Pierce, Blake E. Larson, and Hollis Thompson*

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of April 2018 a true and correct copy of the foregoing was served via e-mail on all counsel of record.

**THE OFFICE OF CRAIG C. REILLY**
Craig C. Reilly
111 Oronoco Street
Alexandria, VA 22314
Telephone: (703) 549-5354
Facsimile: (703) 549-2604
craig.reilly@ccreillylaw.com
*Liaison Counsel*

**ROBBINS GELLER RUDMAN & DOWD LLP**
James E. Barz
Frank A. Richter
200 South Wacker Dr., 31st Floor
Chicago, IL 60606
Telephone: (312) 674-4674
Facsimile: (312) 674-4676
jbarz@rgrdlaw.com
frichter@rgrdlaw.com

Samuel H. Rudman
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: (631) 367-7100
Facsimile: (631) 367-1173
srudman@rgrdlaw.com

Kathleen B Douglas
Maureen E. Mueller
120 E. Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: (561) 750-3000
Facsimile: (561) 750-3364
kdouglas@rgrdlaw.com
mmueller@rgrdlaw.com

**KIRKLAND & ELLIS**
Michael A. Petrino
655 Fifteenth St., NW
Washington, DC 20005
Telephone: (202) 879-5000
michael.petrino@kirkland.com

Shireen A. Barday
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-6418
Facsimile: (212) 446-6460
shireen.barday@kirkland.com

Joshua Z. Rabinowitz
300 N. LaSalle St.
Chicago, IL 60654
Telephone: (312) 862-2284
Facsimile: (312) 862-2200
jrabinovitz@kirkland.com
*Counsel for Defendant Mark DeYoung*

   */s/ Lyle Roberts*
Lyle Roberts (Va. Bar No. 45808)
**SHEARMAN & STERLING**
401 9th Street, N.W., #800
Washington, DC 20004
Telephone: (202) 508-8108
Facsimile: (202) 508-8100
lyle.roberts@shearman.com