IN THE UNITED STATES DISTRICT CIRCUIT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| STEVEN KNURR, et al., )<br><br>Plaintiff, )<br><br>v. )<br><br>ORBITAL ATK, INC., *et al.*, )<br><br>Defendants. )<br><br>) )<br>) )<br>) )<br>) )<br>) )<br>) )<br>) )<br>) )<br>) )<br>) | Civil Action No.: 1:16-cv-01031-TSE-MSN<br><br>CLASS ACTION |

## DECLARATION OF DOUGLAS A. FELLMAN

I, Douglas A. Fellman, declare as follows:

1.      My name is Douglas A. Fellman and I am a partner at Hogan Lovells US LLP ("Hogan Lovells"), based in our District of Columbia office.

2.      I am a 1987 graduate of Cornell Law School, I thereafter clerked for the Honorable James A. Belson of the District of Columbia Court of Appeals, and I joined Hogan & Hartson LLP ("Hogan & Hartson"), the predecessor to Hogan Lovells, in September 1988.

3.      I am a member of the bars of the District of Columbia, Virginia, and Maryland.

4.      At Hogan Lovells, I practice in the Investigations, White Collar, and Fraud practice area of the Litigation, Arbitration, and Employment practice group.

5.      I have practiced in this area of law since shortly after joining Hogan & Hartson.

6.      At Hogan Lovells, I specialize in representing clients, usually public companies, in connection with federal enforcement investigations, including those being conducted by the U.S. Securities and Exchange Commission ("SEC") and the United States Department of Justice ("DOJ"), as well as in connection with internal investigations involving all manner of compliance-related issues, including those relating to financial reporting.

1

7.      On June 23, 2016, my corporate partners at Hogan Lovells asked me to advise our client Orbital ATK, Inc. ("Orbital ATK" or "the Company") regarding a long-term contract awarded to Alliant Techsystems, Inc. ("ATK") in September 2012, and later retained by Orbital ATK, to manufacture small caliber ammunition for the U.S. Army at the Lake City Army Ammunition Plant in Independence, Missouri (the "Lake City matter"). ATK changed its corporate name to Orbital ATK, Inc. on February 9, 2015 in connection with the merger of ATK with Orbital Sciences Corporation.

8.      On June 24, 2016, I met with members of Orbital ATK senior management at Company headquarters in Dulles, Virginia to discuss more specifically the Lake City matter and next steps in relation to same.

9.      It was immediately clear that the Lake City matter posed legal risk to the Company in the form of future litigation or other adversary proceedings. The threat of litigation or other adversary proceedings was clear given the nature of SEC investigations involving public company clients, as well as the fact that Orbital ATK was already subject to an existing inquiry by the SEC related to the restatement the Company filed in February 2016. Furthermore, a mere seven weeks after the June 24, 2016 meeting, the above-captioned litigation was commenced. It was immediately agreed that my firm's efforts to assist the Company would be conducted under legal privilege and work product protections. From June 24, 2016 forward, including with respect to the conduct of the internal investigation that commenced shortly thereafter, all work performed by the Hogan Lovells team, by Alvarez & Marsal ("A&M," the forensic accounting firm engaged by Hogan Lovells under legal privilege to assist in the internal investigation), and by Dickinson Wright PLLC ("Dickinson Wright," retained as counsel by the Audit Committee of the Board of Directors of Orbital ATK), was

conducted in anticipation of, and because of anticipated, litigation or other adversary proceedings. Great care was taken to ensure that our work was legally privileged and confidential.

10.     Those with whom we interacted in connection with the internal investigation were repeatedly reminded that this was a legally privileged investigation. E-mails and documents generated in connection with the internal investigation were marked with an appropriate "Privileged and Confidential" legend, and great care was taken to ensure the confidentiality of all work product generated.

11.     During the course of the internal investigation, a joint team comprised of professionals from Hogan Lovells, A&M, and Dickinson Wright performed a number of tasks. These included the identification and review of relevant documents, the conduct of witness interviews, and the provision of advice and counsel to the client.

12.     In addition, on behalf of Orbital ATK, we voluntarily self-reported to the SEC with respect to the Lake City matter. Also, both Hogan Lovells and Dickinson Wright, along with A&M, had interactions with the Company's two outside audit firms, PricewaterhouseCoopers LLC ("PwC") and Deloitte LLP ("Deloitte"). I also had a due diligence call with counsel for Northrop Grumman Corporation ("Northrop"). Those communications are described below.

13.     With respect to the SEC, on August 9, 2016, on behalf of Orbital ATK, I contacted the SEC Enforcement Staff to advise them of the existence of the Lake City matter then subject to the ongoing internal investigation and advised the Staff that I would keep them apprised with respect to this matter going forward.

3

14.     In our discussions with the SEC Enforcement Staff, we advised the Staff that the internal investigation was being performed under legal privilege and that the Company was not waiving privilege in providing information to the SEC in connection with this matter.  To further memorialize this understanding, the Company and the SEC Enforcement Staff confirmed the applicability of a written agreement dated October 13, 2016 that explicitly provided that in sharing investigation-related information and statements with the SEC, "the Company does not intend to waive the protection of the attorney work product doctrine, attorney-client privilege, or any other privilege applicable as to third parties. The Company believes that the Confidential Materials are protected by, at a minimum, the attorney work product doctrine and the attorney-client privilege." The agreement further stated that "[t]he Staff will not assert that the Company's production of the Confidential Materials to the Commission constitutes a waiver of the protection of the attorney work product doctrine, the attorney-client privilege, or any other privilege applicable as to any third party." As counsel to the Company, we relied on this agreement in our interactions with the SEC.  Had there been no such confidentiality agreement, we would not have been comfortable voluntarily providing Confidential Materials to the SEC.  A true and correct copy of the confidentiality agreement is attached to this declaration as Exhibit A.

15.     On an infrequent basis, during the course of the internal investigation, I would speak briefly with the SEC Enforcement Staff by telephone to let them know that the investigation remained ongoing.  In addition, on two occasions, Hogan Lovells and A&M met with the SEC Enforcement Staff to provide in-person oral briefings with respect to the Lake City matter.  I understood that the information provided during these oral briefings was pursuant

to the terms of the aforementioned privilege non-waiver agreement and that Orbital ATK was not waiving legal privilege in providing the information.

16.     The first in-person SEC briefing occurred on December 8, 2016, at which point the Company's Restatement procedures remained ongoing.  The meeting consisted of a general briefing in which the Hogan Lovells and A&M team provided an overview of the Lake City matter, the procedures that had been used in connection with the internal investigation, and a high level summary of the nature of the issues that were being evaluated.

17.     The second in-person briefing of the SEC Enforcement Staff occurred on April 28, 2017.  It too was an oral briefing conducted by the Hogan Lovells and A&M team.  In this briefing we provided the SEC with greater detail of the internal investigation and the Restatement, which by then had been completed.  Among other things, we advised the SEC that a large number of documents had been identified and reviewed in connection with the internal investigation.  The SEC expressed interest in receiving copies of the non-privileged documents that had been assessed in that regard.

18.     In response to this request, Orbital ATK produced to the SEC approximately 12,725 non-privileged documents.

19.     In addition, also at the SEC's request, the Hogan Lovells and A&M team jointly provided the SEC Enforcement Staff with oral summaries with respect to witness interviews conducted as part of the internal investigation.  At the start of every oral summary, the briefing team confirmed with the SEC that the summary was being provided pursuant to the aforementioned privilege non-waiver agreement and that Orbital ATK was not waiving legal privilege in providing the briefing.  These summaries reflected the thoughts and impressions of

the interviewing team that participated in the witness interviews with current and former Company employees.

20.     Subsequent to the provision to the SEC Enforcement Staff of the oral interview summaries, the Hogan Lovells and A&M team has interacted with the SEC Enforcement Staff by phone on several occasions with respect to the Lake City matter.  I understood that the information provided during these telephone conversations was pursuant to the terms of the aforementioned privilege non-waiver agreement and that Orbital ATK was not waiving legal privilege in providing the information.

21.     In order to further protect applicable legal privilege, no written work product from the internal investigation was provided to the SEC Enforcement Staff at any time.

22.     The investigation team comprised of Hogan Lovells, A&M, and Dickinson Wright also had periodic interactions with Orbital ATK's outside audit firms, PwC and Deloitte. In connection with those interactions, the investigation team consistently confirmed with the outside audit firms that Orbital ATK considered the information being shared to be legally privileged and confidential, that the Company did not waive privilege, and that the outside audit firms would take care to ensure the confidentiality of the information being provided in order to further protect the legal privilege.

23.     Also in order to protect Orbital ATK's legal privilege, only a very limited amount of written work product from the internal investigation was shared with the outside audit firms.  This work product included lists of key words being used in connection with the document collection and review, lists of document custodians as to whom document searches were being conducted, and the names of persons being interviewed.  In addition, approximately 619 documents identified as important in connection with the matters under review in the

internal investigation were provided to the outside audit firms. To ensure the confidentiality of these materials, and further to Orbital ATK's efforts to maintain privilege, only select members of the outside audit firms were provided access to a secure Relativity database.

24.    At a point when the internal investigation was nearing completion, an in-person briefing of the outside audit firms was conducted by Hogan Lovells, A&M, and Dickinson Wright, with the group also joined by members of Orbital ATK senior management. At the start of the briefing the outside audit firms were advised that Orbital ATK considered the information being shared to be legally privileged and confidential and that the Company was not waiving legal privilege. This session was an oral briefing; no written work product from the internal investigation was given to the outside audit firms.

25.    The joint Hogan Lovells and A&M team also provided the outside audit firms with oral summaries with respect to witness interviews conducted as part of the internal investigation. These summaries reflected the thoughts and impressions of Hogan Lovells attorneys who participated in the witness interviews with current and former Company employees. At the start of every oral summary, the summary team confirmed with the outside audit firms the understanding that Orbital ATK considered the briefing to be legally privileged and confidential. We requested that the outside audit firms take care to maintain the confidentiality of what we discussed.

26.    Thereafter, upon information and belief, members of the investigation team, but in the main A&M and Dickinson Wright, had a series of interactions with the two outside audit firms with respect to the completion of the internal investigation and related matters.

27.    We were advised that Dickinson Wright's further interactions with the outside audit firms included provision of additional oral information to these firms. Upon information

and belief, no written work product from the internal investigation was provided to the outside audit firms during the course of the Dickinson Wright interactions, again in order to protect the applicable legal privilege.

28.     It is my understanding that Orbital ATK already has provided to Plaintiffs in the above captioned litigation copies of the non-privileged Orbital ATK documents identified and reviewed as part of the internal investigation and produced to the SEC.  Conclusions reached by Orbital ATK in connection with the internal investigation would reflect the review of those documents, as well as interviews with current and former Company employees, to whom Plaintiffs have access for purposes of taking their own depositions.

29.     Finally, in connection with the announced business combination of Orbital ATK and Northrop, I had a due diligence telephone call with counsel for Northrop to provide an overview of the Lake City matter.  That due diligence phone call occurred on September 6, 2017 and, as best as I can recall, lasted less than one hour.  I understood the call to be governed by the terms of the Non-Disclosure Agreement executed between Northrop and Orbital ATK on June 29, 2017, and updated on August 30, 2017.  At the outset of the call, I advised the participants that the matters I was to describe are protected by the applicable legal privilege and the participants should treat the matters as such.  The focus of the call was largely on the procedural history of the Lake City matter and the status of our interactions with the SEC in connection with same.  I provided no written materials to Northrop at any time.

I declare under penalty of perjury that the foregoing is true and correct to the best of my belief and recollection.

Executed on the ___ of ___, 2018.

_____
Douglas A. Fellman