1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
STEVEN KNURR, Individually    .    Civil Action No. 1:16cv1031
and On Behalf of All Others   .
Similarly Situated; and       .
CONSTRUCTION LABORERS PENSION  .
TRUST OF GREATER ST. LOUIS,   .
                              .
             Plaintiffs,      .
                              .
     vs.                      .    Alexandria, Virginia
                              .    May 4, 2018
ORBITAL ATK, INC., et al.,    .    10:12 a.m.
                              .
             Defendants.      .
                              .
.  .  .  .  .  .  .  .  .  .  .
```

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE MICHAEL S. NACHMANOFF
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

FOR THE PLAINTIFFS:          KATHLEEN B. DOUGLAS, ESQ.
                             Robbins Geller Rudman & Dowd LLP
                             120 East Palmetto Park Road
                             Suite 500
                             Boca Raton, FL 33432
                               and
                             JOHN C. HERMAN, ESQ.
                             Robbins Geller Rudman & Dowd LLP
                             3424 Peachtree Road, N.E.
                             Suite 1650
                             Atlanta, GA 30326
                               and
                             CRAIG C. REILLY, ESQ.
                             Law Office of Craig C. Reilly
                             111 Oronoco Street
                             Alexandria, VA 22314

(APPEARANCES CONT'D. ON PAGE 2)

(Pages 1 - 61)

(Proceedings recorded by electronic sound recording, transcript
 produced by computerized transcription.)

2

```
 1   APPEARANCES:  (Cont'd.)

 2   FOR DEFENDANTS ORBITAL          GEORGE ANHANG, ESQ.
         ATK, INC.; DAVID W.         LYLE ROBERTS, ESQ.
 3       THOMPSON; GARRETT E.        Shearman & Sterling
         PIERCE; BLAKE E. LARSON;    401 - 9th Street, N.W.
 4       AND HOLLIS M. THOMPSON:     Suite 800
                                     Washington, D.C. 20004
 5

 6   FOR DEFENDANT MARK W.           MICHAEL A. PETRINO, ESQ.
         DeYOUNG:                    Kirkland & Ellis LLP
 7                                   655 - 15th Street, N.W.
                                     Washington, D.C. 20005-5701
 8

 9   ALSO PRESENT:                   DOUGLAS A. FELLMAN, ESQ.

10
     TRANSCRIBER:                    ANNELIESE J. THOMSON, RDR, CRR
11                                   U.S. District Court, Fifth Floor
                                     401 Courthouse Square
12                                   Alexandria, VA 22314
                                     (703)299-8595
13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1              P R O C E E D I N G S

2           THE CLERK:  Civil Action 1:16cv1031, Steven Knurr, et

3    al. v. Orbital ATC (sic), Inc.  Counsel, please note your

4    appearance for the record.

5           MR. HERMAN:  Good morning, Your Honor.  John Herman

6    from Robbins Geller for the plaintiff.  With me is my

7    colleague, Katie Douglas, and Mr. Craig Reilly.

8           THE COURT:  Good morning.

9           MR. ANHANG:  Good morning, Your Honor.  George Anhang

10   with Shearman & Sterling for all the defendants except Mark

11   DeYoung.  Here with me today from Shearman & Sterling is my

12   colleague, Lyle Roberts, and also with us is Doug Fellman from

13   the Hogan Lovells firm.

14          THE COURT:  Thank you.  Good morning.

15          A VOICE:  Good morning.

16          MR. PETRINO:  Good morning, Your Honor.  Mike Petrino

17   with Kirkland & Ellis for the individual defendant, Mark

18   DeYoung.

19          THE COURT:  Good morning, Ms. Petrino -- Mr. Petrino.

20          MR. PETRINO:  Good morning.

21          MR. HERMAN:  If I may, Your Honor, we have an update.

22   There are three motions that are pending before you now.

23   Counsel for the defendants and myself, we worked and met and

24   conferred until the late hours last night and even into the

25   early hours of this morning.  We've resolved two out of the

4

1   three motions.

2          We've resolved the motion to compel regarding

3   Interrogatories No. 1 and 3 against the Orbital defendants, and

4   then we've resolved the claim for documents from Mr. DeYoung.

5          The only motion that continues to -- we would request

6   Your Honor's ruling on is the motion to compel regarding the

7   internal investigation, and with Your Honor's permission,

8   Ms. Douglas is prepared to address that as Your Honor sees fit.

9          THE COURT:  Thank you.  I appreciate the update and

10  the efforts that you went to.  I'm sure that you put in many

11  hours yesterday and this morning in coming to those agreements.

12  I don't need to know the details of them.  I trust that you

13  have resolved them, and I will dismiss both of those as moot.

14         I will say that, of course, the Court spent a

15  considerable amount of time preparing to address those issues

16  this morning, and it, of course -- there's limited amount of

17  time in this world, and so it perhaps could have been better

18  spent had I known that you would reach an agreement on those

19  issues, but as I say, better late than never.  So I'm glad that

20  you have been able to resolve them.

21         MR. HERMAN:  Yeah.  And my apologies, Your Honor.  I

22  would have provided notice had we had reached a resolution

23  earlier, but we certainly are, are very cognizant of Your

24  Honor's limited resources, and we apologize for the

25  inconvenience.

5

1      THE COURT:  Well, I, I accept your representation

2 that you would have contacted me as soon as you could have had

3 there been more time to, to foreclose that, that issue.

4      So the issue before the Court today relates to the

5 internal investigation and the discovery requests seeking that

6 information.  This issue has been briefed extensively on both

7 sides, and I will hear argument at this time.

8      I will recommend as we begin this argument that we

9 focus on the really important issues.  You do not need to

10 repeat everything that's in the papers, and please don't think

11 that I'm being rude if I cut you off and ask questions, but

12 frankly, I think questions will probably be more helpful than a

13 long exposition from either side.

14      MS. DOUGLAS:  Good morning, Your Honor.  Kathleen

15 Douglas for the plaintiffs.

16      THE COURT:  Good morning.

17      MS. DOUGLAS:  We have been forced to bring this

18 motion to compel in order to get information, documents, and

19 testimony related to the very relevant internal investigation

20 that was conducted regarding the restatement in this case.  I

21 understand Your Honor is very familiar with the arguments in

22 this case, so there's just two I would just like to quickly

23 highlight.

24      First, defendants have waived any sort of purported

25 privileges as of these documents by disclosing them to the SEC.

6

1    They've admitted to disclosing 12,000 documents, having

2    conversations as well as oral downloads of witness interviews.

3    Defendants are not permitted to, you know, forestall

4    prosecution and obtain lenient treatment from the SEC while

5    withholding these documents from the plaintiffs in this case.

6            That's, you know, *Martin Marietta* counsels that the

7    Fourth Circuit has rejected limited waiver in cases like this,

8    and therefore, it's our position that we are entitled to these

9    oral downloads of these witness interviews.

10           The second issue I'd like to flag for Your Honor is

11   defendants have been using these documents as a sword and

12   shield in their public SEC filings as well as in this case.

13   They -- the internal investigation was brought up in the

14   restatement, which, you know, the restatement that they filed

15   assuring investors that the restatement had been handled, the

16   scope of the investigation, that the issue has been remediated

17   and that it was isolated.

18           More importantly, defendants relied on the internal

19   investigation in their motion to dismiss briefing in this case.

20   Judge Ellis cited the internal investigation as part of his

21   support in granting, granting defendants' motion to dismiss on

22   scienter grounds.  In addition, they relied on the internal

23   investigation for six affirmative defenses in this case,

24   specifically, No. 21 dealing with conduct of others, saying

25   they cannot be responsible for conduct undertaken by other

1   people.  While that affirmative defense does not specifically

2   reference the internal investigation, it's undoubtedly related

3   to that.  And more recently, they've been attempting to

4   diminish the internal investigation's findings in their

5   interrogatory responses.

6        So, Your Honor, the fairness requires that, you know,

7   we're entitled to these documents because they've waived the

8   subject matter of them by putting them in the public realm and

9   in this case.

10        THE COURT:  Then tell me exactly what it is that

11  you're seeking.  Are you seeking all documents, or do you

12  believe that they can validly withhold opinion work product, or

13  do you believe that they have waived it as to everything?

14        MS. DOUGLAS:  Well, Your Honor, we believe that

15  they've, you know, they've done subject matter waiver in regard

16  to any sort of opinion work product.  We feel that that has

17  actually already been waived.

18        They stated that they did disclose some sort of

19  information regarding their, you know, internal impressions, I

20  believe, with the SEC, but what we're really looking for here,

21  Your Honor, is, you know, the witness interview memorandum.

22  They've, you know, already stated that they've disclosed that

23  information to the SEC.  It's the underlying data for the

24  internal investigation's public findings, so we're really

25  entitled to that.

8

1          In addition, any report summarizing the internal

2   investigation's findings.  That --

3          THE COURT:  Do you have any idea how many witness

4   interview memoranda exist?

5          MS. DOUGLAS:  No.  We have no idea about that, Your

6   Honor.  We have no idea as to what -- who was interviewed, the

7   number of people, the extension of the interview memorandum,

8   which is something that we're claiming we need that

9   information.  We're entitled to know, you know, were the

10  defendants even interviewed in this case?  Were they not

11  interviewed?

12         So that is, you know, part of the reason, Your Honor,

13  that we need that information.

14         THE COURT:  Do you think there's any relevance to the

15  fact that they indicate that they have provided oral

16  communications about witness testimony as opposed to any

17  interview memoranda themselves?  And I'll, of course, let them

18  address that issue as well.

19         MS. DOUGLAS:  Well, candidly, Your Honor, I think

20  that that's kind of a progression that people have been turning

21  to knowing of these waiver issues.  They try and, you know,

22  read over the phone:  This is what our interview stated,

23  without actually handing that document over.

24         But cases have addressed that that's, you know, in

25  our briefing:  *U.S. v. Herrera*, which is S.D. Fla. 2017, as

9

1    well as *SEC v. Vitesse*, which is S.D.N.Y. 2011, saying that it

2    is inappropriate to basically do these oral downloads of

3    interview memorandum in order to skirt waiver.

4           So in those cases, they have ordered the parties to

5    produce those underlying interview memorandum that were just

6    disclosed orally, and that's what we're seeking here.

7           THE COURT:  Thank you.

8           MR. ANHANG:  Good morning, Your Honor.  Again, George

9    Anhang with Shearman & Sterling for all the defendants except

10   Mark DeYoung.  I have three simple points to make here today

11   because I do want to be as brief as possible, but before I get

12   to those points, I want to respond even more briefly to a

13   couple points just made.

14          On September 26, 2017, Judge Ellis issued a ruling

15   granting a motion to dismiss that was brought with respect to

16   the first complaint filed in this case.  I'm reading now from

17   that decision:  "In sum," wrote Judge Ellis, "the facts alleged

18   in the complaint tell the following story."  I'm on page 38,

19   Your Honor, of his decision.

20          He then goes on to talk about the facts alleged in

21   the complaint, and his fourth bullet point is as follows:

22   "Individuals below the top executive level did not adhere to

23   company accounting policies and inappropriately concealed from

24   top management information about the Lake City contract's cost

25   overruns."

1            Your Honor, that's straight out of the investigation.

2    It's quite clear that the facts as alleged in the complaint

3    first filed by these plaintiffs referenced the investigation.

4    The notion that it is the defendants who injected the

5    investigation in this case is, with all due respect, nonsense,

6    Your Honor.

7            I now turn to the amended complaint that was filed in

8    the --

9            THE COURT:  Well, let me, let me stop you there just

10   because there are so many different parts to this, I may as

11   well ask the questions --

12           MR. ANHANG:  Of course, Your Honor.

13           THE COURT:  -- when they pop into my head.

14           MR. ANHANG:  Of course, Your Honor.

15           THE COURT:  I understand your reference to Judge

16   Ellis's opinion and the fact that the plaintiffs referenced the

17   investigation in their complaint, but is there significance to

18   the fact that they referenced the investigation because Orbital

19   made reference to the investigation in explaining to its

20   shareholders what had happened and had to explain why there had

21   been a $358 million loss that was unaccounted for and what

22   Orbital was going to do going forward to make sure that people

23   were held accountable and that those mistakes wouldn't be made

24   in the future?

25           Is, is that not part of the evaluation of how the

1   issue has been raised?

2           MR. ANHANG:  I don't think it is, and let me explain

3   briefly why, Your Honor.  The plaintiffs in this case are

4   essentially making what is often referred to as a subject

5   matter waiver-type argument, subject matter because their

6   position is that certain matters relating to the subject of the

7   investigation have been waived as a result of something that

8   the defendants have done.  So the argument clearly falls within

9   the rubric of subject matter waiver arguments.

10          Since the enactment of the new version of Rule 502,

11  that is, Federal Rule of Evidence 502, it's quite clear that

12  there are limitations, important limitations on the subject

13  matter waiver doctrine.

14          And I'm reading now from the important Advisory

15  Committee explanatory notes, not even regular notes, but the

16  explanatory note with respect to the new version of 502, Your

17  Honor.  The rule itself is called Attorney-Client Privilege and

18  Work Product; Limitations on Waiver.  Now let me read the

19  operative language:

20          "Subject matter waiver is limited to situations in

21  which a party intentionally puts protected information into the

22  litigation in a selective, misleading, and unfair manner."

23          Now, as we showed in our brief, Your Honor, there are

24  multiple elements of that that the plaintiffs simply have not

25  met here.  They have not shown that we put protected

1    information, as they must, into the litigation.  Plaintiffs put

2    unprotected information into the litigation.  Plaintiffs put no

3    protected information into the litigation, much less did we do

4    so in a selective, misleading manner.

5              So with respect to subject matter waiver, which is, I

6    think, the world in which these arguments are arising, it's

7    quite clear that the fairness argument -- and opposing counsel

8    concluded with the notion of fairness.  I think, in effect, the

9    plaintiffs here are making an argument that in their view,

10   what's going on is unfair, but there is no waiver or work

11   product doctrine pursuant to which fairness and fairness alone

12   is the crux of the analysis, and since 2007, it is Federal Rule

13   of Evidence 502 that places substantial limitations on the

14   ability of a plaintiff to make use of the subject matter waiver

15   doctrine.

16             Now, Your Honor, returning to the amended complaint

17   in this case, in the amended complaint, paragraph 219, the

18   plaintiffs return themselves to the subject, alleging as

19   follows:  "The investigation revealed" -- so right out of the

20   box, they're referring to the investigation.  "The

21   investigation revealed among other things that management

22   'suppressed certain negative information.'"

23             And there are other references, Your Honor, to the

24   internal investigation in the complaint.

25             So with respect to the critical prerequisite to

1    invoking subject matter waiver of the party in question being

2    the one who puts into the litigation protected information,

3    it's quite clear, Your Honor, we haven't put any protected

4    information into this litigation, and we were certainly not the

5    first to inject or introduce the subject of the investigation

6    into this litigation.

7         THE COURT:  Well, let me, let me see if I understand

8    the, the argument and can move this, this matter forward.  Is

9    your argument, in essence, that Orbital was entitled to make

10   reference to the results of the investigation in informing its

11   shareholders and the public in general of what the conclusions

12   of the investigation reached, what had happened, why things had

13   gone wrong, who was to blame, who was not to blame, in order to

14   for business purposes get back on the right track, but that in

15   no way waived any privilege associated with that internal

16   investigation?

17         Is that the argument?

18         MR. ANHANG:  Yes.  There, there's a multitude of

19   cases from across the country involving public companies as to

20   which there was an internal investigation about some subject

21   that led to some litigation.  This is a case like those cases.

22   The plaintiffs cannot point to any cases out there, they, they

23   do point to *Royal Ahold*, which I want to come back to, Your

24   Honor, but there's simply no doctrine and not even any

25   free-floating cases that suggest that when a company, quite

1    properly, one would argue, is required to make some disclosure

2    of non-privileged, non-work product information to its

3    shareholders to let them know what's going on, public companies

4    have to do that, and presumably courts would not want to treat

5    that basic information as protected or work product, where the

6    shareholders would not find out that information.

7           So in case after case, Your Honor, companies, public

8    companies are disclosing limited, unprotected information about

9    an investigation and what happened.  There's no waiver in

10   connection with that, and a 502 analysis makes that clear.

11          I want to clarify one thing, Your Honor:  Opposing

12   counsel referenced the fact that to the SEC, there was a

13   disclosure of 12,000 documents and went on to suggest that

14   those 12,000 documents have been withheld from the plaintiffs.

15   I want to say two things about those 12,000 documents, and I

16   don't think plaintiffs' counsel are going to stand up and

17   disagree with either one.

18          Those 12,000 documents are not privileged or work

19   product materials, and I don't read anything in their lengthy

20   submission suggesting that, and I don't know of any case law

21   that suggests that.

22          More importantly, Your Honor, those materials were

23   produced to the plaintiffs.  Those documents are not what this

24   motion is about.  This motion is not about any documents at

25   all.  This motion is about oral communications between the

1    company and the SEC and between the company and Northrop, and

2    on top of that, Your Honor, plaintiffs assert a free-floating

3    subject matter waiver theory that has no basis in any doctrine,

4    no basis in any case law, and no basis in Federal Rule of

5    Evidence 502.

6            THE COURT:  Well, let me stop you there and try and

7    again make sure I'm understanding the scope of the argument

8    here.  One of the challenges that the Court has is that this is

9    not an argument about attorney-client privilege or work product

10   based on a privilege log where the Court is looking at some

11   summary of a universe of documents, whether it's 5 or 10 or

12   10,000 that have been withheld, and that, of course, gets to

13   the enormous amount of back-and-forth that has been presented

14   to the Court by e-mails and telephone calls about who responded

15   when and why you-all didn't come to an agreement on what the

16   privilege log should look like, but I've got to deal with where

17   we are today, which is --

18           MR. ANHANG:  Understood, Your Honor.

19           THE COURT:  -- you've got a dispute.

20           That dispute is about documents.  The plaintiffs

21   don't have a document to look at where they can identify a

22   certain number of discrete items to say we want to challenge

23   the designation in this case or that case or the other case.

24           So I need to try and either figure out whether I can

25   make a decision today or figure out what I need in order to

1    make a decision, so maybe you can help me with that.  You said

2    that --

3              MR. ANHANG:  I think I can.  I think I can very

4    easily.

5              THE COURT:  Well, well, let me ask the question, and

6    then you can, you can certainly add to it.  When I asked

7    counsel for plaintiff what, what they were looking for, she

8    identified witness interview memoranda, and so I just heard you

9    say that maybe there's some confusion over what exists and what

10   doesn't.

11             Are there, in fact, written witness interview

12   memoranda, as one would expect there would be in an internal

13   investigation, that exist right now?

14             MR. ANHANG:  I believe there are notes or memoranda

15   of interviews, Your Honor, but they were not put into this

16   litigation.  They were not actually produced to the SEC.

17             So when Your Honor said the dispute here is about

18   documents, and you mentioned that with respect to the privilege

19   log, I want to be clear that with the SEC, there were only oral

20   communications, and I understand that plaintiffs want access

21   through a 30(b)(6) to a company representative to answer

22   questions orally about the substance of the oral discussions

23   with the SEC, and same goes for Northrop, Your Honor, with

24   respect to whether those oral communications somehow triggered

25   a subject matter waiver with respect to the interview --

1          THE COURT:  I want to break this down into much

2    smaller parts.

3          MR. ANHANG:  Of course, Your Honor.

4          THE COURT:  This is for the benefit of the Court that

5    has to think with small words and small pieces.  I understand

6    you to say and I understood from the papers, which is why I

7    asked opposing counsel about the significance of whether they

8    were oral communications or not, that in communicating with the

9    SEC, and we can also talk about Northrop Grumman at some point,

10   perhaps also with Northrop Grumman, that whatever information

11   was disclosed regarding the internal investigation was, in

12   fact, provided verbally, not in writing.

13          Is that correct?

14          MR. ANHANG:  That's correct.  That's my

15   understanding, Your Honor.

16          THE COURT:  Okay.  Now, going back five minutes, you

17   mentioned 12,000 documents.  Those are written pieces of paper

18   that were provided by Orbital to the SEC; is that correct?

19          MR. ANHANG:  Yes.  And they -- none of them were work

20   product, and none were privileged communication.

21          THE COURT:  And your position is that that's not at

22   issue here because those documents have already been turned

23   over?

24          MR. ANHANG:  And not only that; none of them

25   constitute privileged or work product material, so they don't

18

1    satisfy --

2            THE COURT:  Okay.  We don't need to talk about it

3    anymore.  Those 12,000 documents were provided to the SEC.

4    They've been provided to plaintiffs' counsel.  They're not at

5    issue here.  Thank you.  And plaintiffs' counsel has confirmed

6    that.

7            So what we're talking about, and let's just keep it

8    simple, talk about the SEC right now, is information that was

9    provided to the SEC subject to, and I've read the affidavit

10   from Mr. Fellman, who is here, was information provided to the

11   SEC subject to a confidentiality letter that's attached as an

12   exhibit, I believe, to your opposition that included

13   information that Orbital had gleaned from its internal

14   investigation but was conveyed not in writing but orally to SEC

15   lawyers or staff; is that right?

16           MR. ANHANG:  I think I'm going to allow Mr. Fellman

17   to have the last word on that, but I am, I am sure that, that

18   you're right.  So --

19           THE COURT:  Okay.  So now my next question to you

20   is --

21           MR. ANHANG:  Yes.

22           THE COURT:  -- and I think I know the answer to it --

23           MR. ANHANG:  All right.

24           THE COURT:  -- when Orbital provided that information

25   to the SEC, they probably relied on documents that had been

19

1    generated during the investigation, as opposed to simply their

2    memory; is that correct?

3             MR. ANHANG:  I'm not sure what you mean by "relied

4    on," but to some degree, to some degree, they may have relied

5    in part, but critically, that does not effect -- effect,

6    e-f-f-e-c-t -- a subject matter waiver here because we're in

7    the realm, A, of opinion work product, and the Fourth Circuit

8    has been very clear --

9             THE COURT:  I'm going to stop you.

10            MR. ANHANG:  Please.

11            THE COURT:  I'm going to let you make your full legal

12   arguments.

13            MR. ANHANG:  Thank you, Your Honor.

14            THE COURT:  I'm just trying to get sort of the basic

15   facts, here --

16            MR. ANHANG:  I'm sorry, Your Honor.

17            THE COURT:  -- which is, I'm trying to understand

18   that during the internal investigation -- I'm not asking you to

19   divulge any privileged information, information the Court

20   hasn't ruled on -- that there were lawyers or investigators or

21   other people who worked at Orbital's behest at Hogan Lovells or

22   elsewhere that went and talked to employees of Orbital ATK or

23   Alliant to try and find out what happened with regard to those

24   $358 million; is that correct?

25            MR. ANHANG:  That's my understanding, Your Honor.

20

1          THE COURT:  And am I correct that they probably

2    somewhere along the way wrote down what people said in some

3    form or another?  In other words, with a pencil and paper,

4    making notes, summarizing, or with a laptop computer or in some

5    way so that they could keep track of what everyone said so that

6    when the internal investigation of the people who were writing

7    the eventual report are advising Orbital on what they had found

8    had it, that it was all organized in some way; is that correct?

9          MR. ANHANG:  I believe they did so in a manner which

10   infused those notes with opinion work product protection

11   because what was prepared would have reflected mental

12   impressions, opinions, and legal theories of the lawyers in

13   question, but yes, Your Honor.

14         THE COURT:  Yes.  So if I'm understanding, what

15   you're saying is that there were pieces of paper or electronic

16   documents created by the investigators that included

17   information from witnesses, but what I'm hearing you say is

18   they may also have included the mental impressions or

19   subjective views of those individuals about whether they

20   thought someone was believable or other perhaps legal --

21   legally significant issues as to what it might mean for the

22   investigation.

23              Is that a fair characterization of what happened?

24              MR. ANHANG:  That's, that's my understanding, Your

25   Honor.

1          THE COURT:  And then that information in some way was

2     shared with whoever it was that spoke with the SEC; is that

3     right?

4          MR. ANHANG:  I believe that there is opinion work

5     product documents that would contain some things that were

6     shared orally with the SEC; that's right.

7          THE COURT:  So let me ask you this question:  When

8     there's a controversy over whether such documents, number one,

9     exist, and then it's discovered that they do exist, is the best

10    way to resolve it to provide examples of those documents to the

11    Court for a review to determine whether or not the Court agrees

12    that these include the mental impressions and opinions of

13    counsel or whether or not they are essentially fact memoranda,

14    or if you are familiar with criminal matters, what we would

15    call something like an FBI 302 or report of interview that law

16    enforcement officials engage in when they go out and talk to

17    people and collect information that's then turned over to

18    lawyers, who may then take a look and figure out what the legal

19    significance of that information is?

20         MR. ANHANG:  Your Honor, there's at least two very

21    important reasons that in this case that analysis is not

22    required:  first, the confidentiality agreement; second, Rule

23    502, and in particular, the language from 502 that I emphasized

24    before to the effect that there's only going to be waiver in a

25    situation where into the litigation, that matter has been

1    introduced by the party in question in a manner that's

2    selective, but let me get back to the confidentiality

3    agreement.

4              In a context in which there is a confidentiality

5    agreement that on its face covers, however it is you

6    characterize what was disclosed, I think you look first to the

7    confidentiality agreement, and as Your Honor knows in our

8    brief, we submitted, we believe, ample case law establishing

9    that on the basis of the confidentiality agreement here and all

10   the policy and practical considerations underlying it, there's

11   no need to go beyond the analysis given the confidentiality

12   agreement.

13             THE COURT:  Let me ask you this:  How do you

14   distinguish the *Royal Ahold* case with regard to

15   confidentiality?  There was a confidentiality agreement similar

16   to the one that I believe is attached as your exhibit to your

17   opposition in which there was an agreement that the SEC would

18   hold this information confidential -- confidentially.  This was

19   a voluntary disclosure to try and get out ahead of potential

20   litigation with the SEC, but the SEC retained the ability in

21   its discretion to share that information with others that the

22   company that would have otherwise held the privilege was giving

23   up once they chose even under that confidentiality agreement to

24   share.

25             Can you, can you help me distinguish?

23

1          MR. ANHANG:  I can, Your Honor.  There are multiple

2    ways to distinguish.  Let me mention by the way that *Royal*

3    *Ahold* predated Federal Rule of Evidence 502.  It's the 502

4    analysis and the limitations therein that are required to be

5    followed.

6          But let me get to *Royal Ahold*.  *Royal Ahold,* I think,

7    is helpful to the defendants, and I think the plaintiffs use it

8    in an attempt to preempt arguments that defendants would make.

9          First, *Royal Ahold* notes the Fourth Circuit case of

10   *In re Doe*, which contains language *Royal Ahold* cited, basically

11   means where a party has a reasonable expectation that the use

12   of the material is going to be limited in the future, they had

13   a reasonable expectation of confidentiality, and under rulings

14   of Judge Ellis himself, that is sufficient to preclude waiver.

15         In the very next paragraph, Your Honor, here's what

16   the *Royal Ahold* court said.  It said:  "A confidentiality

17   agreement might be sufficient to protect opinion work product

18   in the case," and that is what was at issue in the case.

19   That's why the court is talking about opinion work product.

20         In that same sentence, the court goes on to say:

21   "While that's true, in this case" -- all right, the judge here

22   is about to tell us why in his view primarily the

23   confidentiality agreement in that case was not sufficient, and

24   here's what the judge said:  "[I]n this case, Royal Ahold

25   already has disclosed information obtained from the witness

1    interviews to the public and to the plaintiffs through the

2    internal investigation reports."

3            None of that has happened here, Your Honor.  The

4    judge goes through a few more lines of analysis and then says

5    something that is plainly helpful to the defendants here:

6    "Under all the circumstances," the court said, "Royal Ahold has

7    not taken steps to preserve the confidentiality of its opinion

8    work product."

9            The court was taking pains, Your Honor, to focus on

10   the, the very fact-specific, case-specific analysis that's

11   required, points out that in that case, information obtained

12   from the witness interviews was disclosed to the public and to

13   the plaintiffs, neither of which has happened in this case,

14   Your Honor, and says --

15           THE COURT:  Well, help, help me with that part of it,

16   too.

17           MR. ANHANG:  Yes, Your Honor.

18           THE COURT:  Isn't there an argument that the

19   disclosures of the results of the investigation here are

20   similar to the disclosures in *Ahold*, that simply by explaining

21   what happened, that there were employees at a lower level in

22   the small ammunitions group that didn't do the things a certain

23   way or that the controls weren't appropriate and that there

24   were cost overruns and that Orbital is now going to do things

25   differently and people were fired or disciplined?

25

1      Isn't that the public disclosure of what the results

2 of all of those witness interviews led to?

3      MR. ANHANG:  It's not.  Earlier in the opinion, Your

4 Honor, the court notes that in the first instance, the public

5 disclosures in that case and the production of several internal

6 reports to the plaintiffs in that case constituted a waiver of

7 the privilege and non-opinion work product as to the disclosed

8 matters.

9      We don't have that here.  What we have here is a

10 public company discharging its duties to its investors by

11 disclosing some bare information about the investigation

12 sufficient to advise investors in a manner that in no way

13 caused a disclosure of protected or work product information,

14 Your Honor.

15      So, Your Honor, here in this case, what's missing are

16 a lot of the circumstances that drove the analysis from *Royal*

17 *Ahold*, but we do have a confidentiality agreement.  Judge Ellis

18 in a case that we cited in our opposition called *Federal*

19 *Deposit Insurance Corp. v. Marine Midland* -- and I want to just

20 drop a footnote there, Your Honor.  We cited a large number of

21 cases, many of which the plaintiffs ignored in their reply,

22 understandably perhaps; they have limited space; but the fact

23 that they would ignore a Judge Ellis decision was something

24 that we didn't expect.

25      Here are some things that Judge Ellis said in talking

1   about waivers:  "Waivers must be intentional or knowing acts.

2   If a client wishes to preserve the privilege, he must take some

3   affirmative action to preserve confidentiality.  [T]he

4   privilege is typically lost only when waived.  And waiver does

5   not typically occur unless a known right is deliberately

6   relinquished."

7           Under the circumstances, Your Honor, in which oral

8   communications were made to the SEC under a confidentiality

9   agreement -- the SEC here is not any typical federal or state

10  government agency.  It's an agency that is so protective for

11  its own policy and enforcement reasons that it has filed amicus

12  briefs, Your Honor, as far away as California urging courts to

13  uphold these confidentiality agreements, and I would invite

14  Your Honor, we provided in our brief a link to the amicus brief

15  that the SEC submitted, and I would invite Your Honor to look

16  at what the court said -- excuse me, what the SEC says about

17  why it's so vitally important for courts just like this court,

18  Your Honor, to uphold these confidentiality agreements.

19          So, Your Honor, we think under the circumstances

20  where what's being disclosed is being disclosed to a federal

21  government agency that's gone to the remarkable step of filing

22  amicus briefs with courts to uphold these confidentiality

23  agreements, given they -- there were oral disclosures by

24  Mr. Fellman and his colleagues, who are long-established

25  practitioners in this area, given all the measures that were

27

1    taken and all the surrounding facts and circumstances, Your

2    Honor, we think it's quite clear that Judge Ellis would say

3    there was no deliberate relinquishment of a privilege here.

4              THE COURT:  Let me, let me turn to another topic,

5    related topic, which perhaps is more fundamental, before we get

6    to the issues of the SEC and Northrop Grumman, which is whether

7    or not this internal investigation would have been required or

8    ordered even in the absence of the litigation that came to

9    pass.

10             And I understand the timing, which is that the

11   internal investigation, I believe, started in June, late June

12   of 2016, and the restatement that was in August of 2016, and

13   then the lawsuit was filed a few days after the restatement,

14   and the argument is, well, we knew as soon as this problem

15   arose, we anticipated that there would be a lawsuit, and both

16   sides, I think, have quoted Judge Ellis and his saying about

17   the son and the pope and whatnot.

18             But would there have been an internal investigation

19   setting aside the possibility of litigation at all?  I mean,

20   would that have been required for the auditors and for the

21   shareholders?

22             MR. ANHANG:  Your Honor, I believe this company

23   looked at the issues internally and only at some point took the

24   extraordinary measure of getting outside counsel involved at a

25   time when it would have been clear not just to Judge Ellis but

1    just clear as a matter of common sense that some kind of legal

2    proceedings -- and it didn't have to be this very case; it

3    could have been an SEC enforcement action -- that it was clear

4    that on the horizon were very likely legal proceedings of some

5    kind, and, in fact -- and it may be an issue in part of fact,

6    Your Honor -- but I will represent to you what I understand the

7    facts to be, and Mr. Fellman, if you wish, can elaborate, but

8    the fact is that yes, here, bringing in Hogan Lovells, having

9    them conduct the work on an ongoing basis through the filing of

10   this case and so forth was clearly done because this was a

11   matter that would bring legal proceedings and was anticipated

12   to and obviously did bring legal proceedings upon the company,

13   unfortunately but predictably, as Judge Ellis pointed out.

14          Now, the plaintiffs don't point to case law, coming

15   back to the law as opposed to the facts, that would suggest

16   that really in a situation like this, given the circumstances

17   here, that it can't fairly be said that there was a genuine

18   anticipation of litigation.  And, of course, we're talking

19   about a lot of opinion work product.  I don't think it's

20   disputed we're dealing with work product.

21          We're also dealing with privileged communications,

22   but we're dealing with work product, and I want to remind Your

23   Honor that when it comes to waiver of work product, the courts

24   are clear that the plaintiff carries a burden, and it's a heavy

25   burden, as it should be, because as we point out under *Upjohn*

1   and *Hickman v. Taylor*, the Supreme Court has enunciated very,

2   very important, vitally important public policy and practical

3   considerations underlying the work product privilege in

4   particular, or the work product protection in particular, and

5   we don't believe that the plaintiffs here can even come close,

6   and we also believe that under principles going as far back as

7   *Upjohn* and *Hickman*, it's clear that the work product here is

8   protected work product because it was prepared because of the

9   prospect of anticipated litigation, which, in fact, not only

10  materialized but materialized very, very quickly.

11         Your Honor, I was going to speak briefly about

12  Northrop Grumman, unless Your Honor has any questions about

13  anything I've covered so far.

14         THE COURT:  I'm sure that I do, but please proceed.

15         MR. ANHANG:  Well, I'm, I'm mindful that Your Honor

16  has been inundated with very lengthy briefs, with a lot of case

17  cites, and certainly I agree that the most constructive use of

18  our time is to respond to questions you may have.  So I'm happy

19  to continue to answer questions.

20         THE COURT:  You're welcome to address Northrop

21  Grumman.  I, I assume that the manner in which the information

22  was conveyed is similar to the way in which it was conveyed to

23  the SEC, that your, your -- part of your argument is that this

24  was an oral presentation, that documents or witness interviews

25  or notes from interviews were not turned over to Northrop

1   Grumman; is that correct?

2          MR. ANHANG:  Well, not exactly.  We say a lot about

3   the SEC, and there's a lot to be said in support of our

4   position with regard to the SEC, but one thing we don't say is

5   that there was a common interest between the SEC and, and the

6   defendants here, but there sure was a common interest between

7   the company and Northrop Grumman.

8          Judge Ellis elsewhere has said, as many, many courts

9   have said, that the common interest rule -- and Judge Ellis has

10  cautioned that it's not a privilege; it's a rule -- he says

11  under that rule, there is non-waiver, where information is

12  communicated to a third party, and I'm now quoting Judge Ellis,

13  "who shares a common interest about a legal matter."  A third

14  party who shares a common interest about a legal matter.

15         THE COURT:  Explain to me how Northrop Grumman would

16  share the interests of Orbital.  I understand that Northrop

17  Grumman would want to know about what happened because it might

18  affect whether they would choose to engage in a merger or want

19  to go into business with Orbital, but how, how would they be

20  having a common interest?

21         In other words, is the -- there would be a fear that

22  they might be liable or somehow absorb liability, and

23  therefore, they would have an interest in this information?

24         MR. ANHANG:  Let me answer that in just a few ways.

25  First of all, I just want to make the point, and I think it's

1    an important clarification, that plaintiffs have indicated that

2    the common interest rule or doctrine does not apply because in

3    some respect, Northrop Grumman can be said to be adverse to

4    Orbital ATK, and the reason I read what I did from Judge Ellis

5    is -- and, of course, we don't accept that there's adversity in

6    the meaningful sense -- but the point is there can be a common

7    interest scenario where the parties are adverse in some

8    respects, but that doesn't impact the analysis. The analysis

9    is is there a common interest with respect to the litigation at

10   issue.

11           Now, we cited cases in our brief, Your Honor, that we

12   think make abundantly clear that in the context of merger

13   partners in the case of litigation, that those merger partners

14   are going to have a common interest in the litigation insofar

15   as -- and I would add, Your Honor, the plaintiffs themselves in

16   their brief accept and acknowledge that at that time period, as

17   the plaintiffs themselves put it, Northrop Grumman is in the

18   process of consummating this merger transaction with Northrop.

19   So everything is in process. It's a go.

20           And I think that the commonsense notion underlying

21   the case law that we cited is if you are going to merge with

22   someone and they find themselves a defendant in a lawsuit, as I

23   understand it, claiming hundreds of millions of dollars of

24   damages, that you want your merger partner to win this case

25   because it's important to you, because it's going to impact

1    you, because if you get joined at the hip with someone who has

2    a very large judgment found against them, it's pretty clear

3    your interest isn't having that judgment avoided, and it's in

4    your interest and going to be in your interest if and when, as

5    we believe will happen here, your merger partner successfully

6    defends the litigation to the point that now you go through

7    with a merger without that potential judgment hanging over you.

8            So in that sense, we think it's quite clear that

9    there is a common interest, and I want to focus again on a

10   couple words.  Judge Ellis says there has to be a common

11   interest, not a complete interest, not a 100 percent alignment,

12   but a common interest in connection with the legal matter, and

13   we think that standard here is very easily satisfied.

14           But I want to go back to one thing, Your Honor:  To

15   be clear, what was disclosed to the SEC pursuant to a perfectly

16   valid and enforcible confidentiality agreement in circumstances

17   where that confidentiality agreement should be enforced, there

18   was disclosure to the SEC of material that was not disclosed to

19   Northrop Grumman.

20           I think Mr. Fellman's declaration makes quite clear

21   that there was a short, brief phone call, a lawyer-to-lawyer

22   phone call, and the case that I've been citing, in fact, finds

23   no common interest covered the matter at issue in the case that

24   Judge Ellis decided because that was a phone call, and again,

25   we're speaking here of one phone call with Northrop Grumman,

1    but in the, in the Judge Ellis case, there was a phone call in

2    which no lawyer was speaking for either side.

3         In this case, Your Honor, it was a lawyer-to-lawyer

4    oral communication, that is to say, a lawyer on behalf of

5    Orbital speaking to a lawyer on behalf of a prospective merger

6    partner, disclosing information in a selective way, infused

7    with opinion work product, including fact work product, and so

8    that conversation itself constituted the transmission of work

9    product lawyer-to-lawyer, which would otherwise be waived

10   except where, as Judge Ellis recognized, where each of the two

11   lawyers in that conversation are representing parties who share

12   a common interest about a legal matter, there can be no waiver.

13        And I would just end with this, Your Honor, if I may,

14   and then, of course, I'm happy to answer any further questions

15   you have:  The plaintiffs actually say in a footnote that our

16   reference to the *Hickman v. Taylor* case is a red herring.  It's

17   difficult to understand how that could be so.  What's so

18   important about *Hickman*, among many things, is it is the case

19   in which the Supreme Court made clear that it is not just

20   documents that are protected and deserve the highest protection

21   because Federal Rule of Civil Procedure 26 speaks to documents

22   and tangible things.

23        The significance of *Hickman* is it brings into the

24   analysis intangible things, and that includes conversations,

25   and conversations are the only thing that we're dealing with

1    here.  We're dealing with conversations to Northrop that are

2    alleged to have constituted a waiver of some kind, if not a

3    subject matter waiver, when they didn't, conversations with the

4    SEC that are alleged to have constituted a waiver, if not a

5    subject matter waiver, when they didn't.

6          And then beyond that, as, as I demonstrated, I think,

7    at the outset, there is this free-floating subject matter

8    waiver argument in which the plaintiffs use the right

9    buzzwords:  sword/shield, at issue, but when you look closely,

10   Your Honor, it doesn't comport with Rule 502, as it should, and

11   it doesn't attach itself to any particular doctrine or line of

12   cases, and we readily admit, Your Honor, that where a party

13   puts the nature of an attorney-client relationship at issue as

14   in a legal malpractice case, you don't necessarily need a

15   disclosure by the client of privileged communications or work

16   product.

17         There is because of the nature of that claim, because

18   you cannot prove legal malpractice, courts say, without

19   necessarily bringing into the case privileged and work product

20   information, in that context, there is waiver notwithstanding

21   502's limitation, and in the context, Your Honor, of advice of

22   counsel, there again, we freely admit that in the advice of

23   counsel context, as soon as you say "advice of counsel" in an

24   affirmative defense, for example, you are deemed thereby to

25   have opened the door.

1            There's no advice of counsel defense.  There's

2    nothing like it.  There's no investigative advice defense that

3    we're raising.  The affirmative defenses that the plaintiff

4    points to in, in our answer, A, don't mention the

5    word "investigation."  I think it's wishful thinking on their

6    part that somehow those affirmative defenses involve the

7    investigation.

8            I can represent to you, Your Honor, that the

9    affirmative defenses at issue do not involve the investigation.

10   There's no --

11           THE COURT:  Well, let me ask you a couple of

12   questions to clarify that.

13           MR. ANHANG:  Please.

14           THE COURT:  Does Orbital or do any of the defendants

15   intend to rely on the results of the investigation or the

16   investigation in any way at a trial of this matter?

17           MR. ANHANG:  Only to the extent necessary to respond

18   to ways in which the plaintiffs inject the investigation into

19   this case, forcing us to decide how to respond and perhaps

20   responding in a way that necessarily refers to the

21   investigation.

22           But if the plaintiffs here today represent to you,

23   Your Honor -- and they seem to think that we're the ones who

24   dragged the investigation into this case, and understand that

25   what I'm about to say is something for which I would need

1    client approval, but let me say this, Your Honor:  If the

2    plaintiffs here today represent that they will not bring out

3    the investigation in this case in any affirmative way, then

4    maybe the way to resolve this issue, Your Honor, if they are

5    willing to do that, is for us in consultation with our clients

6    to determine that on the basis of that, we are prepared to say

7    that we will not raise the substance of the investigation in

8    defense of the case.

9           But the reason we're here today, Your Honor, is that

10   is not the current posture.  The current posture is very

11   different.  The plaintiffs from the very first complaint they

12   filed, as Judge Ellis found, have a story that alludes to facts

13   that point to the investigation, and then in their amended

14   complaint, they come back and pound the table about the

15   investigation, and this is among other reasons why, as we put

16   it in our brief, Your Honor, it's the plaintiffs who seem

17   fixated on the investigation, but if they represent to you that

18   they will end their fixation and stop talking about the

19   investigation, that might be a way to resolve this issue, Your

20   Honor.

21          THE COURT:  Okay.  Thank you.

22          MR. ANHANG:  Thank you, Your Honor.

23          MS. DOUGLAS:  Your Honor, may I, may I respond to

24   some of his arguments or --

25          THE COURT:  You may.

37

1          MS. DOUGLAS:  First, Your Honor, I just want to

2     represent that plaintiffs in no way agree to defendants'

3     proposal that we will not be using the internal investigation.

4     It's clear that the internal investigation has backfired on

5     defendants.  It's how, you know, Judge Ellis found the, you

6     know, underlying corporate scienter argument here, and they're

7     trying to backpedal from that, so no, we will not agree to

8     that.

9          I'd like to kind of go through just addressing some

10     of counsel's arguments, if that pleases the Court.

11          THE COURT:  You may.

12          MS. DOUGLAS:  May I respond to certain things?

13          THE COURT:  I may try and focus the argument given

14     the shortness of life, as Judge Ellis would say.

15          MS. DOUGLAS:  Okay.  I'll make this very brief then,

16     Your Honor.  Counsel made numerous, you know, started by

17     quoting the -- Judge Ellis's order, saying how, you know,

18     plaintiffs relied in the internal investigation, and, you know,

19     I think as Your Honor pointed out, we relied on the internal

20     investigation because defendants put it out there as their

21     defense.

22          They relied on it to try and say that the individual

23     defendants had no scienter, so, of course, we were going to

24     rely on it.  That's classic sword/shield, and that's classic

25     why we would be prejudiced if we did not, you know, get that

1    underlying information.

2          If you read -- Mr. Reilly always brings his rule

3    book, so we actually just checked back on Rule 502(a), and it

4    is specifically related to an agency, you know, which would be

5    the SEC, and disclosure to that agency, an intentional

6    disclosure, which was here, so that information has been

7    waived.  That's, you know, what 502(a) talks about.

8          Defendants' argument that they never put any sort of

9    privileged information into the public realm is pretty

10   nonsensical considering in meet-and-confers and in their

11   discovery responses, they've been telling us:  All documents

12   regarding the internal investigation are privileged.  We won't

13   talk to you about it.  We won't put a 30(b)(6) witness up to

14   talk about it, because everything about it is privileged.  Yet

15   somehow you were able to, you know, put those results out in

16   the public realm.

17         The Judge Ellis case that counsel addressed, I want

18   to clarify.  That was an inadvertent waiver case.  That is not

19   here.  Here we're dealing with a voluntary waiver.  So, you

20   know, that case does not stand for the proposition that it was

21   being proffered for.

22         Oh, the SEC has not filed an amicus brief in this

23   case.  I think we're all pretty clear on that.

24         And in regard to the business purpose, that was not

25   something I brought up in my initial argument, but we have

1    alleged in our briefs that there were numerous factors that

2    support the fact that this internal investigation was done for

3    the purpose of a business purpose.  It wasn't just the timing,

4    Your Honor, which that is a very great fact for us.  It was

5    also the scope.  That internal investigation reviewed all

6    contracts, not just the Lake City contract that was the subject

7    of the restatement.

8            And also the *Kidder* decision, which we actually did

9    cite in our briefs --

10            THE COURT:  Can you go back to the issue of the

11   scope?

12            MS. DOUGLAS:  Yes.

13            THE COURT:  I'm not sure I understand that point.

14            MS. DOUGLAS:  Yes.  Let me just grab this, Your

15   Honor.  I just want to make sure I've got everything right.

16            As we pointed out in our briefs, the, the, the

17   purpose of the internal investigation, the company even said

18   its purpose of the internal investigation was the circumstances

19   surrounding the misstatements in the accounting for the Lake

20   City contract and related manner.  That's the -- that's Orbital

21   ATK's own statement as to what the purpose of the internal

22   investigation was.  That's a business purpose.

23            It was to look at the cause of the restatement, the

24   scope of the restatement.  You know, if you remember from our

25   complaint, there was a time when they thought the restatement

1    was, you know, more 2013 heavy.  Then it became, no, more year

2    2014 heavy.  Oh, no, wait, it's actually all, all periods.

3           So part of the internal investigation was to figure

4    out how much is this actual restatement.  That's a business

5    purpose.  You need to tell your shareholders what's your

6    amount.  You know, they did not have that from the front end.

7           They -- in order to ensure investigators that the

8    cause of the restatement had been remediated and was an

9    isolated incident, they looked at all prior contracts, I

10   believe they were all the contracts that relied on the estimate

11   of completion, and to see whether this problem dealt with just

12   the Lake City contract or all contracts, and that's actually

13   taken from the, the language of the 2015 amended 10-K, which

14   was the February 2017 document, the public filing where they

15   discussed the restatement, and they say as part of the internal

16   investigation, I'll quote:  "a comprehensive and intensive

17   review of all relevant material contracts throughout the

18   company."

19          It was not an investigation just related to the Lake

20   City contract.  So that was obviously done for a business

21   purpose.

22          And then, you know, Your Honor, as you picked up on,

23   the internal investigation began in July of 2016, five weeks

24   before the announcement of the restatement and any litigation

25   in this case, and as we cited in our briefing, I believe it was

1    *Royal Ahold* actually held that even when there was an ongoing

2    litigation, defendants' investigation of the restatement still

3    was a business purpose and was not in anticipation of

4    litigation.

5           So I think that we've, you know, aptly proved that

6    these documents had been waived as to any privilege, and in

7    actuality, they couldn't -- for a lot of these documents,

8    they're not even protected work product, and they don't deserve

9    any privilege as it is.

10          Let's see if there's anything else I would like to

11   address.  In regards to the common interest privilege, as we've

12   pointed out in our brief, defendants are relying on patent

13   cases.  That's not where we are here.

14          If -- you know, in these negotiations, had Orbital

15   disclosed to, to Northrop that, hey, there's all this fraud,

16   we're going to lose, you know, this is the underlying issues

17   that really happened in the internal investigation, you know,

18   Northrop would most likely have asked for and insist on a

19   reserve account.  So that is a reserve account for that

20   upcoming litigation.

21          So, you know, it would have impacted the parties.

22   The parties were adversary.  Interests weren't aligned when

23   they were negotiating that acquisition.

24          And, you know, *Royal Ahold* was not a legal

25   malpractice case.  So I think that's an important point to

42

1    point out.

2           And I think for now, there's, you know, there's some

3    of the points I wanted to make responding to counsel's

4    arguments.  If you have any further questions?

5           THE COURT:  I'm still trying to understand exactly

6    what the parties think that the Court should do in the absence

7    of a privilege log and in the representations of counsel that

8    we're really talking about oral communications at least with

9    regard to the SEC and Northrop Grumman.

10          What is it if I were to rule in your favor that you

11   think the Court could do?

12          MS. DOUGLAS:  Your Honor, I think for us, you know, I

13   think a fair ruling will, you know, of course, Your Honor, we

14   feel that we are entitled to, you know, these documents because

15   privilege has been waived, and certain documents are not

16   opinion work product.

17          One thing, you mentioned an in camera review of these

18   interview memorandums, although it's our position that things

19   are not protected.  Counsel is saying that there is opinion

20   work product there, so we think that those documents should be

21   disclosed to us, and actually, we think the best position would

22   be they could be disclosed to us with redactions if that's what

23   they want to do.

24          Give us the interview memorandum.  You can give us

25   redactions as to opinions.  Give us a privilege log so then we

43

1  have the ability, you know, to figure out what actually of that

2  is opinion work product and what isn't.

3          So that would be one suggestion, but I really think

4  the written witness statements, as to that, Your Honor, we

5  really feel that that has been waived and we are entitled to

6  those documents.

7          THE COURT:  Thank you.

8          MR. ANHANG:  Thirty seconds?

9          THE COURT:  You can speak for more than 30 seconds.

10         MR. ANHANG:  I can confirm that there's currently

11 scheduled a Rule 30(b)(6) deposition of a corporate

12 representative of Orbital ATK for this Tuesday.  There was an

13 extensive oral meet-and-confer on that issue in which I

14 participated, and I know what I said, and I made it clear that

15 there were aspects of the investigation that the corporate

16 representative would be prepared to talk about consistent with

17 the company's public disclosures to its investors that I think

18 we all would have to agree the company not only made but was

19 required to make and didn't waive any privilege or work product

20 protections in making.

21         So it is a straw man for the plaintiffs' counsel now

22 to suggest that, quote, we won't talk about the investigation.

23 That's simply not true.

24         Secondly, Your Honor, we continue to think that *Royal

25 Ahold* in some respects supports our position strongly, and in

1    other respects, it's simply that the plaintiffs here are

2    mischaracterizing it, but in any event, in *Royal Ahold*, the

3    company there said that the investigation was being conducted

4    to satisfy the auditors and there was no such statement here,

5    and besides, *Royal Ahold* was looking at a, sort of a driving

6    force-type inquiry into the anticipation of litigation

7    analysis, which is not the controlling analysis, Your Honor.

8             I think I understood plaintiffs' counsel to accept

9    the proposition that this case is covered by the Federal Rules

10   of Evidence, including 502, but if you take a close look at it,

11   and again, take a close look at the language that I quoted from

12   the explanatory note, that what the subject matter waiver

13   limitation within that rule is intended to do, it's intended to

14   apply where the party at issue puts protected material into the

15   litigation in a way that's selective and misleading.

16            It's quite clear that the fact that there was a

17   disclosure here to the SEC pursuant to a confidentiality

18   agreement does not all of a sudden open the floodgates here

19   with respect to work product and doesn't even justify an in

20   camera review.  An in camera review is not a consolation prize

21   that you're entitled to when you can't satisfy --

22            THE COURT:  It's certainly not a consolation prize

23   for the Court.

24            MR. ANHANG:  I couldn't agree more, Your Honor, but

25   when the courts are clear that it is the plaintiffs here who

45

1    bear the burden of establishing waiver, and it's quite clear

2    they don't even have a doctrine or a line of cases, and again,

3    they continue to intone sword/shield, but there's no doctrine

4    there, if you look at those sword/shield cases, they all

5    involve --

6              THE COURT:  Why don't we back up, and maybe I'm

7    missing something.  There is a substantial compliance date of

8    May 1 with regard to the defendants producing documents, was

9    there not?

10             MR. ANHANG:  There was, Your Honor.

11             THE COURT:  And I know that there have been struggles

12   with regards to the production of those documents, and there's

13   been some litigation with regard to what's being produced and

14   what's being withheld.

15             MR. ANHANG:  Unfortunately so.

16             THE COURT:  To the extent that they have sought

17   information about the internal investigation and you have not

18   produced those documents, is it not required by the local rules

19   and the federal rules and this Court's scheduling order that

20   you would produce a privilege log so that the plaintiffs could

21   know and be able to challenge what is being withheld?

22             MR. ANHANG:  Well, Your Honor, I think it was well

23   over a week ago when I communicated with plaintiffs' counsel in

24   the last of what was a string of communications going back to

25   the beginning of the case, and plaintiffs' counsel has never

46

1    disagreed with the fundamental proposition that given the

2    burdens associated with a privilege log, particularly an

3    item-by-item one, that it did not make sense for defendants to

4    plow forward and produce a log that was in a form or format

5    that the plaintiffs didn't agree with and insisted be revised.

6              So I think the case law and the rules and common

7    sense dictate, and you yourself, Your Honor, respectfully, at

8    the last hearing in this case indicated that what was

9    appropriate was for the parties to meet and confer on the

10   format of the log and, barring an agreement, to have motion

11   practice on this issue.

12             THE COURT:  Well, I think what I said was that I

13   expected counsel would be able to reach an agreement on the

14   form of a privilege log, as experienced counsel do in this

15   court every day --

16             MR. ANHANG:  Yes, Your Honor.

17             THE COURT:  -- and that if you couldn't, then I would

18   entertain a motion, and then I think I said but I'd really

19   prefer not to.

20             MR. ANHANG:  Yes, Your Honor.

21             THE COURT:  So I've read all of the e-mails, and I

22   see that unfortunately, my confidence in counsel was not well

23   placed with regard to coming to an agreement because you-all

24   did not do so.  So now the question for the Court is who has

25   the obligation in the absence of having reached an agreement to

1    provide the privilege log?

2            MR. ANHANG:  I would say two quick things:

3    Plaintiffs said something in their brief with which I think we

4    agree, which is -- and I think it's the last thing they said

5    about the privilege log issue.  They said given the nature of

6    the waiver issues before Your Honor, it would appear to make

7    sense from the parties' point of view at least to wait for a

8    ruling, because the judge's rulings on these waiver issues, and

9    I don't believe plaintiffs think require a privilege log, and I

10   don't believe they do require a privilege log.

11           Ruling on the enforceability of the confidentiality

12   agreement here with the SEC does not require a privilege log,

13   and none of SEC in confidentiality agreement cases we've ever

14   seen in any way depend on what the privilege log says about

15   those materials.

16           So what it is that plaintiffs' counsel in their

17   briefs said with which we agree was, well, if we're looking at

18   how we go forward from here, we are prepared to produce a

19   privilege log.

20           As I, as I told counsel the last time we spoke, I

21   said in less -- in a week or less -- and I really had "or less"

22   in mind -- we can give you a categorical log.  I said --

23           THE COURT:  And you think that's sufficient given the

24   dates in this case and the history of the litigation up to this

25   point, to be telling the Court now that you're prepared to

1    provide a privilege log a week from now?

2            MR. ANHANG:  Your Honor, it would be a week from now

3    only because of the failure of the parties to reach what I

4    would think would be a commonsense agreement, but I would add

5    something, Your Honor.  I know you -- Your Honor should not be

6    burdened with sort of the he said/she said aspect of this, but

7    plaintiffs' counsel has never indicated to us until they filed

8    their motion that they were opposed in principle to the concept

9    of a categorical privilege log.

10           In fact, they said things to me over the last few

11   weeks that would have led anyone to think that they were on the

12   verge of agreeing, in which case there would be a categorical

13   privilege log submitted at, at this point.

14           THE COURT:  And you decided as a tactical matter that

15   it would be better not to simply go forward and provide a

16   categorical privilege log because you had not gotten an

17   affirmative agreement from them, despite the fact that the

18   burden falls on the party who is propounding or asserting the

19   privilege?

20           MR. ANHANG:  I think there was a, an understanding

21   between me and plaintiffs' counsel that we would resolve this

22   formatting issue before plaintiffs would argue that our log was

23   untimely, and they only raised their untimeliness argument,

24   frankly, in an untimely way, at a time when it was clearly too

25   late.

1            If, if anyone used this tactically, I think it's

2     plaintiffs.  They strung us along, giving indication they were

3     on the verge of agreeing to something that is agreed on

4     everywhere, that's patently reasonable, and then at the last

5     minute, suddenly say:  We think it's past due.

6            When they told us:  We think it's past due, Your

7     Honor, first of all, they cited no controlling law that --

8     where there's a production deadline of, say, May 1, all logs

9     must be produced by then.

10            In fact, Your Honor, I believe -- and this I'm not

11     completely sure of -- I believe the plaintiffs themselves have

12     not produced a log in this case, so apparently, plaintiffs

13     themselves understand that May 1 was not the deadline both for

14     the substantial production and also the deadline for all

15     privilege logs.  I don't think the parties understood that, and

16     I think it's clear from the behavior of, of all the parties in

17     this case.

18            Lastly, Your Honor, May 1 was a deadline for

19     substantial completion, but I think there was allowance for the

20     fact -- and we had asked for, as Your Honor will recall, a

21     couple extra weeks to complete that phase of discovery, but

22     substantial completion was what was required, with the

23     understanding, we thought, and I think plaintiffs share this

24     understanding, that there were other discrete things that could

25     be provided shortly thereafter.

50

1          In a substantial completion world, we did not

2     understand there to be a requirement that a log be produced for

3     everything by May 1, and I don't think the plaintiffs

4     understood that either, Your Honor.

5          THE COURT:  Let's assume for a moment that I'm not

6     persuaded by your arguments and I believe that the plaintiffs

7     are entitled to some documents that they have not yet received.

8     I believe you've made an argument that whatever notes were

9     prepared during this internal investigation of witness

10    interviews were so intertwined with mental impressions and

11    attorney work product that they should not be turned over

12    perhaps even in a redacted form, or do I misunderstand what

13    you've said to me before?

14         MR. ANHANG:  Well, I think that under a 502(a)

15    analysis, early evidence 502, as well as all the cases on work

16    product waiver and nonwaiver, including opinion work product

17    waiver and nonwaiver, I don't think the circumstances here

18    justify a finding that there's been a waiver of any form of

19    work product by the failure to produce a log by May 1, Your

20    Honor.

21         And this is an issue I would submit has not been

22    briefed, Your Honor, and we would welcome the opportunity -- if

23    Your Honor sees the issue here as coming down to the -- to

24    privilege log, and in their reply, instructively, Your Honor,

25    the plaintiffs --

1          THE COURT:  I'm trying to find a practical solution

2   to resolve this matter, which sooner or later is going to have

3   to be resolved.

4          MR. ANHANG:  And I, and I tried to propose one, Your

5   Honor.

6          THE COURT:  So one of my questions to you is --

7          MR. ANHANG:  Yes, Your Honor.

8          THE COURT:  -- how do you propose if I were to rule

9   against you that I resolve this matter?

10         I could simply grant the motion and require you to

11  turn over all documents related to the internal investigation.

12  I assume that probably would not be your preferred outcome.

13         MR. ANHANG:  No, Your Honor.

14         THE COURT:  This is your opportunity to give me an

15  alternative.

16         MR. ANHANG:  Well, if Your Honor believes that a

17  privilege log would assist Your Honor in any way, you can

18  believe that we will work 24/7 to produce a privilege log for

19  Your Honor, and we will put as many people as are necessary and

20  pull overnight midnight to 6 a.m. shifts to get that privilege

21  log to Your Honor as fast as any human being can do so.

22         So I can represent that to Your Honor.

23         THE COURT:  I'm not sure that a privilege log

24  furthers the issue here.  I think the question is whether or

25  not there are documents in your possession which could be

1   turned over to the plaintiff that to the extent you believe

2   there is some way to preserve opinion work product, as opposed

3   to fact work product, simply the results of the interviews,

4   which I think is the essence of what they are looking for,

5   whether or not that can be done either through redactions on

6   your part and turning it over or through the withholding of

7   documents and the Court reluctantly reviewing them to see

8   whether or not the Court agrees that the mental impressions are

9   so pervasive and mixed up in those documents that they can't be

10  redacted or that the Court has to come to a different

11  conclusion.

12          MR. ANHANG:  Well, Your Honor, of course, we would

13  agree to in camera review of any materials you thought

14  necessary to review in camera.

15          With respect to fact work product versus opinion work

16  product, certainly we can go back and engage in an analysis

17  that we haven't done yet, and I want to explain that in my

18  experience, even privilege logs, and I think plaintiffs will

19  agree with this, do not typically distinguish between fact and

20  opinion, generally in that basis of which protection is

21  asserted, call them privilege logs, it generally says WP work

22  product and an A-C priv., it doesn't get deeper and more

23  granular than that, so for that, for that reason if none other,

24  we haven't performed a document-by-document analysis of fact

25  versus opinion work product, but that is clearly something that

53

1    we are prepared to do and then make any of the results of that

2    analysis available to Your Honor for in camera review.

3              However, Your Honor, we believe we are on very, very

4    strong footing with respect to the legal principles that govern

5    the outcome of the analysis in this case, and I think we'll

6    continue to believe and preserve all our rights with respect to

7    our argument with respect to the, the legal effect of the

8    confidentiality agreement under the circumstances here, the,

9    the proper analysis to be conducted under Federal Rule of

10   Evidence 502(a), the long lines of cases in the Fourth Circuit

11   with respect to work product generally and opinion work product

12   specifically, and then the cases from across the country that

13   we think support our position in every way, and we cited dozens

14   of cases in our brief, Your Honor, as opposed to the plaintiffs

15   here, who think these materials are relevant and thinks that it

16   would be somehow fair, even though relevance and fairness under

17   502(a) and Supreme Court precedent is not the touchstone.

18             And the Supreme Court has recognized, as has Judge

19   Ellis, that withholding fact work product as well as opinion

20   work product is an obstruction to the discovery of truth, okay?

21   It is, but the reason that these doctrines are upheld and very

22   important is because there are some very important policy and

23   practical considerations underlying them.

24             So we are not here to argue these materials are not

25   in any way, shape, or form relevant, but relevance is not the

54

1    touchstone of an inquiry where you're dealing with a privilege

2    and work product assertion.

3              And with that, Your Honor, I'll close.

4              THE COURT:  Do you have any sense of the number of

5    potential witness reports there may be, whether it's in the

6    single digits or the dozens or the hundreds?

7              MR. ANHANG:  I know it's not in the hundreds, and I

8    know that because *Royal Ahold*, of course, literally involved

9    the SEC receiving hundreds of such memos, which is one of many

10   reasons the case is easily distinguished.

11             So I can represent to Your Honor -- and, of course, I

12   am not with the firm that conducted the investigation, so I

13   don't have as sure a grasp of the details as those whose work

14   product is at issue here, Your Honor.  It's not my work

15   product; it's the work product of the good people at Hogan

16   Lovells, including Doug Fellman; but in any event, I can

17   represent to Your Honor that it's here not hundreds.  We're

18   talking double digits and not triple, and not triple digits,

19   Your Honor.

20             THE COURT:  Thank you.

21             MR. ANHANG:  Thank you, Your Honor.  I greatly

22   appreciate your patience today.

23             THE COURT:  Thank you.  I appreciate the effort that

24   everyone's put into this.

25             I hate to do this, but I'm going to take a brief

55

1    recess.  I will try and come to some conclusions and rule from

2    the bench shortly, but I hate to prolong this, we all have many

3    other things to do today, but I think we'll be better served if

4    I take a few minutes to collect my thoughts.

5              Court will be in recess.

6              (Recess from 11:26 a.m., until 11:40 a.m.)

7              THE COURT:  This matter comes before the Court on

8    plaintiffs' motion to compel with regards to documents related

9    to the internal investigation.  I have listened to the

10   arguments of counsel and reviewed the pleadings and tried my

11   best to understand the issues here.  I find that the motion

12   should be granted.

13             Claims of privilege are disfavored.  They shield

14   evidence from the truth-seeking process.  The party asserting

15   privilege has the burden to show specifically why information

16   should be withheld.

17             The first question that the Court has examined is

18   whether or not the information sought was created in

19   anticipation of litigation.  Litigation, of course, is always

20   possible, especially in these circumstances, but it's clear

21   that in this circumstance, Orbital had other independent

22   reasons reflected in their own documents for conducting this

23   investigation.

24             I find that the *Royal Ahold* case is on point in many

25   respects.  I have looked carefully at the defendants' arguments

1    and cases and at their emphasis on Federal Rule of Evidence

2    502(a), and I do not find that it precludes turning over

3    information sought.

4         However, I find -- and plaintiff has conceded that

5    this case is really about -- this matter is really about a

6    limited request for witness interviews if such documents exist,

7    and this motion is being granted based on that narrowed

8    request.

9         I find that to the extent witness interview reports

10   were created during the course of the internal investigation in

11   any form, whether handwritten, typed, or transcribed, whether

12   verbatim or summarized, that they must be turned over, although

13   I find that defendant may redact from those reports any opinion

14   of counsel in the form of mental impressions or thoughts, legal

15   analysis, marginal notes, if such things are still done by

16   attorneys or investigators.

17        I'm going to require that these documents be turned

18   over to the plaintiff, and they can be turned over in their

19   redacted form.  I will give the plaintiff an opportunity to

20   challenge those redactions if they believe there is a basis for

21   doing so.  I am not encouraging the parties to do so, and once

22   again, I'm encouraging counsel to work collaboratively even in

23   less than ideal circumstances to move this litigation forward.

24        I will say that if the redactions are challenged and

25   I review in camera a sample of those unredacted interviews and

57

1  find that the redactions are not appropriate, I may find that

2  not only with regard to the samples but with regard to all

3  reports, that unredacted versions will have to be turned over.

4  So I am saying this up front to encourage the parties and the

5  defendant to be very careful in redacting what is appropriate

6  in this case.

7          I am not going to require -- I'm denying the motion

8  with regard to Northrop Grumman. I do find that the common

9  interest does apply. I am finding, consistent with *Royal*

10 *Ahold*, that these witness interviews that were conveyed in oral

11 form and relied upon through the documents and notes taken are

12 the subject matter that should be turned over.

13         Is there anything that I have failed to address with

14 regard to legal or factual issues that are before the Court

15 right now? I certainly understand -- we'll address the timing

16 of this in one moment. I certainly understand that there may

17 be differences of opinion over my ruling, but is what I have

18 said clear to the parties?

19         MS. DOUGLAS: If I may, Your Honor? What about any

20 sort of reports that stemmed from the investigations? I assume

21 those would fall under your order as well?

22         THE COURT: Come, come to the podium, please.

23 Investigative reports meaning the, some sort of analysis of the

24 entire investigation?

25         MS. DOUGLAS: An analysis of the underlying memos,

58

1    anything like that is kind of what I'm asking more specifically

2    on, reports kind of summarizing the findings of the internal

3    investigation that would most -- that would come from the

4    information obtained from the memos.

5             THE COURT:  No, I'm going to deny the motion.  I'm

6    going to deny it on a variety of bases, not the least of which

7    is the concession that what you're really looking for are the

8    raw information of the interviews of the witnesses, which I

9    think are the most relevant to this litigation.  I think and I

10   can anticipate, although you do not need to make the argument,

11   that defense counsel would argue that those reports really

12   would be the legal analysis and the opinion of the attorneys

13   about what those facts mean, and I'm trying to be clear in what

14   I'm requiring the defendants to turn over here.

15            MS. DOUGLAS:  Thank you for the clarification, Your

16   Honor.

17            THE COURT:  Thank you.

18            You'd be snatching defeat from the jaws of victory if

19   you were to speak on that issue.  Are there any other issues,

20   though, that you wish to address?

21            MR. ANHANG:  Your Honor, I was only standing to say

22   that your rulings from the bench today are crystal clear to us.

23   We thank Your Honor for your indulgence again for being so

24   patient, as you've been all morning with us.  Thank you, Your

25   Honor.

59

1                    THE COURT:  Thank you.

2                    Is there any reason why this can't be done by next

3      Friday at noon?

4                    MR. ANHANG:  No reason that I'm aware of, Your Honor.

5                    THE COURT:  Thank you.

6                    And I understand, I know one of the issues was Topic

7      No. 1 for the 30(b)(6) deposition.  As I understood defense

8      counsel, defense counsel is making a 30(b)(6) witness available

9      to address the internal investigation.  The witness should be

10     able to answer questions consistent with my ruling.

11                   That does not mean that there won't be issues that

12     are withheld based on my ruling, just as with regard to the

13     documents, there will be issues that are presumably redacted,

14     but as I understand, and I'll give you a chance to speak,

15     Mr. Anhang, that there will be a 30(b)(6) deponent prepared to

16     testify on the internal investigation.

17                   MR. ANHANG:  Yes, Your Honor.  And if I, if I was

18     unclear, let me just clarify that.  The 30(b)(6) notice laid

19     out a large number of topics.  I didn't mean to suggest that

20     the internal investigation was the topic, and so I think it

21     will be a day-long deposition on many, many things, but the

22     documents themselves that you've ordered be produced by Friday

23     is something I think we all can understand are going to be

24     produced as required by Friday.

25                   THE COURT:  Thank you.

60

1              MR. ANHANG:  Thank you.

2              THE COURT:  Is there an issue with the timing of the

3    30(b)(6) deposition, which I think may be scheduled prior to

4    the day for disclosure of these documents?

5              MS. DOUGLAS:  The 30(b)(6) deposition is currently

6    scheduled for May 8, so it would actually be -- yes, it would

7    be prior to the disclosure of the documents.

8              THE COURT:  Does that pose a problem?

9              MR. ANHANG:  May I make a suggestion?

10             THE COURT:  You may.

11             MR. ANHANG:  We are happy -- and this comes back to

12   my point about there are many, many topics that the plaintiffs

13   properly want to ask questions of our corporate representative

14   about that will fill the time on Tuesday, I'm sure.  What we

15   would propose is making a corporate representative available

16   sometime after, which we will do promptly, Your Honor, to

17   address issues relating to the investigation, including, Your

18   Honor, whatever is unredacted in the memos produced on the

19   Friday, Your Honor.

20             THE COURT:  I think that would be appropriate and

21   would give plaintiffs the opportunity to see those documents

22   prior to doing the 30(b)(6) deposition on that topic.  I assume

23   there's no objection.

24             MS. DOUGLAS:  No.  No, Your Honor.

25             THE COURT:  And I assume the parties will be able to

61

1     work for a convenient date without any problem, either.

2               MR. ANHANG:  Absolutely.

3               THE COURT:  Is there anything else that I need to

4     address this morning?

5               MS. DOUGLAS:  Not from the plaintiffs, Your Honor.

6               MR. ANHANG:  Not from the defendants, Your Honor.

7               THE COURT:  Thank you.  Thank you for your patience.

8               Court will be in recess.

9                         (Which were all the proceedings

10                          had at this time.)

11

12                    CERTIFICATE OF THE TRANSCRIBER

13        I certify that the foregoing is a correct transcript from

14     the official electronic sound recording of the proceedings in

15     the above-entitled matter.

16

17                          _____
                                      /s/
18                            Anneliese J. Thomson

19

20

21

22

23

24

25