IN THE UNITED STATES DISTRICT CIRCUIT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| STEVEN KNURR, *et al.*, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.: 1:16-cv-01031-TSE-MSN |
| | ) | |
| v. | ) | CLASS ACTION |
| | ) | |
| ORBITAL ATK, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OF DEFENDANTS ORBITAL ATK, INC., DAVID W. THOMPSON, GARRETT E. PIERCE, BLAKE E. LARSON, AND HOLLIS THOMPSON IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL COMPLIANCE WITH THE COURT'S MAY 4, 2018 ORDER**

Defendants Orbital ATK, Inc. (the "Company"), David W. Thompson, Garrett E. Pierce, Blake E. Larson, and Hollis Thompson (collectively, the "Defendants") hereby submit the instant memorandum of law in Opposition to Plaintiffs' Motion to Compel Defendants' Compliance with the Court's May 4, 2018 Order and Production of All Purportedly Privileged Documents ("Motion" or "Motion to Compel".

**INTRODUCTION**

On Friday, June 6 – the same day Plaintiffs filed their Motion – Defendants filed a Motion for Clarification of the Court's May 4, 2018 Order, or, in the Alternative, for a Protective Order ("Motion for Clarification"). The Clarification Motion raised a single core issue regarding the Court's May 4 Order. In meet-and-confer sessions among the parties, Plaintiffs had insisted the May 4 Order required Defendants to produce attorney notes, drafts, and auditor material. In their Motion for Clarification, Defendants explained why they believed the May 4 Order clearly did ***not*** require the production of that material, and they asked the Court to confirm its intentions with regard to the Order. Defendants' arguments concerning the May 4 Order are contained in their Motion for Clarification and only will be referenced here to the extent they are necessary to refute the contentions in Plaintiffs' Motion to Compel.

Plaintiffs' Motion to Compel seeks to cloud the core privilege issue by introducing extraneous matters having nothing to do with the scope of the May 4 Order. Furthermore, even as to those extraneous matters, Plaintiffs are not content to lay bare all the relevant facts (and law) for the Court to consider. Instead, they omit crucial details, and misstate others, on every issue they raise.

With regard to the parties' privilege logs, Plaintiffs' motion fails to inform the Court that last Thursday, in a spirit of accommodation, and to avoid unnecessary motion practice,

Defendants told Plaintiffs that they would produce itemized log entries within one business day. Plaintiffs nevertheless filed their motion early the next day, yet by the end of that same day Defendants, consistent with their earlier representations, had produced a 425-page log itemizing over 3000 log entries. Within another business day, Defendants produced a supplemental log of 300 pages and over 4000 entries.  Plaintiffs' accusations concerning the lack of a privilege log are meritless, as Plaintiffs knew they would be *before they filed their motion*.

With regard to Plaintiffs' accusations regarding Defendants' interrogatories, their motion is riddled with factual errors, manipulative editing, and unsupported conclusions that are detailed further below.  Nothing in the cited interview reports supports a conclusion that there are any inaccuracies in Orbital ATK's interrogatory responses.  And, in any event, supposed inaccuracies in interrogatory responses provide no basis for a privilege waiver.

As for Defendants' compliance with this Court's May 4 Order, Plaintiffs' motion fails to acknowledge a key fact: after Defendants produced redacted versions of Hogan Lovells' interview reports, the parties negotiated an agreement.  Under that agreement, Defendants – notwithstanding the stay of the litigation then in effect – produced the interview reports in wholly unredacted form.  The parties' agreement specified that Plaintiffs would not later argue that this good faith production waived protection over any other documents.  Yet Plaintiffs now attempt to leverage that production in demanding that Defendants produce all investigation-related documents.  No good deed goes unpunished.

In addition, Plaintiffs' motion sidesteps important aspects of Federal Rule of Evidence 502(a) ("FRE 502(a)").  FRE 502(a) is not just relevant authority here, it is ***controlling*** authority. Indeed, in 2008, FRE 502(a) was amended by Congress specifically to resolve conflicting views among the courts on the issue of subject matter waiver, and, as amended, FRE 502(a) codifies a

narrow view of waiver that supersedes the broader waiver standard applied in the cases on which Plaintiffs heavily rely.

Finally, Plaintiffs' motion fails to candidly acknowledge the extraordinary nature of the specific relief they are seeking. Plaintiffs cannot point to a single decision in which a court, applying FRE 502(a), has squarely held that protection over "notes" and preliminary "drafts" is waived whenever final versions of reports are disclosed to a government agency. Plaintiffs do not cite even one FRE 502(a) case in which a court has found waiver when the party withholding the protected material – like Defendants – has not injected protected material directly into the litigation itself.

For all the foregoing reasons, and for the further reasons set forth below, Plaintiffs' motion is completely without merit. Defendants respectfully request that the Court deny the motion.

## BACKGROUND[1]

**The Court's May 4 Order and the Company's Production of Witness Interview Reports**. On May 4, 2018, the Court issued an order directing Defendant Orbital ATK to produce "witness interview reports." The Company's outside counsel, Hogan Lovells US LLP ("Hogan Lovells"), has used such reports in orally debriefing the Enforcement Division of the United States Securities and Exchange Commission ("SEC") on the Company's internal investigation (the "May 4 Order" or "Order").

Following the issuance of the Court's Order, and by the deadline set by the Court's Order, the Company produced all of the witness reports[2] – twenty-seven in total – that Hogan

[1] As the Court already is familiar with much of the factual and procedural background to Plaintiffs' motion, and in the interest of brevity, Defendants will simply summarize herein certain select background information. Other relevant factual and procedural information is incorporated in the argument section below.

Lovells had used to orally debrief the SEC. The Company initially produced the reports with minor redactions that were made in conformance with the May 4 Order, which expressly provided that certain redactions could be made. Shortly after producing the redacted reports, the Company – pursuant to an agreement reached among the parties, and without waiving any rights with regard to its privilege and work product assertions – produced copies of the interview reports in ***wholly unredacted form***.

**Defendants' Privilege Logs**. The 30-day stay recently ordered by the Court was lifted on Wednesday, June 13. The next day, the parties conferred about the logging of privileged and work product documents. The day after that, Defendants produced a 450-pages of itemized log entries, and one business day after that (Monday, June 18), they produced another 350 pages of log entries. Defendants advised Plaintiffs that they will shortly be producing receive further log entries. Anhang Decl. at 3. Defendants expect that, by this coming weekend, they will have completed their itemized logging of privileged documents sent to or from Defendants currently being withheld. All the log entries produced by Defendants will span, in total, approximately 1000 pages. *Id.*

## ARGUMENT

### I. Plaintiffs' Privilege Log Arguments Are Devoid of Merit and Seem Designed Solely To Achieve Tactical Purposes.

Plaintiffs omit crucial details concerning the privilege log issues they raise in their motion. Defendants set forth below (and in the accompanying Declaration of George Anhang ("Anhang Declaration")) a more accurate and detailed recitation of the relevant facts than

[2] In making this compelled production, the Company did not waive, and reserved all of its rights, with respect to its claims of privilege and work product with respect to the documents at issue. *See, e.g.*, *Rambus, Inc. v. Infineon Techs. AG*, 220 F.R.D. 264, 275 (E.D. Va. 2004) (a "judicially compelled" disclosure is not a voluntary one, and does not effect a waiver of rights with regard to the disclosed document).

Plaintiffs disclosed to the Court. Defendants respectfully submit that these facts amply demonstrate that Plaintiffs' arguments and related requests for relief are meritless.

**The Parties' Agreement to Conduct a Private Mediation, Stay the Litigation, and Conserve Resources**. Immediately following the hearing before this Court on Friday, May 4, 2018, the parties had a brief exchange regarding privilege log issues. *See* Anhang Decl. at 1. Plaintiffs' counsel indicated to Defendants' counsel that they would not accept a categorical log for Defendant Orbital ATK's privileged and work product documents. *Id.* at 2. Plaintiffs' counsel asked instead that an itemized log be produced for those materials, and that categorical logs be used only by the Company's law firms for other material they are withholding. *Id.*

The next week, the parties engaged in a telephonic meet-and-confer session to further discuss the matter. *Id.* At that time, the parties had already begun to discuss scheduling a private mediation of the case, and stipulating to a 30-day stay to allow for the mediation and conserve the parties' resources. *Id.*

By the end of the week, the parties had completed their discussions concerning mediation and a stay, prepared a joint motion to stay the case pending the mediation, and filed the motion. *Id.* *See* Joint Motion to Stay This Action to Permit Private Mediation, ECF 169 ("Joint Motion.") Of note, the parties' submission specified, *inter alia*, that "the parties seek to stay to avoid incurring the imminent expenses of continued fact and expert discovery (at great savings to the parties) to permit the parties and their counsel to devote their full attention to the mediation and settlement efforts . . . ." Joint Motion at 3. The Court granted the motion and imposed a stay of the litigation until June 13 (the "Stay"). ECF 170.

**Defendants' Efforts to Resolve the Parties' Privilege Log Disputes on the Very First Day the Stay is Lifted.** Despite the parties' best efforts, a resolution of this litigation could not

be reached during the 30-day stay. On June 13, the parties filed a joint motion asking the Court to reset the deadlines – by approximately 30 days – to fully account for the 30-day stay. ECF 171. The Court granted that motion. ECF 172. The day before the Stay expired, in a proactive effort to immediately restart the parties' prior discussions regarding privilege log issues, Defendants asked Plaintiffs to confer on those issues the first day the Stay expired – June 13. Although a meet-and-confer session was scheduled that day, at the last minute Plaintiffs' counsel postponed it without explanation until the next day. *See* Anhang Decl., Ex. 1.

**Defendants Offer to Break the Parties' Stalemate and Begin Producing Itemized Log Entries Within a Single Business Day.** When the parties spoke the next afternoon, Plaintiffs continued to insist that Defendants produce an itemized log for documents sent to, or sent by, Orbital ATK. Anhang Decl. at 2. Although the parties appeared to be at an impasse, Defendants, mindful of the Court's admonition that the parties seek a resolution without the Court's further intervention, Defendants told Plaintiffs that they would produce itemized log entries "before next Monday" (*i.e.*, within one business day of this last meet-and-confer). *Id.* Defendants further told Plaintiffs that although their initial log would not cover all privileged and work product material, Defendants would produce supplemental log entries covering additional material as soon as possible. *Id.* at 3.

**Plaintiffs Produce Log Entries of Their Own for the First Time.** Within a few hours after the Thursday meet-and-confer, Plaintiffs gave Defendants, for the first time, an itemized log of certain privileged documents. *See* Anhang Decl. Ex. 2 at 1. The log was just two pages long, and it covered just nine redacted documents. *See id.* At the bottom it stated, "This log does not include communications between St. Louis and its attorneys in this case." *Id*. In fact, the log did not cover countless privileged and work product documents that Plaintiffs have previously

conceded they are withholding. In mid-April, Plaintiffs filed Responses and Objections to Defendants' document requests.[3] Each Plaintiff indicated that it was withholding documents—none of which, to date, have been logged in any manner—responsive to roughly a dozen requests for production by Defendants. *See* St. Louis Response, Response Nos. 2-5, 11, 17-18, 20, 23-27; Wayne County Response, Response Nos. 2-5, 11-14, 17-21. By way of example, in response to Defendants' request for the production of all documents reviewed or relied upon by Plaintiffs in the preparation of the complaint or otherwise relating to the investigation of the claims in this action prior to filing the complaint, both Plaintiffs stated that they "will not be producing documents in response to this Request" based on privilege and work-product objections. *See* Anhang Decl. Ex. 3 (Response No. 4) and Ex. 4 (Response No. 4)

**Plaintiffs File the Instant Motion, Apparently Seeking to Make Tactical Use of Privilege Log Issues.** Two days after the Stay was lifted, and one day after Defendants told Plaintiffs they would begin producing itemized log entries within one business day, Plaintiffs filed the instant motion. Based on a selective rendition of the facts, Plaintiffs' motion attempts (*inter alia*) to make hay of privilege log issues in service of their unreasonable demands for privileged and work product documents.

**Defendants Produce an Extensive Itemized Privilege Log as Promised, on the Day Plaintiffs Elected to File the Instant Motion.** It has been the general practice of the parties in this case to file their respective discovery motions on Friday afternoons close to the 5 pm filing deadline. Plaintiffs, however, filed the instant motion in the morning, immediately on the heels

[3] *See* Lead Pl. St. Louis Constr. Laborers Pension Trust of Greater St. Louis Resp. & Objs. to Def. Orbital ATK's First Set of Requests for Production of Documents and Electronically Stored Information ("St. Louis Response"); Named Pl. Wayne Cnty. Empl. Retirement Sys. Resp. & Objs. to Def. Orbital ATK's First Set of Requests for Production of Documents and Electronically Stored Information ("Wayne County Response").

of their submission to Defendants of their own (inadequate) privilege log, *see supra*. By the end of that same day, Defendants, consistent with their earlier representations to Plaintiffs in the parties' meet-and-confer the day before, produced to Plaintiffs a 450-page log itemizing over 3000 log entries. Anhang Decl. at 3. Within another business day, Defendants produced a supplemental log over 350 pages in length and containing over 4000 entries. *Id.*

In light of the foregoing, Plaintiffs' various factual assertions regarding the privilege log issues in question are without merit. As for the law, Plaintiffs do not, and cannot, point to any case authority that supports a finding of waiver, or sanctions in any form, in the circumstances present here. Although it is not entirely clear why Plaintiffs would choose to make their unfounded arguments, it is hard to avoid the conclusion that Plaintiffs are seeking to make tactical use of privilege log issues (and likewise issues relating to interrogatory responses) to support deliberately overreaching document demands. Plaintiffs' apparent hope is that the Court will be persuaded to split the proverbial baby, and at least award them the relief they seek with regard to the May 4 Order. Such tactics should not be rewarded.

## II.   Plaintiffs' Arguments About Defendants' Interrogatories and Hogan Lovell's Interview Reports are Riddled with Inaccuracies and Should be Rejected.

Plaintiffs' further contention that the Interview Reports "directly refuted Defendants' sworn interrogatories" (Mot. at 8-10) is a complete red herring. Plaintiffs fail to cite any case law, because none exists, establishing that a party's dispute over the accuracy of interrogatory responses provides a basis for a broad privilege waiver. Moreover, as is clear on the face of the documents provided to the Court, there is no actual dispute because the interview reports fully

*support* Orbital ATK's interrogatory responses. Plaintiffs' attempts to assert otherwise are pure sophistry.[4]

Plaintiffs claim that Orbital ATK's response to Interrogatory No. 1(d) is inaccurate based on information in the interview reports. Plaintiffs fail, however, to provide the Court with the actual interrogatory question and the full response. Here they are:

> Interrogatory 1(d) - Identify the basis for and facts supporting the conclusions of the Audit Committee and senior management, as reported in the 2015 Form 10-KT/A, that: ". . . (d) negative information was suppressed, and concerns at the SmallCaliber Systems Division about cost overruns were not escalated appropriately to higher-level Company management or finance staff, nor were they communicated to the Audit Committee, the Board of Directors or the independent registered public accounting firms."
>
> Response: Given the importance of the 3.9% EBIT figure (see Response to Interrogatory 1(a)), some Lake City team members felt pressure to present only positive information and results related to the Contract. <u>The employees did not feel that their jobs were at stake, but several team members did feel that their managers at the Small Caliber Systems Division and Defense Systems Group level had difficulty understanding or accepting information that ran contrary to their expectations for the Contract. (The Company is not aware of any evidence that any of this pressure came from the corporate level.)</u> Part of this difficulty was due to the faulty Costpoint data that the Lake City team was relying on for the quarterly EACs (see Response to Interrogatory 1(a)). Because the Lake City team members did not have a full picture of the cost overruns related to the Contract, they were not always armed with sufficient data to convince their managers that there was a problem, and in some instances, their

[4] Plaintiffs also make erroneous assertions concerning their earlier motion to compel regarding interrogatory responses, which they abruptly withdrew on the day the motion was scheduled to be heard. ECF 187 at 8. As the attached e-mail correspondence makes clear, Orbital ATK agreed to provide only one piece of additional information so as to render its responses "proper" in the view of Plaintiffs: "a list of individuals from whom 'negative information was suppressed, and concerns at the Small Caliber Systems Division about cost overruns were not escalated appropriately,' as set forth in the 2015 Form 10-KT/A." *See* Anhang Decl., Ex. 5 at 1. Orbital ATK intends to provide this additional response in conjunction with its responses to Plaintiffs second set of interrogatories that are due on June 25. Defendants presume that Plaintiffs' stated threat to burden this Court with a new motion to compel that single piece of information is an empty one.

> immediate management did not believe the figures being presented to them.

As is abundantly clear from the full question and response, this is referring to cost overruns and results related to the Lake City Contract that occurred *after* the Contract was signed in 2012 and *after* the Contract went into production in 2013.

According to Plaintiffs, however, this answer was inaccurate because there are documents demonstrating that there was pressure from the corporate level to *win the bid* on the Lake City Contract. This is apples and oranges, and Plaintiffs know it. First, Plaintiffs quote [REDACTED] Mem. at 9. Second, Plaintiffs quote [REDACTED] Finally, Plaintiffs quote [REDACTED] What does winning the business and the pricing of the Lake City Contract have to do with results and cost overruns that occurred *after* the business was won? Plaintiffs provide no explanation because none exists.[5]

Plaintiffs then make an even more dubious assertion. Plaintiffs claim that Orbital ATK's response to Interrogatory 1(a) inaccurately states that the Company is unaware of any evidence that company personnel mislead auditors based on alleged contradictory information in (a) the interview reports, and (b) PwC documents that were unavailable to Orbital ATK prior to being produced in this litigation (after the interrogatory responses were served). Not only do these

---

[5] Plaintiffs also quote [REDACTED] ECF 187 at 9. Nothing in this statement refers to "pressure from the corporate level," which is what Plaintiffs claim is inaccurate in Interrogatory 1(d). [REDACTED]

documents once again fail to support Plaintiffs' assertion as a matter of fact, but the use of unseen third party documents to attempt to argue that a party's interrogatory response was inaccurate is beyond the pale.

Plaintiffs again fail to provide the Court with the full interrogatory question and response. Here it is:

> Interrogatory 1(a) - Identify the basis for and facts supporting the conclusions of the Audit Committee and senior management, as reported in the 2015 Form 10-KT/A, that: "(a) there likely was a bias toward maintaining a targeted profit rate . . . ."
>
> Response (in relevant part): A projected profit percentage (EBIT) of 3.9% was built in to the final proposal for the Lake City Contract. Lake City personnel considered this 3.9% figure to be an important metric for the Contract from the Contract's outset. The 3.9% figure arose most often during quarterly Estimate at Completion ("EAC") reviews for the Contract. The EAC team was focused on keeping costs down so that they could hold to the 3.9% EBIT, using management reserve ("MR") when necessary, to meet the objective. <u>This bias led the Lake City team, when faced with the choice of whether to use management reserve or adjust the EBIT number, to choose to use MR. Despite the importance of the 3.9% EBIT to Lake City personnel, the Company is not aware of any evidence that any Lake City personnel falsified the EBIT number or intentionally misled any corporate-level personnel or any auditors, and none of the foregoing should be read to indicate otherwise.</u> In fact, by the fourth quarter of fiscal 2015, the EBIT number in the EAC had been reduced to 1.8%. In addition, certain Lake City personnel were confident that the cost reductions required to achieve the projected EBIT were possible because cost reductions had been achieved under predecessor contracts at the Lake City facility, and because Alliant had successfully achieved cost cutting at its Radford facility.[6]

[6] The response to Interrogatory 1(a) alone goes on for another two dense paragraphs presenting similar factual detail. Plaintiffs' assertion that the interrogatory responses are "heavy on adjectives, argument, and conclusions but very light on factual admissions" (Mot. at 8) apparently is predicated on the assumption that the Court will never actually look at the responses.

As is clear from the question and response, this is specifically referring to the bias to maintain a projected profit percentage (EBIT) of 3.9% *after* the Contract was signed in 2012 and *after* the Contract went into production in 2013.

Plaintiffs start out with the same basic errors as with their [REDACTED] assertions. Plaintiffs assert that [REDACTED]. ECF 187 at 10. First, as the cited [REDACTED]. *See* Ex. F at OA_KNURR_01856532. Second, the *bid process* has nothing to do with the *maintenance of the projected profit rate*. Finally, [REDACTED] hardly qualifies as "evidence" of an attempt to intentionally mislead the auditors about the Lake City Contract.

Next, Plaintiffs assert that [REDACTED] said that [REDACTED] was told by an individual [REDACTED]. ECF 187 at 10. Again, nothing in that statement is "evidence" of an attempt to intentionally mislead the auditors. In fact, [REDACTED] Ex. G, at OA_KNURR_01856513.

Finally, Plaintiffs point to three documents that are *not* interview reports and claim that these documents are "evidence" that PwC was intentionally mislead. Again, Plaintiffs' assertion fails to stand up to the slightest scrutiny. Plaintiffs cite a *draft* memorandum that contains a *comment* from an unidentified individual supposedly stating that PwC found that there was intentional withholding of information from the auditors. ECF 187 at 10. In fact, the comment

says nothing of the sort: [REDACTED]

Ex. H, at OA_KNURR_01672287. Contrary to Plaintiffs' false assertion aided by creative editing, this is not billed as a conclusion by PwC, but rather as a description of the results of the company's internal investigation. The actual conclusions of the Audit Committee and senior management as a result of the internal investigation are set forth in the Restatement, however, and they do not include that there was any attempt to intentionally mislead the auditors. Accordingly, and not surprisingly, this comment was not adopted in the final version of the memorandum in question. *See* Anhang Decl., Ex. 6.

Plaintiffs also cite two PwC documents that were not available to Orbital ATK at the time of its interrogatory responses. But that is not critical, because these documents also provide no "evidence" of any attempt to intentionally mislead PwC (and certainly not about the maintenance of the projected profit rate). The first document merely states PwC's belief that certain responses it received in response to inquiries about the Lake City Contract, "did not appear to include all information which management at Lake City knew." While that may or may not be accurate, it is not "evidence" that the information was deliberately omitted in an attempt to mislead the auditor. The second document, for its part, states that information about the Lake City Contract bid and costs were "not shared with the engagement team at the time." There is no indication that this information was requested by PwC, that it was otherwise required to be provided, or that the omission of the information was somehow part of an attempt to mislead PwC. And, once again, this refers to the bid process for the Lake City Contract, *not* the maintenance of a projected profit rate.

In sum, Plaintiffs have deliberately manipulated the documents they have been provided in discovery to paint an erroneous picture for the Court. The fact that they would go so far as to claim that Plaintiffs are "obstructing the pursuit of justice in this case" based on these documents is an indication of their desperation to prop up a motion that has no legal or factual basis.

## III. Plaintiffs Are Wrong in Asserting That the Production of Attorney's Notes or Preliminary Drafts Was Required by This Court's May 4 Order or the Law.

On May 4, 2018, the Court issued an order directing Defendant Orbital ATK to produce "witness interview reports" created by Orbital ATK's outside counsel, Hogan Lovells, in connection with the Company's internal investigation. The Court's ruling was animated by the fact that Hogan Lovells had used the witness interview reports at issue in orally debriefing the SEC on the investigation. In compliance with the Order, the Company produced those reports.

In the instant motion, Plaintiffs demand that the Company also produce interview-related materials that were not shared with any party outside of the Hogan Lovells/Alvarez & Marsal investigative team and are not otherwise reasonably construed as "interview reports" that the Court ordered be produced. These materials are (1) rough notes prepared by attorneys regarding the interviews, (2) drafts of interview memoranda, and (3) notes prepared by the Company's auditors that relate to the employee interviews. (As Plaintiffs were advised long ago, the auditors themselves did not attend any of the interviews.)

Plaintiffs not only not demand these materials, but also assert that the May 4 Order required Defendants and/or the Company's auditors to produce them. In reality, the Court's Order, its underlying rationale, and controlling legal authority – *i.e.*, FRE 502(a) – do ***not*** require production of all the material Plaintiffs have demanded.[7] Set forth below are the reasons

[7] Defendants have already set forth, in their Motion for Clarification of the Court's May 4, 2018 Order or for a Protective Order, reasons why Plaintiffs' demand, and purported reading of the May 4 Order, are unfounded. In the interest of brevity, Defendants do not herein repeat their

production is not required. By way of background, Defendants first briefly describe the "notes" and "drafts" at issue.

**A. The Hogan Lovells "Notes" and "Drafts"**

The rough attorney notes and draft interview memoranda (the "Withheld Material") underlying the final witness interview reports that were used in providing oral briefings to the SEC, and that have been produced to Plaintiffs, reflect confidential communications between employees and former employees of Orbital ATK, on the one hand, and Hogan Lovells, on the other hand, made in connection with an investigation that Hogan Lovells performed at the instruction of its client. *See* D. Fellman Decl. At the outset of each of the interviews that are the subject of these Withheld Materials, "*Upjohn* disclosures" were provided to the witness. *Id.*

The Withheld Materials have never been disclosed to the SEC by the Hogan Lovells/Alvarez & Marsal investigative team. *Id.* In fact, the Withheld Materials have never been disclosed to ***anyone*** outside of the Hogan Lovells /Alvarez & Marsal investigative team, including Hogan Lovells' client, Orbital ATK, Inc. Hogan Lovells has no intention of disclosing the Withheld Materials to its client, to any of the other Defendants in this case, to any of the employees or former employees who were interviewed, or to anyone else (unless ordered to do so by this Court). *Id.* Hogan Lovells has not used in any proceeding, and does not intend to use in any future proceeding, any of the Withheld Materials. *Id.*

The witness interview reports that were used in providing oral briefings to the SEC were intended by Hogan Lovells to be final versions of the interview reports, and were final versions, which have never since been revised. *Id.* In contrast, the Withheld Materials being withheld here are rough and preliminary in nature. *Id.* The Withheld Materials pre-dated preparation of

previous arguments in full, but instead respectfully refer the Court to their memorandum of law filed in support of their Motion.

the final witness interview reports that were used in providing oral briefings to the SEC. *See* D. Fellman Decl. Although the Withheld Materials and the final witness interview reports used in providing oral briefings to the SEC have overlapping subject matter, it is not the case that these materials are identical in all respects. *Id.* The final witness interview reports incorporate the evaluations, interpretations, and clarifications of the Hogan Lovells /Alvarez & Marsal investigative team, and the wording of the final witness interview reports that were used in providing oral briefings to the SEC. *Id.* In the process of creating the final interview reports that were used in providing oral briefings to the SEC, the Hogan Lovells /Alvarez & Marsal investigative team relied upon their thoughts, mental impressions, and professional judgment and expertise. *Id.*

**B. The Court's Order Does Not Cover the Hogan Lovells Notes and Drafts**

The Court's Order directed Defendants to produce "all witness interview reports, as specified in Court [at the May 4 motion hearing], created during the course of the internal investigation . . .." (Order, ECF 165 at 1.) In issuing its ruling, the Court stated: "I find – and plaintiff has conceded that . . . this matter is really about a limited request for witness interviews if such documents exist, and this motion is being granted based on that narrowed request." (Tr. at 56.) The Court went on: "I find that to the extent witness interview reports were created during the course of the internal investigation in any form, whether handwritten, typed, or transcribed, that they must be turned over . . . ." In summing up his ruling, the Court made clear that the use of the witness interview reports in providing oral briefings to the SEC had driven the ruling and set the boundaries of the waiver that occurred: "I am finding … that ***these witness interviews that were conveyed in oral form [to the SEC] …*** should be turned over." (Tr. at 57 (emphasis added).)

The wording of the Court's ruling confirms that Defendants were ***not*** required to produce to Plaintiffs – in addition to the actual interview reports "that were conveyed in oral form" to the SEC – all the other material that Plaintiffs seek.[8] As a matter of common usage, attorneys' rough "notes" and preliminary "drafts" are not "interview reports," and, moreover, the "notes" and "drafts" at issue here have not been shared with anyone outside of the Hogan Lovells/Alvarez & Marsal investigative team.[9]

Although Plaintiffs seize upon the Court's words, "in any form …," those words do not clearly support Plaintiffs' expansive demand for "notes" and "drafts." Those words merely modify the Court's words, "witness interview reports." The Court made that explicit when he said "***witness reports*** … ***in any form,*** whether handwritten, typed, or transcribed." (Tr. at 56 (emphasis added).) Those words, viewed in context, mean that Defendants had to produce the "witness interview reports," whether the "***reports***" were "handwritten," or "typed," or "transcribed."

### C. The Rationale Behind the Court's May 4 Ruling, and Controlling Legal Authority Do Not Support Plaintiffs' Demand For Notes and Drafts

Plaintiffs' demand for the production of materials other than the final interview reports that were used in providing oral briefings to the SEC is not only inconsistent with the Court's May 4 Order, it conflicts with that Order's underlying rationale and controlling authority.

---

[8] As a threshold matter, for the reasons shown in Defendants' Motion for Clarification, the documents prepared by the auditors could not have fallen within the Court's partial grant of Plaintiffs' original motion because those auditor documents were not even the subject of Plaintiffs' motion, which only sought to enforce document requests propounded against the Company itself, not the auditors. ECF 183 at 3. Plaintiffs have admitted that the underlying disclosures ***to*** the auditors were outside the scope of their motion. In their motion, they told the Court: "***The disclosures to the auditors are not the subject of the present motion*** . . . ." (Reply, ECF 161 at 2 (emphasis added).)

[9] Indeed, the Company's outside counsel did not share the notes and drafts even with the Company itself (or any of the other Defendants).

For the reasons explained in Defendants' Motion for Clarification, the rationale of the Court's Order apparently was that, in the Court's view, the Company had failed to meet its burden of establishing that the final witness interview reports that Company counsel used in providing oral briefings to the SEC retained their privileged and protected work product status despite having been used in orally briefing the SEC. As explained in Defendants' Motion for Clarification, it simply does not follow from any such implicit waiver finding that the Company likewise waived the attorney-client privilege and work product protection afforded to the additional materials that Plaintiffs are now demanding, *i.e.*, the attorney notes, draft memoranda, and material prepared by the auditors relating to the interviews.

**(i) FRE 502(a), which this Court Took Into Account into its May 4 Ruling, is Controlling and Precludes Plaintiffs From Obtaining the Relief They Seek**

As a matter of law, waiver with regard to the memoranda used in orally briefing the SEC would ***not*** result in waiver of all the materials demanded by Plaintiffs. The attorneys' rough notes and draft memoranda were not shared with anyone outside of the Hogan Lovells/Alvarez & Marsal investigative team; only the ***final*** interview reports already produced to Plaintiffs were briefed to the SEC (orally).[10] FRE 502(a) does not permit Plaintiffs to obtain **un**disclosed

[10] Plaintiffs presumably are bent on piercing the attorney-client privilege and work product status of the materials they are now demanding precisely because they believe those materials contain material that is ***not*** also contained in the memos that the Company already has produced to Plaintiffs (and that was orally shared with the SEC, *see supra*). Inasmuch as the attorney notes and draft memos contain information that is duplicative of what is contained in the interview reports used to orally brief the SEC and already produced to Plaintiffs, Plaintiffs would have no practical need for such duplicative material. In fact, Plaintiffs may not pursue production of such duplicative materials. *See*, *e.g*., FRCP 26(b)(2)(C)(i) (courts "must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative . . . .").

On the other hand, to the extent that the attorney notes and draft memos demanded by Plaintiffs contain other material not shared with outside parties, it is not discoverable pursuant to FRE 502(a) (*see infra*). In addition, to the extent the material contains opinion work product,

communications and work product information just because Company counsel used the final witness interview reports in providing oral briefings to the SEC. *See, e.g.*, *In re General Motors LLC Ignition Switch Litigation*, 80 F.Supp. 521 (S.D.N.Y. 2015); *Enns Pontiac, Buick & GMT Truck v. Flores*, 2011 WL 2746599, *3 (E.D. Cal. 2011). Instead, FRE 502(a) provides that when a party makes a disclosure of privileged or work product information to a government agency, subject matter waiver with regard to undisclosed related material "generally" does not occur, with such waiver being "reserved for those unusual situations in which fairness requires a further disclosure of related, protected information, in order to prevent a selective and misleading presentation of evidence to the disadvantage of the adversary . . .[thus] subject matter waiver is limited to situations in which a party intentionally puts protected information into the litigation in a selective, misleading and unfair manner." FED. R. EVID. 502(a), Explanatory Note (2007).[11] In *U.S. v. Moazzeni*, Judge Henry Hudson of the Eastern District of Virginia expressly held that Fourth Circuit privilege waiver cases that predated the amendments to FRE 502(a) "must be

---

Plaintiffs of course may not discover such material as a matter of hornbook law. *See, e.g.*, Opp., 155 at 13, 19-20, 21-22, 24-25. It bears emphasis, in this regard, that in the very process of creating the memos used to orally brief the SEC, the Hogan Lovells lawyers relied upon their thoughts, mental impressions, and professional judgment and expertise. If the Hogan Lovells' notes and drafts were ordered produced to Plaintiffs, it would effectively allow Plaintiffs to discover Hogan Lovells opinion work product beyond the opinion work product that is evident from the face of the notes and drafts.

[11] Under FRE 502(a), although the fact that the Company's outside counsel orally disclosed material in the interview reports ***to the SEC*** naturally brings the disclosures within the scope of the Rule, that disclosure does not lead to a subject matter waiver unless otherwise protected material was injected ***into this "litigation."*** Here, far from injecting the reports into the litigation, the Company did the opposite: it withheld them and vigorously opposed Plaintiffs' motion to produce them. Plaintiffs sought to inject the reports into the litigation, not Defendants, and now effectively complain they will suffer prejudice unless they are permitted to inject yet further material into the litigation. Plaintiffs thereby are standing FRE 502(a) on its head.

considered in conjunction with the 2008 Amendments to Fed.R.Evid. 502(a), which limits the scope of waiver." *U.S. v. Moazzeni*, 906 F.Supp.2d 505, 512 (E.D.Va. 2012).

On this basis, under FRE 502(a), no subject matter waiver can be deemed to have occurred here, because the Company has not put any protected information from the interview reports – or the attorneys' rough notes, draft memoranda, or the auditors' memoranda – "into the litigation," let alone "in a selective, misleading and unfair manner." FED. R. EVID. 502(a), Explanatory Note (2007).*See also* Defendants' Opposition to Plaintiffs' Motion to Compel ("Opp.") ECF 155 at 6-12, 20-22, 24-25 (discussing applicable case law and other authority).

Likewise, there is abundant case law – all consistent with FRE 502(a) – that makes clear that sharing material in a memorandum with a government agency or other third party does not waive protection over underlying drafts or notes. *See United States v. Jones*, 696 F.2d 1069, 1071 (4th Cir. 1982). "Most courts have held . . . that simply because a final product is disclosed to the public (or a third person), an underlying privilege attaching to drafts of the final product is not destroyed." *In re Air Crash Disaster at Sioux City, Iowa*, 133 F.R.D. 515, 518 (N.D.Ill.1990) (concluding that draft reports prepared in connection with accident investigation did not lose work product immunity by virtue of fact that final report was made public).

The recent decision in *In re General Motors LLC Ignition Switch Litigation* ["*General Motors*"], 80 F.Supp. 521 (S.D.N.Y. 2015) is illustrative. In *General Motors*, a multi-district litigation, the plaintiffs sought copies of attorney interview notes and drafts underlying a key report – called the "Valukas Report" – that GM had provided to Congress and otherwise made public. Applying FRE 502(a), the trial court denied plaintiffs' request, because the "company neither offensively used the Valukas Report in litigation nor made a selective or misleading presentation that is unfair to adversaries in this litigation, or any other." *Id.* at 534. The court

further held that the "case d[id] not present the unusual and rare circumstances in which fairness requires a judicial finding of waiver with respect to related, protected information. *Id.*; *see also Enns Pontiac, Buick & GMT Truck v. Flores*, 2011 WL 2746599, *3 (E.D. Cal. 2011) (ordering production of "the underlying data on which the assessment report [provided to the government] was based" but not "drafts or notes regarding the report"); *In re Oracle Securities Litig*., No. C-01-0988 MJJ JCS, 2005 WL 6768164 (N.D. Cal. Aug. 5, 2005) (privilege waiver limited to report actually disclosed in litigation and not underlying attorney notes).

Plaintiffs' reliance on *Wadler v. Bio-Rad Labs., Inc.*, 212 F. Supp. 3d 829, (N.D. Cal. 2016) is misplaced. In *Wadler*, defendant Bio-Rad Laboratories disclosed a presentation prepared by outside counsel to the SEC and DOJ which contained privileged information. *Id*. at 833–34. The Court held, and Bio-Rad did not dispute, that Bio-Rad had waived any privilege it might have claimed as to the presentation ***itself*** by producing the document to a government agency in connection with an investigation. *Id*. at 851. *Wadler* then sought to discover "all information concerning the same subject matter" as the presentation, including any privileged communications about the specific matters disclosed in the presentation. *Id*. The Court ultimately ruled that under FRE 502(a), fairness required that the waiver extend beyond the presentation to any communications on the same subject matter of the disclosed communications. *Id*. at 854. However, the court did so only because Bio–Rad had intentionally and repeatedly "relied on that document as a sword by citing to its conclusion" in defense to Wadler's claims. *Id*. at 851. Thus, the court did not squarely hold that protection over "notes" and preliminary "drafts" is waived whenever final versions of reports are disclosed to a government agency.

Here, unlike in *Wadler*, defendants have not used the conclusions of the interview memoranda at issue offensively, nor have defendants made a selective or misleading presentation that is unfair to adversaries in this litigation or any other. For that reason alone, the *Wadler* case is not on point.[12] Indeed, in matters with factual patterns squarely on point with the instant action – *i.e.*, where a party shared final versions of material with the SEC, and an opposing party sought production of the underling notes and drafts – courts have denied plaintiffs' requests for such material, notwithstanding that, in those cases, final versions were shared with the government. *See, e.g., SEC v. Schroeder*, 2009 WL 1125579 (N.D. Cal. April 7, 2009); *SEC v. Berry*, No. C07-04431, 2011 WL 825742 (N.D. Cal.).

**(ii) Plaintiffs' Motion Fails to Grasp the Significance of FRE 502(a) or Acknowledge the Absence of FRE 502(a) Case Law Squarely Favorable to Their Position**

Although Plaintiffs' motion references FRE 502(a), they fail to grasp its significance. FRE 502(a) is not just relevant authority here, it is ***controlling***. FED. R. EVID. 502 ("The following provisions apply, in the circumstances set out, to disclosure of a communication or information covered by the attorney-client privilege or work-product protection.") Indeed, in 2008, FRE 502(a) was amended by Congress specifically to resolve conflicting views among the courts on the issue of subject matter waiver. 2 David M. Greenwald, Robert R. Stauffer & Erin

[12] The other cases which plaintiffs rely on, including *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 230 F.R.D. 433 (D. Md. 2005); *In re Kidder Peabody Sec. Litig.*, 168 F.R.D. 459 (S.D.N.Y. 1996); and *In re Martin Marietta Corp*. 856 F.2d 619 (4th Cir. 1988) are equally unavailing. These cases were decided prior to the 2008 amendment to FRE 502(a), and therefore, their analysis is "superseded by [Rule 502(a)]." *See* 2 David M. Greenwald, Robert R. Stauffer & Erin R. Schrantz, *Testimonial Privileges* § 2:32 (3d ed. 2017). As the Eastern District of Virginia has held, these cases "must be considered in conjunction with the 2008 Amendments to Fed.R.Evid. 502(a), which limits the scope of waiver." *Moazzeni*, 906 F.Supp.2d at 512. In addition, while *SEC v. Vitesse Semiconductor Corp.*, No. 10 Civ. 9239 (JSR), 2011 U.S. Dist. LEXIS 77538 (S.D.N.Y. July 14, 2011) was decided after the 502(a) amendment, it is distinguishable in the case was not decided on FRE 502 grounds.

R. Schrantz, *Testimonial Privileges* § 2:32 (3d ed. 2017). In proceedings in which FRE 502 is applicable, "pre-FRE 502 decisions imposing subject matter waiver . . . without adequately considering the interests of fairness, are superseded by the new federal standard regarding scope of waiver." *Id.* In short, as amended, FRE 502(a) codifies a narrow view of waiver that supplants the broader waiver standard applied in cases on which Plaintiffs heavily rely. *Id.*

Plaintiffs' motion also fails to candidly acknowledge the extraordinary nature of the specific relief they are seeking and on the grounds they are relying. Plaintiffs cannot point to a single decision in which a court, applying FRE 502(a), has squarely held that protection over "notes" and preliminary "drafts" is waived whenever final versions of reports are disclosed to a government agency. And there is not even one FRE 502(a) case cited in Plaintiffs' motion in which a court has found waiver despite the fact that the party withholding the protected material – like Defendants – has ***not*** injected protected material ***directly into the litigation itself***.[13]

In attempting to circumvent the force of FRE 502(a), Plaintiffs' attempt to squeeze mileage from the Court's passing reference at the May 4 hearing to "raw information" is unavailing. (Tr. at 58.) Although the reference suggests that Plaintiffs sought "raw information" , the point is that Plaintiffs' counsel asked for such information ***in the form of the interview memorandum that were used to orally debrief the SEC***. When the Court asked Plaintiffs' counsel what relief Plaintiffs wanted on that issue "if I were to rule in your favor," (Tr.at 42.) Plaintiffs' counsel answered emphatically, "Give us the ***interview memorandum***." (*Id*. (emphasis supplied).) Plaintiffs' counsel did not say, "notes" or "all the raw material." This is crucial – and fatal to Plaintiffs' position – because when the Court later issued its ruling, it

[13] Defendants showed in their Opposition to Plaintiffs' original motion that Defendants have not injected, directly into ***this litigation***, any privileged or work product material relating to the Company's internal investigation. ECF 155 at 7–12. In the interest of brevity, Defendants will not repeat that showing, but incorporates it herein by reference.

expressly referenced Plaintiffs' counsel's narrow request and limited the scope of its ruling to that request: "I find – and plaintiff has conceded that . . . this matter is really about a limited request for witness interviews if such documents exist, ***and this motion is being granted based on that narrowed request***." (Tr. at 56.)

Finally, Plaintiffs adopt a similarly unreasonable construction of the Court's words, "I am finding that these witness interviews that were conveyed in oral form and relied upon through the documents and notes are the subject matter that should be turned over." (Tr. at 57.) Plaintiffs argue that Court's reference to "subject matter" compels the conclusion that the Court intended that Hogan Lovells' "notes" and "drafts" be produced. Plaintiffs' argument is unavailing. Among other problems, it overlooks the important qualifying words, "that were conveyed in oral form." These words indicate that in this passage, the Court simply was using "subject matter" to refer to what actually was used in orally debriefing the SEC. Defendants have already produced to Defendants that "subject matter," because they have produced the actual reports that were the basis for Hogan Lovells' oral briefing of the SEC. *See* Anhang Decl. at 3. As shown above, under the plain terms of FRE 502(a), the fact that those reports were used for oral debriefs does ***not*** mean that such disclosure waived privilege and work product protection over **<u>un</u>**disclosed material – ***even if on the same or a related subject matter***. For Plaintiffs to argue otherwise misses the whole point of FRE 502(a).

## CONCLUSION

For all the reasons set forth above, Defendants respectfully request that the Court deny Plaintiffs' Motion to Compel Defendants' Compliance with the Court's May 4, 2018 Order and Production of All Purportedly Privileged Documents.

Dated: June 20, 2018
Washington, DC

Respectfully submitted,

**SHEARMAN & STERLING**

*/s/ Lyle Roberts*

Lyle Roberts (Va. Bar No. 45808)
George Anhang (*pro hac vice*)
401 9th Street, N.W.
Suite 800
Washington, DC 20004
Telephone: (202) 508-8000
Facsimile: (202) 508-8100
lyle.roberts@shearman.com
george.anhang @shearman.com

Daniel C. Lewis (*pro hac vice*)
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 848-4000
Facsimile: (212) 848-7179
daniel.lewis@shearman.com

*Counsel for Defendants Orbital ATK, Inc., David W. Thompson, Garrett E. Pierce, Blake E. Larson, and Hollis Thompson*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 15th day of June 2018, a true and correct copy of the foregoing was served via CM/ECF filing on all counsel of record.

*/s/ Lyle Roberts*
Lyle Roberts (Va. Bar No. 45808)
401 9th Street, N.W.
Suite 800
Washington, DC 20004
Telephone: (202) 508-8000
Facsimile: (202) 508-8100
lyle.roberts@shearman.com

*Counsel for Defendants Orbital ATK, Inc., David W. Thompson, Garrett E. Pierce, Blake E. Larson and Hollis Thompson*