IN THE UNITED STATES DISTRICT CIRCUIT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| STEVEN KNURR, et al., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ORBITAL ATK, INC., *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

Civil Action No.: 1:16-cv-01031-TSE-MSN

CLASS ACTION

**DEFENDANTS ORBITAL ATK, INC., DAVID THOMPSON, GARRETT PIERCE,
BLAKE LARSON, AND HOLLIS THOMPSON'S PARTIAL OPPOSITION TO
PLAINTIFFS' MOTION TO EXTEND THE SCHEDULE**

Defendants Orbital ATK, Inc. (the "Company"), David Thompson, Garrett Pierce, Blake

Larson, and Hollis Thompson (collectively, "Defendants") hereby oppose, in part, the relief

sought by Lead Plaintiff Construction Laborers Pension Trust of Greater St. Louis and Named

Plaintiff Wayne County Employees' Retirement System's (collectively, "Plaintiffs") Motion to

Extend the Schedule (the "Motion") for the reasons set forth below.

I.      **INTRODUCTION**

As narrowed by the Court in its rulings to date, this securities class action is about what a

small group of Orbital ATK employees knew about the "Lake City Contract" being in a loss

position prior to May 9, 2016 (the last date that Plaintiffs claim a false statement was made to

investors).  Understanding that this Court expected the parties to complete discovery quickly and

efficiently, Defendants began their discovery work many months before the Court's final motion

to dismiss decision on March 2, 2018.  The purpose of that work was to develop a discovery plan

that, once the Court determined which claims (if any) covering which specific periods of time it

would allow to go forward, would enable Defendants to provide Plaintiffs with all of the key

documents in the case within the first month of the discovery period so that the parties could quickly proceed to depositions.  Defendants spent a considerable amount of time and resources identifying the right custodians, determining appropriate search terms, retaining an e-discovery vendor, and generally making preparations so that it could promptly respond to Plaintiffs' discovery requests.  And Defendants did just that – by April 6, just one month into the discovery period, Plaintiffs received every key document held by Defendants related to the subject matter of this case.  As this case proves, however, even the best of discovery plans can be defeated by opponents that insist on fishing expeditions and engage in dilatory tactics.

Plaintiffs' delays, unreasonable requests, and refusals to accept reasonable compromises have hindered the parties' ability to reach finality on document discovery.  It was not until April 23, 2018, *nearly two months* after discovery began in this action, that Plaintiffs proposed what they described as their "preliminary list" of additional search terms and custodians beyond what Defendants had already provided.  *See* Exs. A and B.  It is Plaintiffs, not Defendants, that were unprepared for discovery upon the denial of the motion to dismiss, and whose tardiness has prevented the parties from moving further down the path of completing discovery.

Nevertheless, Defendants recognize that this is a complex case that is taxing the resources of both sides.  In a spirit of compromise, last week Defendants agreed with Plaintiffs to an *extension of the expert discovery deadlines* so as to allow the experts on both sides more time to address the significant volume of documents that have been produced.  *See* Ex. C at 2.  Instead of presenting that agreement to the Court, however, Plaintiffs reversed course and decided – without having engaged in the required meet-and-confer with Defendants – to file the instant motion seeking *both* an extension of the expert discovery deadlines *and* the overall fact

discovery deadline in the case.[1]  *Id*.  Defendants remain willing to support an extension of the expert discovery deadlines, but oppose any extension of the fact discovery deadline or related attempts to expand the scope of the already voluminous fact discovery in the case.

## II.   DISCUSSION

### A.  Background on Discovery

It is well-established that the producing party is presumed to be in the best position to choose the appropriate method for the searching and culling of its own documents.  *In re Ford Motor Co. v. Edgewood Props., Inc.,* 257 F.R.D. 418, 427 (D.N.J. 2009) (responding party has presumption that it is in best position to choose appropriate method for searching and culling data); *see also Kleen Prods. LLC v. Packaging Corp. of Am.,* 2012 U.S. Dist. LEXIS 139632 (N.D. Ill. Mar. 28, 2012) (refusing to order responding party to use requesting parties' preferred method for search and review); *Diepenhorst v. City of Battle Creek,* 2006 U.S. Dist. LEXIS 48551, at *10-11 (W.D. Mich. June 30, 2006) (noting that "discovery process . . . relies upon the responding party to search his records to produce the requested data.").  From the outset of the discovery period, Defendants have been upfront and transparent with Plaintiffs about exactly how they would engage in that process.  First, Defendants would use a set of over 100 exhaustive search terms to find responsive electronic material from the 23 individuals at the company who either had relevant involvement with the Lake City Contract or were named defendants.  Second, Defendants would collect any relevant hard copy materials from those same individuals.

To accomplish these goals, Defendants brought a huge amount of resources to bear on the case.  First, via outside counsel Shearman & Sterling ("Shearman"), the Company retained an e-

---

[1] Defendants ask the Court to take notice that this is (at least) the third time that Plaintiffs have failed to fulfill their obligations to meet and confer in good faith prior to filing motions in accordance with Local Rules 7(E) and 37(E).  *See* ECF No. 135 at 6; ECF No. 249 at 2.

discovery vendor to collect, process, analyze and produce in suitable form the documents that Defendants have produced in this case. Employees of Shearman's vendor have travelled to the Company's sites across the country to collect relevant data and hard copy documents, and process them for review.

With this data in hand, the Company hired more than 34 contract review attorneys[2] to analyze and review the collected documents. The Company has produced nearly 600,000 documents and incurred costs of more than $1.5 million just on its e-discovery vendor and the reviewing of documents. That does not include the considerable amount of attorney time that has gone into negotiating document discovery with Plaintiffs and preparing a massive privilege log. Suffice it to say, the Company has devoted significant resources to fulfilling its document discovery obligations.

Utilizing all of these resources and applying the discovery plan that Defendants openly shared with Plaintiffs, by April 6, just one month into the discovery period and nearly four weeks before the May 1 cutoff for the substantial completion of document discovery, Defendants produced to Plaintiffs a production of more than 150,000 documents (not pages) containing nearly every key, non-privileged document in the case.[3] Not only did the production contain *all* of the e-mails derived from Defendants' search terms (with no delay for a secondary review by

---

[2] Plaintiffs' complaint they need more time for discovery because they have "fewer assigned attorneys" (Motion at 4) demonstrates that their staffing choices are the real reason that they now seek additional time to review documents that have long been in their possession. As this Court has made clear, however, Plaintiffs must "move with some alacrity – a phenomenon that is not unusual in this District," and develop "clear strategies for completing discovery in a timely manner." ECF No. 121 at 1-2.

[3] Plaintiffs' use of "pages" in discussing the document productions to date is, of course, designed to create the false impression that they have been overwhelmed by material and therefore need extra time. Of course, in the modern age with the ability to engage in complex electronic searches of all produced documents, litigants do not review even every document they receive, much less every page of those documents.

Defendants), but it also contained *every* document – more than 12,000 in total – produced by Orbital ATK to the U.S. Securities and Exchange Commission ("SEC") in connection with the SEC's non-public investigation related to the Lake City Contract.[4]

Rather than propound requests for additional custodians or search terms at that time, Plaintiffs informed Defendants that their priority was for Defendants to segregate the documents that had been produced to the SEC from Defendants' larger overall production. Although Defendants had no obligation under the federal rules to do so, they provided Plaintiffs with a full, separate searchable copy of those documents so as to facilitate Plaintiffs' ability to move their case forward expeditiously.[5]

At that point, in early April, Plaintiffs had more than enough documents to determine if there were additional sources or types of documents that they believed would be necessary to support their case. Defendants continued to collect any remaining hard copy materials from the 23 custodians they had identified, as well as documents that post-dated the filing of Plaintiffs' complaint.[6] Plaintiffs should have quickly reviewed the key documents they already had received and identified whether there was a narrow group of additional custodians or search terms that should be used to generate additional, potentially relevant documents. That is not

---

[4] Subsequent to that production, the Company provided a handful of additional documents to the SEC, and Defendants promptly produced those additional documents to Plaintiffs.

[5] Plaintiffs also curiously complain about extensions to Defendants' deadlines for interrogatory responses during this time period. First, Plaintiffs agreed to these minor extensions. Second, Plaintiffs then propounded even more interrogatories – indeed, in excess of the FRCP limits – and Defendants responded exactly within the required time. Defendants have served all of their interrogatory responses and any supplements that they have agreed to provide. Discovery via interrogatory, at least as it pertains to Defendants, is over.

[6] The parties disagreed whether and under what conditions Defendants should produce e-mail created after the filing of the Complaint, and "through the present date" as Plaintiffs had requested. *See* ECF No. 133 at 2. Magistrate Judge Nachmanoff ordered on April 20 that relevant e-mail created through June 30, 2017 should be produced by May 1. Defendants fully complied with that order.

what Plaintiffs did.  Instead, they took nearly three weeks of valuable discovery time to decide their next step.  Then, on April 23, nearly *two months* after the commencement of discovery, and just *days* before the May 1 cutoff for the substantial completion of document discovery, Plaintiffs approached Defendants with a "preliminary list" of 25 *additional* custodians and 170 *additional* search terms.[7]  *See* Exs. A and B.

Many of the custodians Plaintiffs proposed clearly were not relevant to the case, and Plaintiffs could not even articulate a basis for some of their requests.[8]  After Defendants sought rationales for these proposed custodians, Plaintiffs quickly withdrew many names from their list. Eventually, on May 1, to avoid motions practice on this issue, Defendants agreed to provide additional documents from 10 custodians[9] and began to immediately collect and produce those documents (once again without secondary review so as to make sure that the production could be completed quickly).  At that point, Plaintiffs were clearly aware that a late request for additional documents from a large number of custodians covering a period of 6 years would greatly increase the number of documents they received and presumably – because they had requested these documents – they were prepared to complete their review of the documents within the already established discovery deadlines.

As for Plaintiffs' proposed 170 additional search terms, Defendants informed Plaintiffs that these search terms were grossly overbroad and would call for the production of nearly 2.5 million <u>documents</u> (not pages) when applied to only the existing 23 custodians.  Specifically,

---

[7] Defendants had earlier responded to Plaintiffs' general inquiries about custodians and search terms, but April 23 was the first time that Plaintiffs made a concrete proposal as to custodians and search terms they wanted Defendants to employ.
[8] For example, Plaintiffs were unable to explain the basis for their request that Antonio Elias, the Company's Chief Technical Officer, who had no relation to the Lake City Contract, serve as a custodian.
[9] The parties agreed to add an eleventh additional custodian shortly thereafter.

Defendants pointed out that the proposed search terms included terms such as "small cal*", which would generate every document that referenced the Company's Small Caliber Systems division, and "profit* AND ("Lake City" or "LC")", which would generate every financial document concerning the Lake City facility.  These terms alone would result in approximately half a million "hits" on documents each.[10]

Plaintiffs' response was to *increase* the number of their proposed search terms.   On May 1, 2018, the last day for the substantial completion of document discovery, Plaintiffs proposed a revised set of *192* search terms for all of the custodians (including the 11 custodians that had just been added).  Defendants informed Plaintiffs that these terms were still overbroad by a wide margin, and would hit upon more than 1.3 million <u>documents</u> (not pages), when applied to just the existing 23 custodians.  Plaintiffs' proposal had scarcely narrowed their terms, and Defendants again pointed out unreasonable search strings that were not limited by terms specific to the issues in this Action, or that used an "AND" connector rather than "w/5" or "w/10."  Defendants again asked Plaintiffs to narrow their terms to reflect the fact that they would be applied to data of more 34 custodians over the course of six years and that Defendants had already produced hundreds of thousands of documents.

Rather than making any significant adjustments to their proposal, Plaintiffs let another week go by and then, on May 9, 2018, again proposed an overbroad set of *183* additional search terms.  *See* Ex. D.  The proposal still included broad search strings such as "restate" or ("proxy statement" AND draft or notes).  *Id.*  Defendants informed Plaintiffs that these terms would hit upon *more than 600,000 document*s in addition to those already produced.  Plaintiffs maintained

---

[10] The fact that Plaintiffs even proposed terms like this demonstrates that these requests were largely designed to raise the costs of discovery for Defendants, as opposed to actually seeking relevant information.

that this number was *not excessive* even at this stage of the Action, and insisted that Defendants produce these documents subject to potential edits to only a handful of terms.

Although Defendants began preparing to file a motion for protective order on these search term requests, a few days later the parties instead agreed to halt discovery (and any accompanying motions practice) and file a joint motion to stay the litigation for 30 days pending private mediation.  ECF at 169.  The parties further agreed that "the parties and their counsel [would] devote their full attention to the mediation and settlement efforts . . . ," and "avoid incurring the imminent expenses of continued fact and expert discovery."  *Id*. at 3.  The Court granted the motion and stayed the litigation until June 13.  ECF at 170.  Per the parties' agreement, all work on discovery, including any pending production, was halted for those 30 days.  Therefore, when Plaintiffs refer to the "months" that Defendants have had to produce documents, or the fact that it has been "months" since the May 1 cutoff for the substantial completion of document discovery, they intentionally omit the month during which the parties agreed to bring all discovery efforts to a standstill.

Following the lifting of the stay on June 13, Defendants immediately began producing documents from the additional custodians.[11]  Defendants produced more than 115,000 documents two days after the stay was lifted, and another 85,000 documents ten days after that.[12]

---

[11] Plaintiffs' gripe about being unaware of forthcoming productions is entirely without merit.  On May 1 and May 2, 2018, Defendants informed Plaintiffs of the categories of documents that remained outstanding at that time, including those from Plaintiffs' newly proposed custodians, and these are the categories of documents that have been subsequently produced.

[12] The addition of new custodians required an entirely new collection of electronic and hard copy documents.  Hard copy documents must be scanned and processed in order to be produced according to the ESI protocol applicable in this case, but the size of a hard copy production is not ascertainable until after the documents are scanned.  Defendants have been producing the documents as quickly as they have been gathered and reviewed, but the size of a hard copy production is not ascertainable in advance.  Accordingly, Plaintiffs' complaints that they have not been provided "advance notice" of the size of the productions also have no merit.

In the face of Plaintiffs' continued intransigence on search terms, but in an effort to avoid wasteful motions practice and complete document discovery in a timely manner, Defendants also proposed a compromise set of *92* additional search terms that covered virtually all of the new terms proposed by Plaintiffs.  The major difference between these and Plaintiffs' prior proposals, as Defendants had requested all along, was that they contained appropriate limiters that tied the results to the Lake City Contract, and that resulted in a more reasonable set of 64,000 documents to review.  *See* Ex. E.   Plaintiffs suddenly reversed course once again.   Having previously insisted that they would seek a motion to compel on their grossly overbroad search terms, Plaintiffs now said they would agree to these limiters (a position that could have saved the parties' *weeks* worth of discovery time).

But instead of moving forward quickly, Plaintiffs then caused another *week's delay* by refusing to fully accept Defendants' compromise set of terms, and making yet more pointless modifications, including insisting that documents containing generic terms like "hide" and "between you and me" be searched even if they contain no reference to Lake City, or even the Small Caliber Systems Division.  When Defendants agreed to these modifications and to make the resulting production *within a week*, Plaintiffs suddenly argued – with no legal authority – that in their view Defendants also should produce any *non-responsive, irrelevant documents* generated by these search terms.  *See* Ex. F at 2.  The combination of poorly restricted search terms and a demand for irrelevant documents demonstrates that Plaintiffs view this entire exercise as little more than a fishing expedition designed to run up the time and expense of discovery.  In any event, Defendants have gathered the documents generated by the agreed upon terms, are in the process of reviewing of them, and will produce nearly all of the responsive, relevant materials by tomorrow (July 3).

### B.      Plaintiffs' Requested Relief Should Be Denied in Part

As the course of document discovery in this case shows, any delays in document production in this case have been caused by Plaintiffs' unreasonable requests and dilatory tactics. Plaintiffs' course of action has been clear: make overly broad document demands late in the process, refuse to back down from them, spend weeks "negotiating" to some more reasonable position, and then, when Defendants promptly produce the resulting documents, claim that they are surprised to be receiving this many documents, have been prejudiced by the delay, and need extra time from the Court to complete discovery.

Nevertheless, Defendants are willing to support Plaintiffs motion, but only in part. Prior to their filing, Plaintiffs and Defendants had agreed to a *joint* submission proposing a modest extension of the expert discovery deadlines in this case. *See* Ex. C at 2. Plaintiffs then changed their minds and, without engaging in a meet-and-confer with Defendants, unilaterally filed this Motion. *Id.*

Whatever the merit of Plaintiffs' contention that they need more time for expert discovery in light of the volume of documents they have received, the instant motion *also* seeks to move the fact discovery deadline out a month. But Defendants have produced (or will have this week) all of the documents that will be produced in this case, and Plaintiffs already have scheduled a total of 14 fact depositions (out of the 15 allotted to them by the Court).[13] Moreover, Plaintiffs have not indicated to Defendants that they have any intention of moving those deposition dates even if the deadline for fact discovery is extended. So why is there any need to extend the deadline for fact discovery? It would seem that what Plaintiffs are really after is an

---

[13] Plaintiffs' complaints about the scheduling of depositions are without merit. 14 depositions have been scheduled and only two of them are scheduled within the last two weeks of the discovery period. Indeed, this fact further suggests that there is no need for an extension of the fact discovery period.

extension of the fact discovery deadline so that they can then come to the Court and seek to expand deposition and document discovery in the case. Accordingly, Defendants would suggest that if the Court is inclined to extend the expert deadlines in this case, it should either (a) do so without also extending the fact discovery deadline in the case (as the parties already agreed), or (b) only extend the fact discovery deadline with the understanding that Plaintiffs cannot use such an extension as a basis upon which to seek even more discovery in the case (and Defendants will agree to the same limitation).

Dated:  July 2, 2018

Washington, DC

Respectfully submitted,

SHEARMAN & STERLING

  /s/ Lyle Roberts
Lyle Roberts (Va. Bar No. 45808)
Daniel L. Sachs (*pro hac vice*)
401 9th Street, N.W.
Suite 800
Washington, DC 20004
Telephone: (202) 508-8000
Facsimile: (202) 508-8100
lyle.roberts@shearman.com
daniel.sachs@shearman.com

Daniel C. Lewis (*pro hac vice*)
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 848-4000
Facsimile: (212) 848-7179
daniel.lewis@shearman.com

*Counsel for Defendants Orbital ATK, Inc., David W. Thompson, Garrett E. Pierce, Blake E. Larson, and Hollis Thompson*

## CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of July 2018, a true and correct copy of the foregoing was served via CM/ECF filing on all counsel of record.


_/s/ Lyle Roberts_
Lyle Roberts (Va. Bar No. 45808)
401 9th Street, N.W.
Suite 800
Washington, DC 20004
Telephone: (202) 508-8000
Facsimile: (202) 508-8100
lyle.roberts@shearman.com

_Counsel for Defendants Orbital ATK, Inc., David W. Thompson, Garrett E. Pierce, Blake E. Larson and Hollis Thompson_

12