UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

(Alexandria Division)

| | |
|---|---|
| STEVEN KNURR, Individually and on Behalf of All Others Similarly Situated, ) ) | Civil Action No. 1:16-cv-01031-TSE-MSN |
| ) | <u>CLASS ACTION</u> |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | <u>DEMAND FOR JURY TRIAL</u> |
| ORBITAL ATK, INC., et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

LEAD PLAINTIFF'S SECOND AMENDED COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS[1]

---

[1]    This Court previously granted in part and denied in part Defendants' motions to dismiss. Dkt. Nos. 75 and 99.  This second amended complaint leaves all prior allegations untouched and only adds  additional scienter allegations against Defendants DeYoung, Pierce, and Larson based on certain discovery to date.  A redline can be made available, but, for ease of reference, the new allegations are all contained in ¶¶216-249.  The only other changes were to update any internal paragraph references.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................1

JURISDICTION AND VENUE ..........................................................................5

PARTIES ............................................................................................................6

CLASS ACTION ALLEGATIONS ....................................................................7

FACTUAL BACKGROUND .............................................................................10

    Pre-Merger Events ....................................................................................10

    Alliant Bids to Retain the Lake City Contract .........................................11

    The Merger ...............................................................................................14

    The Purported Merger Synergies ..............................................................17

    Red Flags Indicated that the Lake City Contract Was Operating at a Massive Loss ........18

DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS ...................19

    Statements Regarding Merger Synergies ...................................................20

    Statements Regarding the Lake City Contract's Performance ...................27

    Statements Regarding Financial Results ....................................................35

    Statements Regarding Internal Controls ....................................................42

    Analyst Reaction to the False and Misleading Statements .........................47

THE TRUTH BEGINS TO EMERGE ...............................................................49

POST-CLASS PERIOD DEVELOPMENTS .....................................................53

ADDITIONAL INDICIA OF SCIENTER ..........................................................57

    Defendants' Responsibilities for the Company's Public Statements ................57

    Defendants Closely Monitored the Lake City Contract ...............................60

    Red Flags Indicated that the Lake City Contract Was Operating at a Loss ...............62

    The Simplicity of the Accounting ..............................................................64

    Defendants' Disregard for Accurate Accounting and Financial Reporting ...............68

    Delaying Disclosure of the Lake City Contract Loss Was Critical to Promoting the Success of the Merger ................72

# TABLE OF CONTENTS

**Page**

Insider Trading ........................................................................................... 74

DeYoung's and Larson's Roles at Alliant ....................................................... 74

Further Indicia of DeYoung's Scienter ........................................................... 76

Further Indicia of Scienter for Pierce and Larson ........................................... 84

Additional Indicia of Scienter for Pierce ....................................................... 87

Further Indicia of Hollis Thompson's Scienter ............................................... 89

Discipline and Firings Support an Inference of Scienter .................................. 93

LOSS CAUSATION ........................................................................................... 96

APPLICABILITY OF THE PRESUMPTION OF RELIANCE  AND FRAUD ON THE
   MARKET ....................................................................................................... 99

NO SAFE HARBOR ........................................................................................... 101

FRAUD BASED CLAIMS FOR RELIEF ............................................................ 101

   COUNT I ...................................................................................................... 101

      For Violation of Section 10(b) of the Exchange Act and Rule 10b-
      5 Against All Defendants ......................................................................... 101

   COUNT II ..................................................................................................... 103

      For Violation of Section 20(a) of the Exchange Act Against
      Defendants Thompson, Pierce, Larson, and Hollis Thompson .............. 103

NON-FRAUD JOINT PROXY CLAIMS ............................................................. 105

   Overview of Non-Fraud Joint Proxy Claims .................................................. 106

   Events Leading Up to the Merger .................................................................. 107

   False and Misleading Statements in the Joint Proxy ....................................... 108

      Statements Regarding Alliant's Financial Results .................................... 109

      Statements Regarding the Lake City Contract ......................................... 111

      Statements Regarding Internal Controls .................................................. 111

      Statements Regarding Fairness of the Exchange Ratio ............................ 112

- ii -

# TABLE OF CONTENTS

**Page**

Shareholders Approve the Merger on the Basis of the False and Misleading Joint Proxy ..................................................................................................114

Post-Merger Events..................................................................................114

JOINT PROXY CLAIMS FOR RELIEF ...................................................................116

COUNT III....................................................................................................116

For Violation of Section 14(a) of the Exchange Act and Rule 14a-9 Against All Joint Proxy Defendants .........................................................116

COUNT IV....................................................................................................118

For Violation of Section 20(a) of the Exchange Act Against DeYoung, Thompson, and Pierce ...........................................................118

PRAYER FOR RELIEF .........................................................................................119

JURY DEMAND ....................................................................................................119

Plaintiffs, individually and on behalf of all others similarly situated, allege the following based upon personal knowledge as to Plaintiffs' own acts and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things: a review of Orbital ATK Inc.'s ("Orbital ATK" or the "Company") Securities and Exchange Commission ("SEC") filings; conference call transcripts and releases; media and analyst reports about the Company; SEC filings, conference call transcripts and releases of related companies, Orbital Sciences Corporation ("Orbital Sciences"), Alliant Techsystems Inc. ("Alliant"), and Vista Outdoor Inc. ("Vista"); media and analyst reports about those related entities; documents received in response to a Freedom of Information Act ("FOIA") request submitted to the U.S. Army; and other public information regarding Orbital ATK and the aerospace and defense industry.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.      This securities class action is brought on behalf of all persons who (i) purchased shares of Orbital ATK common stock between May 28, 2015 and August 9, 2016, inclusive ("Class Period"), or (ii) held shares of Orbital Sciences common stock as of December 16, 2014 (the "Record Date") and exchanged shares of Orbital Sciences common stock for shares of Orbital ATK common stock on or around February 9, 2015[2] (collectively, the "Class").  This action seeks remedies under §§10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934

---

[2]      Orbital Sciences and Alliant merged on February 9, 2015, at which time Orbital Sciences shareholders were issued Alliant stock, and Alliant changed its name to Orbital ATK.  Legacy Alliant shareholders continued to hold their shares in the combined company and were not issued new stock.  For simplicity, post-merger Alliant stock (including stock issued to Orbital Sciences shareholders) is referred to as Orbital ATK stock.

(the "Exchange Act") and SEC Rules 10b-5, 17 C.F.R. §240.10b-5 ("Rule 10b-5"), and 14a-9, 17 C.F.R. §240.14a-9 ("Rule 14a-9"), promulgated thereunder.[3]

2.      Orbital ATK was formed on or about February 9, 2015 through a merger of Orbital Sciences and Alliant (the "Merger").  Prior to the Merger, Alliant's largest contract was to manufacture small caliber ammunition (bullets) for the U.S. military at the government's Lake City Army Ammunition Plant ("Lake City") in Independence, Missouri.  After operating the plant for 12 years, in 2012, Alliant faced aggressive competition for a ten-year renewal.  In order to secure the contract, Alliant submitted a bid that was hundreds of millions of dollars less than the cost of the contract, and, in doing so, ultimately secured a $2.3 billion contract to begin in October of 2013 ("Lake City Contract").  Although Alliant was required under Generally Accepted Accounting Principles ("GAAP") to immediately record a forward loss on the Lake City Contract to account for the difference between the price of the contract and the costs, it failed to do so.  Instead, Alliant misstated its financial results while publicly claiming it would not lose money on the Lake City Contract.

3.      Since the Lake City Contract was Alliant's largest contract, the bidding received considerable attention from the media and analysts.  For example, Alliant, and more specifically its Chief Executive Officer ("CEO"), Defendant Mark W. DeYoung ("DeYoung"), faced pointed questions about the profitability of the contract and how the company could run the plant more efficiently than it had already been doing for the past decade.  DeYoung claimed savings could be obtained by driving efficiency improvements, reducing workforce, and using excess capacity to manufacture ammunition for commercial sales and splitting the overhead.

---

[3]   This complaint sets forth fraud based claims first and then separately sets forth the non-fraud based claims beginning at ¶281.

4.     In early 2013, Alliant and Orbital Sciences began discussing a possible business combination and ultimately reached an agreement in April 2014.  Although Alliant was larger than Orbital Sciences, both in terms of revenue and market capitalization, DeYoung did not remain as CEO of the combined company (Orbital ATK), but left to become the CEO of a spun-off portion of Alliant's business (Vista), while remaining as a director of Orbital ATK.  Orbital Sciences' CEO and President, Defendant David W. Thompson ("Thompson"), and Chief Financial Officer ("CFO"), Defendant Garret E. Pierce ("Pierce"), became the CEO and CFO of Orbital ATK.  Defendant Blake E. Larson ("Larson"), a long-time Alliant employee, became the Chief Operating Officer ("COO") of Orbital ATK.  Defendant Hollis M. Thompson ("Hollis Thompson"), Orbital Sciences' Controller and Principal Accounting Officer ("PAO"), became the Vice President of Financial Reporting and PAO[4] of Orbital ATK.

5.     DeYoung was able to rid himself of responsibility for the losing Lake City Contract by sending it to Orbital ATK and leaving to run Vista.  Despite being unaware of the massive imbedded loss the Lake City Contract created, analysts still questioned the logic of the Lake City Contract going to Orbital ATK since Orbital Sciences had never manufactured small caliber ammunition and Vista was to remain one of the largest manufacturers and distributors of such ammunition.

6.     Just before the Merger, production under the new Lake City Contract ramped up.  Thus, after the Merger, Orbital ATK had the data to see that production costs under the new Lake City Contract were exceeding revenues.  In fact, Orbital ATK was achieving only approximately half of the cost savings necessary to break-even on the contract.  Nevertheless, for

---

[4]   Hollis Thompson was referred to as the Chief Accounting Officer or Principal Accounting Officer in various filings.  Those terms are treated synonymously herein.

over a year after the Merger, Thompson, Pierce, Hollis Thompson, and Larson claimed and signed financial statements reporting that the Merger was an unmitigated success and that they were achieving tens of millions of dollars in merger synergies.  This was misleading because, in touting the cost savings from the Merger, Defendants concealed that the Lake City Contract was priced below cost and was costing Orbital ATK hundreds of millions of dollars in losses, substantially outweighing the synergies.  Orbital ATK's financial statements misrepresented its financial performance and failed to record the loss on the Lake City Contract in accordance with GAAP and Orbital ATK's publicly stated accounting policy.

7.      On August 10, 2016, the truth was revealed when Orbital ATK, Thompson, Pierce, and Larson shocked investors by disclosing that they would be restating Orbital ATK's Class Period financial statements to reflect the Company would lose hundreds of millions of dollars from the Lake City Contract.  Significantly, they did not claim any change in circumstances regarding the Lake City Contract but admitted that the loss had been "evident" since 2014 and "should have been recorded for the Contract in fiscal 2015, which was the first year of large-scale production under the Contract."  Thompson admitted that the Lake City Contract "had in fact, been in a substantial loss position since 2014, rather than the roughly breakeven profit level that had been previously recorded."  Orbital ATK, Thompson, Pierce, and Larson announced that correction of the false financial statements would "reduce previously reported pre-tax operating income by approximately $400 million to $450 million."

8.      Worse still, even though Thompson and Pierce had signed certifications swearing that they had designed and maintained effective internal controls over financial reporting, they admitted that Orbital ATK had material weaknesses in internal controls over financial reporting. Orbital ATK's accounting restatement was so massive and their internal controls so ineffective

that it was unable to issue its second quarter 2016 financial statements in August 2016, its third quarter 2016 financial statements in November 2016, and its full year 2016 financial statements in March 2017.  Rather, investors were forced to wait eleven months after the issuance of Orbital ATK's first quarter 2016 financial statements on May 9, 2016, before Orbital ATK was even able to deliver a set of accurate financial statements for 2016.  It was not until April 2017 that Orbital ATK was finally able to issue its quarterly financial statements for 2016.

9.      As a result of the revelations, Orbital ATK's stock price dropped by more than 20%, from approximately $89 on August 9, 2016, to $71 on August 10, 2016, resulting in hundreds of millions of dollars of losses for investors.  In addition, DeYoung was replaced on the board of directors, Hollis Thompson was replaced as the PAO, and several other employees were fired or disciplined.

10.     This lawsuit seeks to recover damages for investors under the securities laws designed to protect them from false and misleading statements such as those that artificially inflated Orbital ATK's stock throughout the Class Period.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to §§10(b), 14(a), and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b), 78n(a), and 78t(a), and Rules 10b-5 and 14a-9 promulgated thereunder.  This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

12.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b), because Orbital ATK maintains its principal place of business in this District, and many of the acts and practices complained of herein, including the dissemination of materially false and misleading information to the investing public, occurred in substantial part in this District.

13.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

### PARTIES

**Plaintiffs**

14.     Lead Plaintiff Construction Laborers Pension Trust of Greater St. Louis ("Lead Plaintiff") purchased the common stock of Orbital ATK during the Class Period as set forth in its certification (Dkt. No. 53-1) and was damaged as the result of Defendants' wrongdoing as alleged in this complaint.

15.     Named Plaintiff Wayne County Employees' Retirement System ("Wayne County") owned shares of Orbital Sciences common stock before the close of business on the Record Date and was entitled to vote at the special meeting of stockholders on January 27, 2015 (the "Special Meeting").  As set forth in its certification (Dkt. No. 53-2), Wayne County held shares of Orbital Sciences common stock on February 9, 2015 which were exchanged for shares of Orbital ATK common stock, and also purchased the common stock of Orbital ATK during the Class Period.  Wayne County was damaged as the result of Defendants' wrongdoing as alleged in this complaint.

16.     Lead Plaintiff and Wayne County are collectively referred to herein as "Plaintiffs."

**Defendants**

17.     Defendant Orbital ATK operates as an aerospace and defense company.  Orbital ATK maintains its headquarters at 45101 Warp Drive, Dulles, Virginia.  Orbital ATK stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "OA."

18.    Defendant Thompson has been the CEO and President of Orbital ATK since the Merger.  At all relevant times prior to the Merger, Thompson was the Chairman of the Board, CEO, and President of Orbital Sciences.

19.    Defendant Pierce has been the CFO of Orbital ATK since the Merger.  At all relevant times prior to the Merger, Pierce was the Vice Chairman of the Board and CFO of Orbital Sciences.

20.    Defendant Larson has been the COO of Orbital ATK since the Merger.  Prior to the Merger, Larson was Senior Vice President of Alliant and President of its Aerospace Group since 2010.

21.    Defendant DeYoung served as a Director of Orbital ATK from the Merger through March 2016, when he did not stand for re-election.  Prior to the Merger, DeYoung was the CEO and President of Alliant since 2010.

22.    Defendant Hollis Thompson served as the Vice President of Financial Reporting and PAO of Orbital ATK from the Merger through February 27, 2017, when the board of directors replaced him with a new PAO.  Prior to the Merger, Hollis Thompson was the PAO of Orbital Sciences since 2003 and its Controller since 1999.  Hollis Thompson is a Certified Public Accountant ("CPA"), holds a bachelor's degree in accounting, and previously served at Arthur Andersen & Co. as an audit manager.

23.    Defendants Thompson, Pierce, Larson, DeYoung, and Hollis Thompson are collectively referred to as the "Individual Defendants."   Orbital ATK and the Individual Defendants are collectively referred to as the "Defendants."

## CLASS ACTION ALLEGATIONS

24.    Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all those who (i)

purchased or otherwise acquired the publicly traded common stock of Orbital ATK during the Class Period, or (ii) held shares of common stock of Orbital Sciences on the Record Date and exchanged shares of Orbital Sciences common stock for shares of Orbital ATK common stock on or around February 9, 2015.  Excluded from the Class are Defendants and the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

25.     The members of the Class are so numerous that joinder of all members is impracticable.  Orbital ATK trades on the NYSE and according to the Company's SEC filings had approximately 59 million shares of stock outstanding during the Class Period. Approximately 27.4 million shares of Orbital ATK common stock were issued to Orbital Sciences shareholders in exchange for their shares of Orbital Sciences common stock upon the Merger.  While the exact numbers of Class members can only be determined by appropriate discovery, Plaintiffs believe that Class members number at least in the hundreds, if not the thousands, and that they are geographically dispersed.

26.     Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs and all of the Class members sustained damages arising out of Defendants' wrongful conduct complained of herein.

27.     Plaintiffs will fairly and adequately protect the interests of the Class members and have retained counsel experienced and competent in class actions and securities litigation. Plaintiffs have no interests that are contrary to, or in conflict with, the members of the Class.

28.     Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members in that Defendants have acted on grounds

generally applicable to the entire Class.  Among the questions of law and fact common to the Class include:

(a)     Whether the Exchange Act was violated by Defendants;

(b)     Whether the Joint Proxy (as defined below) and other public statements, made by or chargeable to Defendants during the Class Period, misrepresented material facts and/or omitted material facts necessary to make the statements made not misleading;

(c)     Whether and to what extent the market prices of Orbital ATK common stock were artificially inflated and/or distorted due to the misrepresentations and/or omissions complained of herein;

(d)     Whether, with respect to the claims under §10b of the Exchange Act, Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     Whether, with respect to the claims under §10b of the Exchange Act, Defendants engaged in perpetrating a manipulative and deceptive devise and/or scheme and/or otherwise engaged in a fraudulent course of conduct; and

(f)     Whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of damages.

29.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## FACTUAL BACKGROUND

**Pre-Merger Events**

30.     Before merging to form Orbital ATK on February 9, 2015, Alliant and Orbital Sciences were publicly traded companies headquartered in Virginia.  Alliant was the larger of the two, with a market capitalization of $4.1 billion immediately prior to the Merger and fiscal year 2014[5] net income of around $340 million, compared to Orbital Sciences' $1.7 billion market capitalization and net income of around $78 million for 2014.

31.     Both Alliant and Orbital Sciences operated business segments focused on space systems and military defense.  Alliant was an aerospace, defense, and commercial products company with end-products such as rocket motors used by NASA and the U.S. military, and a variety of components for aircraft, spacecraft, satellites, and weapons systems.  Most relevant to this case, Alliant was a leading producer of ammunition (*e.g.*, bullets) for the U.S. military.

32.     Orbital Sciences focused on space and launch systems with end products such as in-space satellites and rockets used for various applications, including cargo delivery for NASA and missile defense systems for the military.   Unlike Alliant, Orbital Sciences did not manufacture or sell ammunition.

33.     Significantly, both Alliant and Orbital Sciences had substantial experience accounting for long-term contracts and both companies sold products to the U.S. government.  In fiscal 2013, government contracts accounted for more than 80% of Orbital Sciences' $1.4 billion in sales and nearly 70% of Alliant's $4.4 billion in sales.  Both companies recognized revenue for their long-term contracts under the percentage-of-completion method of accounting.  Under

---

[5]   Orbital Sciences used a calendar year ending December 31 for financial reporting.  Alliant, however, used a fiscal year beginning on April 1 and ending on March 31.

GAAP, if the total estimated costs on a long-term contract exceed the total estimated revenue, the contract is considered to be in a "forward loss" position, and the loss must be recognized immediately. *See infra* ¶¶181-187.

**Alliant Bids to Retain the Lake City Contract**

34.     Alliant divided its business into three groups: (1) Sporting, (2) Defense Systems, (3) and Aerospace.  Within the Defense Systems Group, Alliant operated ammunition facilities for the U.S. Army.  Alliant began operating the Radford Army Ammunition Plant ("Radford") in Radford, Virginia in 1995, which produced warheads, bomb fill, and propellants.  For fiscal year 2010, Radford's revenues represented approximately 5% of Alliant's $4.81 billion in total sales.

35.     More important to Alliant's business was its contract to operate Lake City, the primary supplier of the U.S. military's small caliber ammunition.  On April 1, 2000, Alliant took over operation and management of Lake City under a ten-year contract.

36.     In fiscal year 2010, Alliant obtained a four-year renewal, extending the contract into fiscal year 2014.  Through these contracts, Alliant manufactured billions of rounds of small caliber ammunition.  For example, in fiscal year 2010, Alliant produced approximately 1.4 billion rounds.  Lake City was Alliant's most important contract as its revenues represented approximately 13% of Alliant's total revenues in fiscal year 2010, and no other contract contributed more than 10% of the company's sales.

37.     Alliant could renew the Radford and Lake City contracts only by prevailing in a bidding process administered by the U.S. Army.  Accordingly, in fiscal year 2011, Alliant submitted a bid for a new multi-year contract to operate Radford for a ten-year period.  However, Orbital ATK was underbid and the U.S. Army awarded BAE Systems PLC ("BAE") the ten-year $733 million contract to operate Radford.

38.     On news of losing the Radford contract, Alliant's stock fell by 7%.  Analysts from JPMorgan cut their price targets for Alliant, in part, because the loss "heightened concerns" about the company's ability to renew the larger and far more fundamental Lake City Contract.

39.     Alliant's management knew it could not afford to lose the Lake City Contract, especially after losing Radford.  Just as with the Radford bid, BAE was the competing company for the Lake City Contract.  Accordingly, Alliant crafted a low-ball bid with what DeYoung called very "aggressive" pricing.

40.     During a February 23, 2012 investor conference, DeYoung commented on both Alliant's bid to obtain the Lake City Contract and their experience operating the plant, stating, "I think we put together a strong proposal.  We know that plant really well."

41.     On September 28, 2012, Alliant learned it had won the Lake City Contract.  The contract had a seven-year base term with an option to extend the term by three years.  Alliant began production under the new Lake City Contract on around October 1, 2013.

42.     In the interim, and for a period of time after October 1, 2013, Alliant continued to manufacture ammunition for the government under the 2010 Lake City contract four-year renewal, which had a $700 million backlog as of November 2012.  According to Alliant's CFO, the backlog continued to make up a "big, significant – if not the vast majority" of the Lake City ammunition delivered in Alliant's third quarter for fiscal 2014 (*i.e.*, October through December 2013).  The backlog existed because the U.S. Government placed annual orders for bullets every spring, and Alliant had 12 months to start production and another 12 months to deliver the bullets.

43.     Even apart from the lower pricing, making a profit on the new contract would be more difficult than under the prior contract because the volume under the new ten-year Lake City

Contract was expected to be lower.  Since overhead was spread across total production, the lower

volumes would hurt profit margins.  As a result, Alliant needed to monitor volumes closely in

order to adjust workflow, maximize productivity, and lower costs at Lake City.  After securing

the Lake City Contract, Alliant repeatedly assured investors that it was doing so and was meeting

monthly to discuss it.  For example, on a February 5, 2013 earnings call – eight months prior to

the new Lake City Contract going into effect – DeYoung was asked how they were monitoring

costs in light of volume reductions and said:

> [I]f we get reductions in volumes, we have a very sophisticated model which
> allows us to look at the cost impacts from overhead absorption, how those fixed
> costs are spread across our factories, as well as the variable and semi-variable
> costs in the factory.  So, we have a model that allows us to see what those changes
> are and that we can adjust our workforce and our workflow, to try and minimize
> the impacts from reductions in volume.  But, there clearly are those relationships.
> So, going forward we do believe we will see reduced quantities ordered, which
> will put pressure on margins.

44.     On a Cowen Aerospace/Defense investor conference call the next day, DeYoung

reiterated that Alliant was closely monitoring profitability from the Lake City Contract with

"meetings every month" and stated:

> Also when we bid Lake City, and we mentioned for some time I think we've been
> quite transparent that this was going to be an aggressive bid, that we were bidding
> against a much larger company who had proven to be very aggressive on prior
> bids for government go-go facilities.  The price would be a very important
> element of that and as a result of that, we I think tried to condition people to
> understand that yes, our intent is to win Lake City and yes, in doing so we
> probably will have to take some price reductions which could impact margins in
> the early years of winning the recompete.

45.     Several months after the new contract became effective, on February 20, 2014,

DeYoung discussed the purported lower profit margins under the Lake City Contract, stating:

> The Lake City contract was an aggressive contract.  It was a difficult competition.
> We announced over a year ago when we won the contract that, as we got into the
> period we are just now entering in this quarter, that there would be some initial
> periods of margin pressure and some reduced revenue generated from that one
> contract, or that one P&L.  And that is happening and that will occur largely in

this quarter, our first really full quarter under manufacturing product on the new contract.  That will give us some margin pressures.

46.     On a May 15, 2014 earnings call, DeYoung noted that Alliant's fiscal year 2015 (April 1, 2014 to March 31, 2015) would be the first year "with full production against the new [Lake City] contract" and repeated that a "highly contested proposal led us to be aggressive to ensure our win."

47.     On October 30, 2014, DeYoung told investors Alliant reduced staff to improve Lake City's profitability and was using sales through the sporting division to absorb overhead as well, stating:

> We've reduced some staffing, and the work force there has been reduced to a more efficient and appropriate size for the volumes.  We continue to work closely between Lake City and sporting to offer commercial ammunition out of the Lake City capacity, which is available.  And that helps the prime contract by absorbing overhead and adding efficiency and skilled work force to the plant.

48.     In sum, prior to the Merger it was clear that the Lake City Contact was aggressively bid, had lower margins, and needed to be consistently monitored by Alliant's senior executives.  Alliant had conducted layoffs to reduce costs and was continuing to use excess capacity at Lake City to manufacture commercial ammunition for its sporting division to share overhead.  However, it remained concealed from investors that the Lake City Contract was bid hundreds of millions below costs of production.

**The Merger**

49.     As to Orbital Sciences, heading into the Merger, Thompson, Pierce, and Hollis Thompson were dealing with a series of missteps.  For example, in first quarter 2014, Orbital Sciences' revenue dropped from prior year and missed analyst expectations.  In second quarter 2014, Orbital Sciences again missed analysts' revenue expectations and also reduced its full year 2014 revenue guidance.   In third quarter 2014, Orbital Sciences missed analyst revenue

expectations for a third time and again reduced its full year 2014 revenue guidance.  Then, on October 28, 2014, Orbital Sciences' critical product, the Antares rocket, exploded upon launch, which called into jeopardy Orbital Sciences' multi-year agreement with NASA for cargo delivery to space stations.

50.     In light of these failures, the potential merger provided an opportunity for some good news.  On April 29, 2014, Orbital Sciences and Alliant announced they would merge to form Orbital ATK.   The surviving corporation would retain Orbital Sciences' Virginia headquarters.  Thompson and Pierce would serve as CEO and CFO of Orbital ATK, and Hollis Thomson would serve as the Company's Vice President of Financial Reporting and PAO.

51.     As part of the transaction, Alliant would spin-off its sporting segment, which would become a new public company, Vista.  DeYoung would become the CEO and Chairman of Vista.  Alliant shareholders would receive stock in Vista and retain their stock in Alliant, which would change its name to Orbital ATK.  Orbital Sciences shareholders would exchange each share of their common stock for .449 shares of Orbital ATK common stock.   The companies provided the following to summarize the transaction:



52.     After the Merger, Vista was to "hold the No. 1 sales position in the U.S. markets for ammunition," according to its 2016 annual report on Form 10-K.  Nevertheless, Vista and DeYoung were not taking the Lake City Contract that DeYoung had been directly involved in securing.

53.     Analysts questioned why DeYoung was leaving behind the Lake City Contract. For example, an analyst from Barclays Capital questioned "the rationale of having the Lake City business . . . go with [Alliant] into the merged entity [Orbital ATK], as opposed to keeping it tied to the spun entity [Vista]."  DeYoung, who had praised the Lake City Contract as CEO of Alliant and tied the contract's profitability to the ability to create synergies with the sporting business, claimed that Lake City would go to Orbital ATK because it "operate[s] under the government contracting obligations and requirements," and "[t]he accounting standards and everything associated with that business are really noncommercial in nature.  They are government, in

nature."  However, this statement conflicted with the fact that Vista continued to sell ammunition to the U.S. government after the Merger.

54.     In any event, the Merger was consummated on February 9, 2015, and Alliant changed its name to Orbital ATK and each outstanding share of Orbital Sciences common stock was converted into 0.449 shares of Orbital ATK common stock, with cash paid in lieu of fractional shares (the "Exchange Ratio").

55.     After the Merger, Orbital ATK reported its business in three segments: Flight Systems Group, Defense Systems Group, and Space Systems Group.  The Defense Systems Group was the Company's "largest business segment from a revenue standpoint" and an "employee standpoint."  Within the Defense Systems Group was the Small Caliber Systems Division which was "the largest producer of small-caliber ammunition in the U.S."  Lake City remained Orbital ATK's largest contract in fiscal 2015 and was the largest source of revenue reported within its largest segment, the Defense Systems Group.

**The Purported Merger Synergies**

56.     Given the missteps at Orbital Sciences leading up to the Merger, it was critical to its senior management team, most notably, Thompson, Pierce, and Hollis Thompson, that the Merger not become their next failure.  Thompson put his credibility at stake by backing the Exchange Ratio and the purported benefits of the Merger with statements like, "I am convinced that this merger is the kind of event that is often sought, but rarely found, one with compelling benefits for all of our stakeholders . . . . [T]he merger will feature a stronger outlook for faster growth and increased profitability, with robust cash generation and near-term synergy potential."

57.     During an April 29, 2014 conference call, Thompson explained the Merger's purported synergies, stating that management expected "up to $200 million in annual revenue synergies, and up to $100 million in cost synergies which we estimate can be realized by the end

of . . . 2016." Without this improvement there would be no reason for investors to support the Merger or for analysts to get excited about the increased valuation of a joint entity.

58. On October 16, 2014, Thompson confirmed the synergies and described the careful analysis that went into determining them, stating Orbital Sciences had "verified, based on detailed bottoms up analysis, the feasibility and timeliness of the revenue and cost synergies that we previously announced for the first several years of the combined operation." Pierce added that Orbital Sciences had uncovered "[n]o negative surprises" and reiterated that the analysis "from the bottoms up on both the revenue synergy targets and the annual cost targets" made him "very confident in the ranges that we have committed to for the first two years of combined operations." He added, "hopefully [we] will even do a little bit better."

59. Adding to the pressure on Thompson and Pierce to deliver on these synergies, analysts (even without knowledge of the Lake City losses) believed that DeYoung had negotiated a better deal than Thompson and Pierce. For example, an April 30, 2014 report from KeyBanc Capital Markets stated, "we believe current [Alliant] shareholders came out on top, while [Orbital Sciences] shareholders must now deal with significantly more operational challenges post deal. . . . The new Orbital ATK faces significant execution, integration, and synergy realization issues that are critical to meeting earnings growth targets."

**Red Flags Indicated that the Lake City Contract Was Operating at a Massive Loss**

60. The largest hurdle to delivering the Merger's purported synergies, and delivering results in the face of the stinging critique of the one-sidedness of the deal, was the low-ball $2.3 billion Lake City Contract that had been pushed off onto Orbital ATK.

61. Prior to the Merger, DeYoung spoke about his active role in monitoring the Lake City Contract, and, after the Merger, Thompson, Pierce, Hollis Thompson, and Larson would assume this responsibility. The need to closely monitor the Lake City Contract because it was

the largest source of revenue was compounded by the red flags surrounding the contract, including: (i) it was obtained through a very competitive bidding process that DeYoung publicly stated would reduce profit margins; (ii) its profitability depended on splitting overhead with commercial sales for the sporting division, which would be spun-off in the Merger; (iii) DeYoung had touted the contract as a critical win for Alliant yet was not taking it with him despite Vista being a leader in U.S. ammunition sales; (iv) production under the Lake City Contract had ramped up in the year leading up to the Merger so actual data on costs was available to compare to estimated costs; (v) the Company was achieving only half of the cost savings necessary to make a profit on the contract; (vi) Orbital ATK's accounting policy (approved by Hollis Thompson as PAO) failed to include all Lake City costs in its forward loss measurements; and (vii) pricing on the Lake City Contract was set to decline with each delivery under the contract.

62.    Not only were these red flags available to Defendants, but Thompson assured investors that they were looking for such matters and had clear visibility into the operations after the Merger.  For example, shortly after the Merger and at the start of the Class Period, during a May 28, 2015 conference call, Thompson assured investors "we really haven't encountered any significant bad-news surprises."  He added that they had clear visibility "due to the fact that the Companies had known and worked closely together for many years prior to the merger, and also because we did have about a nine-month long period from the time we agreed to the merger and announced it until the closing.  So we had plenty of time to get ready."

## DEFENDANTS' FALSE AND MISLEADING
## CLASS PERIOD STATEMENTS

63.    Following the Merger, Orbital ATK continued on Alliant's fiscal year beginning April 1 and ending March 31, while transitioning to a December 31 calendar year.  The Class

Period begins on May 28, 2015, with Orbital ATK's first reported financial results after the Merger.

**Statements Regarding Merger Synergies**

64.     On <u>May 28, 2015</u>, Orbital ATK issued a release announcing its financial results for the first transition period quarter, ending March 31, 2015 ("1Q15"), which was filed with the SEC on Form 8-K ("1Q15 Release").  The 1Q15 Release quoted Larson as claiming that "***[w]e are very pleased with progress made in integrating the two companies and are on track to achieve the cost synergies we targeted for this year and in 2016***."[6]

65.     That same day, <u>May 28, 2015</u>, Thompson, Larson, and Pierce held a conference call to discuss 1Q15 results and made the following statements:

(a)     Thompson stated, "***We also have moved aggressively in the past few months to capture cost and revenue synergies targeted both for 2015 and 2016 with substantial progress already achieved*** and more to come later this year" and "***integration activities*** are proceeding at a good pace and ***are achieving the targeted cost and revenue synergies that we expected***";

(b)     Discussing the Company's merger synergies, Larson claimed the Company was "***on track to achieve the synergies we targeted for this year and the coming years***," and "***[f]rom a cost-synergy perspective, we are on track to achieve over $60 million in cost reductions in 2015 and $100 million or more in calendar 2016***";

(c)     Larson further noted the Company's merger-related costs, stating, "***We have also incurred about $30 million in merger-related costs***";

---

[6]     Emphasis has been added to identify the false and misleading statements.

(d)     Discussing the Company's cost reductions, Thompson said, "we're making good progress" and will "**have achieved between $60 million and maybe $65 million of cost reduction this year**"; and

(e)     When asked specifically how the combined organization was working and "where some of the challenges lie," Thompson commented:

> **[W]e really haven't encountered any significant bad-news surprises**. I think that is in part due to the fact that the Companies had known and worked closely together for many years prior to the merger, and also because we did have about a nine-month long period from the time we agreed to the merger and announced it until the closing. So we had plenty of time to get ready. **So there have been no bad-news surprises. . . . [O]ne specific positive surprise has been . . . the degree of interconnectedness between the defense systems group and some of the other parts of the business**.

66.     On <u>August 6, 2015</u>, Thompson, Larson, and Pierce held a conference call to discuss Orbital ATK's financial results for the second transition period quarter 2015, ending July 5, 2015 ("2Q15"), during which Larson stated:

> On the synergy front **we continue to be pleased with progress made to achieve the synergies we targeted for this year and the coming years**. From a cost-synergy perspective **we are on track to achieve over $60 million in cost reductions in 2015 . . . . We've incurred just over $30 million in merger-related transition and integration costs to date . . . .**

67.     On <u>October 27, 2015</u>, Thompson, Larson, and Pierce held a conference call to discuss Orbital ATK's financial results for the third transition period quarter of 2015, ending October 4, 2015 ("3Q15") and made the following statements:

(a)     Discussing the benefits of the Merger, Larson said, "We also remain intensely focused on achieving our **merger-related synergies, which continue on a path to meet or exceed our targets**"; and

(b)     Larson further stated, "Turning to the synergy front, **we continue to be pleased with the progress made to achieve the synergies we targeted for this year and the**

**coming years.  From a cost synergy perspective we are on track to achieve over $60 million in**

**cost reductions in 2015 and $100 million or more in 2016**, as shown on chart 9."

68.     The <u>May, August, and October 2015</u> statements regarding merger synergies were false and misleading when made.  The true facts, which were then known to or recklessly disregarded by Defendants, were:

(a)     Larson's and Thompson's positive statements regarding the benefits, cost savings, and synergies from the Merger were misleading as they omitted to disclose that such synergies (for example, the $60 million in cost reductions) were substantially outweighed by the $375 million loss on the Lake City Contract;

(b)     Thompson's May 28, 2015 statements highlighting positive surprises after the Merger and claiming there had not been any "bad-news surprises" were misleading as they concealed that the Lake City Contract was then operating at a massive loss;

(c)     The Lake City Contract had been priced hundreds of millions of dollars below cost and, in violation of GAAP and the Company's stated Accounting Policy (as defined below), Defendants failed to record the $375 million forward loss on the Lake City Contract, which had been evident since at least September of 2013; and

(d)     Defendants omitted to disclose that their efforts to reduce costs at the Lake City plant had failed to achieve the savings necessary to make the Lake City Contract profitable.

69.     On <u>February 29, 2016</u>, the Company issued a release announcing its financial results for the fourth transition period quarter 2015 and full calendar year 2015, ending December 31, 2015 ("4Q15" and "CY15"), which was filed with the SEC on Form 8-K ("CY15 Release").  The CY15 Release included the following statements:

(a)     The CY15 Release quoted Larson as stating the Company "*met production demand in our small caliber ammunition business for commercial and government customers.  We also exceeded our cost synergy targets for 2015*, with more progress to be made this year, which should enable us to reach the high end of our expectations"; and

(b)     The CY15 Release quoted Pierce as stating, "As we look forward to 2016 and beyond, we expect to *continue to see benefits from the merger in terms of additional cost and revenue synergies that will propel margin expansion*, top-line growth and continued robust free cash flow."

70.     On <u>March 1, 2016</u>, Thompson, Larson, and Pierce held a conference call to discuss 4Q15 and CY15 results and made the following statements:

(a)     In discussing the Company's fourth quarter operational performance, Thompson stated, "*[W]e continued to make excellent progress in merger integration and in particular exceeded our target for synergy recapture last year*"; and

(b)     Addressing merger synergies, costs, and integration, Larson stated:

On the synergy front, *we continue to meet or exceed the synergies we targeted for this year and the coming years. From a cost synergy perspective, we achieved over $80 million in cost reductions in 2015*, which is up from our prior estimates. And *we are on track for more than $100 million in 2016* as shown in chart 10.

*        *        *

*We've incurred approximately $55 million in merger-related transition and integration costs to date*, and are likely to expend approximately $15 million more through mid-2016 when the majority of such expenses should be recognized.

71.     On <u>March 8, 2016</u>, Pierce spoke at the Raymond James Institutional Investors Conference on behalf of the Company, during which Pierce made the following statements:

(a)     Regarding the Merger, Pierce said, "*The merger has gone very well from a cultural standpoint, but, more importantly and equally as importantly, from a cost standpoint and a revenue standpoint and a profitability standpoint*"; and

(b)     Commenting on the Company's margin expansion through cost reductions, Pierce stated, "*So, we're looking for margin expansion through cost reductions. The synergies that we have employed; $80 million in the first nine months. We're going to add another $20 million to that.*"

72.     The February and March 2016 statements regarding merger synergies were false and misleading when made. The true facts, which were then known to or recklessly disregarded by Defendants, were:

(a)     Thompson's, Larson's, and Pierce's positive statements regarding the benefits, cost savings, and synergies of the Merger were misleading as they omitted to disclose that such synergies (for example, the $80 million in cost reductions) were substantially outweighed by the $375 million loss on the Lake City Contract;

(b)     Pierce's statement claiming the "merger has gone very well" from a "profitability standpoint" was false and misleading as it concealed that the Lake City Contract resulted in a massive loss that had, and would continue to, negatively impact operations for years;

(c)     The Lake City Contract had been priced hundreds of millions of dollars below cost and, in violation of GAAP and the Company's stated Accounting Policy, Defendants failed to record the $375 million forward loss on the Lake City Contract, which had been evident since at least September of 2013; and

(d)     Defendants omitted to disclose that their efforts to reduce costs at the Lake City plant had failed to achieve the savings necessary to make the Lake City Contract profitable.

73.     On <u>May 5, 2016</u>, the Company issued a release announcing its financial results for the first quarter of 2016, ending April 3, 2016 ("1Q16"), which was filed with the SEC on Form 8-K ("1Q16 Release").  The 1Q16 Release included the following statements:

(a)     The 1Q16 Release quoted Thompson as stating, "as we entered the second year of the merger, the company *continued to achieve cost and revenue synergies that are helping us* lower costs for customers, *improve profit margins and generate top-line growth in the years ahead*"; and

(b)     The 1Q16 Release quoted Larson as stating, "*While a large fraction of our post-merger cost synergy targets were realized in 2015, we are continuing to pursue another $25 to $30 million in annual efficiency gains this year* that, if achieved, will put us above the high end of our targeted range of $70 - $100 million in annual savings."

74.     Also on <u>May 5, 2016</u>, Thompson, Larson, and Pierce held a conference call to discuss 1Q16 results and made the following statements:

(a)     Discussing the Company's merger synergies, Larson stated, "*We're also delivering on our merger-related synergies*, which for 2016 will exceed our initial targets, *and which are already driving improved profit margins*";

(b)     Larson further stated, "*From a cost-synergy perspective, after achieving $85 million in cost reductions in 2015, we are on track for more than $100 million in 2016*, as shown on chart 9";

(c)     Larson added that the Company's operational performance "***combined with our synergy savings, is resulting in improved competitiveness and profit margins in our operations***"; and

(d)     Thompson concluded the conference call, stating, "Orbital ATK began 2016 with a productive first quarter.  Financial results were in line with our plan for the year, ***with profit margins benefiting from cost efficiencies achieved following last year's merger*** . . . . Operational performance continued to be excellent on over 100 major research and development and production programs . . . ***with revenue and cost synergies on or ahead of plans***."

75.     On <u>May 11, 2016</u>, Thompson spoke at the Wells Fargo Industrial and Construction Conference.  In response to an analyst question regarding examples of "the revenue synergies that you've seen and why you see the prospects for that to continue to grow?" Thompson stated, "We beat our first year targets on both counts in 2015. ***We reduced our combined annual cost by about $85 million*** . . . ."

76.     The <u>May 2016</u> statements regarding merger synergies were false and misleading when made.  The true facts, which were then known to or recklessly disregarded by Orbital ATK, Thompson, Pierce, and Larson,[7] were:

(a)     Thompson's and Larson's positive statements regarding the benefits, cost savings, and synergies from the Merger were misleading as they omitted to disclose that such synergies (for example, the $85 million in cost reductions) were substantially outweighed by the $375 million loss on the Lake City Contract;

---

[7]     DeYoung left the Company prior to the May 2016 statements.

(b)     Larson's statements, such as that the synergy savings were "driving improved profit margins," were false and misleading as they concealed that the Lake City Contract resulted in hundreds of millions in losses negatively impacting profit margins;

(c)     The Lake City Contract had been priced hundreds of millions of dollars below cost and, in violation of GAAP and the Company's stated Accounting Policy, Defendants failed to record the $375 million forward loss on the Lake City Contract, which had been evident since at least September of 2013; and

(d)     Defendants omitted to disclose that their efforts to reduce costs at the Lake City plant had failed to achieve the savings necessary to make the Lake City Contract profitable.

**Statements Regarding the Lake City Contract's Performance**

77.     On May 28, 2015, Orbital ATK issued its 1Q15 Release, which reported that the Defense Systems Group delivered "***approximately 300 million rounds of small- and medium-caliber ammunition in the quarter***."

78.     That same day, May 28, 2015, Thompson, Larson, and Pierce held a conference call to discuss 1Q15 results and made the following statements:

(a)     In response to an analyst question regarding the "incremental headwind in small-cal ammo," Thompson responded, "***I would say the small-cal[iber] effect on margins was not particularly significant. It certainly was on revenue, but on margins, the small-cal[iber] guys did a good job of dealing with the downturn and there wasn't a lot of unexpected margin pressure as a result of that***";

(b)     Thompson noted the combined Company's major developments, including "***producing over 400 million rounds of small- and medium-caliber ammunition so far this year***"; and

- 27 -

(c)     Larson reiterated that the Defense Systems Group "*produced over 300 million rounds of small caliber ammunition*" in 1Q15.

79.     On June 1, 2015, Orbital ATK filed its annual report on Form 10-K for the fiscal year ending March 31, 2015 ("2015 Form 10-K").   The 2015 Form 10-K was signed by Thompson, Pierce, Hollis Thompson, and DeYoung and included the following statements:

(a)     The 2015 Form 10-K emphasized the size of Lake City's operations and the significant contribution of the Lake City Contract to the Company's financial results, stating, "the Company has operated and modernized [Lake City], and is currently under contract with the U.S. Army to operate [Lake City] through September 2020.  *In fiscal 2015, the Company produced approximately 1.4 billion rounds of small-caliber ammunition in the [Lake City] facility*," and the Lake City Contract "*contributed 13%, 9% and 19% to the Company's sales in fiscal 2015, 2014 and 2013, respectively*.  No other single contract contributed more than 10% of our sales in fiscal 2015";

(b)     With regard to the Lake City Contract, the 2015 Form 10-K stated,

> In September 2012, the Company was awarded a new contract for the continued production of ammunition and continued operation and maintenance of [Lake City]. The production contract runs through September 2019 and the facility contract runs through September 2020, *with an option to extend the contract to 2023. As a result of the significant competition for this contract, the Company has experienced a lower profit rate in the Small-Caliber Systems division following the implementation of our new contract*;

(c)     The 2015 Form 10-K warned that if "*costs for ammunition* [at Lake City]" rise they "*could also have an adverse effect on [our]* operating results and *profit margin*" ("Lake City Costs Statement").

80.     The May and June 2015 statements regarding the Lake City Contract performance were false and misleading when made.   The true facts, which were then known to or recklessly disregarded by Defendants, were:

- 28 -

(a)      While making positive statements regarding the production volumes and revenue contribution from the Lake City Contract and the purported ten-year term, Defendants concealed that Orbital ATK was actually losing money on those sales, that is, selling those bullets at a significant loss, not at "a lower profit rate";

(b)      Thompson falsely claimed the "small-cal[iber] effect on margins was not particularly significant" and thereby concealed that the Lake City Contract was then operating at substantial losses and negative margins; and

(c)      Defendants' statements in the 2015 Form 10-K regarding the "lower profit rate" and possible "adverse effect" on profit margins from Lake City were misleading because the Lake City Contract was generating negative margins and massive losses.

81.      On <u>August 6, 2015</u>, the Company issued a release announcing its financial results for 2Q15, which was filed with the SEC on Form 8-K ("2Q15 Release").  The 2Q15 Release reported that the Defense Systems Group delivered "***approximately 300 million rounds of small- and medium-caliber ammunition in the second quarter.***"

82.      On the same day, <u>August 6, 2015</u>, Thompson, Larson, and Pierce held an earnings conference call to discuss the 2Q15 results and made the following statements:

(a)      In response to a question about margins, Pierce stated that "[t]he revenue decline in, particularly in ***small caliber ammunition, which is not one of our higher-margin businesses to be sure***, has been partly but not entirely offset by strength in areas like Precision weapons and tactical missile systems"; and

(b)      Larson reiterated that the Defense Systems Group delivered "***approximately 300 million rounds of small- and medium-caliber ammunition in the second quarter***."

83.     On <u>October 14, 2015</u>, the Company issued a release stating: (i) that the Company had "***received orders totaling $203 million to produce small caliber ammunition for the U.S. Army***" under the Lake City Contract; and (ii) that "Orbital ATK and the U.S. Army are making facility upgrades and investing in state-of-the-art, high-volume technology ***to enhance the efficiency and cost-effectiveness of Lake City***."

84.     On <u>October 27, 2015</u>, the Company issued a release announcing its financial results for 3Q15, which was filed with the SEC on Form 8-K ("3Q15 Release").  The 3Q15 Release included the following statements:

(a)     The 3Q15 Release reported that the Defense Systems Group delivered "***approximately 300 million rounds of small- and medium-caliber ammunition in the third quarter***"; and

(b)     The 3Q15 Release quoted Larson as stating:

In addition, ***we saw continued progress in the quarter*** on the simultaneous ramp-up of several programs in the aerospace structures division, ***and a higher production rate of commercial small caliber ammunition***.

85.     That same day, <u>October 27, 2015</u>, Thompson, Larson, and Pierce held a conference call to discuss 3Q15 results and made the following statements:

(a)     Thompson stated that the "Defense Systems group ***maintained high rates of production . . . of small and medium caliber ammunition*** while also ramping up deliveries of our AARGM advanced air-to-ground missile"; and

(b)     Larson reiterated that the Defense Systems Group produced "***approximately 300 million rounds of small and medium caliber ammunition for domestic and international customers in the quarter***."

86.     The August and October 2015 statements regarding the Lake City Contract's performance were false and misleading when made.  The true facts, which were then known to or recklessly disregarded by Defendants, were:

(a)     While making positive statements regarding the production volumes and revenue contribution from the Lake City Contract, Defendants concealed that Orbital ATK was actually losing money on those sales, that is, selling those bullets at a significant loss;

(b)     By stating that the small caliber business was "not one of our higher-margin businesses," Pierce concealed that the Lake City Contract was neither high nor low margin, but rather was operating at negative margins which resulted in substantial losses; and

(c)     Despite any purported enhancements to improve the "cost-effectiveness" of the Lake City plant, the Lake City Contract was still operating at a massive loss.

87.     On February 29, 2016, the Company issued its CY15 Release, which reported that the Defense Systems Group "*produced over 250 million rounds of small- and medium-caliber ammunition in the fourth quarter*."

88.     On March 1, 2016, Thompson, Larson, and Pierce held a conference call to discuss 4Q15 and CY15 results.  An analyst noted that "it looks like the margin outlook is probably flat to down slightly" for the Defense Systems Segment, and asked, "is that just a matter of the investment in precision munitions or is there more going on there with the margins?" to which Thompson responded,

> *[T]here are really two things that are two major things that are affecting margins.  One* as you pointed out *is the investment in the growth initiative* for defense and the effect that has in round terms on the defense margins is about 50 basis points . . . . *There's a second affect* that is sometimes overlooked *and that is the adjustment for pension cost between the financial accounting and the cost accounting standards*.

89.     On <u>March 8, 2016</u>, Pierce spoke at the Raymond James Institutional Investors Conference on behalf of the Company.  In response to an analyst question about revenue growth and earnings per share ("EPS") leverage over the next three-to-five years, Pierce commented, "***Our munitions business is coming back. I mean***, obviously, there's been a turndown after we've changed our profile on war.  But, ***we've driven cost out of that***.  The commercial side looks good. So, I see that growing."

90.     On <u>March 15, 2016</u>, the Company filed its report on Form 10-KT for the transition period from April 1, 2015 to December 31, 2015 ("2015 Form 10-KT").[8]  The 2015 Form 10-KT was signed by Thompson, Pierce, Hollis Thompson, and DeYoung and included the following statements:

(a)     The 2015 Form 10-KT emphasized the size of Lake City's operations and the significant contribution of the Lake City Contract to the Company's financial results, stating, "the Company has operated and modernized [Lake City], and is currently under contract with the U.S. Army to operate [Lake City] through September 2020," and "***[o]ur small-caliber ammunition contract with the U.S. Army, which is reported within Defense Systems Group, comprised 7%, 13% and 9% of our sales in the 2015 transition period, fiscal 2015 and fiscal 2014, respectively***";

(b)     With regard to the Lake City Contract, the 2015 Form 10-KT stated,

> In September 2012, we were awarded a new contract for the continued production of ammunition and continued operation and maintenance of [Lake City]. The production contract runs through September 2019 and the facility contract runs through September 2020, ***with an option to extend the contract to 2023. As a result of the significant competition for this contract, we have experienced a***

---

[8]     The 2015 10-KT explained that in March 2015 Orbital ATK switched from a fiscal year ending March 31 to a calendar year ending December 31 and that the 10-KT was "a transition report . . . for the transition period from April 1, 2015 through December 31, 2015."

*reduction in profit margin in the Small Caliber Systems division following the implementation of the contract*;

(c)     The 2015 Form 10-KT contained the same ***Lake City Costs Statement*** as set forth in ¶79(c).

91.     The February and March 2016 statements regarding the Lake City Contract performance were false and misleading when made.  The true facts, which were then known to or recklessly disregarded by Defendants, were:

(a)     While making positive statements regarding the production volumes and revenue contribution from the Lake City Contract and the purported ten-year term, Defendants concealed that Orbital ATK was actually losing money on its sales, that is, selling those bullets at a significant loss, not at a "reduction" in profit margins;

(b)     Pierce's statement that "we've driven cost" out of ammunition business concealed that they had achieved only approximately half of the savings needed to make the Lake City Contract profitable and those savings were hundreds of millions of dollars short of making the Lake City Contract profitable;

(c)     Thompson's stated reasons for margin compression in the ammunition business were misleading because he omitted to disclose and concealed that the Lake City Contract was then operating at negative margins that resulted in massive losses; and

(d)     Defendants' statements in the 2015 Form 10-KT regarding the "reduction" in and possible "adverse effect" on "profit" margins from Lake City were misleading because the Lake City Contract was generating negative margins and massive losses.

92.     On May 5, 2016, the Company issued its 1Q16 Release, which reported that the Defense Systems Group "***manufactured over 400 million rounds of small-caliber, medium-caliber and large-caliber ammunition*** for domestic and international customers."

- 33 -

93.     Also on May 5, 2016, Thompson, Larson, and Pierce held a conference call to discuss 1Q16 results.   An analyst asked for the "outlook" for "Lake City" and Thompson responded:

> *The outlook in the small caliber ammo business is pretty good this year. Certainly, stronger overall than last year*.  Last year was actually -- within the commercial ammo production for Vista, was quite good.   We think it will continue to be strong this year.  *What we are seeing in 2016, though, is a significant bounce back in demand on the part of the Army*.
>
> *[W]e produced about 400 million rounds of ammo in the first quarter*.  Just based on a round count, *that was dominated by small-caliber production at Lake City*.
>
> *The higher domestic production at Lake City* is anticipated to be partly offset by lower nonstandard -- non-NATO-standard -- ammo sales.   Nevertheless, when you put it all together, *we do see a reasonable increase in total small cal ammo sales this year*.

94.     On May 11, 2016, Thompson spoke at the Wells Fargo Industrial and Construction Conference.  Thompson was specifically asked about the small caliber ammunition business, which was referred to as "a hot topic for a little while."   In response to a question regarding Department of Defense demand, Thompson stated that the Company "***built 400 million rounds of small caliber ammunition in the first 90 days of this year. So if you work out the math that turns out to be just under 50 bullets a second 24 hours a day, every day and we sell them for about $0.25 a piece.***"

95.     The May 2016 statements regarding the Lake City Contract performance were false and misleading when made.   The true facts, which were then known to or recklessly disregarded by Orbital ATK, Thompson, Pierce, and Larson, were:

(a)     While making positive statements regarding the production volumes and revenue contribution from the Lake City Contract, Defendants concealed that Orbital ATK was actually losing money on its sales, that is, selling those bullets at a significant loss; and

(b)     While touting the production volumes and revenue per bullet, Thompson concealed that the more bullets Orbital ATK made pursuant to the Lake City Contract, the more money it lost, since the bullets cost more than the $0.25 selling price.

**Statements Regarding Financial Results**

96.     On <u>June 1, 2015</u>, Orbital ATK filed its 2015 Form 10-K, which was signed by Thompson, Pierce, Hollis Thompson, and DeYoung and included the following statements:

(a)     The 2015 Form 10-K reported ***Total current liabilities of $1.097 billion, Retained earnings of $1.16 billion***, and ***Net receivables of $1.794 billion***;

(b)     The 2015 Form 10-K reported ***fiscal year 2015 Income from continuing operations, before interest, income taxes and non-controlling interest ("Pre-Tax Operating Income") of $232 million*** and ***EPS of $2.14***;

(c)     The 2015 Form 10-K reported prior results for Alliant, including, ***fiscal year 2014 Pre-Tax Operating Income of $302 million*** and ***EPS of $4.87***; and ***fiscal year 2013 Pre-Tax Operating Income of $338 million*** and ***EPS of $5.73***;

(d)     The 2015 Form 10-K reported Defense Systems Group ***fiscal year 2014 Pre-Tax Operating Income of $210.7 million***; and

(e)     The 2015 Form 10-K claimed the Company's accounting policy for long-term government contracts ("Accounting Policy"), including the Lake City Contract, was: "***[i]n the period in which it is determined that a loss will be incurred on a contract, the entire amount of the estimated gross margin loss is charged to cost of sales***."

97.     The <u>June 2015</u> statements regarding the Company's financial results were false and misleading when made.  The true facts, which were then known to or recklessly disregarded by Defendants, were:

(a)     The Lake City Contract had been priced hundreds of millions of dollars below cost and, in violation of GAAP and the Company's stated Accounting Policy, Defendants failed to record the $375 million forward loss on the Lake City Contract, which had been evident since at least September of 2013;

(b)     Orbital ATK's 2015 Form 10-K contained material errors, including, the Company's reported fiscal 2015 Retained earnings were overstated by $266.3 million (approximately 30%); reported fiscal 2015 Total current liabilities were understated by $280.3 million (approximately 20%); reported fiscal 2015 Net receivables were overstated by $97 million (approximately 6%); reported fiscal 2015 Pre-Tax Operating Income was overstated by $9.2 million (approximately 4%); and reported fiscal 2015 EPS was overstated by $0.21 (approximately 11%); and

(c)     Likewise, the 2015 Form 10-K contained material errors regarding prior periods, including, the reported fiscal 2014 Pre-Tax Operating Income was overstated by $360.8 million (approximately 613%) and EPS was overstated by $6.84 (approximately 347%); reported fiscal 2013 Pre-Tax Operating Income was overstated by $35 million (approximately 11%) and EPS was overstated by $0.66 (approximately 13%); and fiscal 2014 Defense Systems Group Pre-Tax Operating Income was overstated by $53 million (approximately 34%).

98.     On <u>August 6, 2015</u>, the Company issued its 2Q15 Release, which included the following statements:

(a)     The 2Q15 Release reported ***Total current liabilities of $989 million and Total equity of $1.873 billion***; and

(b)     The 2Q15 Release reported prior results for Alliant, including, ***for the quarter ending June 29, 2014, Pre-Tax Operating Income of $71.8 million*** and ***EPS of $0.96***.

99.     On August 11, 2015, the Company filed its quarterly report on Form 10-Q for 2Q15 ("2Q15 Form 10-Q"), which was signed by Thompson and Pierce.  The 2Q15 Form 10-Q included the following statements:

(a)     The 2Q15 Form 10-Q reported **Total current liabilities of $989 million, Retained earnings of $1.233 billion,** and **Net receivables of $1.89 billion**;

(b)     The 2Q15 Form 10-Q reported prior results for Alliant, including, **for the quarter ending June 29, 2014, Pre-Tax Operating Income of $71.8 million** and **EPS of $0.96**; and

(c)     The 2Q15 Form 10-Q contained the same **Accounting Policy** as set forth in ¶96(e).

100.    The August 2015 statements regarding financial results were false and misleading when made.  The true facts, which were then known to or recklessly disregarded by Defendants, were:

(a)     The Lake City Contract had been priced hundreds of millions of dollars below cost and, in violation of GAAP and the Company's stated Accounting Policy, Defendants failed to record the $375 million forward loss on the Lake City Contract, which had been evident since at least September of 2013;

(b)     Orbital ATK's 2Q15 Release and 2Q15 Form 10-Q contained material errors, including, the Company's reported 2Q15 Retained earnings were overstated by $261.5 million (approximately 27%); reported 2Q15 Total equity was overstated by $261.5 million (approximately 16%); reported 2Q15 Total current liabilities were understated by $284 million (approximately 23%); reported 2Q15 Net receivables were overstated by $103 million (approximately 6%); and

- 37 -

(c)     Likewise, the 2Q15 Form 10-Q contained material errors regarding prior periods, including, the reported quarter ending June 29, 2014 Pre-Tax Operating Income was overstated by $4.4 million (approximately 6%) and EPS was overstated by $0.09 (approximately 9%).

101.    On <u>October 27, 2015</u>, the Company issued its 3Q15 Release, which included the following statements:

(a)     The 3Q15 Release reported ***Total current liabilities of $975 million*** and ***Total equity of $1.906 billion***; and

(b)     The 3Q15 Release reported that Defense Systems Group's financial results decreased "***primarily from lower Small Caliber Division revenues and operating margins*** compared to the same period last year."

102.    On <u>November 5, 2015</u>, the Company filed its Form 10-Q for 3Q15 ("3Q15 Form 10-Q"), which was signed by Thompson and Pierce.   The 3Q15 Form 10-Q included the following statements:

(a)     The 3Q15 Form 10-Q reported ***Total current liabilities of $975 million, Retained earnings of $1.284 billion,*** and ***Net receivables of $1.9 billion***;

(b)     The 3Q15 Form 10-Q reported prior results for Alliant, including, ***for the quarter ending September 28, 2014, Pre-Tax Operating Income of $80.3 million and EPS of $1.29***; and

(c)     The 3Q15 Form 10-Q contained the same ***Accounting Policy*** as set forth in ¶96(e).

103.     The October and November 2015 statements regarding financial results were false and misleading when made.  The true facts, which were then known to or recklessly disregarded by Defendants, were:

(a)     The Lake City Contract had been priced hundreds of millions of dollars below cost and, in violation of GAAP and the Company's stated Accounting Policy, Defendants failed to record the $375 million forward loss on the Lake City Contract, which had been evident since at least September of 2013;

(b)     Orbital ATK's 3Q15 Release and 3Q15 Form 10-Q contained material errors, including, the Company's reported 3Q15 Retained earnings were overstated by $262.6 million (approximately 26%); reported 3Q15 Total equity was overstated by $262.6 million (approximately 16%); reported 3Q15 Total current liabilities were understated by $274.3 million (approximately 22%); and reported 3Q15 Net receivables were overstated by $108.7 million (approximately 6%); and

(c)     Likewise, Orbital ATK's 3Q15 Form 10-Q contained material errors regarding prior periods, including, the reported quarter ending September 28, 2014 Pre-Tax Operating Income was overstated by $5.2 million (approximately 7%) and EPS was overstated by $0.11 (approximately 9%).

104.     On February 29, 2016, the Company issued its CY15 Release, which reported **Total current liabilities of $974 million** and **Total equity of $1.947 billion**.

105.     On March 15, 2016, the Company filed its 2015 Form 10-KT, which was signed by Thompson, Pierce, Hollis Thompson, and DeYoung and included the following statements:

(a)     The 2015 Form 10-KT reported **Total current liabilities of $967 million, Retained earnings of $1.306 billion,** and **Net receivables of $1.78 billion**;

(b)     The 2015 Form 10-KT reported prior results, including, the same *fiscal year 2015, 2014, and 2013 Pre-Tax Operating Income* and *EPS* as set forth in ¶¶96(b)-(c); *nine months ending December 28, 2014 Pre-Tax Operating Income of $233 million and EPS of $3.64; three months ending December 28, 2014 EPS of $1.41*; and *nine months ending December 28, 2014 Defense Systems Group Pre-Tax Operating Income of $144 million*; and

(c)     The 2015 Form 10-KT contained the same *Accounting Policy* as set forth in ¶96(e).

106.    The <u>February and March 2016</u> statements regarding financial results were false and misleading when made.  The true facts, which were then known to or recklessly disregarded by Defendants, were:

(a)     The Lake City Contract had been priced hundreds of millions of dollars below cost and, in violation of GAAP and the Company's stated Accounting Policy, Defendants failed to record the $375 million forward loss on the Lake City Contract, which had been evident since at least September of 2013;

(b)     Orbital ATK's CY15 Release and 2015 Form 10-KT contained material errors, including, the Company's reported transition period Retained earnings were overstated by $262.5 million (approximately 25%); reported transition period Total equity was overstated by $262.5 million (approximately 15%); reported transition period Total current liabilities were understated by $287 million (approximately 23%); and reported transition period Net Receivables were overstated by $114 million (approximately 7%); and

(c)     Likewise, Orbital ATK's 2015 Form 10-KT contained material errors regarding prior periods, including, the reported fiscal 2015, 2014, and 2013 Pre-Tax Operating Income and EPS were overstated by the amounts set forth in ¶¶97(b)-(c); reported nine-months

ending December 28, 2014 Pre-Tax Operating Income was overstated by $13.9 million (approximately 6%) and EPS was overstated by $0.27 (approximately 8%); reported three-months ending December 28, 2014 EPS was overstated by $0.09 (approximately 7%); and reported nine-months ending December 28, 2014 Defense Systems Group reported Pre-Tax Operating Income was overstated by $16.2 million (approximately 13%).

107.    On May 5, 2016, the Company issued its 1Q16 Release, which reported **Total current liabilities of $954 million** and **Total equity of $1.99 billion**.

108.    On May 9, 2016, the Company filed its quarterly report on Form 10-Q for 1Q16 ("1Q16 Form 10-Q"), which was signed by Thompson and Pierce and included the following statements:

(a)    The 1Q16 Form 10-Q reported **Total current liabilities of $954 million, Retained earnings of $1.36 billion,** and **Net receivables of 1.97 billion**; and

(b)    The 1Q16 Form 10-Q contained the same **Accounting Policy** as set forth in ¶96(e).

109.    The May 2016 statements regarding financial results were false and misleading when made.  The true facts, which were then known to or recklessly disregarded by Orbital ATK, Thompson, Pierce, and Larson, were:

(a)    The Lake City Contract had been priced hundreds of millions of dollars below cost and, in violation of GAAP and the Company's stated Accounting Policy, Defendants failed to record the $375 million forward loss on the Lake City Contract, which had been evident since at least September of 2013; and

(b)    Orbital ATK's 1Q16 Release and 1Q16 Form 10-Q contained material errors, including, the reported 1Q16 Retained Earnings were overstated by $255 million

(approximately 23%); reported 1Q16 Total equity was overstated by $255 million (approximately 15%); reported 1Q16 Total current liabilities were understated by $264 million (approximately 22%); and reported 1Q16 Net receivables were overstated by $119 million (approximately 6%).

**Statements Regarding Internal Controls**

110.   On May 28, 2015, Thompson, Larson, and Pierce held a conference call to discuss 1Q15 results, during which Pierce stated that from a "financial operational control and financial public reporting" standpoint, those working on financial operational control "***have done a superb job . . . integrating our control systems to run this merged business***" and that merging the financial reporting "***turned out to be very, very positive***."

111.   On June 1, 2015, Orbital ATK filed its 2015 Form 10-K, which was signed by Thompson, Pierce, Hollis Thompson, and DeYoung and included the following statements:

(a)   The 2015 Form 10-K assured investors that the Company maintained effective internal controls over financial reporting, stating that  the "***Company's Chief Executive Officer and Chief Financial Officer*** evaluated the effectiveness of the design and operation of the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934) . . . and ***have concluded that the Company's disclosure controls and procedures are effective*** . . . ." ("Disclosure Controls Statement");

(b)   The 2015 Form 10-K included "Management's Report on Internal Control over Financial Reporting," signed by Thompson and Pierce, stating that "Management regularly monitors the Company's internal control over financial reporting, and actions are taken to correct any deficiencies as they are identified.  Based on our assessment, ***management has concluded that the Company's internal control over financial reporting is effective***." ("Internal Controls Statement"); and

(c)     The 2015 Form 10-K also included Sarbanes Oxley Certifications ("SOX Certifications") signed by both Thompson and Pierce which stated, among other things, that the Company's 2015 Form 10-K fully complied with the requirements of Section 13(a) or 15(d) of the Exchange Act, that the information in the 2015 Form 10-K "*fairly presents, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods expressed*," and that Thompson and Pierce had "*[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles*."

112.    The <u>May and June 2015</u> statements regarding internal controls were false and misleading when made.  The true facts, which were then known to or recklessly disregarded by Defendants, were:

(a)     Pierce's statements praising the "superb job" and "very positive" integration of financial operational control and public reporting were misleading as they concealed that the combined Company had failed to integrate the accounting systems of the merged entities to enable it to generate accurate financial reporting; and

(b)     Orbital ATK's controls were not operating effectively but suffered from several material weaknesses, including a failure to maintain an effective control environment at the Company's Defense Systems Group and Small Caliber Systems Division, which placed undue pressure on those groups to maintain a targeted profit rate and to achieve cost savings, all of which contributed to Orbital ATK issuing false financial statements that did not comply with GAAP and the Company's stated Accounting Policy.

113. On <u>August 11, 2015</u>, Orbital ATK filed its 2Q15 Form 10-Q, which contained the same ***Disclosure Controls Statement*** and ***SOX Certifications*** signed by Thompson and Pierce as set forth in ¶¶111(a),(c).

114. On <u>November 5, 2015</u>, Orbital ATK filed its 3Q15 Form 10-Q, which contained the same ***Disclosure Controls Statement*** and ***SOX Certifications*** signed by Thompson and Pierce as set forth in ¶¶111(a),(c).

115. The <u>August and November 2015</u> statements regarding internal controls were false and misleading when made for the same reasons as set forth in ¶112(b).

116. On <u>March 1, 2016</u>, Thompson, Larson, and Pierce held a conference call to discuss 4Q15 and CY15 results, during which Larson stated, "***We've also completed over 95% of some 1,350 pre- and post-merger integration milestones.  Concurrent with the successful merger integration***, the consolidated Company delivered excellent performance on key operational metrics . . . ."

117. On <u>March 15, 2016</u>, Orbital ATK filed its 2015 Form 10-KT, which was signed by Thompson, Pierce, Hollis Thompson, and DeYoung.  Significantly, the 2015 Form 10-KT included the restatement of the Company's financial statements for 2Q15 (quarterly period ended July 5, 2015) and 3Q15 (quarterly period ended October 4, 2015).  According to the 2015 Form 10-KT, the restatement related to the Company's inaccurate accounting for long-term contracts. Although this restatement did not purport to impact the Lake City Contract, it involved errors in the application of the same accounting rules used to account for Lake City.  Specifically, the 2015 Form 10-KT said the restatement related to: "corrections resulting from the application of purchase accounting with respect to certain long-term contracts, which are accounted for under the percentage-of-completion method that should be based on the estimate of remaining effort on

such contracts at the acquisition date instead of the inception-to-date progress of each contract," as well as "corrections resulting from the reconciliation and analysis of certain accounts."

118.    In addition, the 2015 Form 10-KT disclosed that the Company's internal controls were not effective and suffered from certain material weaknesses related to the accounting for long-term contracts and integration of the accounting operations after the Merger.  Further, the 2015 Form 10-KT admitted Orbital ATK needed to increase its oversight of accounting operations and hire more qualified accountants.  Specifically, the 2015 Form 10-KT provided:

> [W]e did not maintain controls over measurement period adjustments and controls over the calculation of acquired contracts' percentage of completion used to recognize revenue.  In addition, we did not maintain controls over the integration of accounting operations of the two merged companies and over the preparation, analysis and review of accounts of the combined business.
>
> These material weaknesses resulted in errors . . . .
>
> *        *        *
>
> In addition, we plan to augment our corporate accounting and controls oversight functions with additional resources and professionals to provide increased oversight, appropriate maintenance of policies and procedures related to complex transactions, integration of accounting operations and analysis of accounts of the combined business.

119.    Notwithstanding the admitted material weaknesses in internal controls, the 2015 Form 10-KT contained the same ***SOX Certifications*** signed by Thompson and Pierce as set forth in ¶111(c), attesting that the 2015 Form 10-KT was accurate and prepared in accordance with GAAP.

120.    On May 5, 2016, Thompson, Larson, and Pierce held a conference call to discuss 1Q16 results and made the following statements:

(a)    Thompson addressed the merger integration, claiming "***integration activities now substantially completed***"; and

- 45 -

       (b)     Thompson concluded the conference call, stating that "***post-merger integration activities neared completion***."

      121.   On <u>May 9, 2016</u>, the Company filed the 1Q16 Form 10-Q, which was signed by Thompson and Pierce and included the following statements:

       (a)     The 1Q16 Form 10-Q contained the same ***SOX Certifications*** signed by Thompson and Pierce as set forth in ¶111(c); and

       (b)     The 1Q16 Form 10-Q referred to the internal control disclosures in the 2015 Form 10-KT and added:

> [W]e previously reported material weaknesses in internal control over financial reporting related to: establishing and maintaining accounting policies and procedures related to complex transactions; maintaining a sufficient complement of personnel with appropriate levels of accounting and controls knowledge, experience and training commensurate with the nature and complexity of our business and contract activity; designing appropriate controls to ensure completeness and accuracy of purchase accounting . . . and maintaining controls over the integration of accounting operations of the two merged companies and over the preparation, analysis and review of accounts of the combined business. As a result of the material weaknesses in our internal control over financial reporting, which were not remediated as of April 3, 2016, our Chief Executive Officer and Chief Financial Officer concluded our disclosure controls and procedures were not effective as of April 3, 2016.

>                *      *      *

> Management is in the process of improving and strengthening the internal controls related to the above matters including: i.) hiring sufficient complement of personnel with appropriate levels of accounting and controls knowledge, experience and training commensurate with the nature and complexity of our business, ii.) continuing to execute on our integration program moving the accounting operations towards centralized processing with standard tools and procedures and iii.) assessing existing policies and practices and related internal controls with respect to the extent and precision of controls impacting certain balance sheet accounts. Furthermore, during the quarter ended April 3, 2016 we finalized our purchase accounting related to the Merger and we maintained sufficient controls over measurement period adjustments. In addition, for future acquisitions we will ensure the percent complete on contracts will be reset to zero in accordance with the accounting literature.

122.    The <u>March and May 2016</u> statements regarding internal controls were false and misleading when made.  The true facts, which were then known to or recklessly disregarded by Defendants, were:

(a)    Larson's statement touting "the successful merger integration" was false and misleading as it concealed that the combined Company had failed to integrate the accounting systems of the merged entities to enable it to generate accurate financial reporting;

(b)    Despite the disclosure of errors in the accounting for a "limited number" of long-term contracts, Defendants continued to conceal the massive losses from the Lake City Contract;

(c)    Despite their disclosure that Orbital ATK was unable to properly apply the percentage-of-completion method of accounting to certain long-term contracts, Defendants continued to conceal that they were not complying with GAAP and their stated Accounting Policy of recording a loss on the Lake City Contract as soon as it was evident;

(d)    Despite the disclosure of certain material weaknesses in internal controls, and contrary to Thompson and Pierce's SOX Certifications, Defendants continued to conceal that the Company suffered from additional material weaknesses relating to the accounting for the Lake City Contract which permitted Orbital ATK to issue false financial statements; and

(e)    Thompson's statement claiming the merger integration was "substantially completed" concealed that the combined Company had failed to integrate the accounting systems of the merged entities to enable it to generate accurate financial reporting.

**Analyst Reaction to the False and Misleading Statements**

123.    Analysts reacted positively to the false and misleading statements.  For example, on June 1, 2015, Jefferies analysts issued a "BUY" rating for the Company and commented,

"volumes from the military small caliber ammunition (Lake City) contract increased to $413MM, up from $263MM a year ago."

124.    Similarly, on August 6, 2015, Credit Suisse analysts increased their 12-month price target for Orbital ATK to $89.00 per share, commenting that the Company was "well position[ed] in a bottoming defense market."  On the same day, Wells Fargo analysts rated Orbital ATK as a "market outperform" and highlighted the Company's expectation "to deliver 1.20-1.25B small caliber ammunition rounds in 2015."

125.    Next, on October 27, 2015, Credit Suisse increased its 12-month price target for Orbital ATK by $10.00 to $99.00 per share claiming that the Company was "[u]nderpromising and overdelivering."  On the same day, Jefferies also raised its price target by $10.00 to $100.00 per share.  Jefferies listed "DoD restocking of consumables such as small caliber ammunition and projectiles" as an "Upside Scenario" and noted that Orbital ATK received a number of "notable awards in Q3" including: "$203MM for small caliber ammunition" as part of the "seven year contract to produce ammunition at Lake City."

126.    Analysts continued to react positively to the false and misleading statements in 2016.  For example, uninformed as to the massive losses that Orbital ATK was facing on the Lake City Contract, analysts assessed that Orbital ATK's outlook was positive.  Specifically, on March 1, 2016, Credit Suisse analysts reiterated their Outperform rating and commented that they were "encouraged" by the "growth guidance in Defense Systems" and that the Company was benefitting from a "tailwind."

127.    On May 6, 2016, Barclays analysts commented that "the company's small caliber forecast was encouraging (with Army rounds expected up 25-30% YoY and commercial orders up from the VSTO side, partially offset by an expected decline in short-cycle non-standard

ammunition), leading to LSD% anticipated growth." Wells Fargo raised its 12-month target valuation range by $8.00 to $90-95 per share, and commented that Orbital ATK expects "small-caliber ammunition this year, up 25-30%, more than offsetting expect declines in other ammunition types."

## THE TRUTH BEGINS TO EMERGE

128.   Before the market opened on August 10, 2016, Orbital ATK stunned investors by announcing (i) it was not able to file its quarterly report on Form 10-Q for second quarter 2016 ("2Q16 Form 10-Q") on time; (ii) its previously issued quarterly and annual financial statements in fiscal year 2015, transition period 2015, and 1Q16 should no longer be relied upon; (iii) it would be restating the financial statements due to material misstatements contained therein relating to its Lake City Contract; and (iv) Orbital ATK's internal controls were not effective and suffered from additional material weaknesses.

129.   In a report on Form 8-K filed with the SEC ("August 10, 2016 8-K"), Orbital ATK disclosed that the misstatements "relate primarily to" the Lake City Contract. The August 10, 2016 8-K continued:

> After considering the misstatements . . . the Company believes that the [Lake City] Contract will result in a net loss over its 10-year term. Under generally accepted accounting principles, the Company is required to record the entire anticipated forward loss provision for a contract in the period in which the loss becomes evident. The Company believes that a forward loss provision should have been recorded for the Contract in fiscal 2015, which was the first year of large-scale production under the Contract.
>
> The misstatements were discovered in connection with management's enterprise business optimization program, working capital efficiency initiative and ongoing efforts to enhance accounting controls and oversight. Management subsequently identified that the underlying costs estimate at completion for the Contract in prior periods contained misstatements which, when corrected, indicate that the Contract's estimated costs were in excess of the contracted revenues of $2.3 billion, necessitating a forward loss charge for the 10-year term of the contract.

130.    With regard to the financial impact, Orbital ATK reported that the loss would "reduce previously reported pre-tax operating income by approximately $400 million to $450 million, after-tax net income by approximately $250 million to $280 million, and the applicable balance sheet accounts including retained earnings by approximately $250 million to $280 million."  In addition, it disclosed "[t]he misstatements also resulted in revenues being overstated by $100 million to $150 million, primarily in fiscal 2015, but also to a lesser extent in subsequent periods, and in unbilled receivables being overstated by $100 million to $150 million in fiscal 2015 and in subsequent periods."

131.    With regard to the material weaknesses in internal controls, the August 10, 2016 8-K revealed:

> The Company believes that the misstatements that caused the Restatement indicate the existence of one or more material weaknesses in its internal control over financial reporting and disclosure controls and procedures during the Restated Periods.  The Company will report those material weaknesses in its amended reports and in its Quarterly Report on Form 10-Q for the quarter ended July 3, 2016.

132.    The August 10, 2016 8-K stated that the Company would file an amended 2015 Form 10-KT and an amended 1Q16 Form 10-Q "as soon as reasonably practicable" and the Company had obtained an extension from its lenders until November 14, 2016 to do so.

133.    Thompson, Pierce, and Larson hosted a conference call later that day.  During the call, Pierce said, "I would hope that we will be filing in the next 45 days" and "we're not planning to take the [full] 90" day extension from the lenders.

134.    Thompson and Pierce admitted the losses on the Lake City Contract were evident from the beginning.  Thompson said that the Lake City Contract "had in fact, been in a substantial loss position since 2014, rather than the roughly breakeven profit level that had been previously recorded."  Pierce noted that it was not until fiscal year 2015 that the new Lake City

Contract "moved into high-rate production" as it was "the first year of large-scale production under the contract."  Pierce acknowledged that the Company had been closely monitoring the contract by stating, "Despite vigorous and sustained efforts to achieve productivity improvements, and despite realizing substantial cost efficiencies, our Lake City team was unable to reduce the production costs far enough for the contract to be profitable."

135.    Pierce noted that the Lake City Contract was "very high volume, a very simple product that's probably got six or eight parts to the bill of material."  Relatedly, he acknowledged that as a result cost savings could only be achieved through cuts in labor and overhead, and "there's not a lot of room to move on that."  Perhaps most notably, Larson admitted that Lake City had only achieved "one-half to two thirds of the objective cost reduction that the bid anticipated."  This made clear how unrealistically low the Lake City Contract bid had been since, after achieving half to two-thirds of their cost reductions, they were still $400 million short of profitability.

136.    As to the financial impact, Pierce said the restatement was expected to reduce free cash flow in 2016, 2017, "and in future years."

137.    After these disclosures, the Company's stock price plummeted, dropping from a close of $89 per share on August 9, 2016 to a close of $71 per share on August 10, 2016, losing more than 20% of the value of the stock in a single day on trading volume of more than 8.7 million, more than 10 times the prior day's volume.  This drop wiped out more than a billion dollars of the Company's market capitalization, revealing the economic loss and damages to the putative Class who bought the stock at artificially inflated prices prior to the disclosure.

138.    On August 10, 2016, Wells Fargo analysts commented that while the 20% drop in shares "may seem harsh [it] can be justified" by, among other things, "a surprisingly large

accounting revision in a single business (small-caliber ammo) when investor sentiment was very positive."   As a result, Wells Fargo revised its earnings and EPS estimates downward, "stemming from . . . booking $200MM+ of ammo sales at a zero margin."  Wells Fargo reflected investor disappointment by commenting: "We find the magnitude of the revision remarkable – particularly for a program where it would seem costs would be more estimable (raw material prices are fixed).  The annual FCF headwind from this ammo contract will now be $25MM-$30MM."

139.   Wells Fargo noted the disclosure came after Orbital ATK "stock had been receiving increased investor interest" because its "outlook implied above-average . . . margin expansion," but "[w]ith the announced forward loss on the Lake City contract . . . those targets are all now more challenging."   Wells Fargo reiterated that the "forward loss and unbilled receivable write-down for the Army small-caliber ammunition program were surprises."

140.   Likewise, Barclays lowered its 12-month price target and discussed its disbelief that such a large loss could be missed when it commented:

> Our perspective on the Lake City contract restatement is that OA's principal failure on the evaluation of this contract was not digging into it enough in the due diligence process of the ORB/ATK combination.  At the time, this was ATK's largest single contract, and after a loss of a similar (but much smaller) contract at the Radford Army Ammunition Plant (RAAP) to BAE, we think most assumed ATK would throw in an extremely aggressive bid to avoid losing the once-in-a-decade recompete for Lake City . . . . [W]e would've hoped that if legacy ATK's assumptions were too aggressive in the out-years of this ten-year contract, Orbital's management would've caught it and corrected for it at the time of purchase.  Apparently that wasn't the case . . . . [W]e'd also have to assume that the hit to management credibility will linger for some time, making peer multiples difficult if not impossible to achieve.

141.   Jefferies analysts also lowered their 12-month price targets and noted, "There has been a management change at the unit and new business practices put into place."

## POST-CLASS PERIOD DEVELOPMENTS

142.    On August 23, 2016, Wells Fargo issued another analyst report reiterating that "the magnitude of the expected charge is surprisingly large, considering that most of the cost-of-goods sold for this work are fixed-price metals."

143.    On November 3, 2016, Orbital ATK announced that its 2Q16 Form 10-Q would be further delayed, it would not be releasing its quarterly report on Form 10-Q for third quarter 2016 ("3Q16 Form 10-Q") on time, and it had still not completed the restatement.  Contrary to its statement in August that the loss first became evident in fiscal 2015, the Company disclosed that it "has now preliminarily determined that the majority of the Contract loss provision should be recorded at the inception of the Contract which occurred in fiscal 2013."  The Company estimated that the restatement will reduce (i) pre-tax operating income by approximately $350 million, rather than the approximately $400 to $450 million previously estimated, and (ii) after-tax net income by approximately $220 million, rather than the approximately $250 million to $280 million previously estimated.  Orbital ATK also revealed that it had obtained an extension from its lenders to file its financial statements on or before February 14, 2017.

144.    On November 8, 2016, the Company held a conference call.  At the start of the call, the Company said that Thompson, Pierce, and Larson would not be able answer any questions about the ongoing restatement process.  Nevertheless, an analyst sought clarification as to when the forward loss should have been recorded.  Pierce said that the Company had determined that "the majority" of the forward loss was evident in fiscal 2013, "at inception" of the Lake City Contract.  The analyst commented that "the issues date back that far, always did," to which Pierce responded, "That's what we have verified."

145.    On February 14, 2017, Orbital ATK did not file its restatement and instead disclosed that it would be filing its restated 2013, 2014, and 2015 financial statements by the end

of February 2017.  Orbital ATK disclosed that it had received another extension from its lenders to file its 2016 financial statements on or before April 14, 2017.

146.    On February 24, 2017, Orbital ATK filed its amended Form 10-K for the nine-month transition period ending December 31, 2015 ("Amended 2015 Form 10-KT").  In the Amended 2015 Form 10-KT, Orbital ATK restated its results for the 2015 nine-month transition period, fiscal year 2015, and fiscal year 2014.  The Amended 2015 Form 10-KT disclosed that the Audit Committee determined that those previously issued financial statements, as well as the last three quarters of 2013, all quarters in fiscal 2014, and the first quarter financial statements for 2016 "should no longer be relied upon as a result of misstatements."  The Amended 2015 Form 10-KT said that the restatements were primarily related to the Lake City Contract wherein "misstatements in the estimation of contract costs at completion caused a forward loss provision to not be timely identified and recorded in prior periods."  The Amended 2015 Form 10-KT stated that the Lake City Contract would result in a $373.5 million loss, all of which was "evident" on or before the start of the Class Period.

147.    Contrary to both the August and November claims, the Amended 2015 Form 10-KT said the majority of the loss was evident in fiscal 2014.  Specifically it said that "[t]he Company determined that $31.5 [million] of the loss was evident at contract signing (second quarter of fiscal 2013) and $342 [million] became evident at the time of initial production (second quarter of fiscal 2014)."  As a result, the Amended 2015 Form 10-KT "restated those periods and the consequential impact in subsequent periods."

148.    In addition to restating Orbital ATK's previously issued financial statements, the Amended 2015 Form 10-KT confirmed that it served "to restate management's report on internal

control over financial reporting . . . to disclose the additional material weaknesses" as well as to restate its auditors' prior reports over internal controls.

149.    Leaving no doubt that the restated items were material, at various points in the Amended 2015 Form 10-KT, the Company noted that, in contrast to the restated items, it had identified other errors that were "immaterial" and not being corrected.  More explicitly, it conceded that "the Company's costs will exceed expected revenues under its long-term contract . . . resulting in a material net loss over the contract's term."

150.    In addition, the Amended 2015 Form 10-KT revealed that the Company's stated Accounting Policy, which was developed or approved by Hollis Thompson as the PAO, failed to comply with GAAP as it erroneously excluded general and administrative costs from the measurement of forward losses.

151.    On February 27, 2017, the first business day following the filing of the Amended 2015 Form 10-KT, the Orbital ATK Board of Directors elected Christopher Voci to "replace[] Hollis M. Thompson, Vice President of Financial Reporting, as the Company's principal accounting officer."

152.    Although the Lake City Contract had been considered a ten-year benefit for Orbital ATK, the Amended 2015 Form 10-KT now claimed the initial seven-year term was subject to a three-year extension but "it is probable that we will provide written notice of rejection of the additional three-year award term" because of the massive losses.  In response, analysts from Credit Suisse commented that cancellation "is good because it means a bad contract ends sooner."

153.    Among the consequences of the Company's inability to timely file accurate financial statements, the Amended 2015 Form 10-KT disclosed that such failures "limits our

access to the public markets to raise debt or equity capital" and that Orbital ATK was therefore "ineligible to use shorter and less costly registration forms, such as Form S-3, to register [its] securities for sale until approximately one year from the date we regain and maintain status as a current filer."

154.   The Company also revealed that it was the subject of a "non-public" investigation by the SEC.  It also disclosed the existence of this lawsuit and that the restatement "could result in government enforcement actions and adverse determinations in litigation" for which the Company was unable to "estimate our potential exposure."

155.   The Amended 2015 Form 10-KT removed misleading statements that referred to "profit" from the Lake City Contract from its previously issued 2015 Form 10-K and 10-KT. Specifically, it deleted the statement: "As a result of the significant competition for this [Lake City] contract, we have experienced a reduction in profit margin in the Small Caliber Systems division following the implementation of the contract."   In addition, it corrected the prior statement that Lake City costs "could also have an adverse effect on our operating results and profit margin" by deleting "profit margin" and replacing it with "further increase our net loss under that contract."

156.   On March 8, 2017, Orbital ATK held a conference call and disclosed certain of its unaudited fourth quarter and full year 2016 results.  During the call, Thompson said that the Company was still working to file "the 2016 10-Qs and 10-Ks as soon as possible."  In response to an analyst question about the negative impact on cash flow from the Lake City Contract loss for the remaining contract term, Pierce stated that it would have a pre-tax negative impact of around $35 to $40 million each year.  Thompson likewise acknowledged there would be a "cash flow deficit coming out of the remaining three plus years on the Army ammo contract."

157.    On April 3, 2017, Orbital ATK filed its amended quarterly report on Form 10-Q for first quarter 2016 ("Amended 1Q16 Form 10-Q"), in which the Company restated its financial statements for 1Q16 due to misstatements related to the loss on the Lake City Contract and the Company's erroneous accounting policy.  The restated items included total current liabilities, retained earnings, and net receivables, as discussed herein.  ¶¶108-109.

158.    The next day, April 4, 2017, Orbital ATK filed its 2Q16 Form 10-Q.  Then, on April 7, 2017, Orbital ATK filed its 3Q16 Form 10-Q.  In each of the three quarterly filings for 2016, Orbital ATK confirmed that it continued to suffer from the same uncorrected material weaknesses in internal controls identified in the Amended 2015 Form 10-KT and that remediation efforts were ongoing.

159.    Orbital ATK was unable to timely file its 2016 annual report on Form 10-K ("2016 10-K") to include its fourth quarter results.  Instead, the Company announced that it had been forced to seek and obtain another extension by its lenders to file the 2016 10-K to June 30, 2017.

## ADDITIONAL INDICIA OF SCIENTER

**Defendants' Responsibilities for the Company's Public Statements**

160.    In their respective roles as CEO, CFO, COO, and PAO, Thompson, Pierce, Larson, and Hollis Thompson were able to, and did, control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  Thompson, Pierce, and Larson attended conference calls and spoke on behalf of the Company throughout the Class Period.  *See, e.g.*, ¶¶65, 67, 70-71, 74-75, 78, 82, 85, 88-89, and 93-94.  Thompson and Larson were repeatedly quoted in the Class Period releases alleged herein to be false and misleading (*see, e.g.*, ¶¶64, 69, 73, and 84), and Pierce signed the Form 8-Ks which were submitted to file those releases with the SEC.  Thompson, Pierce, Larson, and Hollis

Thompson participated in the drafting, preparation, and/or approval of such public statements and were provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.

161.    Hollis Thompson, as PAO throughout the Class Period, had the ultimate responsibility for setting accounting policies and ensuring compliance with GAAP.  In that role, Hollis Thompson had day to day responsibility for the Company's accounting and would have had direct and supervisory responsibility for, and access to reports relating to, the accounting for the Lake City Contract.  The PAO is the person directly responsible for resolving accounting issues and the ultimate company authority on GAAP.

162.    As a Director, DeYoung also had the ability to review, approve, and modify Orbital ATK's public statements.  For example, Thompson, Pierce, Hollis Thompson, and DeYoung signed the 2015 Form 10-K and 2015 Form 10-KT.  Accordingly, the Individual Defendants are responsible for the accuracy of the public reports and releases detailed herein and are therefore liable for the misrepresentations contained therein.

163.    During and prior to the Class Period, as senior executive officers and directors of Orbital ATK, Thompson, Pierce, Larson, Hollis Thompson, and DeYoung were privy to confidential and proprietary information concerning Orbital ATK, and its operations, finances, financial condition, internal controls and present and future business prospects, including the financial performance of the Lake City Contract.  Each of them also had access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, as well as reports and other information provided to them in connection therewith.  Because of their

possession of such information, each of them knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

164.    The Individual Defendants made specific statements about the Lake City Contract, its performance, and its impact on margins, as well as statements regarding internal controls and the Company's accounting and financial performance, further confirming that they had access to such reports and information.

165.    Moreover, throughout the Class Period, Thompson, Pierce, and Larson held themselves out to investors and the market as the persons most knowledgeable about Orbital ATK's accounting, financial performance, and business operations and specifically the performance of the Lake City Contract in discussing such matters during quarterly conference calls.   These Defendants were the persons with ultimate responsibility for directing and managing the Company's business, financial reporting, and communications to investors, and they were required not only to keep themselves informed of the Company's day-to-day business and operations, but also to keep Orbital ATK's non-management directors apprised of the state of the Company's business and operations.

166.    By executing SOX Certifications, Thompson and Pierce undertook the affirmative obligation to ensure the Company's disclosures to the market were true and to obtain the requisite knowledge of material information, like the performance of one of the Company's largest contracts, the Lake City Contract.   In fact, through signing the SOX Certifications, Thompson and Pierce certified that they had designed "disclosure controls and procedures . . . to ensure that material information relating to the registrant . . . is made known to us by others . . . particularly during the period in which [each] report [was] being prepared."

**Defendants Closely Monitored the Lake City Contract**

167.    The Individual Defendants' access to the Lake City Contract, its costs and estimated costs of production, prior production costs, and revenues is confirmed both by their affirmative obligation to ensure that material information relating to the critically important Lake City Contract was provided to them and by the fact that ammunition sales, profits, and margins, were discussed at conference calls throughout the Class Period.

168.    As admitted at the end of the Class Period, all of that information made evident that the Lake City Contract was priced at hundreds of millions of dollars below cost and that Orbital ATK was only achieving approximately half of the cost savings required to make the contract profitable.

169.    Defendants' obligation to monitor the costs and performance of the Lake City Contract is reflected by its importance to the Company's profitability.  The Lake City Contract continued to be Orbital ATK's largest contract for fiscal 2015 and accounted for 9%, 13% and 7% of the Company's total sales in fiscal 2014, fiscal 2015 and the 2015 transition period, respectively.  It also represented as much as 22% of the Defense Systems Group's revenue during the Class Period, and the Defense Systems Group was the Company's largest segment from both a revenue and employee standpoint.  Due to the contract's importance to the Company's profitability and the profitability of its most important segment, Defendants closely monitored the Lake City Contract and discussed its volumes and impact on profit margins each quarter.

170.    Defendants were also required to monitor and analyze the Lake City Contract as part of the Company's impairment testing of certain assets.  Defendants represented in the 2015 Form 10-K and Amended 2015 Form 10-KT that the Company reviews "property, plant and equipment" for impairment "when indicators of potential impairment are present" and "[w]hen

such impairment is identified, it is recorded as a loss in that period." Defendants further stated that "[t]he Company tests goodwill for impairment . . . upon the occurrence of events or changes in circumstances that indicate that the asset might be impaired." To ensure compliance with such accounting policies, Defendants, and in particular Hollis Thompson as the PAO, were required to monitor the Lake City Contract in conducting these impairment analyses in each reporting period. In fact, after admitting the Lake City Contract losses, Orbital ATK wrote off approximately $3.7 million of goodwill recorded at Small Caliber Systems as well as $48 million in long lived assets at the Lake City plant.

171. Beyond its financial impact, as the senior managers of the business, Defendants were required to closely monitor the performance of Lake City because it gave Orbital ATK operational control of a U.S. Army facility and made Orbital ATK the primary small-caliber ammunition supplier to the U.S. Army. Terms of the agreement required the Company to maintain a "SECRET" facility security clearance and to maintain stringent safety, storage, transportation, and testing standards. It also required Orbital ATK to maintain and regularly deliver information about Lake City's operations and performance to the U.S. Army, including weekly production status reports, weekly management level updates regarding production and quality, monthly delivery status reports, and projected costs and schedules for modernization projects. The Company was subject to U.S. Government investigations and could be suspended or disbarred from government contracts based on the results. In fact, the Amended 2015 Form 10-KT disclosed that "[u]nder government regulations, a company, or one or more of its operating divisions or subdivisions, can also be suspended or debarred from government contracts . . . based on the results of investigations" and admitted that the Company was being subjected to such U.S. Government investigations.

172.    DeYoung told investors that Alliant closely monitored Lake City with "meetings every month" and tracked the profitability of the Lake City Contract with a "very sophisticated model."   After the Merger, DeYoung and Larson continued to be aware of the need for such monitoring and tracking in their high-ranking roles at Orbital ATK, and, Thompson, Pierce, and Hollis Thompson as CEO, CFO, and PAO took over the responsibility for holding those meetings and tracking the performance models for Lake City.   At the end of the Class Period, Thompson, Pierce, and Larson essentially admitted they had been doing so when they said they had been aggressively seeking to cut costs at Lake City.

**Red Flags Indicated that the Lake City Contract Was Operating at a Loss**

173.    As PAO, Hollis Thompson set the Company's accounting policies and ensured they complied with GAAP.   Given his education, CPA designation, former experience as an audit manager, and long tenure as the PAO at Orbital ATK and its predecessor Orbital Sciences, Hollis Thompson knew or recklessly disregarded that Orbital ATK's accounting policy, which applied to the Lake City Contract, failed to comply with GAAP in that it erroneously excluded general and administrative costs from its forward loss measurements.   This was an enormous red flag that the Lake City costs were understated because they did not include an entire category of obvious, material costs.

174.    The high risk of issuing materially false financial statements due to this erroneous accounting policy approved by Hollis Thompson as PAO was amplified because the Lake City Contract was aggressively bid, its profitability was dependent upon achieving hundreds of millions in cost savings that had never been achievable in the Company's long history of manufacturing ammunition, and Defendants were already reporting razor-thin profit margins on the Lake City Contract.   This meant that actually booking all relevant costs as required by GAAP

would have converted the reported "roughly breakeven profit level" on the Lake City Contract into a loss.

175.    Each of the Individual Defendants knew that the Lake City Contract was aggressively bid based on the numerous public statements by DeYoung and Alliant and because it was bid after Alliant had lost out on the Radford contract.  From the time Alliant was awarded the contract, and throughout the Class Period, Defendants discussed their awareness that the Lake City Contract was going to result in lower "profit" margins (though concealing that the margins were negative).

176.    The Company was reporting a "roughly breakeven profit level" on the Lake City Contract which also required close scrutiny because SEC Staff Bulletin No. 99 specifically provides that even small amounts can be material when they make the difference between recording a profit or a loss.  Heightening the need for close monitoring was the fact that prices were set to decline over the life of the contract and as volumes increased.

177.    Given Alliant's long history of manufacturing ammunition at Lake City, Defendants had considerable records on costs of production and knew or recklessly disregarded that the Company's ability to cut costs by $750 million or more[9] was unrealistic.  As admitted on February 24, 2017, Alliant had issued a bid for the Lake City Contract at a "significantly lower price . . . than [Alliant] had experienced under the predecessor contract."  Since these were high volume, low cost bullets that were sold for approximately $0.25 each, cost cutting opportunities were severely limited.

---

[9]    Defendants disclosed that after achieving half to two-thirds of the cost savings they were still approximately $375 million short of profitability which suggests the break-even price on the Lake City Contract was $3.05 billion based on prior costs of production.  In attempting to cut costs to $2.3 billion, Orbital ATK got only half way there.

178.    Pierce stated that ammunition produced at Lake City is "a very simple product" and that the "single largest [cost] component in [the Lake City Contract] is the material," which "is pretty much fixed."[10]   As a result, Pierce admitted there was "not a lot of room" to improve costs of production.   Since Alliant had attempted to run an efficient plant for over 10 years, reducing costs by 25% or more through layoffs was not possible.   Moreover, the layoffs implemented by DeYoung to enhance profitability took place prior to the Merger and therefore Defendants knew or recklessly disregarded based on the accounting records (relating to the first full year of production under the Lake City Contract prior to the start of the Class Period) that insufficient savings were being achieved to avoid massive losses.

179.    In addition to cost records regarding production under the old contracts and performance under the new Lake City Contract prior to the Merger, the fact that DeYoung negotiated the Merger so that he did not take the Lake City Contract with Vista should have been a further red flag to Thompson, Pierce, Hollis Thompson, and Larson since ammunition sales were to be Vista's leading business.   In addition, the Lake City Contract requirement that Orbital ATK incur additional costs to make facility improvements as consideration for commercial use of the plant made achieving profitability under the new contract even more challenging than in the past.

**The Simplicity of the Accounting**

180.    Alliant, Orbital Sciences, and thereafter, Orbital ATK, were required to report their financial statements in accordance with GAAP.   SEC Regulation S-X (17 C.F.R. §210.4-

---

[10]   The Lake City Contract included an "Economic Price Adjustment" clause and a "Currency Fluctuation Provision" that provided for price adjustments based on changes in metal prices or foreign currency rates.

01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.

181.    The Lake City Contract was required to be accounted for as a long-term contract in accordance with GAAP as prescribed by ASC 605-35, Revenue Recognition Construction-Type and Production-Type Contract ("ASC 605-35").  Under ASC 605-35, sales are accounted for under the "percentage-of-completion method" meaning revenues are recorded on a pro-rata basis based on the percentage of the contract completed.

182.    Defendants were required under GAAP to maintain a sophisticated cost accounting system to accurately track the costs of the Lake City Contract.  Specifically, in order to use the percentage-of-completion accounting method, ASC 605 requires that "contract costs shall be identified, estimated, and accumulated with a reasonable degree of accuracy."  It continues: "entities with significant contracting operations generally have the ability to produce reasonably dependable estimates and for such entities the percentage-of-completion method of accounting is preferable in most circumstances."

183.    In other words, Defendants' selection of the percentage-of-completion accounting method was an implicit admission that they were able to accurately track actual costs of the Lake City Contract.  Having such information, Defendants were required to book the loss at the start of the Class Period.

184.    In addition to what GAAP required, the Lake City Contract provided that in order to receive any progress payments, Orbital ATK was required to maintain adequate accounting standards and provide best estimates "of total costs to complete all remaining contract work required under the contract."

185.     Defendants, and in particular Hollis Thompson as PAO, had decades of experience accounting for long-term contracts with the U.S. Government.  GAAP, as well as Orbital ATK's stated Accounting Policy, required them to perform a detailed review of the Lake City Contract at each quarter-end to determine if it was operating at a loss.  Given their experience with accounting for long-term government contracts using the percentage-of-completion standards, Defendants were very familiar with the accounting rules applicable to such contracts.

186.     The failure of Orbital ATK's accounting policy to comply with GAAP, in that it excluded certain costs from the calculation of total costs under the Lake City Contract, was not the result of a change in accounting standards.  Similarly, the restatement did not result from any new accounting rule or any changed interpretation of existing rules.  Rather, the restatement related to long standing accounting rules that Hollis Thompson had decades of experience, education, and training applying.

187.     In addition to having years of experience applying the accounting rule, the rule is simple. If total production costs to date plus estimated future costs exceed total estimated revenue on a contract, the contract is considered to be in a "forward loss" position and that loss must be recognized immediately.  More specifically, ASC 605-35-25 provides that "GAAP requires recognition of the entire anticipated loss as soon as the loss becomes evident." Thompson, Pierce, Hollis Thompson, and DeYoung signed Orbital ATK's SEC filings which explicitly required the Company to record a loss on a long-term contract "[i]n the period in which it is determined that a loss will be incurred on a contract."

188.     The Lake City loss was not the result of unexpected cost increases that subsequently arose and made prior costs or cost estimates unreliable.  Rather, as Defendants

acknowledged at the end of the Class Period, the forward losses were already "evident" in the earlier periods in which the false financial statements were issued, meaning all of the information to accurately calculate or estimate costs existed at that time.  In addition, Defendants reported a profit based on an assumption that they would achieve hundreds of millions of dollars in cost savings over prior production costs.  To support the action they had taken in reporting a profit, Defendants needed affirmative evidence that those savings were being achieved, but did not have it, as acknowledged at the end of the Class Period.

189.    Moreover, the nature of the product supports the simplicity of calculating and estimating costs of production.  The cost estimates in this case were straightforward given that the bullets were low cost high volume items.  Orbital ATK sold the bullets for roughly $0.25 each and had over a ten-year history of making billions of bullets and recording costs of production.  Analysts from Wells Fargo at one point commented that failure to accurately estimate costs under the Lake City Contract would be "remarkable" because of these factors.

190.    The fact that Orbital ATK withdrew and restated its Class Period financial statements is an admission that they were false, and materially so, based on information available to the Defendants at the time the results were originally reported.  GAAP only allows a restatement of prior financial statements based upon information that existed at the time the financial statements were prepared.  Restatements do not take into account subsequent information that did not and could not have existed at the time the original financial statements were prepared.  Defendants confirmed that all of the information to record the loss was available at and prior to the issuance of the false financial statements, when Orbital ATK acknowledged in its restatement that "$32 million of the loss should have been evident at contract signing" during

the second quarter of fiscal 2013 and "$342 million should have been evident at the time of first production" in the second quarter of fiscal 2014.

191.    The Lake City Contract was awarded in September 2012 and took effect in or around October 2013.   For fiscal 2015, the Lake City Contract was the Company's largest contract and it had been in a forward loss provision for more than two years.   Moreover, production under the contract had "ramped up" in fiscal 2015 providing clear visibility into the losses it was generating and the inability to achieve the cost savings required to avoid the massive losses.

192.    Given the size of the Lake City Contract, the impact of the restatement was substantial.   It impacted four years-worth of financial statements, revealed material weaknesses in internal controls, and eliminated more than $370 million in Pre-Tax Operating Income, exceeding the Company's entire Pre-Tax Operating Income for the transition period 2015.

**Defendants' Disregard for Accurate Accounting and Financial Reporting**

193.    Thompson and Pierce were responsible for establishing and maintaining effective internal controls over financial reporting pursuant to the Sarbanes-Oxley Act of 2002 but failed to do so.   During the Class Period, Thompson and Pierce assured investors that Orbital ATK's internal controls were designed, and operating, effectively to prevent or detect material misstatements.   This disclosure meant that Orbital ATK did not have any material weakness in internal controls over financial reporting.   Such assurance was critical to the reliability of Orbital ATK's financial statements because a material weakness is a:

> [S]ignificant deficiency, or combination of significant deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected.

194.   Orbital ATK has acknowledged that Thompson's and Pierce's certifications of internal controls were false and that Orbital ATK suffered from several long-standing material weaknesses in its internal controls.

195.   On March 15, 2016, Orbital ATK announced that its financial "disclosure controls and procedures were not effective as of December 31, 2015."   Orbital ATK admitted that Thompson and Pierce had initially concluded that they were effective earlier in 2015 but "re-evaluated their conclusions" and "concluded that the Company's disclosure controls and procedures were also not effective as of July 5, 2015 and October 4, 2015 because of the material weaknesses . . . that existed at that time."

196.   Having admitted material weaknesses in internal controls in March 2016, Orbital ATK was required to undergo remediation to ensure that controls were effective.   The material weaknesses in internal controls Orbital ATK admitted in March 2016 related specifically to accounting for percentage-of-completion contracts, like the Lake City Contract.   More directly, Orbital ATK admitted also that it "did not maintain controls over the integration of accounting operations of the two merged companies [Orbital Sciences and Alliant] and over the preparation, analysis and review of accounts of the combined business."   The Company disclosed it needed to hire more and better qualified accountants and improve training.   *See* ¶¶118, 121(b). Identification of these material weaknesses would have required Defendants to thoroughly evaluate their controls over accounting for the Lake City Contract, yet, they concealed or recklessly disregarded the additional material weaknesses that were not disclosed until August 2016.

197.   The additional material weaknesses included a failure to maintain an effective control environment at the Defense Systems Group (the Company's largest segment) and its

Small Caliber Systems Division (the largest division in the Defense Systems Group).   The
Amended 2015 Form 10-KT stated:

> [T]he Small Caliber Systems Division did not maintain a control environment
> where procedures to escalate accounting issues to Defense Systems Group or
> Corporate management were followed, which led to the suppression of
> information by Small Caliber Systems Division management related to cost
> overruns and the override of certain controls due to pressure to achieve cost
> savings and maintain a targeted profit rate . . . the material weakness in our
> control environment contributed to a material weakness at the Small Caliber
> Systems Division, where the Small Caliber Systems Division did not design and
> maintain controls related to the preparation, review and approval of costs incurred
> and contract estimates used to determine revenue.

198.    In addition to having multiple material weaknesses and further demonstrating the
lack of regard for proper controls and compliance with GAAP, the Company had to restate
certain other financial results during the Class Period.   As the Company disclosed in its
Amended 2015 Form 10-KT, the fact that it had "restated . . . financial statements twice in 2016 .
. . may lead to additional risks and uncertainties, including loss of investor confidence and
negative impacts on our stock price."

199.    The Company's remediation efforts further demonstrate how open and obvious
the undisclosed material weaknesses in internal controls were at Orbital ATK.   For example, the
accounting personnel and cost estimating processes were so ineffective that, according to the
Amended 2015 Form 10-KT, the Company had to, among other things, hire 11 new accounting
professionals "with the appropriate levels of accounting and controls knowledge, experience and
training," redesign, develop, and implement "processes and controls over the execution of
purchase accounting," revise "account reconciliation policy and controls," and "develop[]
extensive analysis and procedures to develop our management estimates going forward."   The
Company's reported efforts to "design[] an enterprise-wide process to timely identify, track and
appropriately resolve and conclude on complex transactions and disclosures," effectively

admitted that Thompson, Pierce, and Hollis Thompson had failed to ensure such process had existed previously.

200.    The depth of the inadequacy was further confirmed by the Company's inability to issue financial statements for eight months after Orbital ATK acknowledged the falsity of its fiscal year 2015 financials and the inadequacy of its internal controls.  When disclosing the Company was unable to issue its 2Q16 financial statements on time, Defendants claimed the Company would file by November 14, 2016 and Pierce claimed it would not take that long. ¶¶132-133.  Because the errors were so significant and accounting controls so deficient, the date got repeatedly delayed until April 4, 2017, over one month after Hollis Thompson was replaced and a new PAO was brought in by the Board of Directors.  *See* ¶¶143, 145, 151, 158.

201.    The lack of regard for accurate disclosures and proper accounting controls is further confirmed by the Defendants' inability or unwillingness to accurately state the amount or timing of the losses from the Lake City Contract.  In August 2016, the Company initially claimed the Lake City Contract loss was evident and should have been recorded in fiscal 2015 and would reduce Pre-Tax Operating Income by $400 to $450 million.  Then, in November 2016, the Company claimed the loss should have been recorded in fiscal 2013 and it would reduce Pre-Tax Operating Income by $350 million.  Ultimately, the Amended 2015 Form 10-KT contradicted both prior disclosures on both timing and amount, stating the forward loss was $373.5 million and should have been recorded primarily in fiscal 2014.  *See* ¶¶130, 143, 146-147.

202.    The Company acknowledged that the multiple restatements and admissions of material weaknesses had made it "the subject of a non-public investigation" by the SEC.  Apart from the multiple restatements, Defendants had received warnings from the SEC that their reporting was potentially misleading in other respects as well.  For example, on February 4,

2016, the Company received an SEC Comment Letter regarding the 2015 Form 10-K and 3Q15 Release, telling the Company to "ensure that all non-GAAP financial measures are given titles that are not the same or confusingly similar to the titles used for the GAAP measures."

203.    On February 10, 2016, the Company responded and acknowledged, "in all future filings, we will (i) title all non-GAAP measures appropriately to distinguish them from GAAP measures and (ii) present and discuss the GAAP financial measures with equal or greater prominence than any non-GAAP measures."  The SEC warnings, prior restatement, and prior admission of material weaknesses are further support that the Defendants knew or recklessly disregarded the true facts disclosed at the end of the Class Period.

**Delaying Disclosure of the Lake City Contract Loss Was Critical to Promoting the Success of the Merger**

204.    Defendants were under significant and unique pressure to report the success of the Merger.  The Merger also was designed to and did elevate the positions of Thompson, Pierce, Hollis Thompson, and Larson, and provided a significant financial benefit to each defendant. Following the Merger, the Company approved "meaningful increases to the base salary and annual incentive components of compensation to recognize the leadership and experience required of our executive officers in successfully executing our integration plans following the Merger."  Thompson was given a 21% salary increase and Larson was given a 37% salary increase.[11]  Larson was also awarded a $573,000 cash "transaction and retention" bonus by Alliant that was contingent on the closing of the Merger.

205.    In addition, the largest weighted component (25%) of Thompson, Pierce, and Larson's post-Merger annual incentive compensation was achieving "Operations and Integration

---

[11]   DeYoung received a $1 million per year salary at Vista and was entitled to $5 million worth of Vista stock, in addition to compensation he would receive as a director of Orbital ATK.

Milestones."   Thompson, Pierce, and Larson were awarded $1.5 million, $840,000, and $800,000, respectively, in incentive compensation for the transition period 2015 for their success with respect to Orbital ATK's falsely reported performance and success in integrating operations.   In explaining the 2015 performance highlights related to executive compensation, the Company noted that the stock price increased by 40% throughout 2015, the Company realized "cost synergies from the Merger of more than $80 million," and the Company completed "substantially all transition/integration activities."

206.   Moreover, just prior to the Merger, Orbital Sciences had reported several quarters of disappointing results and suffered a major product failure.   Although analysts questioned whether DeYoung had negotiated the more favorable deal for Alliant's shareholders given the Exchange Ratio, the deal was even worse than analysts knew.   The analysts remained unaware that the Lake City Contract, which was to be taken over by Orbital ATK, was such that it would necessarily result in massive losses over the life of the contract.   And, DeYoung was free to operate Vista's ammunition business without the burden of the Lake City Contract.

207.   The success of the Merger was quantified by analysts who reported purported synergies as conveyed by Defendants.   For example, analysts from KeyBanc wrote in a February 8, 2015 report that "Top- and bottom-line synergy realization . . . will be critical to meeting expectations."   On February 11, 2015, analysts from Wells Fargo likewise identified the "$150-200MM of annual revenue synergies and $70-100MM of annual cost savings from the merger" as the "Value Drivers" to investment in Orbital ATK.

208.   Reporting the Lake City Contract loss immediately following the Merger would have substantially outweighed the purported synergies and immediately called into question Thompson's and Pierce's judgment in entering into and negotiating the terms of the Merger and

their public representations concerning the Merger.  Delay gave the Company time to show progress on the synergies and spin the Merger as a success rather than another failure.

**Insider Trading**

209.    None of the Defendants purchased shares of Orbital ATK common stock on the open market during the Class Period.  Between the close of the Merger and the end of the Class Period, DeYoung sold almost $14 million of Orbital ATK stock on the open market, nearly 14 times his annual salary at Alliant or Vista.  These sales, which occurred between March and June 2015, involved DeYoung exercising options that were not set to expire for several years.  DeYoung's sales were extraordinary in both timing and amount as prior thereto, DeYoung had not reported a sale of a single share of Orbital ATK or Alliant stock since December 2009, or more than five years.

210.    Similarly, on May 17, 2016, less than three months before the Lake City Contract loss was revealed (and while Orbital ATK stock was trading near then all-time highs at close to $90 per share), Thompson sold 5,000 shares of Orbital ATK stock for $435,000.  Thompson's last reported sale of Orbital ATK or Orbital Sciences stock prior thereto was in November 2013, before the announcement of the Merger.

**DeYoung's and Larson's Roles at Alliant**

211.    As senior executive officers of Alliant, DeYoung and Larson also had access to confidential information concerning Alliant, including its Lake City Contract bid and the financial performance of the Lake City Contract while under the operation of Alliant.

212.    DeYoung was Alliant's CEO, and Larson was a high-ranking Alliant executive when the Lake City Contract – Alliant's largest contract – was bid and won.  DeYoung was intimately involved in the Lake City Contract from its inception.  During the first two years of Alliant's original 2000-2010 Lake City contract, DeYoung served as President of Alliant's Lake

City operation (which, at that time, was called "Alliant Lake City Small Caliber Ammunition Company, LLC."). As the head of Alliant's ammunition division, DeYoung continued to oversee Lake City's operations. Additionally, in 2012, he was the CEO responsible for bidding on and securing the Lake City Contract.

213.   On a February 23, 2012 conference call, DeYoung explained how intimately he was involved with Lake City, noting he previously had "lived at" and "r[a]n" the Lake City plant. On Alliant conference calls, moreover, DeYoung routinely discussed his monitoring of the costs and profitability of the "highly contested" and "aggressive" Lake City Contract, which was competitively bid and would result in "margin pressure" and "reduced revenue." Larson was also involved in efficiency initiatives at Lake City, as made clear by DeYoung's references to Larson and himself as "believers" in such efforts.

214.   While DeYoung and Larson were executives at Alliant, the company's fiscal year 2014 operating income was overstated by approximately 160% and EPS was overstated by approximately 190%. This overstatement allowed Alliant to report EPS of $10.42, exceeding the guidance provided to investors on January 30, 2014 of $9.50 to $9.80 per share and almost 200% beyond what Alliant would have reported had it accurately accounted for the Lake City Contract. Without the inflated financial results, Alliant's EPS would have been $3.58 per share.

215.   As a result of the inflated results, DeYoung and Larson received substantial bonuses that they would not have been entitled to if the loss on the Lake City Contract had been timely reported. For example, in fiscal year 2014, 50% of DeYoung's annual incentive bonus and 25% of Larson's annual incentive bonus were dependent on Alliant meeting its threshold EBIT target of $420 million. If Alliant had reported the forward loss and complied with GAAP, Alliant's EBIT would have been less than $300 million, and DeYoung and Larson would not

have been entitled to 50% and 25% of their annual incentive bonuses, respectively.   For DeYoung alone, this resulted in a $1.23 million windfall.  DeYoung was also awarded 100% of a $615,000 "discretionary" bonus in fiscal year 2014 based on the Board's assessment of his performance, which was influenced by the inflated results.

**Further Indicia of DeYoung's Scienter**



216.

217.

218.

220. ███████████████████████████████████████

████████████████████████████████████████████ added

222.



224.

226.

227.

229.

231.



233.

234.

**Further Indicia of Scienter for Pierce and Larson**



242.

**Additional Indicia of Scienter for Pierce**

245.



247.

248.

tements

**Further Indicia of Hollis Thompson's Scienter**

250.    Hollis Thompson was the highest ranking Orbital ATK officer[12] to face adverse employment action following the restatement.  The findings the Company chose to disclose regarding the restatement made clear that Hollis Thompson knew or recklessly disregarded the accounting fraud, which led to his replacement as PAO and departure from Orbital ATK.  Specifically, the disclosed findings trace to areas for which Hollis Thompson was responsible.

251.    Orbital ATK's stated accounted policy for calculating the costs of the Lake City Contract failed to comply with GAAP by excluding certain costs.  Hollis Thompson, as PAO, set or approved the erroneous policy.  In approving a policy that permitted the exclusion of relevant costs, Hollis Thompson set an improper tone for the entire finance organization within Orbital ATK.

252.    The Company disclosed it did not have sufficiently qualified accountants or a sufficient number of them during the Class Period, leading to the hiring of 11 additional accountants with adequate experience and training.  The Amended 2015 10-KT also disclosed

---

[12]    As PAO, Hollis Thompson was a Section 16 officer pursuant to SEC rules.  Section 16 officers include an issuer's president, principal financial officer, principal accounting officer, any vice-president in charge of a principal business unit, and any other officer who performs a policy-making function.  17 CFR 240.16a-1 (Definition of Terms).

the Company had multiple weaknesses in internal controls at multiple levels of the organization. As PAO and Vice President of Financial Reporting with signature authority for the financial statements, Hollis Thompson had responsibility for ensuring the Company had appropriate controls over financial reporting, including sufficient and competent accounting staff.

253.    The investigation revealed that the "Small Caliber Systems Division management" (a) did not maintain a proper control environment over financial reporting, (b) suppressed certain negative information, (c) overrode internal controls, and (d) did so as a result of pressure (which is necessarily applied from above) to achieve cost savings and maintain a targeted profit rate.    The investigation found other intentional misconduct such as the "inappropriate use of management reserves."    Several Small Caliber Systems Division management employees were fired as a result.   In addition, the widespread improper conduct resulted in discipline in the form of reduced compensation and forced additional training and supervision of individuals in the Defense Systems Group.   The inappropriate conduct of the Caliber Systems Division and Defense Systems Group, the exertion of undue pressure, and the lack of proper internal controls were all areas under the control and responsibility of the PAO, Hollis Thompson.

254.    It is clear that these were areas for which Hollis Thompson was responsible because in establishing its internal control over financial reporting ("ICFR"), the Company disclosed in its 2015 Form 10-K that Orbital ATK and its management adopted and followed the criteria set forth in *Internal Control – Integrated Framework* (Committee of Sponsoring Organizations of the Treadway Commission, 1992) ("*COSO Framework*").[13]  This meant that, as

---

[13]    SEC and Sarbanes Oxley rules require companies to use a suitable framework, such as the *COSO Framework*.    The *COSO Framework* was created in response to the *Treadway Commission Report*'s recommendation to establish guidance for public companies.    The

PAO, Hollis Thompson was primarily responsible for "designing, implementing, and monitoring the company's financial reporting system and internal accounting controls." *Treadway Commission Report* at 37. In this role, it was recognized that Hollis Thompson's "actions especially influence[d] employees who perform[ed] the accounting function." *Id.* As PAO, Hollis Thompson was required to be "familiar with the company's financial position and operations" and therefore able to "identify unusual situations caused by fraudulent financial reporting perpetrated at the divisional level." *Id.* Also, as PAO, Hollis Thompson "help[ed] set the tone of the organization's ethical conduct" and was "directly responsible for the financial statements," meaning he "c[ould] and should take authoritative action to correct them if necessary." *See id.* Moreover, as a financial executive (Vice President of Financial Reporting), Hollis Thompson's responsibilities included "track[ing] and analyz[ing] performance, often from operations and compliance perspectives, as well as a financial one." *COSO Framework* at 85. He would "commonly also have 'dotted line' responsibility for monitoring division, subsidiary or other unit activities." *Id.* At Orbital ATK, that would include overseeing the accounting departments at the corporate, group, and divisional levels.

255. Moreover, consistent with Orbital ATK policy, Hollis Thompson was subject to "Special Ethics Obligations of Employees with Financial Reporting Obligations." That policy required him to take "responsibility for ensuring that the Company's filings with the [SEC] and other Company disclosures contain information that is full, fair, accurate, timely, and

---

Treadway Commission, headed by former SEC Commissioner James C. Treadway, included representatives from industry, public accounting investment firms, and the New York Stock Exchange, and was created in 1985 "to identify the causal factors of fraudulent financial reporting and to make recommendations to reduce its incidence." *COSO Framework* at 96. The Treadway Commission issued its report in 1987. *See Report of the National Commission on Fraudulent Financial Reporting* (National Commission on Fraudulent Financial Reporting, 1987) ("*Treadway Commission Report*").

understandable." It also required that he "[p]romot[e] ethical behavior among personnel under [his] supervision at Orbital ATK" and "ensure such individuals are appropriately educated on applicable laws, rules, and regulations." The restatement and finding of wrongdoing show such obligations were not met.

256. As discussed herein, the sheer size of the Lake City Contract losses, at nearly $400 million, and the admission they were "evident" from the start, support that the Company's PAO, Hollis Thompson, knew or recklessly disregarded the fraud. The accounting in the circumstances of this case was simple. This was not a new venture, but involved manufacturing a high volume, low cost product for which the Company had over a decade of cost records. The Company was protected from errors in estimating costs likely to be subject to unpredictable variations, currency exchange rate and materials, through the "Currency Fluctuation Provision" and "Economic Price Adjustment" clause that provided for price adjustments based on changes in foreign currency rates and metal prices.

257. The purported cost savings were to be achieved through more predictable cost areas, like plant efficiencies and reduced labor costs, where the Company's historical records provided clear visibility into the costs of running the plant.[14] As Pierce put it, there was "not a lot of room" to improve costs of production. The layoffs implemented by DeYoung to reduce labor costs took place prior to the Merger and therefore were evident to PAO Hollis Thompson at

---

[14] A "Memorandum For Record" received from a FOIA request shows that the agency responsible for selecting the winning bidder for the Lake City Contract reported that (a) the bidders had modest advantages over one another in various areas, but Orbital ATK's bid "clearly provides the more advantageous price to the Government," and (b) Orbital ATK's bid was based on purported efficiencies to be gained at Lake City through "increased plant and machine efficiencies, improved product quality, reduced scrap, reduced risk of production disruption, reduced labor hours, and decreased maintenance expenses." In acknowledging the losses were "evident" from the beginning, Defendants conceded that there was no evidence at that time that sufficient cost savings were being achieved to report a profit.

the time he assumed responsibilities for the accounting post Merger.  Moreover, the Company disclosed that all of the losses were evident at the start of production under the new contract in the second quarter of 2014 (the second quarter began on July 1, 2013 and ended on September 29, 2013).  The first financial statement signed by Hollis Thompson, which contained false and misleading statements, was issued in June 2015, nearly two years later.  Thus, Hollis Thompson had two years of accounting records reflecting production costs under the new contract after the losses had first been evident to realize the necessary plant efficiencies were not being achieved.

258.    As the restatement, disclosed investigative findings, and his termination of employment revealed, Hollis Thompson failed in his duties.  The multitude of failures, including the magnitude of the restatement, deficiency in accounting personnel, lack of appropriate training, failure to prioritize ethical behavior and compliance, undue pressure to hit targets, lack of internal controls, lack of a GAAP compliant accounting policy, and vast number of individuals involved in inappropriate conduct, all make clear that Hollis Thompson either knew or recklessly disregarded the accounting fraud.  By approving an accounting policy that excluded certain costs required to be included under GAAP from the calculation of Lake City losses, Hollis Thompson set an improper tone at the top which enabled the other individuals within the finance organization to engage in additional tactics to manipulate Orbital ATK's financial results and avoid reporting the hundreds of millions in losses incurred under the Lake City Contract.

**Discipline and Firings Support an Inference of Scienter**

259.    On March 8, 2016, approximately one week after the Company admitted certain material weaknesses relating to internal controls over long-term contracts and the Merger, it was revealed that DeYoung would not be seeking re-election to the Orbital ATK Board of Directors. The suspicious timing of DeYoung's departure from the Company's board, a week after the

- 93 -

disclosure of a forthcoming restatement related to the accounting on long-term contracts, further supports an inference of scienter as to DeYoung and Orbital ATK.

260.   In addition, the Company admitted that wrongdoing by senior employees contributed to the issuance of false financial statements.  According to the Amended 2015 Form 10-KT, based on an internal investigation initiated by the Audit Committee, the Company determined that "personnel at the Small Caliber Systems Division and, in some cases, Defense Systems Group, acted inappropriately," and its accounting improprieties were the product of, among other things, "a bias toward maintaining a targeted profit rate," "inappropriate use of management reserves to maintain the targeted profit rate," and failures to "follow up and inquire further into indicators that cost overruns were occurring."  Moreover, as to "Small Caliber Systems Division management," the Amended 2015 Form 10-KT noted that they engaged in the inappropriate conduct "due to pressure to achieve cost savings and maintain a targeted profit rate."

261.   With regard to punishment, the Amended 2015 Form 10-KT revealed that "Certain Small Caliber Systems Division personnel responsible for the inappropriate behaviors . . . are no longer employed by the Company" and "certain members of the Defense Systems Group leadership will receive appropriate training, adverse compensation action and additional supervision."

262.   On February 27, 2017, the first business day following the Amended 2015 Form 10-KT, the Orbital ATK Board of directors replaced Hollis Thompson as the Company's PAO, a position he had held since the Merger.  In an investor presentation filed with the SEC on June 30, 2017, Orbital ATK provided an update on the restatement.  In it, Orbital ATK disclosed that it "[u]pgraded experience *and professionalism* of personnel in [its] finance organization,"

"[e]xpanded and intensified training program for personnel on controls and procedures," "changed its auditors from PwC to Deloitte," and confirmed it "[t]erminate[d] responsible personnel." (Emphasis added).   In describing how the Company "upgraded its Finance organization" the presentation disclosed, among other things, that it had added a "new Controller and Principal Accounting Officer," in clear reference to the new PAO being an "upgrade" over Hollis Thompson and to all of the new finance organization hires having more "professionalism" than those that were replaced.  It also said that a contributing factor to the restatement was its "application of a prior accounting policy," clearly referring to the erroneous policy in place under Hollis Thompson.  Finally, Orbital ATK noted that part of its remediation was to "[t]erminate responsible personnel; take adverse compensation action for divisional mangers; [and] add supervision."

263.   Notably, Hollis Thompson, who had signed the false 2015 Form 10-K and 2015 Form 10-KT, did not sign the Amended 2015 Form 10-KT issued on February 24, 2017. Moreover, when the Company announced it had replaced Hollis Thompson as PAO there was no public claim or announcement by him or the Company that he was leaving voluntarily to pursue a new or better position.  The Company also announced that it changed auditors from PwC to Deloitte after the restatement.  This was significant because PwC had been Orbital Sciences' long standing auditor before the Merger, and had initially been selected over Deloitte to audit the post-Merger entity.

264.   The Company's findings that several individuals inappropriately "use[d] management reserves to maintain the targeted profit rate," ignored "indicators that cost overruns were occurring," and "suppressed" certain negative information make clear that the false and misleading statements were the result of intentional wrongdoing and not inadvertence or neglect.

Since the individuals fired and disciplined for engaging in the wrongdoing had furnished information regarding the Lake City Contract's revenue, costs, and estimated costs that was rolled up into the restated financial statements, their scienter is attributable to Orbital ATK.

## LOSS CAUSATION

265.   As detailed herein, Defendants' fraudulent scheme artificially inflated the Company's stock price by misrepresenting and concealing the true nature of the Company's operations, financial results, and business performance and prospects, and, in particular, the fact that: the Lake City Contract was operating at a massive loss for the Company, substantially outweighing any of the Merger's purported synergies; the Company's reported financials were prepared in violation of GAAP and would need to be restated; and the Company was suffering from material weaknesses in its internal controls which were not operating effectively.

266.   Defendants' false and misleading statements and omissions, individually and collectively, concealed Orbital ATK's true business prospects, resulting in the Company's stock price being artificially inflated until, as indicated herein, the relevant truth about the Company's financial and operational condition and future business prospects was revealed.  While each of Defendants' misrepresentations and omissions were independently fraudulent, they all artificially inflated the Company's stock price and gave the market the false notion that the Company's Lake City Contract was profitable, that the Merger brought numerous benefits and synergies, that the Company's financials were prepared in accordance with GAAP, and its internal controls were effective.  These false and misleading statements and omissions, among others, prevented the market from learning the truth and kept the Company's stock price artificially inflated throughout the Class Period.  Indeed, Defendants' false and misleading statements and omissions caused, or were a substantial contributing cause of, the Company's stock trading at artificially inflated levels, reaching as high as $94.55 per share during the Class Period, on January 6, 2016.

267.    The truth eventually emerged before the market opened on August 10, 2016, when, as detailed above in ¶¶128-136, Orbital ATK surprised investors by announcing that it was unable to timely file its 2Q16 Form 10-Q, and that it would be restating previously issued quarterly and annual financial statements in fiscal 2015, transition 2015, and 1Q16 as a result of material "misstatements" of reported financials related to the Lake City Contract, and that it suffered from one or more material weaknesses in its internal controls.   Specifically, in the August 10, 2016 8-K and earnings call, Defendants revealed that the Company should have recorded a forward loss provision in prior periods and would require restatement of previously issued financial statements.   Defendants stated that the Lake City Contract had "been in a substantial loss position since 2014," and that the Company was "unable to reduce the production costs far enough for the contract to be profitable."

268.    As a result of the information revealed to the market, the Company's stock dropped approximately 20% ($17.98) falling from a close of $88.77 per share on August 9, 2016 to a closing price of $70.79 per share on August 10, 2016, on unusually high trading volume of approximately 8.7 million shares.

269.    The decline in the Company's stock price by approximately 20% on August 10, 2016, removed artificial inflation and was the direct result of the nature and extent of the revelations made to the market regarding the financial and operational problems facing the Company that had been concealed or misrepresented by Defendants.

270.    The timing and magnitude of the Company's stock price decline on August 10, 2016 negates any inference that the losses suffered by Plaintiffs and other Class members were caused by changed market conditions, macroeconomic factors or Company-specific facts unrelated to Defendants' fraudulent conduct.   The point is evidenced by the chart below, which

demonstrates the clear divergence of the Company's stock price from its benchmark indices and its identified competitors' stock prices ("Competitor Index") as the revelation of the truth became known.  Notably, while Orbital ATK's stock price fell over 20% on August 10, 2016, the Standard & Poor's Composite Index, the Dow Jones U.S. Aerospace and Defense Index, and the Company's Competitor Index declined a mere .3%, .1%, and 0%, respectively.

<u>Orbital ATK</u>

vs Standard & Poor's Composite 500 Index, Dow Jones U.S. Aerospace

and Defense Index, and Competitor Index



271.    Moreover, analyst reports reflected that the revelation of the previously undisclosed information was responsible for the stock drop.  *See* ¶¶138-141.

272.    Accordingly, the economic losses, *i.e.*, damages, suffered by Plaintiffs on August 10, 2016, were direct and proximate results of the Defendants' misrepresentations and omissions that artificially inflated the Company's stock price and the subsequent significant decline in the

value of the Company's stock when the truth concerning Defendants' prior misrepresentations and fraudulent conduct entered the marketplace.

## APPLICABILITY OF THE PRESUMPTION OF RELIANCE
## AND FRAUD ON THE MARKET

273.    A Class-wide presumption of reliance for the Exchange Act claims is appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class claims are grounded on the Defendants' material omissions.  Because this action involves the Defendants' failure to disclose material adverse information regarding Orbital ATK's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Defendants' Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

274.    A Class-wide presumption of reliance is also appropriate under the fraud-on-the-market doctrine.  As a result of the Defendants' materially false and misleading statements, Orbital ATK's publicly traded common stock traded at artificially inflated prices during the Class Period on a market that was open, well-developed, and efficient at all times.  Plaintiffs and other members of the Class purchased or otherwise acquired Orbital ATK's publicly traded stock relying upon the integrity of the market price of that stock and the market information relating to Orbital ATK, and have been damaged thereby.

275.    At all relevant times, the market for the Company's stock was efficient for the following reasons, among others:

(a)     Orbital ATK stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Orbital ATK filed periodic public reports with the SEC and the NYSE;

(c)     Orbital ATK regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases on the national circuits of major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services; and

(d)     Orbital ATK was followed by numerous securities analysts employed by major brokerage firms, such as Wells Fargo, Barclays, and Jefferies, among others, who wrote reports that were distributed to the brokerage firms' sales forces and the public at large.  Each of those reports was publically available and entered the public marketplace.

276.    As a result of the foregoing, the market for Orbital ATK stock promptly digested current information regarding Orbital ATK from all publicly available sources and reflected such information in the price of such stock.  Under these circumstances, all purchasers of Orbital ATK stock during the Class Period suffered similar injury through their purchase of Orbital ATK stock at artificially inflated prices.

277.    At the times they purchased Orbital ATK stock, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not reasonably have discovered those facts.

278.    As a result of the above circumstances, the presumption of reliance applies.

**NO SAFE HARBOR**

279.    The false and misleading statements alleged herein were not forward looking and the safe harbor does not apply.  To the extent any of the alleged false and misleading statements were forward looking, the federal statutory safe harbor providing for forward-looking statements under certain circumstances does not apply.  Many of the specific statements alleged were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements accompanying them.  To be meaningful, cautionary statements must identify important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Such cautions were absent from Orbital ATK's Class Period filings.

280.    Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because, at the time each of those forward-looking statements were made, the speaker knew that the particular forward-looking statement was false or misleading and/or the forward-looking statement was authorized and/or approved by an executive officer of Orbital ATK who knew that those statements were false or misleading when made.  Moreover, to the extent that Defendants issued any disclosures designed to warn or caution investors of certain risks, those disclosures were also false and misleading since they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining such disclosures.

**FRAUD BASED CLAIMS FOR RELIEF**

**COUNT I**

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants**

281.    Plaintiffs repeat and reallege each allegation above as if fully set forth herein.

282.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

283.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Orbital ATK common stock during the Class Period.

284.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the Class have suffered damages in connection with their respective purchases of Orbital ATK common stock during the Class Period, because, in reliance on the integrity of the market, they paid artificially inflated prices for Orbital ATK stock and experienced losses when the artificial inflation was released from Orbital ATK as a result of the revelations and price declines detailed herein.  Plaintiffs and the Class would not have purchased Orbital ATK common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

285.    By virtue of the foregoing, Defendants have each violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act Against Defendants Thompson, Pierce, Larson, and Hollis Thompson

286.    Plaintiffs repeat and reallege each allegation above as if fully set forth herein.

287.    Thompson, Pierce, Larson, and Hollis Thompson acted as controlling persons of Orbital ATK within the meaning of §20(a) of the Exchange Act.

288.    By virtue of their high-level positions with the Company, participation in, and/or awareness of, the Company's operations, and/or intimate knowledge of the Company's fraudulent practices and the Company's actual results and future prospects, Thompson, Pierce, Larson, and Hollis Thompson had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. Thompson, Pierce, Larson, and Hollis Thompson were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. Moreover, Thompson and Pierce each signed the Company's 2015 Form 10-K, 2015 Form 10-KT, and each of the Company's quarterly reports on Form 10-Q throughout the Class Period. Hollis Thompson likewise signed the Company's 2015 Form 10-K and 2015 From 10-KT.

289.    In addition, Thompson, Pierce, Larson, and Hollis Thompson had direct involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.

290.    As set forth above, Orbital ATK, Thompson, Pierce, Larson, and Hollis Thompson each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.   By virtue of their positions as controlling persons, and as a result of their aforementioned conduct, Thompson, Pierce, Larson, and Hollis Thompson are liable pursuant to §20(a) of the Exchange Act for Orbital ATK's violations of §10(b).   As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's stock during the Class Period, as evidenced by, among others, the stock price declines discussed above, when the artificial inflation was released from the Company's stock.

291.    By virtue of the foregoing, Thompson, Pierce, Larson, and Hollis Thompson violated §20(a) of the Exchange Act, 15 U.S.C. §78(a).

# NON-FRAUD JOINT PROXY CLAIMS

**Overview of Non-Fraud Joint Proxy Claims**

292.    The claims set forth below in Counts III and IV allege violations of §14(a) of the Exchange Act, Rule 14a-9 promulgated thereunder, and §20(a) of the Exchange Act (the "Joint Proxy Claims"). The Joint Proxy Claims are based solely on negligence, and not on knowing or reckless conduct. For purposes of the Joint Proxy Claims, Plaintiffs repeat and reallege the parties, jurisdiction, and factual allegations from ¶¶11-47, 50-55, 59, 128-131, 137, 146-149, and 155. The Joint Proxy Claims are brought against Thompson, Pierce, DeYoung, and Orbital ATK (collectively, the "Joint Proxy Defendants").

293.    On April 28, 2014, Alliant and Orbital Sciences agreed to a merger between Alliant's aerospace and defense business ("Alliant A&D") and Orbital Sciences (the "Merger Agreement"). Pursuant to the Merger Agreement, Orbital Sciences shareholders would receive 0.449 shares of Alliant stock for each share of Orbital Sciences stock held (the "Exchange Ratio"). Immediately following the Merger, Alliant would change its name to Orbital ATK, Inc.

294.    The Merger required shareholder approval. The Joint Proxy Claims are based on the Joint Proxy Defendants' dissemination of a materially false and misleading Joint Proxy Statement/Prospectus filed with the SEC on December 17, 2014 (the "Joint Proxy") and used to obtain approval of the Merger on January 27, 2015. The Joint Proxy was materially inaccurate in that it (i) included materially misstated financial statements for Alliant; (ii) omitted to disclose the massive loss from the Lake City Contract; (iii) represented Alliant's compliance with GAAP and the effectiveness of Alliant's internal controls, and (iv) included statements that the deal was "fair" to and in the best interests of Orbital Sciences shareholders. The false and misleading statements detailed below caused Alliant to be overvalued and impacted the Exchange Ratio to the determinant of Orbital Sciences shareholders, depriving Wayne County and other members of the Class of their right to a fully informed shareholder vote and inducing them to vote their

shares and accept inadequate consideration.  The Joint Proxy Claims seek to recover for losses suffered by Wayne County and all those similarly situated who exchanged shares of Orbital Sciences stock for shares of Orbital ATK stock.

**Events Leading Up to the Merger**

295.    As discussed in further detail above (¶¶34-47), on September 28, 2012, Alliant secured a ten-year contract to operate and produce ammunition at Lake City.  Orbital ATK has since acknowledged that the Lake City Contract was in a forward loss position – *i.e.*, the costs exceeded revenue – as of its inception.

296.    On March 21, 2013, Alliant and Orbital Sciences entered into a confidentiality agreement to facilitate the exchange of information regarding a possible merger.  Alliant and Orbital Sciences thereafter discussed various business combinations.

297.    In November 2013, DeYoung proposed a business combination that would include a spin-off of Alliant's sporting division to form Vista, with the remaining Alliant A&D business (including Lake City) merging with Orbital Sciences.

298.    In the first week of February 2014, the companies exchanged proposals as to financial ownership of the combined company.  Alliant proposed that Alliant stockholders receive approximately 56.3% and Orbital Sciences shareholders receive approximately 43.7% of the equity in the combined company.  Orbital Sciences proposed a 51.3% and 48.7% split in favor of Alliant shareholders.  According to the Joint Proxy, "The difference in the proposed equity splits was attributable to different views and assumptions related to the projected future growth and cash flow of the two businesses."  On February 6, 2014, the parties agreed that Alliant shareholders would receive 53.8% of the equity of the combined company and Orbital Sciences shareholders would receive 46.2%.

299.    The Merger was announced on April 29, 2014.  The announcement and structure of the Merger is discussed in further detail in ¶¶50-51 above.  Under the terms of the Merger Agreement, Vista was to be spun off, Alliant shareholders would receive two shares of Vista stock, "each share of Orbital [Sciences] common stock issued and outstanding immediately prior to the closing of the Merger will be converted into the right to receive 0.449 shares of [Orbital ATK] common stock," Alliant stockholders "will own approximately 53.8% of the combined company on a fully diluted basis and 100% of [Vista], and Orbital [Sciences] stockholders will own the remaining approximately 46.2% of the combined company on a fully diluted basis."

300.    To be completed, the Merger required "affirmative vote of holders of a majority of the outstanding shares" of Alliant and Orbital Sciences common stock.  As such, the Joint Proxy Defendants solicited votes.

**False and Misleading Statements in the Joint Proxy**

301.    The Joint Proxy Defendants caused the Joint Proxy to be filed with the SEC on December 17, 2014 and mailed to shareholders on or around the next day.  The Joint Proxy, by its own terms, was "a joint proxy statement of [Alliant] and Orbital [Sciences] for the [Alliant] special meeting and the Orbital [Sciences] special meeting," and "constitute[d] a joint proxy statement under Section 14(a) of the Securities Exchange Act of 1934."  Orbital Sciences attached proxy cards to the Joint Proxy sent to shareholders, with the proxy card stating, "THIS PROXY IS SOLICITED ON BEHALF OF THE BOARD OF DIRECTORS."  Thompson and Pierce were the Chairman and Vice Chairman of Orbital Sciences' Board of Directors, respectively.  The Joint Proxy was signed by Thompson and DeYoung.

302.    Section 14(a) and Rule 14a-9 promulgated thereunder require that proxy materials shall not contain statements which are false or misleading with respect to any material fact, or which omit to state any material fact necessary in order to make the statements made therein not

false or misleading.  The Joint Proxy violated §14(a) and Rule 14a-9 because it misrepresented and/or omitted material facts that a reasonable Orbital Sciences shareholder would have considered important in deciding how to vote.

### Statements Regarding Alliant's Financial Results

303.    The Joint Proxy provided "historical consolidated financial information for [Alliant]," including fiscal year 2014 and fiscal year 2013 results of operations, which were "derived from the audited consolidated financial statements of [Alliant]," as well as first half fiscal year 2015 results of operations, which were "derived from" Alliant's quarterly report on Form 10-Q for the second quarter 2015.  In addition, the Joint Proxy expressly incorporated by reference Alliant's annual report for the year ended March 31, 2014 ("Alliant 2014 Form 10-K") and quarterly report on Form 10-Q for the quarter ended September 28, 2014 ("Alliant 2Q15 Form 10-Q").

304.    The financial statements in the Joint Proxy and incorporated therein by reference included the following information regarding Alliant's purported financial performance:

|  | First Half Fiscal Year 2015 | Fiscal Year 2014 | Fiscal Year 2013 |
|---|---|---|---|
| Gross Profit | *$611 million* | *$1.1 billion* | *$941 million* |
| Operating Income | *$316 million* | *$590 million* | *$470 million* |
| EPS | *$5.54* | *$10.42* | *$8.34* |

305.    The Joint Proxy also included "summary unaudited pro forma condensed consolidated financial information . . . about the financial condition and results of operations of the combined company" for fiscal year 2014 and the first half of fiscal year 2015, with adjustments "to give effect to events that are directly attributable to the transactions and factually supportable and, in the case of the statement of income information, that are expected to have a

continuing impact."  The condensed consolidated financial information was "derived from . . . the historical consolidated financial statements and accompanying notes of [Alliant] and Orbital [Sciences]."  The pro forma consolidated financial information included the following:

|  | First Half Fiscal 2015 | Fiscal Year 2014 |
|---|---|---|
| Gross Profit | *$445 million* | *$965 million* |
| Consolidated Earnings | *$122 million* | *$252 million* |
| EPS | *$2.03* | *$4.20* |

306.    In addition, the Joint Proxy included the Merger Agreement dated April 28, 2014. The Merger Agreement contained "Representations and Warranties" by Alliant regarding "all reports, schedules, forms, statements and other documents required to be filed by [Alliant] with the SEC since January 1, 2011."  Alliant's Representations and Warranties claimed that "***none of the [Alliant] SEC Documents** as of such respective dates . . . **contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading*.**"

307.    Alliant's Representations and Warranties also addressed Alliant's compliance with GAAP, stating that Alliant's financial statements filed with the SEC since January 1, 2011, "***present fairly in all material respects the financial position of [Alliant]*,**" and "***were prepared in accordance with GAAP*.**"

308.    The Alliant 2014 Form 10-K and Alliant 2Q15 Form 10-Q, which were incorporated into the Joint Proxy by reference, claimed that Alliant's accounting policy for long-term government contracts, including the Lake City Contract, was: "***In the period in which it is***

*determined that a loss will be incurred on a contract, the entire amount of the estimated gross margin loss is charged to cost of sales*."

### Statements Regarding the Lake City Contract

309.   The Alliant 2014 Form 10-K, which was incorporated into the Joint Proxy by reference, described the size of Lake City's operations and the significant contribution of the Lake City Contract to Alliant's financial results, stating, "*In fiscal 2014, [Alliant] produced approximately 2.0 billion rounds of small-caliber ammunition in the [Lake City] facility*," and the Lake City Contract "*contributed approximately 14%, and 15% of total fiscal 2013 and 2012 sales, respectively*.  No other single contract contributed more than 10% of [Alliant's] sales in fiscal 2013, or 2012."

310.   The Alliant 2014 Form 10-K further discussed the Lake City Contract, stating:

On September 28, 2012, [Alliant] was notified by the U.S. Army that it was selected for both the production of ammunition and continued operation and maintenance [Lake City]. The production contract runs through September 2019 and the facility contract runs through September 2020, with an option to extend the contract to 2023. *Due to the competition for the contract, [Alliant] has experienced a lower profit rate in the Small Caliber Systems division as we implemented the new contract*.

### Statements Regarding Internal Controls

311.   Alliant's Representations and Warranties in the Merger Agreement included in the Joint Proxy stated that Alliant "maintains disclosure controls and procedures required by Rule 13a-15 or 15d-15 under the Exchange Act" and "*has not identified any material weaknesses in the design or operation of the internal controls over financial reporting*."

312.   The Alliant 2014 Form 10-K and Alliant 2Q15 Form 10-Q, which were incorporated into the Joint Proxy by reference, also stated that the Company maintained effective controls and procedures.  Specifically:

(a)      The Alliant 2014 Form 10-K and Alliant 2Q15 Form 10-Q represented that management's disclosure controls and procedures were effective, stating that Alliant's "Chief Executive Officer and Chief Financial Officer evaluated the effectiveness of the design and operation of [Alliant]'s disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934) as of March 31, 2014 [and September 28, 2014] and have concluded that *[Alliant's] disclosure controls and procedures are effective* . . . ."; and

(b)      The Alliant 2014 Form 10-K further included "Management's Report on Internal Control over Financial Reporting," stating that "Management regularly monitors [Alliant]'s internal control over financial reporting, and actions are taken to correct any deficiencies as they are identified. Based on our assessment, management has concluded that *[Alliant]'s internal control over financial reporting is effective as of March 31, 2014*."

### Statements Regarding Fairness of the Exchange Ratio

313.      The Joint Proxy repeated the following statement by the Orbital Sciences Board of Directors:  "*After careful consideration*, the Orbital [Sciences] board of directors, on April 28, 2014, unanimously approved the transaction agreement and *determined that the transaction agreement and the merger transactions, including the merger, are advisable, fair to and in the best interests of Orbital [Sciences] and its stockholders*" and "unanimously recommends" that shareholders "vote 'FOR'" the Merger.

314.      The statements in ¶¶329-304 above were false and misleading for the following reasons:

(a)      The Lake City Contract had been in a forward loss position since fiscal year 2013, and, in violation of GAAP and Alliant's stated Accounting Policy, Alliant failed to record the forward loss on the Lake City Contract;

(b)      Alliant's financial results reported and incorporated in the Joint Proxy were materially misstated, including Alliant's reported first half 2015 Gross Profit, Operating Income, and EPS were overstated by approximately: $9 million (approximately 2%), $9 million (approximately 3%), and $0.19 (approximately 3%), respectively; reported fiscal year 2014 Gross Profit, Operating Income, and EPS were overstated by approximately: $357 million (approximately 45%), $360 million (approximately 160%), and $6.85 (approximately 190%), respectively; and reported fiscal year 2013 reported Gross Profit, Operating Income, and EPS were overstated by approximately: $35 million (approximately 4%), $35 million (approximately 8%), and $0.66 (approximately 8%), respectively;

(c)      The "summary unaudited pro forma condensed consolidated financial information" were derived from and/or based on the materially misstated financial results, and were therefore also materially misstated;

(d)      Alliant was losing money on Lake City Contract sales, that is, selling those bullets at negative margins and a significant loss, not at "a lower profit rate";

(e)      Alliant suffered material weaknesses in its internal controls over financial reporting and disclosure controls and procedures during 2Q15 and fiscal year 2014, which rendered Alliant incapable of accurately reporting its financial results;

(f)      As a result of the foregoing, the Merger was not "advisable, fair to and in the best interests of Orbital [Sciences] and its stockholders," but rather was predicated upon an exchange ratio negotiated and agreed to based on false performance results; and

(g)      The Orbital Sciences Board of Directors, including Thompson and Pierce, lacked a reasonable basis to conclude that the Merger was "advisable, fair to and in the best interests of Orbital [Sciences] and its stockholders" because the directors failed to adequately

investigate the Lake City Contract, Alliant's internal controls and lack of compliance with GAAP, all of which a reasonable investor would expect the Board of Directors to have thoroughly investigated before recommending the Merger and deeming it fair for Orbital Sciences shareholders.

**Shareholders Approve the Merger on the Basis of the False and Misleading Joint Proxy**

315.    On January 27, 2015 Orbital Sciences held its Special Meeting, at which Orbital Sciences shareholders voted to approve the Merger based on the false and misleading Joint Proxy.

316.    The Merger was consummated on February 9, 2015.  In connection with the Merger, each outstanding share of Orbital Sciences common stock was converted into the right to receive 0.449 shares of Alliant common stock, with cash paid in lieu of fractional shares. Alliant issued approximately 27.4 million shares of common stock to Orbital Sciences stockholders.  Immediately following the Merger, Orbital Sciences stockholders owned 46.2% of the common stock of the combined company and Alliant stockholders owned 53.8%.  Based on the closing price of the Company common stock on February 9, 2015, the aggregate value of the consideration received by former holders of Orbital Sciences common stock was approximately $1.7 billion.

**Post-Merger Events**

317.    As described in more detail above in ¶¶146-148, Orbital ATK has admitted the falsity of each of Alliant's filed and thereafter restated financial statements dating back to fiscal year 2013, including the financial statements incorporated by reference in the Joint Proxy.  The restatement is due to a failure to record the $375 million loss on the Lake City Contract in accordance with GAAP.

318.    The restatement also disclosed that the Company suffered material weaknesses in its internal controls that resulted in misstated financial statements for fiscal 2015, 2014, and 2013.  The material weaknesses are detailed above in ¶¶118, 121(b), 131, 148, and 197.

319.    As described in more detail above in ¶¶146-148, by restating its financial statements dating back to fiscal year 2013, Orbital ATK has acknowledged it was evident that the Lake City Contract would result in a loss at the time of the Joint Proxy and the documents incorporated therein.  Moreover, numerous aspects of the Lake City Contract put the Joint Proxy Defendants on notice of the need to investigate the Lake City Contract and the accounting thereof, including, but not limited to:

(a)    The Lake City Contract was a $2.3 billion contract to make ammunition for the U.S. Army;

(b)    The Lake City Contract was Alliant's single largest contract, and would become the single largest contract of Orbital ATK's largest business segment (the Defense Systems Group) and the largest contract of the Company overall upon consummation of the Merger;

(c)    As discussed above in ¶¶39-47, the Lake City Contract was obtained through a very competitive bidding process that resulted in lower profit margins and was being recorded at a break-even profit level meaning any reduction in profitability could convert it to a loss;

(d)    Pricing on the Lake City Contract was set to decline with each delivery and as volumes increased;

(e)    As reflected in the restatement, the Lake City Contract was in fact priced at hundreds of millions of dollars below Alliant's actual cost;

(f)     Due to the nature of the materials and end-product, there was "not a lot of room" to reduce costs, particularly given Alliant had been attempting to run the facility as efficiently as possible for over a decade;

(g)     The cost savings efforts at Lake City had only achieved, approximately, half of the necessary savings for the contract to break even;

(h)     Alliant planned to spread overhead costs at Lake City across government and commercial production, but its commercial ammunition unit was being spun-off in the Merger;

(i)     Alliant's ability to make a profit on the Lake City Contract was negatively impacted by the requirement that Alliant make improvements to the facility as consideration for commercial use; and

(j)     The Lake City Contract had been in a forward loss provision since fiscal year 2013, more than two years prior to the Joint Proxy.

320.    The Joint Proxy Defendants failed to exercise due care to ensure that the Joint Proxy did not omit material facts necessarily to make the statements made therein not materially false and misleading.

## JOINT PROXY CLAIMS FOR RELIEF

## COUNT III

### For Violation of Section 14(a) of the Exchange Act and Rule 14a-9 Against All Joint Proxy Defendants

321.    Plaintiffs repeat and reallege each allegation in ¶¶292-320 above as if fully set forth herein.

322.    The Joint Proxy was a "proxy solicitation" within the meaning of §14(a) of the Exchange Act.

323.    As stated herein, the Joint Proxy contained untrue statements of material facts and omitted to state material facts necessary to make the statements made not misleading in violation of §14(a) of the Exchange Act and Rule 14a-9.  The Joint Proxy Defendants failed to disclose Alliant's misstated financial results, Lake City Contract losses, incorrect accounting, and material weaknesses in internal controls.

324.    Each of the Joint Proxy Defendants was negligent in preparing, reviewing, and disseminating the false and misleading Joint Proxy.

325.    The Joint Proxy was an essential link in the consummation of the Merger.  Orbital Sciences shareholders approved the Merger on the basis of the materially false and misleading information contained in the Joint Proxy.

326.    As a direct and proximate result of the dissemination of the false and/or misleading Joint Proxy, Wayne County and the other members of the Class were deprived of their right to a fully informed shareholder vote and were induced to vote their shares and accept inadequate consideration through a 0.449 exchange ratio, causing damage and actual economic losses in an amount to be determined at trial.

327.    The omissions and false and misleading statements in the Joint Proxy were material in that a reasonable shareholder would have considered them important in deciding how to vote on the Merger.  In addition, a reasonable investor would view the omitted information as having significantly altered the "total mix" of available information.

328.    By reason of the conduct detailed herein, the Joint Proxy Defendants are liable pursuant to §14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

## COUNT IV

### For Violation of Section 20(a) of the Exchange Act Against
### DeYoung, Thompson, and Pierce

329.     Plaintiffs repeat and reallege each allegation in ¶¶292-328 above as if fully set forth herein.

330.     DeYoung acted as a controlling person of Orbital ATK (then Alliant) within the meaning of §20(a) of the Exchange Act.

331.     By virtue of his position of control and authority as the CEO of Alliant, DeYoung had the power and authority to cause Alliant to engage in the conduct complained of herein. DeYoung was able to and did control, directly and indirectly, the decision-making of Alliant, including the content and dissemination of the Joint Proxy which contained false and misleading statements.

332.     Thompson and Pierce acted as controlling persons of Orbital Sciences within the meaning of §20(a) of the Exchange Act.

333.     By virtue of their positions of control and authority as Chairman and CEO, and Vice Chairman and CFO, respectively, Thompson and Pierce had the power and authority to cause Orbital Sciences to engage in the conduct complained of herein.  Thompson and Pierce were able to and did control, directly and indirectly, the decision-making of Orbital Sciences, including the content and dissemination of the Joint Proxy which contained false and misleading statements.

334.     Thompson, Pierce, and DeYoung were provided with or had unlimited access to copies of the Joint Proxy prior to and/or shortly after it was issued and had the ability to prevent its issuance or cause it to be corrected.

335.    By reason of such conduct, Thompson, Pierce, and DeYoung are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, pray for relief and judgment, as follows:

A.    Declaring that this action is a proper class action and certifying Plaintiffs as Class representatives pursuant to Rule 23 of the Federal Rules of Civil Procedure and Robbins Geller Rudman & Dowd LLP as Class Counsel for the proposed Class;

B.    Awarding compensatory damages in favor of Plaintiffs and other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.    Awarding Plaintiffs and other members of the Class such other and further relief, including any injunctive or other equitable relief, that may be deemed just and proper by the Court.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED:                                    THE OFFICE OF CRAIG C. REILLY
                                          CRAIG C. REILLY, VSB #20942


                                          _____
                                                  CRAIG C. REILLY

111 Oronoco Street
Alexandria, VA  22314
Telephone:  703/549-5354
703/549-2604 (fax)
craig.reilly@ccreillylaw.com

Liaison Counsel

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
JAMES E. BARZ
200 South Wacker Drive, 31st Floor
Chicago, IL  60606
Telephone:  312/674-4674
312/674-4676 (fax)

Lead Counsel for Plaintiffs

VANOVERBEKE MICHAUD &
  TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)

Additional Counsel for Plaintiff Wayne County
Employees' Retirement System

**CERTIFICATE OF SERVICE**

I hereby certify that I filed the foregoing pleading or paper through the Court's CM/ECF system, which sent a notice of electronic filing to all registered users:

_____
Craig C. Reilly, Esq.
VSB#20942
111 Oronoco Street
Alexandria, Virginia 22314
TEL (703) 549-5354
FAX (703)549-5355
EMAIL craig.reilly@ccreillylaw.com

*Liaison Counsel for Lead Plaintiff*