1

```
                    UNITED STATES DISTRICT COURT
1                   EASTERN DISTRICT OF VIRGINIA
                         ALEXANDRIA DIVISION
2

3   -----------------------------x
                                 :
4   STEVEN KNURR,                :
    Individually and on          :
5   Behalf of All Others         :
    Similarly Situated,          : Civil Action No.
6                                :
                       Plaintiffs,: 16-CV-1031
7                                :
               versus            :
8                                :
    ORBITAL ATK, INC., et al,    :
9                                :
                      Defendants.: June 7, 2019
10  -----------------------------x

11          The above-entitled Motion Hearing was heard by
    the Honorable T.S. Ellis, III, United States District Judge.
12
                         A P P E A R A N C E S
13
    FOR THE PLAINTIFFS:          CRAIG C. REILLY, ESQ.
14                               Law Office of Craig C. Reilly
                                 111 Oronoco St
15                               Alexandria, VA 22314

16                               JAMES BARZ, ESQ.
                                 TED PINTAR, ESQ.
17                               Robbins Geller Rudman & Dowd
                                 655 West Broadway
18                               Suite 1900
                                 San Diego, CA 92128
19
    FOR THE DEFENDANTS:          LYLE ROBERTS, ESQ.
20                               Shearman & Sterling
                                 401 9th Street, N. W.
21                               Suite 800
                                 Washington, DC 20004
22

23  OFFICIAL COURT REPORTER:     MS. TONIA M. HARRIS, RPR
                                 United States District Court
24                               Eastern District of Virginia
                                 401 Courthouse Square, Ninth Floor
25                               Alexandria, VA 22314
```

─────Knurr v. Orbital─────

2

1                    **P R O C E E D I N G S**

2            THE COURT:  Good morning.  You may call the next

3     matter, please.

4            THE DEPUTY CLERK:  The Court calls civil case Steven

5     Knurr versus Orbital ATK.  Case No. 2016-CV-1031.

6            May I have appearances, please?  First for the

7     plaintiff.

8            MR. BARZ:  Good morning, Your Honor.  Jim Barz on

9     behalf of the plaintiffs.

10           THE COURT:  All right.  And who will be heard today

11    on behalf of the plaintiffs?

12           MR. BARZ:  Your Honor, I'll be sharing time with my

13    colleague, Mr. Pintar, from the settlement department.  I'll

14    be addressing any questions about the litigation, he'll be

15    addressing the factors regarding settlement approval.

16           THE COURT:  All right.  And who is going to be

17    addressing the fee?

18           MR. BARZ:  I'll address the fee.

19           THE COURT:  And Mr. Reilly is here.

20           MR. REILLY:  Yes, Your Honor.

21           THE COURT:  Good morning.

22           MR. REILLY:  Good morning.

23           THE COURT:  And good morning, sir.  You're here for?

24           MR. ROBERTS:  Lyle Roberts from Shearman and

25    Sterling on behalf of the defendants, Your Honor.

Knurr v. Orbital

3

1          THE COURT:  You really don't have a dog in this

2     hunt.  There's a settlement that you-all have reached and

3     we're now talking about how those -- that settlement amount,

4     the spoils, how they're going to be divided, and your client

5     doesn't care.

6          MR. ROBERTS:  Well, Your Honor, we support,

7     obviously, the approval of the settlement.

8          THE COURT:  Yes.  But I'm talking about the fee and

9     that sort of thing.  You don't care what they do with the 108

10    million.

11         MR. ROBERTS:  That's between the Court, the class,

12    and the plaintiffs, Your Honor.

13         THE COURT:  Right.  Good morning to you, sir.

14         All right.  The other gentleman, are you here for

15    the arraignment?

16         INTERPRETER:  Yes, Your Honor.

17         (Discussion off the record.)

18         THE COURT:  All right.  We don't need to spend very

19    much time.  You-all have submitted very helpful briefs.  We

20    don't need to spend a lot of time on the final approval.  I

21    have preliminarily reviewed it, and, of course, that's why it

22    went out.  But it might be helpful, since this is now on the

23    record, at this hearing, to have a brief summary of why I

24    should finally approve this as a fair, sufficient, and

25    reasonable settlement.  That is the 108 million.

Knurr v. Orbital

4

1            And it might be helpful too if you would summarize,

2     again, what this involved.  This involved statements by the

3     defendant that concealed the fact that the expense of

4     manufacturing ammunition in Louisiana was far greater than

5     what was revealed.  And I think, my recollection is, that

6     there was not a lot of dispute about that.  The real dispute

7     focused on who knew when and whether those people who knew

8     were people who would be caught under 10b-5.

9            Do I have that about right?

10           MR. BARZ:  Yes, you do, Your Honor.

11           THE COURT:  Let me hear from you briefly, just to

12    put this in context, this hearing today.

13           MR. BARZ:  Sure, Your Honor.  And then let me

14    summarize, as you've set out, the allegations in this case.

15           In this case, we had alleged that when the company

16    bid out for the Lake City contract, the contract that they had

17    done for over ten years, they concealed from the public that

18    this bid was roughly a billion dollars below their historical

19    cost to manufacturing.  Instead, they touted it as a great

20    success and that it was going to be profitable.

21           We allege that this hurt two sets of folks.  One

22    was, Orbital Science's shareholders, who were about to enter

23    into a merger with Alliant.  So those folks, we alleged, were

24    undercompensated in the merger.  Had they known that they were

25    buying into a company that was about to incur a $400 million

─────Knurr v. Orbital─────

5

1    loss approximately, they would have negotiated a better deal

2    for the exchange rate of their shares from their old company

3    and the shares of the new company.  Those are our Section 14

4    claims, which were the non-fraud negligence based claims.

5          The second set of claims we have is that after the

6    merger, when the company Orbital ATK, as it was renamed, began

7    issuing its post-merger financial statements, they continued

8    to report the contract as profitable.

9          Mentioned that they were achieving substantial

10   savings in production and making a profit on that contract and

11   spoken in generally favorable terms about it.

12         Then in August of 2016, as we alleged, the truth was

13   revealed when the company came out and said, in fact, they

14   were going to have to restate their prior financial statements

15   to record this $400 million loss.

16         We, at that time, alleged Section 10b fraud claims

17   against several of the individuals who made those statements

18   and also the company.  If Your Honor recalls, Your Honor

19   dismissed the individuals, found that the plaintiffs had

20   failed to sufficiently allege Scienter on their behalf because

21   the company had noted that it was terminating some lower-level

22   employees, folks closer to the numbers, and the plan.

23         The 10b case was dismissed in its entirety with

24   permission to replead, which we took advantage of.  We tried

25   to bring in the chief accounting officer at that time, along

—Knurr v. Orbital—

6

1  with a corporate Scienter theory that Your Honor in *Computer*

2  *Sciences* had addressed.  Now, we felt that we had presented

3  arguments that they had not presented.

4       And ultimately Your Honor, on the second motion to

5  dismiss, dismissed the individual again, the chief accounting

6  officer, but kept in the company on a corporate Scienter

7  theory.  So that formed our two claims.  The first was a

8  Section 14 for the merger, and the second was the 10b-5 for

9  the class period of financial statements issued prior to the

10  statement against solely the company.

11       We believe --

12       THE COURT:  Refresh my recollection, the Section 14

13  ruling where I held that negligence was required, was that

14  novel?

15       MR. BARZ:  Well, there was a split.  They argued

16  that it should be a Scienter standard.  Because under Section

17  14 they have 14(a) claims and 14(e) claims.  14(e) claims --

18  it's a weird statute -- 14(e) claims speak to manipulation and

19  scheme.  Language typically associated with fraud.  Section

20  14(a) does not.

21       So the courts, and we believe the better of the

22  courts, have held that Section 14(a) is a negligent standard

23  which Your Honor held, as well, and followed.

24       The defendants have argued that it's the same

25  section.  Section 14, it makes more sense to apply fraud to

———Knurr v. Orbital———

7

1    all 14(a) and 14(e), rather than have 14(a) negligence, 14(a)

2    fraud.

3              THE COURT:  All right.  Go on.

4              MR. BARZ:  So, at that point in time, we engaged in

5    incredibly hard-fought negligence.  The defendants certainly

6    did their jobs to make us jump through every hoop possible,

7    multiple motions to dismiss, and they fought us incredibly

8    hard for the documents.

9              There was some documents that we felt, that related

10   to the internal investigation, that would really be where the

11   best evidence lie, the best evidence to support our claims.

12   They made us fight at every turn; Judge Nachmanoff worked

13   incredibly hard.  Ten motions to compel, we had to file.  And

14   Judge Nachmanoff commented at one of the final hearings that

15   it was extremely litigious litigation.  We were before the

16   Court almost weekly at one point on motions to compel.

17             Ten motions to compel, 26 depositions, three experts

18   on complex issues, and ultimately we believe we recovered an

19   excellent result for the class, which is what they cared the

20   most about, and I think it's supported by the lack of

21   objections.  There's not a single objector.  115,000 notices

22   went out.  No one objected to the $108 million settlement,

23   which is extremely rare.  No one opted out.

24             What you'll find in these cases, sometimes, Your

25   Honor, as I'm sure you're aware, is some plaintiffs, because

─Knurr v. Orbital─

8

1    our class isn't like a consumer class, right, where it's a

2    bunch of consumers that got too much ice in their coffee, and

3    don't pay attention.  Ours tend to consist of a high

4    proportion of institutional investors, folks with in-house

5    counsel often, large pension funds.  And if they believe

6    they've got enough money at stake, they'll opt out, and

7    they'll sue the defendants outside the class.  We didn't have

8    a single opt-out in this case, which is also rare.  And we

9    think that speaks volumes to the absolute support that we've

10   gotten for the --

11           THE COURT:  So the only objection is the New York

12   Fund's objection to the fee?

13           MR. BARZ:  Correct, correct.  We did get four

14   exclusions, but they were from individuals, as we noted.  And

15   two of them aren't even -- didn't appear to be class numbers

16   because they bought outside the time frame of our class

17   period.

18           And another one was settling the estate of their

19   father, didn't want to keep it open because they had like half

20   a share.  So their recovery was going to be de minimis.

21           And the third one, we believe, also we put it in

22   footnote 3 of our reply brief, which is Docket 459 on page 4.

23   We identified that three of the four didn't appear to have any

24   damages and the fourth one had maybe half a share at issue.

25           THE COURT:  What page number again?

─────────────── Knurr v. Orbital ───────────────

9

1          MR. BARZ:  So Docket 459.

2          THE COURT:  I have that, but what page?

3          MR. BARZ:  Page 4, footnote 3.

4          THE COURT:  Oh, yes, I see it.

5          MR. BARZ:  We identify each of the four individuals

6    that sought exclusion.  And, as we said, no one complained

7    about the settlement that it wasn't an excellent result.  They

8    had their own unique reasons for not wanting to be part of it.

9    For example, wanting to settle an estate and not keep it open

10   for the length of these proceedings.

11         THE COURT:  All right.  Go on.

12         MR. BARZ:  So we believe that the classes support

13   for this, plus we've identified in some charts we've

14   submitted, that this $108 million settlement represents about

15   a 30 percent recovery of estimated damages, which is an

16   unusually high recovery for these types of cases.  Some of

17   these economists have estimated that class action recoveries

18   for securities fraud are 2 to 3 percent.

19         If you look at some of the recent cases settled,

20   like the *Genworth* case before Judge Gibney in the Eastern

21   District of Virginia, which was also a securities fraud case,

22   they estimated about 15 percent of damages.  So we had twice

23   as good of a recovery in this case.

24         Even despite the incredibly hard-fought

25   litigation -- I think they had one motion to compel in that

─Knurr v. Orbital─

10

1   case; we had to go through ten.  So we believe that every

2   factor that courts consider for the approval of a settlement,

3   the results achieved, the reaction of the class, all

4   completely support the approval of $108 million.

5           THE COURT:  All right.  Let's turn -- I assume if

6   the defendant wishes to add anything, you'll let me know, but

7   I assume you're satisfied with that summary?

8           MR. ROBERTS:  Well, Your Honor, of course, I

9   disagree with the number of aspects of that summary, but in

10  terms of the overall scope of the case, I think it accurately

11  described it.

12          THE COURT:  Well, you wouldn't disagree that it was

13  hard-fought.

14          MR. ROBERTS:  I certainly wouldn't, Your Honor.

15          THE COURT:  All right.  Let's turn to the New York

16  Retirement Fund's argument that the fee is excessive.  You

17  responded to that in your reply brief, but let's put things in

18  context here.

19          What was the lodestar figure?

20          MR. BARZ:  So our lodestar was approximately 16.7

21  million.  That's after accounting for the fact that I wrote

22  off about 1500 hours in the exercise of billing judgment.  I

23  was a partner of a defense firm, so I've reviewed bills that

24  go out to the defense side.  And I try to apply the same types

25  of analysis here.  If I look at time and one of my colleagues,

─────Knurr v. Orbital─────

11

1    for whatever reason, they were busy and they didn't give an

2    adequate description, I'll write it off.  If they spent -- if

3    they came out two nights for a deposition, I think they could

4    have been out one, I'll write off one of the hotel nights.

5    Things that I sort of would apply if I was on the other side.

6              We believe -- so when you look at our fee --

7              THE COURT:  How many people in a deposition?

8              MR. BARZ:  One or two.  You know, I took the

9    deposition of the CEO.  I had a colleague along because we had

10   a high volume of paper and that was a critical deposition, but

11   a lot of our depositions were attended by just a person.  You

12   know, if you recall, all the hearings I've done here,

13   including the motion to dismiss, those were substantive

14   critical hearings, you saw just me and Mr. Reilly, my local

15   counsel, whose advice I value and thought he was necessary.

16             I run an efficient ship.  I actually gave you some

17   charts because I looked at some recent settlements.  And if

18   you look at our hours, 29,000 hours.  For example, if you

19   compare that to *Genworth*, they billed 66,000 hours in their

20   lodestar.  They had roughly the same number of depositions as

21   us, fewer documents reviewed.  They had 3 million pages, we

22   had 4.7 million page to get through.  And we had the same

23   number of depositions, ten motions to compel versus one for

24   them, and we had -- so *Genworth* 66,000.  It's the most recent

25   securities fraud class action.  66,000 hours.  We had 29,000

─────Knurr v. Orbital─────

12

1   hours.  About half.  They had one motion to compel to brief

2   and argue.

3           THE COURT:  Refresh my recollection.  Where was that

4   case pending?

5           MR. BARZ:  Judge Gibney in the Eastern District of

6   Virginia.

7           THE COURT:  All right.

8           MR. BARZ:  2016.

9           THE COURT:  In Richmond.

10          MR. BARZ:  Correct.

11          They had 66,000 hours reported, we had 29,000.  They

12  had one motion to compel to brief and argue, we had ten.  They

13  had 3.2 million pages to review, we had 4.7 million pages.

14  Not only did we get the defendant's documents, but we got

15  about 30 third parties, analysts; we did a FOIA to the

16  Government for their records on the contract in the bid, they

17  took 30 depositions, we did 26.  So we did, I believe,

18  relative to cases, and I laid these out -- it's our opening

19  brief, Docket 451, page 12.  I think we litigated, very

20  efficiently, in terms of what our lodestar was.

21          I gave you other comparisons, *NII Holdings* and the

22  two cases that Your Honor has had in securities fraud,

23  *MicroStrategy* and *Computer Sciences*.  Out of those five cases,

24  we had the fewest number of hours.  We had the most number

25  motions to compel.  We had the second most number of documents

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

Knurr v. Orbital

13

1  to review and comparable number of depositions.  So we believe

2  we litigated efficiently and the key -- the key, Your Honor,

3  is that we got an excellent result.  And we believe that

4  that's what the class cares the most about.  Did they get an

5  excellent result?  People are happy to pay more for an

6  excellent result than to pay a low fee on a terrible result.

7       THE COURT:  Did you have any ex-antiarrangement with

8  anyone concerning your fee?

9       MR. BARZ:  No.  In this case, we did not.  So we had

10  a sophisticated lead plaintiff that Your Honor appointed.  We

11  also had a second-named plaintiff on the Section 14 claims and

12  our agreement with them was that we would discuss the fee at

13  the end.  We discussed the fee, in light of the incredible

14  results, the amount of time it took, the effort, the fact that

15  the case was initially dismissed, and they were comfortable

16  supporting a 28 percent fee.  And I believe that's, candidly,

17  I would have wanted 30 or 33 percent.  I think would have been

18  supported.

19       If you look at the *Celebrex Antitrust* case, out of

20  this district, they awarded 33 percent.  If you look at Judge

21  Gibney's case, he awarded 28 percent.  And I think our results

22  were better, our lodestar was more efficient.  And our

23  multiplier is lower than those cases.  Judge Gibney recited

24  several cases, in his opinion, that in this district a

25  lodestar multiplier of two to three times your lodestar is

14

1    common.  Ours is only 1.8.

2         If you look at your prior decision, Your Honor, in

3    *MicroStrategy,* you approved a lodestar multiplier of 2.6,

4    which, in this case, would have supported a 33 percent fee.

5    But our fee was negotiated with our lead plaintiffs.  28

6    percent is what they were comfortable supporting.  So we put

7    in for 28 percent, and it's only a 1.8 multiplier.

8    Substantially less than the 2.6 you approved.

9         THE COURT:  This will come as no surprise to you,

10   but I received a certain amount of criticism for my decision

11   in MicroStrategy from economists and others who reviewed it at

12   one or another seminar.

13        All right.  Let's look at the New York Pension

14   Fund's objection.

15        MR. BARZ:  So what I would note about their

16   objection is, it's a single objection out of 115,000 notices

17   that went out.  They're a sophisticated investor as they

18   state.  But notably, they never moved to be lead plaintiff in

19   this case.

20        So at the beginning of this case, at the outset,

21   they didn't think this case was good enough to pursue, despite

22   what they've said in their objection as having the

23   availability of a number of law firms to do this litigation

24   for them.  And notably, we did have another lead plaintiff

25   movant, if you'll remember, Your Honor, we competed for the

─Knurr v. Orbital─

15

1   case with one other party and that party has not objected to

2   our fee or the result.  And I think that's notable.

3          They took the time to fly out here and make a motion

4   to lead this case, and they have no problem with the

5   settlement.  They're not opting out of the case.  They don't

6   think they can do better, and they have no problem with our

7   fee.  So out of 115,000 notices, we did receive one objection.

8   That objection, by the New York Fund, was recently rejected in

9   another case Walmart, that we cited.

10          It's devoid of any analysis of the particulars of

11   the case.  I think it's contrary to law.  They are making a

12   boilerplate objection, it appears, in multiple cases to impose

13   their one-size fits all fee grid in lieu of a court's careful

14   analysis of the particular risks and results achieved in a

15   particular case.

16          In our reply brief, for example, I gave a

17   comparison, I think this is informative.  The fee grid that

18   they're proposing is the one that they claim they used in the

19   *BP* case in order to support a lower fee.  Well, that BP case

20   bears no resemblance to this case.  And the reason why I say

21   that is that case is a mega fund case where they had $91

22   billion in market capitalization loss in that case.  That's

23   what they alleged, 91 billion.

24          We had approximately 360 million.  Okay.  They have

25   300 times the losses than our case.  You know what our

─────────────────────── Knurr v. Orbital ───────────────────────

16

1    settlement was?  108 million.  You know what theirs was?  175

2    million.  Theirs came four years after the company pled

3    guilty.  We had no guilty plea.

4            To the contrary, as Mr. Roberts just reiterated

5    here, they, from the beginning to this day, have denied our

6    claims.  And that's why he got up and said, "Well, I don't

7    agree with this summary," because they have steadfastly denied

8    our claims.

9            In the *BP* case, where the New York Common Fund was

10   lead plaintiff, and said, "Hey look at us, we got a low fee."

11   Well, they got a terribly low recovery, too.  They recovered

12   .2 percent, not 1 percent.  1/5th of 1 percent of what they

13   allege to be their damages of 91 billion in that case.  We got

14   30 percent.

15           Their settlement came after the SEC recovered $525

16   million from the company for the alleged conduct.  There's no

17   SEC recovery in this case.  Their settlement came after a

18   guilty plea.  Again, there's been no guilty plea here, no

19   suggestion that there's ever going to be, or that there's even

20   an investigation.

21           Our case fit what the Supreme Court said is that the

22   private bar can be a necessary supplement to the resources to

23   the Government.  Right.  And that's what we've done here.

24   We've stepped in when the Government has not and gotten an

25   excellent recovery that otherwise would not have been

1    achieved.  In the *BP* case that the New York State Common Fund

2    applied its fee grid to, they have layers of declining fees.

3    The top two tiers don't even apply here.  They have a

4    declining fee for recoveries above 500 million and a billion.

5    That was not possible.  We didn't have that much damages in

6    this case.

7            So we think when you compare our results, getting 30

8    percent of damages and their results, less than 1 percent of

9    damages, it shows why nothing -- no -- no universal fee grid

10   can be applied across the board.  And that's why it was

11   rejected in Walmart because Your Honor knows best the

12   particulars of this case.

13           Let me give you one more example.

14           In *Genworth*, Judge Gibney's case, he awarded 28

15   percent on a larger settlement of $219 million.  I would

16   argue, you know what made our case riskier than that case,

17   which justified a better result and a better fee for the

18   lawyers in this case than in that case?  He didn't get

19   dismissed.  You dismissed our 10b case.  We had a tougher road

20   to hoe.  That case got by the motion to dismiss.  Our case we

21   had to dig deep --

22           THE COURT:  Well, the other side of that coin is not

23   a happy one for you, which is to say that money spent in

24   getting the complaint and the right forms so that it went

25   ahead ought not to be awarded.  You should have done it right

─────────Knurr v. Orbital─────────

18

1    the first place.  That's a contention.  I'm not saying that.

2         But the point is, you spent a good deal of time at

3    the beginning on these threshold motions and you lost some

4    things.  So it could be argued that the fee should reflect

5    that as well as what you've won.

6         MR. BARZ:  And I think, in a certain case, that's a

7    valid argument, but I don't think it's in this case.  I think

8    Your Honor knows, and I think counsel here would agree with

9    me.  This was an incredibly complex case.  You're talking

10   about the intersection of nuanced accounting.  Percentage of

11   completion accounting.

12         Now, fortunately I passed the CPA exam before I went

13   to law school, so this is kind of my bailiwick, I like this

14   stuff, I geek out on it.  But it's very challenging to present

15   this stuff in a colorable way, and distinguish the line

16   between what is erroneous or negligent accounting, and

17   something that rises above to either that knowing or extremely

18   reckless.

19         And we also had that issue plus the corporate

20   Scienter, plus the Section 14 appropriate standard.  We had

21   very complex legal issues here in this case.  And I don't

22   think any court -- Justice O'Connor -- we cited the case out

23   of the Fifth Circuit, when she sat by designation -- you know

24   noted, that plaintiff's attorneys in this particular space of

25   securities fraud class actions, have had to thread a needle,

─────Knurr v. Orbital─────

19

1    made smaller over time by judicial decree and legislation.  I

2    think all courts recognize this is an incredibly complex and

3    challenging area of the law.

4           THE COURT:  And profitable.

5           MR. BARZ:  When they succeed, absolutely.

6           We've cited other cases.

7           Absolutely, Your Honor.  But we've cited a lot of

8    cases where we've gone -- *Oracle* we took that case all the way

9    to summary judgment, had millions of dollars invested, and got

10   dismissed at summary judgment.  We've cited other cases that

11   have gone to trial and lost.  Right.  We had a case 16 years

12   that was litigated, went to trial through an appeal, and back.

13   You know you get the benefit of seeing two of us here today.

14   We have over 400 employees in ten offices across the nation.

15   This is what we do.  We like what we do.  We like our clients.

16   We work hard for our clients, just like Mr. Roberts does for

17   his.

18          And we'd like to be rewarded similar to the defense

19   bar.  They're very highly paid on that side of the fee, as

20   well.  We like to recruit talented lawyers that are capable of

21   competing with the exceptional backgrounds of the people we go

22   up against.

23          THE COURT: All right.  Let me ask, is the defendant

24   in the arraignment here yet?  He won't know because he's in

25   custody.  Can we check with the marshals to see if they've

—Knurr v. Orbital—

20

1 gone to get him yet?

2          What I'm going to do is take a recess, do the

3 arraignment, and then complete this matter.  But let me check

4 to see whether he's here yet.

5          Mr. Roberts, do you have anything you want to add to

6 any of this?

7          MR. ROBERTS:  Not at this time, Your Honor.

8          THE COURT:  Do you anticipate that the time will

9 come when you will say something?

10          MR. ROBERTS:  No, Your Honor, not unless you direct

11 a question towards me.

12          THE COURT:  All right.  Thank you.  You've made me a

13 prophet.  I predicted to my law clerks that you would have

14 nothing to say.  So I understand that entirely.

15          I think I do have a picture of this case.  I'm sort

16 of curious about one thing.  You said there was a split on

17 whether it was scienter or negligence for the Section 14

18 claim.

19          Has that issue progressed at all anywhere?  It

20 hadn't gone to the Supreme Court, has it gone to a circuit

21 since then?

22          MR. BARZ:  No.

23          THE COURT:  All right.

24          (A pause in the proceedings.)

25          THE COURT:  The New York objection says -- and I

─Knurr v. Orbital─

21

1    quote "that after I decide on a reasonable percentage, I hope

2    the Court would also use a lodestar crosscheck."

3            Actually, I work the other way around.  I look at

4    the lodestar first, and then I consider what the multiplier --

5    what a reasonable multiplier of the lodestar should be, given

6    the complexity of the case, the magnitude of the effort, all

7    of the problems that were involved in it.  And, again, the

8    multiplier in this case was 1.8.

9            MR. BARZ:  Correct, Your Honor.  Which we've

10   highlighted is lower than the two to three in several cases.

11   And that's the dichotomy we've presented is, our result is

12   exceptional.  It's above comparable cases.  30 percent

13   recovery versus 2 percent to 15 percent.  And yet our

14   multiplier is less than those same cases.  So we've

15   got about --

16           THE COURT:  It's like the *Payment Card* case from the

17   Eastern District of New York, and I don't recall whether you

18   addressed that particular case in your reply.

19           MR. BARZ:  So we did not, but that's the -- the

20   *Interchange* case is a case that we're one of several firms

21   working on.  That's a $6 billion settlement.  We gave you

22   Enron, which is the largest securities fraud case settlement

23   and that we noted, yes.  Their fee grid, which talks about

24   what fee you should get for recoveries over a billion dollars,

25   is it inapplicable to these cases.

─Knurr v. Orbital─

22

1        For example, in Enron, the Court awarded a 9 percent

2   fee on a $7 billion settlement, but the multiplier in that

3   case was 5.2.  So, yeah, as you get into these mega fund

4   cases, where the recoveries are in the billions of dollars,

5   like *Interchange* or *Enron*, you'll see the fee percentage go

6   down, but sometimes you see that multiplier go up in

7   recognition.

8             THE COURT:  All right.  Let me ask one more question

9   here.  I take your point, but in the interest of the shortness

10  of life, let me focus your attention.  In the letter from the

11  Office of the State Controller objecting to the fee.  They say

12  that the fund has served as lead plaintiff in cases,

13  securities cases, with large recoveries, including Country

14  Wide and VP.

15        What fee did they get in those cases?

16        MR. BARZ:  So in -- I'm not sure for Country Wide.

17  In BP, however, both those cases were much larger cases.

18             THE COURT:  Well, certainly Country Wide was,

19  because there the settlement was 624 million, he says.  And in

20  *BP* the settlement was a 160- or 75 million.  So tell me about

21  *BP* and what fee they got in *BP*.

22        MR. BARZ:  So I -- I'm not positive, but I assume

23  the fee followed their fee grid, and what I did is, in the

24  reply brief on -- I'm -- which is Docket No. 459, Your Honor.

25             THE COURT:  I have it in front of me.

—Knurr v. Orbital—

23

1          MR. BARZ:  Page 8, at the bottom.

2          THE COURT:  I see it.

3          MR. BARZ:  I've given you a chart, which compares

4   that case to our case.  In that case, there was potentially

5   $91 billion with a "B" in market capitalization losses.  The

6   company had pled guilty to the underlying conduct.  The SEC

7   recovered $525 million.  And yet, the settlement there was

8   only $175 million.  Barely more than ours, despite having 300

9   times more damages in play, plus a great record to piggy back

10  off of from the government.

11         THE COURT:  Did you compete for lead plaintiff in

12  that case?

13         MR. BARZ:  I don't know if we did, Your Honor.

14         I personally was not involved in it, but I don't

15  know if one of my colleagues did.

16         So that's a rather modest recovery that might have

17  warranted a very modest fee.  Given that, the case was kind of

18  a slam dunk, particularly to get that kind of a result piggy

19  backing off of the government.

20         Our case was nowhere near a sure thing.  And one

21  other thing I'd like to point out about this New York Common

22  Fund, Your Honor, they filed this early.  They had until May

23  10th to object.  This came in in mid-April.

24         THE COURT:  Yes, I know.  You made the argument that

25  they waived it, but I'm obviously not going to --

─Knurr v. Orbital─

24

1       MR. BARZ:  Yeah, address it on the merits.  But what

2   I think is interesting is this --

3       THE COURT:  I am going to address it on the merits.

4       MR. BARZ:  They're not here today, and they never

5   bothered to respond to our brief, which came in after.  And I

6   think that's a little telling, because I think if they really

7   knew the details that we laid out for Your Honor, in terms of

8   the motions to compel, the hard fought nature of the

9   litigation, the excellent recovery, they filed this before

10  they even knew the details surrounding that aspect of it.

11      And they've yet -- they could have come back and

12  said:  Hey, not withstanding that, Your Honor look at X, Y,

13  and Z.  But they haven't done that.  So I think they're pretty

14  pleased.  They didn't opt out.  They're not pursuing their own

15  recovery, and I think that's pretty telling, too.  They

16  mentioned in here that they've got a number of law firms at

17  their disposable.  But apparently, none of them want to try to

18  opt out and do better than we've done and they never moved for

19  leave in the beginning.

20      So they made this virtually identical, the same

21  letter, just changed the name of the judge and the name of the

22  case in Walmart.  And the Court there rejected it , because

23  it's contrary to the approach that courts take, which is to

24  analyze the particulars of a case, not to apply a one-size fee

25  grid across the country.

─────Knurr v. Orbital─────

25

1          THE COURT:  Thank you.

2          MR. BARZ:  Thank you, Your Honor.

3          THE COURT:  Let me ask Mr. Roberts, briefly.  There

4    was a final judgment and order, sketch of one, attached, and

5    I'm sure you've reviewed that.

6          MR. ROBERTS:  Correct, Your Honor.

7          THE COURT:  That, of course, would affect your

8    client.  Are you satisfied with the form of that order?

9          MR. ROBERTS:  Yes, Your Honor.

10          THE COURT:  All right.  And there's also an order

11   approving a plan of allocation and that, of course, is another

12   one that you don't have a real interest in.  You don't have

13   any objection to that one either I take it.

14          MR. ROBERTS:  No objection.

15          MR. PINTAR:  Your Honor, if I could interject for a

16   second.  We do have an alternative order awarding attorney's

17   fees and expenses, which just has a very minor change to the

18   penultimate paragraph regarding lead plaintiff awards.  If I

19   could hand that up.  We have given a copy to Mr. Roberts

20   beforehand.

21          THE COURT:  Paragraph 8, you're changing?

22          MR. PINTAR:  Correct.

23          THE COURT:  All right.  What's the change in

24   paragraph 8?

25          MR. PINTAR:  Yeah.  At the end, it's the -- let me

─────Knurr v. Orbital─────

26

1     just pull up --

2              THE COURT:  It's Pension Trust of Greater St. Louis

3     and the named plaintiff Wayne County Retirement System.  And

4     the amount for them was 4,000 and 9,000 respectively.  Has

5     that changed?

6              MR. PINTAR:  That part has not changed.

7              THE COURT:  What has changed?

8              MR. PINTAR:  Just after that for reasonable -- I'm

9     sorry, for the time they spent we have inserted or changed

10    that to "for reasonable costs and expenses" so that it

11    properly tracks the language of the statute.

12             THE COURT:  Instead of "for the time they spent," it

13    now reads what?

14             MR. PINTAR:  "For reasonable costs and expenses."

15             THE COURT:  But the amounts do not change?

16             MR. PINTAR:  Correct.

17             THE COURT:  All right.  Is he here yet?  I'm going

18    to recess this matter, do an arraignment, and take about a

19    15-minute recess, and then I'll complete this matter.

20             MR. PINTAR:  Your Honor, would you like me to hand

21    up this copy of the --

22             THE COURT:  Yes, please.

23             MR. PINTAR:  Expense order?

24             THE COURT:  Thank you.

25             MR. PINTAR:  Thank you.

─────Knurr v. Orbital─────

27

1          THE COURT:  Then following that I'll take up, first,

2    the Shahaddah matter and then the Medina against Melon One.

3          Are counsel here in this case?

4          (Discussion off the record.)

5          THE COURT:  The Court takes a -- I'll take a

6    15-minute recess and then do the arraignment, and then we'll

7    proceed to complete the case, the Knurr matter.

8          Let me ask Mr. Roberts one more thing.  I'm fairly

9    clear that I think I've heard everything I need to hear from

10   you, but is there anything you want to add at this point?

11         MR. ROBERTS:  No, Your Honor.

12         THE COURT:  Anything that you-all wish to add that

13   hasn't been said already?

14         MR. BARZ:  No, Your Honor.

15         THE COURT:  Court stands in recess.

16         (Recess.)

17         (Court proceedings resumed at 10:39 a.m.)

18         THE COURT:  Call the Knurr case.

19         THE DEPUTY CLERK:  The Court calls Steven Knurr, et

20   al versus Orbital ATK Inc., et al.  Case No. 2016-CV-1031.

21         May I have appearances again for the parties?

22         THE COURT:  Well, that's all right.  Counsel are

23   present and prepared to proceed as they were earlier today.

24         I've been reviewing these documents for some time,

25   and I have some familiarity with the case, of course.  I'm

─────Knurr v. Orbital─────

28

1   very sensitive to the fee issue on 10b-5 cases.  I've listened

2   carefully to criticisms of my past decisions in that regard.

3   So I'm not insensitive to those kinds of criticisms.

4           In the end, I think, as I said earlier, that the

5   settlement reached here is fair, adequate, sensible, and

6   appropriate.  I approved it preliminarily.  I will approve it

7   again.  It's a reasonable settlement.  Could it have been

8   more, perhaps, could it have been less, probably.  I don't

9   know.  But I think, given the facts that have been presented

10  to me, it is reasonable.  It's fair and just.  So I will

11  approve it.

12          I spent more time on the fee, because of what I have

13  indicated to you.  I'm very sensitive to criticisms of cases

14  in which judges have approved significant fees above a certain

15  percentage.  Here, the fee for $108 million settlement and 28

16  million is right around -- what is it, 25 percent?  It's a

17  little over 25 percent.

18          MR. BARZ:  28 percent.

19          THE COURT:  28 percent.  Thank you.

20          And it's roughly 1.8 multiplier of the lodestar

21  figure.

22          Let me say, that I think the case was fully and

23  appropriately litigated.  I did not pay attention to the

24  discovery disputes, because they were fairly and reasonably

25  resolved by the magistrate judge.  I thank my lucky stars

─Knurr v. Orbital─

29

1   everyday that Judge Albert Bryan, who was the chief judge when

2   I came here in the mid-'60s -- '80s, he's really the designer

3   of the so-called "rocket docket."  Not the earlier judges, not

4   Judge Hoffman, or Judge Butzner, or Judge Oren Lewis.

5           Judge Albert Bryan really was the designer, who is

6   still living and quite a wonderful man.

7           So I didn't pay attention to the discovery.  And I

8   did receive a report every now and then, but I think the case

9   was really fully litigated.  And Mr. Roberts, I don't have any

10  doubt that you-all made them earn their money in discovery,

11  and that you-all did also a very good job for your client; but

12  I don't have to make that determination.  You have to deal

13  with your client on fees.  But I did want to say that I think

14  you-all did a very good job.  And so did you for the

15  plaintiff.

16          I have vacillated somewhat, but I'm going to approve

17  the fee request.  And I will enter the orders that you have

18  provided, including the substitute order that you have entered

19  today.  And to thank you for your service in the court.

20          I've often said that with first-class lawyers, a

21  monkey could do my job.  It's not entirely true, but it's

22  close.  The problems I have are when they aren't first-class

23  lawyers.  But, of course, you-all had millions at stake.

24  You're collecting 28 million, and I'm sure that -- that will

25  add some furniture to your house in the Hamptons.  No, that's

─Knurr v. Orbital─

30

1   right; you're from Chicago.

2            MR. BARZ:  Yes.

3            THE COURT:  So you don't have a house in the

4   Hamptons.

5            And you're from San Diego?

6            MR. PINTAR:  That's right, Your Honor.

7            MR. BARZ:  I've got six kids running around.  So

8   maybe some education.

9            THE COURT:  That's your fault.  There are ways to

10  prevent that.

11           MR. BARZ:  Not if you're Catholic.

12           THE COURT:  And that's quite true, quite true.

13           All right.  I did want to complicate both sides on

14  your behavior in this case.  I don't think there was any

15  feeling on the part of the magistrate judge that you-all

16  engaged in petty or unnecessary behavior.  It was hard fought

17  and as it should be.

18           So I'm going to enter the orders and thank you once

19  again for your participation in this case.  I hope I see your

20  firm and your firm here again.  I will look forward to that.

21           Thank you.

22           MR. BARZ:  Thank you, Your Honor.  We hope you will,

23  as well.

24           MR. PINTAR:  Thank you.

25           THE DEFENDER:  Thank you.

─Knurr v. Orbital─

31

1           (Discussion off the record.)

2           MR. BARZ:  Your Honor, we appreciate as well the

3    decisiveness and the pace at which this case went on.  We

4    appreciate it.

5           THE COURT:  Well, that's largely due to Judge Bryan

6    and the discipline that he set up.  I had nothing to do with

7    it.  I just did what he -- you know the cases are assigned by

8    computer now.  They're randomly assigned.

9           But when I first arrived here, in the mid-'80s,

10   Judge Bryan assigned the cases.  And it was different.  He not

11   only assigned them, but he expected them to be done promptly.

12   He took great pride in what had become the rocket docket.  As

13   you're aware Mr. Reilly.

14          MR. REILLY:  Yes, Your Honor.

15          THE COURT:  Thank you-all very much.  Call the next

16   case, please.

17

18          **(Proceedings adjourned at 10:47 a.m.)**

19

20

21

22

23

24

25

1                         <u>CERTIFICATE OF REPORTER</u>

2

3              I, Tonia Harris, an Official Court Reporter for

4    the Eastern District of Virginia, do hereby certify that I

5    reported by machine shorthand, in my official capacity, the

6    proceedings had and testimony adduced upon the Motion

7    Hearing in the case of the **STEVEN KNURR, versus ORBITAL**

8    **ATK, INC.,** Civil Action No. 16-CV-1031, in said court on

9    the 7th day of June, 2019.

10             I further certify that the foregoing 32 pages

11   constitute the official transcript of said proceedings, as

12   taken from my machine shorthand notes, my computer realtime

13   display, together with the backup tape recording of said

14   proceedings to the best of my ability.

15             In witness whereof, I have hereto subscribed my

16   name, this June 17, 2019.

17

18

19

20

21   _____

22   Tonia M. Harris, RPR
     Official Court Reporter

23

24

25

                                                              32